management of his finances. Albert created GWB Trust into which any interest he may have held in the Estate could be funneled. He then created Renhaw, Inc., and Pentex Royalty Trust into which any interest he may have held in GWB Trust could be funneled. When a federal tax lien was filed against Pentex Royalty Trust in Fall 2013, Albert then created GBC Trust into which any interest he held in Pentex Royalty Trust could be funneled. Albert's plan was that by the time the I.R.S. caught up with his own specialized version of the trickle-down theory, Albert would be long gone to Central America.

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
1/12/2015 4:29:33 PM
DEBBIE AUTREY
Clerk

14.    Scott is aware that Albert deliberately engages in fraud and that he illegally drafted the CSL. By seeking protection for Albert in terms of the deposition while still maintaining that Albert is not his client, Scott knowingly furthers Albert's efforts to elude justice, in violation of Texas Rules of Evidence Rule No. 503(d)(1).

15.    Albert's defense that he is too ill to travel is blatant subterfuge, designed to protect Albert from exposure to this suit, including the deposition. The statement provided by Albert's alleged physician, Leonel Montenegro, did not declare that Dr. Montenegro examined Albert, only that Albert's medical file was in the office, and that the statement was presented at the request of an interested party. *See* Exhibit D. Albert has a history of faking health issues to avoid legal action. For instance, in or around November 30, 2009, Albert was said to have faked a heart attack in order to avoid prosecution for not cleaning the wreckage of his $500,000 yacht, The Great Escape, which ran aground off the Coast of Belize and fouled its pristine barrier reef. News reports from Channel 5 of Belize quoted Newspaper Editor Roy McNett, who stated that he spoke with Albert following the accident. According to Roy, Albert "did not have a heart attack," and at that time was buying land in Rio Dulce. *See* Exhibit E.

OBJECTIONS TO MOTION TO QUASH OR FOR PROTECTIVE ORDER
RELATING TO SUBPOENAS AND DEPOSITION NOTICES AND
MOTION TO COMPEL DEPOSITIONS OF ALBERT BARCROFT AND
ANGELLI CARRASCO ON OCTOBER 13, 2014

CAUSE NO. CV-14-41665
-6-

*PENTEX FOUNDATION V. GIBBS, ET AL.*

406



16.     The Subpoena to Albert stated that the deposition would take place in the office of Pentex's Counsel, on October 13, 2014.  The location is obviously convenient to Pentex's Counsel, and the date was offered as available by Pentex's Counsel.  There can be no place and time more convenient for the deposition.[3]

17.     Pentex's resistance to the Subpoena is because Albert and Pentex have a great deal of information that each wishes to hide, as it promises to affect the outcome of this suit adversely.  Albert is a crucial element in the events addressed in this suit.  Albert is the admitted Legal Representative for Pentex.  Pentex must therefore produce Albert for deposition at the appointed place and time.

### III.  DEPOSITION OF ANGELLI CARRASCO.

18.     On September 2, 2014, Ken and Candy issued Angelli a State of Texas Subpoena Duces Tecum for Oral Deposition, to be conducted on October 13, 2014, at 10 o'clock a.m., at the office of Pentex's Counsel Scott Smith, 120 South Crockett Street, Sherman, Texas  75091-0354.  *See* Exhibit F.

19.     Based on information provided to Ken and Candy during discovery, Angelli Carrasco is President, Director, and Chairman of Pentex – three (3) apex-level positions of authority in Pentex.  Per the Texas Rules of Civil Procedure requiring service to counsel when counsel exists, the Subpoena to Angelli was rightfully served to Scott.  Service to any other party would not be effective, as Scott represents Pentex.

---

[3] Ken and Candy believe that Albert, whose residence is in Guatemala, is currently traveling in Texas. Although Scott was able to produce a signed unverified Affidavit from Albert on September 3, 2014, Scott claimed that obtaining an Affidavit from Angelli Carrasco, from Panama, was impossible due to logistics.

OBJECTIONS TO MOTION TO QUASH OR FOR PROTECTIVE ORDER
RELATING TO SUBPOENAS AND DEPOSITION NOTICES AND
MOTION TO COMPEL DEPOSITIONS OF ALBERT BARCROFT AND          CAUSE NO. CV-14-41665
ANGELLI CARRASCO ON OCTOBER 13, 2014                                      -7-

*PENTEX FOUNDATION V. GIBBS, ET AL.*

407



20. Angelli's deposition is necessary to achieve justice in this matter. Angelli was noticed that her deposition will address questions concerning her personal knowledge of the following: (1) the incorporation of Pentex Foundation; (2) daily activities of Pentex Foundation; (3) all monies received from the Estate and GWB Trust; (4) the board minutes on or about August 4, 2014, in which she agreed to file suit against Kenneth Gibbs and Candace Gibbs in Fannin County; and (5) Albert's and Danny Unger's legal authority to act on Pentex Foundation's behalf. Each of the issues goes to allegations made by Albert concerning the functions of Pentex as relates to the CSL, the FSA, and GWB Trust. Each of these issues is highly pertinent to the Cause, likely to lead to information which is highly pertinent to the Cause, and therefore discoverable.

21. As a President and Director and Chairman of a multi-national corporation, which is currently involved in a lawsuit concerning more than $1 million in assets, Angelli's excuse that she does not own a passport for travel to the United States is only that – an excuse. The excuse that Pentex does not control Angelli is yet another excuse – as President and Director and Chairman of Pentex, Angelli answers to Pentex for her actions involving the organization. Pentex can indeed require her to attend a deposition on its behalf.

22. The Subpoena to Angelli stated that the deposition would take place in the office of Pentex's Counsel, on October 13, 2014. The location is obviously convenient to Pentex's Counsel, and the date was offered as available by Pentex's Counsel. There can be no place and time more convenient for the deposition.

23. Pentex's resistance to Angelli's Subpoena suggests that, as is the case with Albert's deposition, Pentex has a great deal to hide. Angelli holds the top-ranked positions in

OBJECTIONS TO MOTION TO QUASH OR FOR PROTECTIVE ORDER
RELATING TO SUBPOENAS AND DEPOSITION NOTICES AND
MOTION TO COMPEL DEPOSITIONS OF ALBERT BARCROFT AND        CAUSE NO. CV-14-41665
ANGELLI CARRASCO ON OCTOBER 13, 2014                                              -8-

*PENTEX FOUNDATION V. GIBBS, ET AL.*

408

Pentex, positions whose responsibilities must necessarily be executed with awareness of the ongoing affairs of the organization. It is reasonable to think that Angelli, as President/Director/Chairman, would know of the ongoing lawsuit (particularly since she allegedly signed Minutes of Board Meetings approving Scott's retention), just as it is reasonable to assume that Scott represents her as President/Director/Chairman because he represents Pentex. Ken and Candy are entitled to depose Angelli. As Plaintiff in this matter, Pentex is responsible for producing Angelli for the deposition.

## IV. PRAYER FOR RELIEF.

24.     Ken and Candy therefore respectfully pray that this Court:

25.     Compel Albert Barcroft to appear for deposition at the office of Pentex Foundations's Counsel, Scott Smith, on October 13, 2014, at 10 a.m.; and present upon demand all relevant documents requested by Defendants; and

26.     Compel Angelli Carrasco to appear for deposition at the office of Pentex's Counsel, Scott Smith, on October 13, 2014, at 10 a.m.; and present upon demand all relevant documents requested by Defendants;

27.     Compel document production as requested from Danny Unger at the deposition on October 13, 2014 and hearing on September 30, 2014;

28.     Compel document production as requested from Joshua Unger at the deposition on October 13, 2014 and hearing on September 30, 2014; or,

29.     In the alternative, stay the proceedings until such time that Pentex Foundation produces Albert Barcroft and Angelli Carrasco for deposition in the matter, and until such time that all requested discovery is produced by Danny Unger and Joshua Unger; and

OBJECTIONS TO MOTION TO QUASH OR FOR PROTECTIVE ORDER
RELATING TO SUBPOENAS AND DEPOSITION NOTICES AND
MOTION TO COMPEL DEPOSITIONS OF ALBERT BARCROFT AND       CAUSE NO. CV-14-41665
ANGELLI CARRASCO ON OCTOBER 13, 2014                                           -9-

*PENTEX FOUNDATION V. GIBBS, ET AL.*



30.    Deny Plaintiff's Motion for Sanctions and award Candy and Ken just attorney

fees to defend Plaintiff's frivolous (and very poorly written) Motion to Quash.

Respectfully submitted,

LAW OFFICES OF CHRISTY LEE, P.C.

Christy L. Lee
Texas State Bar No. 24052302
777 Main Street, Ste. 600
Fort Worth, Texas 76102
(817) 504-6075
(800) 437-7901 - Fax
clee@christyleelaw.com

ATTORNEY FOR CANDACE WALTON AND
KENNETH GIBBS

Objections to Motion to Quash or For Protective Order
Relating to Subpoenas and Deposition Notices and
Motion to Compel Depositions of Albert Barcroft and
Angelli Carrasco on October 13, 2014

Cause No. CV-14-41665
-10-

*Pentex Foundation v. Gibbs, et al.*

410



## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above Defendants' Objections to Motion to Quash for Protective Order Relating to Subpoenas and Deposition Notices and Motion to Compel Depositions of Albert Barcroft and Angelli Carrasco on October 13, 2014, and was delivered, pursuant to Texas Rules of Civil Procedure, to the following parties on this 25th date of September, 2014:

| Party: | Via: |
|---|---|
| Howard Kirk Gibbs<br>4360 Western Center Blvd., No. 205<br>Fort Worth, TX 76157 | Mail<br>Email: hkgibbs@gmail.com |
| Pentex Foundation, **and**<br>GBU Friends and Associates Trust<br>c/o Scott Smith, Attorney of Record<br>120 South Crockett Street<br>Sherman, TX 75091-0354 | Email: smithlaw@airmail.net<br>Fax: |

_____
Christy L. Lee

OBJECTIONS TO MOTION TO QUASH OR FOR PROTECTIVE ORDER
RELATING TO SUBPOENAS AND DEPOSITION NOTICES AND
MOTION TO COMPEL DEPOSITIONS OF ALBERT BARCROFT AND
ANGELLI CARRASCO ON OCTOBER 13, 2014

CAUSE NO. CV-14-41665
-11-

*PENTEX FOUNDATION V. GIBBS, ET AL.*

411



| | | |
|---|---|---|
| PENTEX FOUNDATION | ) | IN THE DISTRICT COURT |
| PLAINTIFF. | ) | |
| | ) | |
| VS. | ) | 336TH JUDICIAL DISTRICT |
| | ) | |
| KENNETH VERN GIBBS; AND | ) | |
| CANDACE GIBBS WALTON; AND | ) | |
| HOWARD KIRK GIBBS, | ) | |
| DEFENDANTS. | ) | FANNIN COUNTY, TEXAS |

## THE STATE OF TEXAS SUBPOENA DUCES TECUM FOR ORAL DEPOSITION

TO:   Albert Barcroft, legal representative and alter ego of Pentex Foundation c/o Scott Smith, 120 South Crockett Street, Sherman, Texas 75091-0354.

YOU ARE COMMANDED by the State of Texas to appear at 120 South Crockett Street, Sherman, Texas 75091-0354, on the 13th day of October, 2014, at 10 o'clock a.m., to attend and give testimony at a deposition. Albert Barcroft is be deposed to his personal knowledge of the following: (1) division and distribution of attorney fees from the Estate of Bert Gibbs in 2008, (2) drafting of the GWB Family and Friends Trust, (3) the Contract for Sale of Contract for Sale of Land, Mineral Rights and Royalties and all other Assets or Monies Received from the Estate of Bert Hughes Gibbs, Kathryn G. Gibbs, and/or the Mary L. Houseworth Trust(s) or "The Kathryn Houseworth Gibbs Irrevocable Trust." (the "CSL") (4) signing of the Family Settlement Agreement, and (5) Pentex Royalty Trust federal tax liens.

The deposition will be stenographically recorded by Merit Court Reporters, 307 West 7th Street, Ste. 1350, Fort Worth, Texas 76102, (817) 336-3042, or such other qualified court reporter as may be designated. Such deposition when taken will be used in evidence upon the trial of this cause. The deposition will continue from day to day until completed. All counsel and parties are invited to attend and cross-examine as they may deem proper.

THE STATE OF TEXAS SUBPOENA
PENTEX FOUNDATION VS. GIBBS, ET AL.

CAUSE NO. CV-14-41665
-1-

Exhibit

Page ___ of ___

412

## ENFORCEMENT OF SUBPOENA

Pursuant to Texas Rules of Civil Procedure No. 176.8, failure by any person without adequate excuse to obey a subpoena upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.

## DUCES TECUM

YOU ARE FURTHER COMMANDED to produce and permit inspection and copying of documents or tangible things in your custody or control as follows (if not otherwise noted, the date is since the inception of Pentex Foundation, or November 1, 2008, whichever is earlier):

1. A true and correct copy of all documents showing that you had legal authority to act as legal representative of Pentex Foundation.

2. A true and correct copy of all documents showing that you had legal authority to act as legal representative of Pentex Royalty Trust.

3. A true and correct copy of all documents showing that you had legal authority to act as legal representative of Renshaw, Inc.

4. A true and correct copy of all emails and documents in which you corresponded with the Estate of Bert Gibbs concerning the distribution of attorney fees associated with Kenneth Gibbs, Candace Walton, and Howard Kirk Gibbs.

5. A true and correct copy of any payment (including cancelled checks, money orders, money transfers, etc.) from you, Pentex Royalty Trust, Pentex Foundation, Renshaw, Inc., GBU Friends and Associates Trust, or any other entity in which you have an interest, paid to Scott Smith.

6. A true and correct copy of any payment (including cancelled checks, money orders,

THE STATE OF TEXAS SUBPOENA
*PENTEX FOUNDATION VS. GIBBS, ET AL.*

CAUSE NO. CV-14-41665
-2-

413

Exhibit
Page __2__ of __7__

money transfers, etc.) from you, Pentex Royalty Trust, Pentex Foundation, Renshaw, Inc., GBU Friends and Associates Trust, or any other entity in which you have an interest, paid to John Skotnik.

7. A true and correct copy of any payment (including cancelled checks, money orders, money transfers, etc.) you, Pentex Royalty Trust, Pentex Foundation, Renshaw, Inc., GBU Friends and Associates Trust, or any other entity in which you have an interest, paid to Beverly Miller.

8. A true and correct copy of any payment (including cancelled checks, money orders, money transfers, etc.) you or Pentex Foundation received from GWB Family and Friends Trust.

9. A true and correct copy of all your United States federal income tax returns from 2008 to present filed by you.

10. A true and correct copy of all legal rulings in any lawsuit in which you have been a party since January 1, 2005.

11. A true and correct copies of Pentex Royalty Trust document.

12. A true and correct copies of United States federal income tax returns from 2008 to present filed by Pentex Royalty Trust.

13. A true and correct copy of your personal phone records from January 1, 2013, to the present.

14. A true and correct copy of your resume.

15. A true and correct copy of your professional certificates and qualifications to be a legal representative of an international company.

16. A true and correct copy of all communications (including such things as emails,

THE STATE OF TEXAS SUBPOENA
*PENTEX FOUNDATION VS. GIBBS, ET AL.*

CAUSE NO. CV-14-41665
-3-

414

Exhibit A

Page __3__ of __7__

documents, tape recordings, memorandums, etc.) with Scott Smith in association with GWB Family and Friends Trust, Pentex Foundation, Pentex Royalty Trust, GBU Friends and Associates Trust, and the Estate of Bert Gibbs, since January, 1, 2013, in regard to monies received or distributed to anyone or any entity, GBU Friends and Associates Trust's existence, employer identification number, communications with the Internal Revenue Service, the CSL, Family Settlement Agreement, any distributions of attorney fees from the Estate of Bert Gibbs, and the administration of the Estate of Bert Gibbs.

17. A true and correct copy of all communication (including such things as emails, documents, tape recordings, memorandums, etc.) with Beverly Miller, and her attorneys Sharron Cox and Earl Hargrave, concerning GWB Family and Friends Trust, Pentex Foundation, GBU Friends and Associates Trust, and the Estate of Bert Gibbs, since January, 1 2013, in regard to monies received or distributed to anyone or any entity, GBU Friends and Associates Trust existence, employer identification number, communications with the Internal Revenue Service, the CSL, Family Settlement Agreement, any distributions of attorney fees from the Estate of Bert Gibbs, and the administration of the Estate of Bert Gibbs.

18. A true and correct copy of all communications (including such things as emails, documents, tape recordings, memorandums, etc.) with John Skotnik concerning GWB Family and Friends Trust, Pentex Foundation, GBU Friends and Associates Trust, and the Estate of Bert Gibbs since January, 1 2008, in regard to monies received or distributed to anyone or any entity, GBU Friends and Associates Trust's existence, employer identification number, communications with the Internal Revenue Service, the CSL, Family Settlement Agreement, any distributions of attorney fees from the Estate of

THE STATE OF TEXAS SUBPOENA
PENTEX FOUNDATION VS. GIBBS, ET AL.

CAUSE NO. CV-14-41665
-4-

Exhibit

415

Page __4__ of __7__

Bert Gibbs, and the administration of the Estate of Bert Gibbs.

19. A true and correct copy of all communications (including such things as emails, documents, tape recordings, memorandums, etc.) with Howard Kirk Gibbs concerning GWB Family and Friends Trust, Pentex Foundation, and GBU Friends and Associates Trust since January, 1 2008, in regards to monies received or distributed to anyone or any entity, GBU Friends and Associates Trust's existence, employer identification number, communications with the Internal Revenue Service, the CSL, Family Settlement Agreement, any distributions of attorney fees from the Estate of Bert Gibbs, and the administration of the Estate of Bert Gibbs.

20. A true and correct copy of all communications (including such things as emails, documents, tape recordings, memorandums, etc.) with Earl Hargrave concerning the Estate of Bert Gibbs, including the administration of the estate and distribution of attorney fees since June 1, 2014, in regard to monies received or distributed to anyone or any entity, GBU Friends and Associates Trust existence, employer identification number, communication with the Internal Revenue Service, the CSL, Family Settlement Agreement, any distributions of attorney fees from the Estate of Bert Gibbs, and the administration of the Estate of Bert Gibbs.

21. A true and correct copy of all communications (including such things as emails, documents, tape recordings, memorandums, etc.) with Rickey Brantley or his office concerning the Estate of Bert Gibbs, including the administration of the estate and distribution of attorney fees since January, 1 2008.

22. True and correct copies of all drafts of the GWB Family and Friends Trust.

23. True and correct copies of all drafts of GBU Friends and Associates Trust.

THE STATE OF TEXAS SUBPOENA
PENTEX FOUNDATION VS. GIBBS, ET AL.

CAUSE NO. CV-14-41665
-5-
**Exhibit**

**Page** 5 **of** 7

416

24. A true and correct copy of any articles, books, blogs, or any communications in which you advised any person on how to avoid paying United States federal income taxes or avoiding participation in lawsuits.

25. True and correct copies of all drafts of the CSL since January 1, 2005.

26. A true and correct copy of proof of all legal documents in your possession which attest to your legal representative of any entity that have been provided to GWB Family and Friends Trust and to the Estate of Bert Hughes Gibbs.

The subpoena is prepared and issued for Defendants Kenneth Gibbs and Candace Walton, by Counsel, in accordance with Rule 176 of the Texas Rules of Civil Procedure

Issued on September, 2, 2014.

LAW OFFICES OF CHRISTY LEE, P.C.

Christy L. Lee
Texas State Bar No. 24052302
777 Main Street, Suite 600
Fort Worth, TX 76102
Office: (817) 504-6075
Fax: (800) 437-7901
clee@christyleelaw.com

ATTORNEY FOR KENNETH GIBBS
AND CANDACE WALTON

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was delivered, pursuant to Texas Rules of Civil Procedure and Rule 11 Agreement, to the following parties on this 2nd day of September, 2014:

Pentex Foundation *and*                                     Via fax and email
GBU Friends and Associates Trust
c/o Scott Smith, Attorney of Record

120 South Crockett Street
Sherman, TX 75091-0354

Howard Kirk Gibbs                                    Via mail and email
9929 Crawford Farm Drive
Fort Worth, TX 76244

_____
Christy L. Lee

| | | |
|---|---|---|
| PENTEX FOUNDATION, | § | IN THE DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| V. | § | |
| | § | FANNIN COUNTY, TEXAS |
| KENNETH VERN GIBBS, CANDACE | § | |
| GIBBS WALTON and HOWARD | § | |
| KIRK GIBBS, *Defendants* | § | 336th JUDICIAL DISTRICT |

## PENTEX FOUNDATION'S RESPONSE
## TO DISCOVERY FROM KENNETH GIBBS

TO:  Kenneth Vern Gibbs, by and through his attorney of record.

COMES NOW, Pentex Foundation, files this its response to the First Request for Discovery received on August 11, 2014, and would show as follows:

### GENERAL OBJECTION

Pentex Foundation objects to the Instructions and Definitions to the extent they enlarge the responsibilities of a litigant under the Texas Rules of Civil Procedure. Pentex Foundation specifically objects to the definition of "You" and "Your" to the extent it combines the existence of Pentex Foundation with "Albert Barcroft, as Legal Representative." They are not one in the same. Pentex Foundation answers and responds only in its own right. Pentex Foundation will respond subject to the Rules.

Pentex Foundation objects to producing any documents in the offices of counsel. To the extent there are documents to be produced, they will be produced at the offices of counsel for the responding party.

### RESPONSE TO DISCOVERY REQUESTS

As a predicate to responding, pursuant to the laws of Panama, a foundation is required to keep records only for the current year. Submitted herewith are documents marked as Plaintiff/Intervenor 00001-000257.

DISCOVERY REQUESTS REQUEST FOR PRODUCTION NO. 1: Produce all documents dating back to September 1, 2008, that you have concerning distribution of attorney fees from the Estate.

RESPONSE: Pentex Foundation has no documentation in its possession responsive to this request, except those marked Plaintiff/Intervenor 000135-

419



Exhibit
Page___1___of___29___

175.

REQUEST FOR PRODUCTION NO. 2: Produce all documents dating back to January 1, 2013, that you have concerning the GBU Trust.

RESPONSE: Objection. This request is overly broad and fails to direct Plaintiff to any class or type of documents. *See, Loftin v. Martin*, 766 S.W.2d 145 (1989).

REQUEST FOR PRODUCTION NO. 3: Produce all documents proving your existence and validity, including names of the Board of Directors and Legal Representatives who have served since the inception of the entity; and letters, emails, bank records, correspondence, and accountings related to Albert's involvement in your formation.

RESPONSE: Objection. This request is overly broad and outside the scope of discovery to the extent it requests "letters, emails, bank records, correspondence, and accountings related to Albert's involvement in your formation." Subject to this objection, please see the documents attached hereto as Plaintiff/Interpleader 00001-00033.

REQUEST FOR PRODUCTION NO. 4: Produce a copy of every federal tax return that you and Pentex Trust has filed with the Internal Revenue Service since 2008.

RESPONSE: Objection, the request is made merely to harass and no other purpose, as tax returns are generally not discoverable, see *Hall v. Lawlis*, 907 SW2d 493 (Tex. 1995); *Chamberlain v. Cherry*, 818 SW2d 201 (Amarillo 1991).

REQUEST FOR PRODUCTION NO. 5: Produce a copy of the Pentex Trust.

RESPONSE: Objection. This request seeks information which is outside the scope of discovery.

REQUEST FOR PRODUCTION NO. 6: Produce all communication dating back to September 1, 2008. including letters, tape recordings, or emails, that you have had with any representative of ConocoPhillips concerning you yourself, Albert, GWB Trust, Pentex Trust, or GBU Trust.

RESPONSE: Pentex Foundation has no documentation in its possession responsive to this request.

REQUEST FOR PRODUCTION NO. 7: Produce any communication dating back to January 1, 2013, including letters, tape recordings, or emails, that you have had

420



with Danny Unger concerning GBU Trust.

> RESPONSE: Pentex Foundation objects to any such communications initiated after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections, Pentex Foundation has no documentation in its possession responsive to this request.

REQUEST FOR PRODUCTION NO. 8: Produce any communication dating back to September 1, 2008, including letters, tape recordings, or emails, that you have had with Howard Kirk concerning the Estate's attorney fees.

> RESPONSE: Pentex Foundation has no documentation in its possession responsive to this request.

REQUEST FOR PRODUCTION NO. 9: Produce any communication dating back to January 1, 2013, including letters, tape recordings, or emails, that you have had with Howard Kirk concerning GBU Trust.

> RESPONSE: Pentex Foundation has no documentation in its possession responsive to this request. None

REQUEST FOR PRODUCTION NO. 10: Produce any communication dating back to September 1, 2008, including letters, tape recordings, or emails, that you have had with Rickey Brantley or Scott Pelley concerning the Estate's attorney fees.

> RESPONSE: Pentex Foundation has no documentation in its possession responsive to this request.

REQUEST FOR PRODUCTION NO. 11: Produce any communication dating back to January 1, 2013, including letters, tape recordings, or emails, that you have had with Danny Unger concerning GBU Trust.

> RESPONSE: Pentex Foundation objects to any such communications initiated after the anticipation of litigation. Subject to these objections, Pentex Foundation has no documentation in its possession responsive to this request.

REQUEST FOR PRODUCTION NO. 12: Produce any communication dating back to September 1, 2008, including letters, tape recordings, or emails, that you have had with Ken concerning the Estate's attorney fees.

> RESPONSE: Pentex Foundation has no documentation in its possession


Exhibit 13
Page 3 of 29

responsive to this request.

REQUEST FOR PRODUCTION NO. 13: Produce all documentation dating back to September 1, 2008, which you have concerning Renhaw, Inc., including the transfer of rights of the CSL to you, letters, emails, tape recordings, and any other records involving Renhaw, Inc..

RESPONSE: Please see Plaintiff/Intervenor 000123, 000034.

REQUEST FOR PRODUCTION NO. 14: Produce any communication dating back to May 1, 2008, including letters, tape recordings, or emails, that you have had with Albert concerning GWB Trust.

RESPONSE: Pentex Foundation objects to any such communications initiated after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections, Pentex Foundation has no documentation in its possession responsive to this request.

REQUEST FOR PRODUCTION NO. 15: Produce any communication dating back to January 1, 2013, including letters, tape recordings, or emails, that you have had with Albert concerning GBU Trust.

RESPONSE: Pentex Foundation objects to any such communications initiated after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections, Pentex Foundation has no documentation in its possession responsive to this request.

REQUEST FOR PRODUCTION NO. 16: Produce any communication dating back to May 1, 2008, including letters, tape recordings, or emails, that you have had from Albert concerning distributions from the Estate.

RESPONSE: Pentex Foundation objects to any such communications initiated after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections, Pentex Foundation has no documentation in its possession responsive to this request.

REQUEST FOR PRODUCTION NO. 17: Produce any communication dating back to May 1, 2008, including letters, tape recordings, or emails, that you have had

422

Exhibit B

Page 4 of 29

with Albert concerning Pentex Trust.

> RESPONSE: Pentex Foundation objects to any such communications initiated after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Additionally, this request is outside the scope of discovery. Subject to these objections, Pentex Foundation has no documentation in its possession responsive to this request.

REQUEST FOR PRODUCTION NO. 18: Produce any communication dating back to September 1, 2008, including letters, tape recordings, or emails, that you have had with Candy concerning GWB Trust.

> RESPONSE: Pentex Foundation has no documentation in its possession responsive to this request.

REQUEST FOR PRODUCTION NO. 19: Produce any communication dating back to January 1, 2013, including letters, tape recordings, or emails, that you have had with Candy concerning GBU Trust.

> RESPONSE: Pentex Foundation has no documentation in its possession responsive to this request.

REQUEST FOR PRODUCTION NO. 20: Produce all documents related to Pentex Trust's interest in the Estate and GWB Trust, and dating back to September 1, 2008, including, but not limited to, documents verifying its existence, letters, emails, bank records, correspondence, and accountings.

> RESPONSE: Pentex Foundation has no documentation in its possession responsive to this request.

REQUEST FOR PRODUCTION NO. 21: Produce any communication dating back to January 1, 2011, including letters, tape recordings, or emails, that you have had with Beverly Miller involving Albert.

> RESPONSE: Pentex Foundation objects to any such communications protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, Pentex Foundation has no documentation in its possession responsive to this request other than as may be produced herewith.

REQUEST FOR PRODUCTION NO. 22: Produce all documents upon which you

423

base the claims against Candy and Ken in your Original Petition.

> RESPONSE: Pentex Foundation objects to this request as overly broad and fails to direct Plaintiff to any class or type of documents. *See, Loftin v. Martin*, 766 S.W.2d 145 (1989). Subject to this objection, please see the documents attached to the Motion for Partial Summary Judgment submitted in this case.

REQUEST FOR PRODUCTION NO. 23: Produce any communication dating back to January 1, 2011, including letters, tape recordings, or emails, that you have had with Beverly Miller concerning Pentex Trust.

> RESPONSE: Pentex Foundation objects to this request as outside the scope of discovery, and additionally as to any such communications protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, Pentex Foundation has no documentation in its possession responsive to this request.

REQUEST FOR PRODUCTION NO. 24: Produce any communications dating back to January 1, 2011, including letters, tape recordings, or emails, that you have had with Beverly Miller concerning GBU Trust.

> RESPONSE: Pentex Foundation objects to any such communications initiated after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Additionally, this request is outside the scope of discovery. Subject to these objections, Pentex Foundation has no documentation in its possession responsive to this request other than as may be produced herewith.

REQUEST FOR PRODUCTION NO. 25: Produce any communications dating back to January 1, 2011, including letters, tape recordings, or emails, that you have had with Beverly Miller concerning GWB Trust.

> RESPONSE: Pentex Foundation objects to any such communications initiated after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Additionally, this request is outside the scope of discovery. Subject to these objections, Pentex Foundation has no documentation in its possession responsive to this request other than as may

424

Exhibit 13
Page 6 of 29

be produced herewith.

REQUEST FOR PRODUCTION NO. 26: Produce all documents and communications dating back to September 1, 2008, including letters, tape recordings, or emails, that you have had with Rickey Brantley concerning the Estate's distributions to Heirs and the calculations of the Heirs' attorneys' fees.
RESPONSE: Pentex Foundation has no documentation in its possession responsive to this request.

REQUEST FOR PRODUCTION NO. 27: Produce all documents and communications dating back to September 1, 2008, including letters, tape recordings, or emails, that you have had with Scott Pelley concerning the Estate's distributions to Heirs and the calculations of the Heirs' attorneys' fees.

RESPONSE: Pentex Foundation has no documentation in its possession responsive to this request.

REQUEST FOR PRODUCTION NO. 28: Produce any communication dating back to September 1, 2008, including letters, tape recordings, or emails, that you have had with any representative of JW Operating Company concerning you yourself, Albert, GWB Trust, Pentex Trust, and GBU Trust.

RESPONSE: Pentex Foundation has no documentation in its possession responsive to this request.

REQUEST FOR PRODUCTION NO. 29: Produce any communication dating back to September 1, 2008, including letters, tape recordings, or emails, that you have had with any representative of Trio Consulting and Management, LLC, concerning you yourself, Albert, GWB Trust, Pentex Trust, and GBU Trust.

RESPONSE: Pentex Foundation has no documentation in its possession responsive to this request.

REQUEST FOR PRODUCTION NO. 30: Produce any communication dating back to September 1, 2008, including letters, tape recordings, or emails, that you have had with any representative of Devon Energy concerning you yourself, Albert, GWB Trust, Pentex Trust, and GBU Trust.

RESPONSE: Pentex Foundation has no documentation in its possession responsive to this request.

INTERROGATORY NO. 1: Explain your relationship with Pentex Trust, including details concerning your agreement with Pentex Trust to receive distributions from GWB Trust; your arrangement with Albert to act as Legal

425

Representative for both entities; whether you or Pentex Trust was formed first; the management associated with Pentex Trust in Texas, as effected from a Panamanian locale; the manner in which you determine tax obligations; and arrangement with Pentex Trust concerning voting rights in GWB Trust

ANSWER: Pentex Foundation objects to this interrogatory as outside the scope of permissible discovery and overly broad. Interrogatories may be used to ascertain basic legal and factual claims and defenses, but may not be used to force a party to marshal evidence." *See*, Rule 197 of the Texas Rules of Civil Procedure, at comment 1. Subject to this objection, Pentex Foundation answers as follows:

Pentex Royalty Trust is a trust domestic to the United States that was created as a trust to take in all revenue due from taxable sources within the United States, pay any U.S. taxes or other obligations due, and then distribute its remaining beneficial interests. Pentex Foundation is the sole beneficiary of Pentex Royalty Trust. Pentex Royalty Trust has a paid trustee who is not associated, or familiar with, any other phase of Pentex Foundation. The tax obligations are figured by computing and filing a Return 1042 with the Internal Revenue Service meeting the requirements of the Internal Revenue Code. The voting rights issue was always a problem because the purported trustees of GWB trust never had a clear and defined way of doing anything. For that reason, Pentex Foundation assigned it voting shares by proxy to Jim Walton as long as he was the purported trustee. We have no record of any official votes after Beverly Miller became the purported trustee.

INTERROGATORY NO. 2: Detail your relationship with Albert, including specifics concerning his activities within your entity; on whose authority Albert serves as your Legal Representative; amounts of payment for Albert's services to you; percentages of distributions to you from GWB Trust which Albert ultimately receives; Albert's arrangements to pay Estate attorneys in order to uphold his responsibilities to the CSL and the FSA; Albert's payments of legal fees with regard to this lawsuit; Albert's involvement in this lawsuit (i.e., whether Albert was responsible for instigating the lawsuit); and all other involvement of Albert concerning your involvement with GWB Trust.

ANSWER: Pentex Foundation objects to this interrogatory as outside the scope of permissible discovery and overly broad. Interrogatories may be used to ascertain basic legal and factual claims and defenses, but may not be used to force a party to marshal evidence." *See*, Rule 197 of the Texas Rules of Civil Procedure, at comment 1. Pentex Foundation objects to the terms of payments as confidential under the laws of Panama, and outside the scope of discovery in any event. Subject to these objection, Pentex Foundation answers as follows, and under a defintion of "you" and "your" to refer to

Exhibit β
Page 8 of 29

Pentex Foundation only as specified in the general objections:

Pentex Foundation purchased an interest in the Contract for Sale that Albert Barcroft originally owned. It was mutually advantageous to continue to work with Albert to bring the terms of the contract to conclusion, and he served and serves on our behalf in the matter. To the knowledge of Pentex Foundation, Albert had no responsibilities to pay any attorneys other than John Skotnik in the matter, and such was not shown in any documentation presented to Pentex Foundation. When Pentex was forced to hire new counsel in the case, it did not have sufficient funds in the United States to pay the full retainer. Mr. Barcroft did. Pentex Foundation gave Mr. Barcroft money here, and he sent that money to Scott Smith in the United States. Mr. Barcroft definitely made Pentex Foundation aware that he thought there was a problem in the way proceeds were being paid by GWB Trust, if that qualifies as instigation. In brief, Barcroft was our express liaison with GWB trust, whatever it is.

INTERROGATORY NO. 3: Explain the reasons you came to believe that contingency fee attorneys were deducting their fees from the total due you, Ken, Candy, and Howard Kirk, then issuing one check to GWB Trust, including the rationale for believing that in excess of $ 1 million in attorney fees were due from Ken, Candy, and Howard Kirk; when and how you arrived at these alleged facts; and the reason that Beverly Miller was instructed to assign 57.19% interest in GWB Trust to GBU Trust, when you were entitled to a far smaller percentage.

ANSWER: Pentex Foundation objects to this interrogatory as outside the scope of permissible discovery and overly broad. Interrogatories may be used to ascertain basic legal and factual claims and defenses, but may not be used to force a party to marshal evidence." *See*, Rule 197 of the Texas Rules of Civil Procedure, at comment 1. Subject to these objection, Pentex Foundation answers as follows, and under a defintion of "you" and "your" to refer to Pentex Foundation only as specified in the general objections:

The percentage due Pentex Foundation under the Contract for Sale. Barcroft's share was 30% of everything Ken, Candy and Howard received. Ken, Candy and Howard each received 25%, for a total of 75%, of the estates. Of the 75%, Pentex Foundation owned 30%, equaling 22.5% of everything distributed by the estate (75% X 30%=22.5%). The estate distributed mineral interests to GWB Trust equaling 35.04% of the total minerals owned by the estate. It also distributed 2.46% directly to John Skotnik in payment for his services as attorney (an amount due solely by Barcroft). Of the 35.04% distributed to GWB Trust, Pentex Foundation owned 20.04% (22.5% minus the 2.46% already distributed to Skotnik). 20.04% is 57.19% of 35.04%; thus, Pentex Foundation owned 57.19% of the

427

Exhibit _13_

Page____9____of__29_

minerals transferred to GWB Trust by the estate.

INTERROGATORY NO. 4: Detail and explain the contents of all oral communications dating back to September 1, 2008, which you have had with Howard Kirk, including all agreements to cooperate with you, Albert or Danny Unger in this lawsuit; including your communications with Howard Kirk at the Tarrant case hearing on July 31, 2014, including the reason for conferring with him, when he is a Defendant in this case; and disclose whether you consulted Howard Kirk in drafting your requests for Admissions and whether you assisted Howard Kirk in producing his responses to your demands for discovery, since he was capable of response to you within fewer than five (5) hours of receiving your Requests; and disclose whether John Skotnik, when acting as your Counsel, cooperated with Howard Kirk in motioning the Court to remove Ken as Independent Administrator of the Estate.

> ANSWER: Pentex Foundation objects to any such communications initiated after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Pentex Foundation objects to this interrogatory as outside the scope of permissible discovery and overly broad. Subject to these objection, Pentex Foundation answers as follows, and under a defintion of "you" and "your" to refer to Pentex Foundation only as specified in the general objections:

> Pentex Foundation has had no such communications with Howard Kirk.

REQUEST FOR ADMISSION NO. 1: Admit or deny that Scott Smith and Howard Kirk consulted with each other at the July 31, 2014, hearing in the Tarrant County case.

> RESPONSE: Pentex Foundation objects to this request as (1) well outside the scope of legitimate discovery; (2) a communication initiated after the anticipation of litigation; (3) protected pursuant to the work product exemption from discovery; and/or (4) protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding).

REQUEST FOR ADMISSION NO. 2: Admit or Deny that you, Ken, Candy, and Howard Kirk are members of the GWB Family and Friends Trust.

> RESPONSE: Admit that Pentex Foundation is an an assignee of the business organization created pursuant to the CSL, if "you" refers to Pentex

428

Exhibit _13_

Page __/0__ of __27__



Foundation as discussed in the general objections; otherwise, deny.

REQUEST FOR ADMISSION NO. 3: Admit or Deny that you were formed specifically because Albert stood to receive proceeds from the Estate as a result of the CSL and FSA, and Albert wanted the funds to flow through a third party in order to avoid federal tax and similar obligations.

RESPONSE: Assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 4: Admit or Deny that you have received no money from GWB Trust.

RESPONSE: Assuming that "you" refers solely to Pentex Foundation as discussed in the general objections: admit, as all money was received by Pentex Trust).

REQUEST FOR ADMISSION NO. 5: Admit or Deny that Albert is your Primary Beneficiary.

RESPONSE: Pentex Foundation objects to this request as outside the scope of legitimate discovery. Subject to this objection, and assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 6: Admit or Deny that Pentex Trust is your Primary Beneficiary.

RESPONSE: Pentex Foundation objects to this request as outside the scope of legitimate discovery. Subject to this objection, and assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 7: Admit or Deny that the GWB Trust document established the process and percentages by which Howard Kirk, Candy, Ken, and you received interest from the Estate.

RESPONSE: Pentex Foundation objects to this request as misleading and assuming facts which do not exist. There is no known GWB Trust document. Subject to this objection, and assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 8: Admit or Deny that the GWB Trust Trustee is responsible for distributing assets to the Beneficiaries according to the

429

percentages specified in the GWB Trust document.

RESPONSE: Pentex Foundation objects to this request as misleading and assuming facts which do not exist. There is no known GWB Trust document. Subject to this objection, and assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 9: Admit or Deny that if the percentages of interest specified in the GWB Trust document are incorrect, then you are fully responsible for the inaccuracy because Albert, as your Legal Representative, entered into negotiations with the Estate's attorneys concerning the appropriate distributions.

RESPONSE: Pentex Foundation objects to this request as misleading and assuming facts which do not exist. There is no known GWB Trust document. Subject to this objection, and assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 10: Admit or Deny that you authorized Albert to serve as your Legal Representative with regard to GWB Trust, GBU Trust, Pentex Trust, and the Estate.

RESPONSE: Pentex Foundation objects to this request as multifarious. Subject to this objection, and assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 11: Admit or Deny that Pentex Trust is a Trust which Albert, acting on your behalf, established in the United States in order to receive funds because you are a foreign entity, and as such, it is difficult to receive distributions from the Estate.

RESPONSE: Pentex Foundation objects to this request as multifarious. Subject to this objection, and assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 12: Admit or Deny that Albert, acting on your behalf, resisted Candy and Ken's inquiries into the legitimacy of your existence.

RESPONSE: Assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 13: Admit or Deny that there are active United States Federal Tax Liens filed against you in Texas.

430



Exhibit 13

Page 12 of 29

RESPONSE: Pentex Foundation objects to this request as outside the scope of legitimate discovery. Subject to this objection, and assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 14: Admit or Deny that Albert approached you previous to 2008 to invest in the settlement of the Estate.

RESPONSE: Pentex Foundation objects to this request as outside the scope of legitimate discovery. Subject to this objection, assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, Pentex Foundation has made reasonable inquiry and the information known or easily obtainable is insufficient to enable it to admit or deny this request.

REQUEST FOR ADMISSION NO. 15: Admit or Deny that you invested $250,000 for expenses related to the settlement of the Estate.

RESPONSE: Pentex Foundation objects to this request as outside the scope of legitimate discovery. Subject to this objection, and assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 16: Admit or Deny that you were established after Albert entered into discussions with Candy, Howard Kirk, and concerning the settlement of the Estate.

RESPONSE: Pentex Foundation objects to this request as outside the scope of legitimate discovery, unclear and ambiguous, and unspecified as to time.

REQUEST FOR ADMISSION NO. 17: Admit or Deny that, Pentex Trust was a Beneficiary of GWB Trust with 24.965 16% interest.

RESPONSE: Assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied. Pentex Foundation held the Barcroft interests in the original Contract for Sale, but it is unclear as to how that was interpreted by the original purported trustee.

REQUEST FOR ADMISSION NO. 18: Admit or Deny that you compensated Albert, John Skotnik, and Danny Unger for their services regarding the Estate and GWB Trust.

RESPONSE: Assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

431

Exhibit *13*
Page *13* of *29*

REQUEST FOR ADMISSION NO. 19: Admit or Deny that the GWB Trust owns 35.04% of the assets that are still left in the estate, including real estate.

**RESPONSE:** Pentex Foundation objects to this request as calling for pure legal question. Plaintiff has made reasonable inquiry and the information known to it or easily obtainable to it is insufficient with which to either admit or deny this request.

REQUEST FOR ADMISSION NO. 20: Admit or Deny that GWB Trust receives oil and gas royalties from the Estate, from which administrative costs are deducted before the Trustee distributes the assets to the Beneficiaries, yourself including, according to the percentages as stated in the GWB Trust document.

RESPONSE: Pentex Foundation objects to this request as misleading and assuming facts which do not exist. There is no known GWB Trust document. Subject to this objection, and assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 21: Admit or Deny that you have not received any funds from GWB Trust or the Estate.

RESPONSE: Assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, it is admitted that all funds to Pentex Foundation have come through Pentex Royalty Trust.

REQUEST FOR ADMISSION NO. 22: Admit or Deny that Albert drafted the Pentex Trust document.

RESPONSE: Pentex Foundation objects to this request as outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 23: Admit or Deny that your Board of Directors profit, or have profited, from GWB Trust.

RESPONSE: Pentex Foundation objects to this request as outside the scope of legitimate discovery. Subject to this objection, and assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 24: Admit or Deny that you have distributed, or will distribute, to Albert any proceeds from GWB Trust in excess of the $250,000 which Albert claimed you originally invested in settlement of the Estate.

RESPONSE: Pentex Foundation objects to this request as multifarious and

Exhibit 13
Page 14 of 27

speculative (when speaking about future events which may or may not occur). Pentex Foundation objects to this request as outside the scope of legitimate discovery.

REQUEST FOR ADMISSION NO. 25: Admit or Deny that you authorized Albert to vote on your behalf in decisions concerning GWB Trust, from its' inception to around February 2014.

RESPONSE: Assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, admit that Albert had the authority to carry on all business in the United States for Pentex Foundation.

REQUEST FOR ADMISSION NO. 26: Admit or Deny that Beverly Miller acts according to your instructions in performing her duties as Trustee of GWB Trust.

RESPONSE: Assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 27: Admit or Deny that on September 11, 2013, Albert, acting on your behalf, stated in an email that he refused to allow for Candy and Ken to remove their interest from GWB Trust.

RESPONSE: Assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 28: Admit or Deny that, in or around November 2013, you, or Albert acting on your behalf, instructed the GWB Trust Trustee, Beverly Miller, to transfer 57.19% of the existing GWB Trust assets into a newly created trust, the GBU Trust.

RESPONSE: Assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, admit.

REQUEST FOR ADMISSION NO. 29: Admit or Deny that you, or Albert acting on your behalf, informed Beverly Miller that, if she did not transfer 57.19% of GWB Trust assets into the GBU Trust, she would be held personally liable for any losses.

RESPONSE: Assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, admit that she was told she "could" be held responsible for not doing her duties.

REQUEST FOR ADMISSION NO. 30: Admit or Deny that upon your instructions, or upon instructions from Albert acting on your behalf, Beverly Miller

433

Exhibit 13

Page 15 of 29

transferred 57.19% interest from GWB Trust to GBU Trust.

> RESPONSE: If "you" refers solely to Pentex Foundation as discussed in the general objections, admit that Pentex Foundation demand to split the assets according to the Contract for Sale was honored by the Trustee, Beverly Miller.

REQUEST FOR ADMISSION NO. 31: Admit or Deny that GWB Trust was formed to receive the Heirs' distributions from the Estate.

> RESPONSE: Admit that GWB trust was created by the expression of the Contract for Sale to help facilitate the terms of that Contract for Sale.

REQUEST FOR ADMISSION NO. 32: Admit or Deny that your Original Petition admits that the FSA, as an extension of the CSL, is the subject of this suit.

> RESPONSE: Objection. The pleadings speak for themselves. Subject to this objection, assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 33: Admit or Deny that you protested moving this case to Tarrant County Probate Court No. 2 because the Estate was responsible for establishing the amounts of the distributions to the heirs, but you could not challenge the Estate because you would be disqualified as recipient of Estate assets due to the terms of the FSA.

> RESPONSE: Pentex Foundation objects to this request as multifarious. Subject to this objection, assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 34: Admit or Deny that you instigated the Fannin County lawsuit.

> RESPONSE: Pentex Foundation objects to this request as argumentative. Subject to this objection, assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, admit that it is the Plaintiff and filed this suit.

REQUEST FOR ADMISSION NO.35: Admit or Deny that your lawsuit against Candy and Ken was filed as revenge because of their inquiries into the administration of GWB Trust.

> RESPONSE: Assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

434

Exhibit 15

Page 16 of 29



REQUEST FOR ADMISSION NO. 36: Admit or Deny that you have ordered and received assets from GWB Trust in addition to the 24.96515% you were originally assigned.

RESPONSE: Assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 37: Admit or Deny that you willingly engaged in discussions of the creation of Pentex Trust in order to avoid having to observed United States and Texas State law.

RESPONSE: Pentex Foundation objects to this request as outside the scope of legitimate discovery. Assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 38: Admit or Deny that you existed prior to 2008 and that you provide multiple benefits to Beneficiaries other than Albert.

RESPONSE: Pentex Foundation objects to this request as outside the scope of legitimate discovery. Assuming that "you" refers solely to Pentex Foundation as discussed in the general objections, denied as to the date, and admit the balance of this request.

REQUEST FOR ADMISSION NO. 39: Admit or Deny that the Estate is responsible for the flow of cash to GWB Trust, which in turn flows to the Beneficiaries.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 40: Admit or Deny that Candy does not have the authority to control the Estate's distributions to the Heirs.

RESPONSE: Pentex Foundation has made reasonable inquiry and the information known or easily obtainable is insufficient to enable it to admit or deny this request.

REQUEST FOR ADMISSION NO. 41: Admit or Deny that Ken does not have the authority to control the Estate's distributions to the Heirs.

RESPONSE: Pentex Foundation has made reasonable inquiry and the information known or easily obtainable is insufficient to enable it to admit or deny this request.

REQUEST FOR ADMISSION NO. 42: Admit or Deny that suing Ken individually

435



was inappropriate, as Ken individually does not have the authority to control the Estate's distributions to the Heirs.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO.43: Admit or Deny that Renhaw, Inc., received your interest in GWB Trust, then transferred it back to you.

RESPONSE: If "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUESTFORADMISSIONNO.44: Admit or Deny that you were effectively rendered a "nonentity" with regard to GWB Trust, because of the transfers as follows: Albert Barcroft> Renhaw > GWB Trust.

RESPONSE: If "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 45. Admit or Deny that Howard Kirk and you worked together to remove assets from GWB Trust which did not belong to you in order to benefit unjustly from those assets.

RESPONSE: If "you" refers solely to Pentex Foundation as discussed in the general objections, denied.

REQUEST FOR ADMISSION NO. 46: Admit or Deny that prior to around November 2013, you did not question the distributions from GWB Trust.

RESPONSE: If "you" refers solely to Pentex Foundation as discussed in the general objections, admit.

REQUEST FOR ADMISSION NO. 47: Admit or Deny that you issued instructions via Albert to Beverly Miller concerning the administration of GWB Trust.

RESPONSE: Ojbection. This request is ambiguous. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 48: Admit or Deny that you occasionally hired and paid Danny Unger to perform minor accounting work, as well as research.

RESPONSE: Admit that he did some accounting for Pentex Foundation.

REQUEST FOR ADMISSION NO.49: Admit or Deny that you were aware that you were entitled to less than a quarter of the proceeds in GWB Trust, after

436

Exhibit 13
Page 18 of 29

expenses, when you, or Albert acting on your behalf, instructed Beverly Miller to transfer 57.19% interest in GWB Trust to GBU Trust.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 50: Admit or Deny that you were aware that you were entitled to only 24.96516% interest of GWB Trust at the time you instructed Beverly Miller to transfer 57.19% to GBU Trust.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 51: Admit or Deny that you benefitted substantially from GWB Trust since the time it was established in September 2008.

RESPONSE: Pentex Foundation objects to this request as vague and ambiguous.

REQUEST FOR ADMISSION NO. 52: Admit or Deny that Albert drafted the Original Petition in this lawsuit.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 53: Admit or Deny that no changes could be made to GWB Trust distributions unless approved by unanimous vote.

RESPONSE: Pentex Foundation objects to this request as assuming facts that have not been established, namely the terms of the GWB Trust. Admit that the CSL which established GBW Trust required that all 4 parties to the CSL sign any amendments before a notary.

REQUEST FOR ADMISSION NO. 54: Admit or Deny that, once Renhaw transferred its share of assets to the GWB Trust, Ken, Candy, and Howard Kirk are the only three (3) remaining members, as well as Beneficiaries, of the GWB Trust, and that therefore you are no longer a Beneficiary of GWB Trust.

RESPONSE: Pentex Foundation objects to this request as multifarious. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 55: Admit that Albert authorized the percentages of interest which the Estate assigned to the Heirs.

RESPONSE: Objection. This request is ambiguous and vague. It is also outside the scope of legitimate discovery. Pentex Foundation has made

437

Exhibit B
Page 19

reasonable inquiry and the information known or easily obtainable is insufficient to enable it to admit or deny this request.

REQUEST FOR ADMISSION NO. 56: Admit or Deny that, under the terms of the FSA, an Heir who disputes the terms can lose his or her interest in the Estate.

RESPONSE: Denied.

REQUEST TO ADMISSION NO. 57: Admit or Deny that Admit your inclusion of Howard Kirk as a Defendant in this Cause is a smoke screen designed to deflect from the fact that Howard Kirk is cooperating with you in this lawsuit and in the lawsuit filed in Tarrant County, which involves Albert, Howard Kirk, Candy, and Ken.

RESPONSE: The Intervenor objects to this request as argumentative, multifarious, and outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 58: Admit or Deny that John Skotnik was forced to withdraw from representing you in this case, as he originally assisted in the Estate settlement involving the Heirs.

RESPONSE: Pentex Foundation objects to this request as calling for a legal conclusion as to why Mr. Skotnik withdrew, and as being outside the scope of any legitimate discovery. Subject to these objections, Pentex Foundation admits that it was agreed in the CSL that John Skotnik could represent Barcroft's interests if a dispute ever arose, admit that Defendants reneged on that provision of the CSL, thereby breaching the contract.

REQUEST FOR ADMISSION NO. 59: Admit or Deny that you, or your representative, assisted Howard Kirk in his Answer and his Admission responses in this case.

RESPONSE: Objection. This request is outside the scope of legitimate discovery. It invades the protections for communications made after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections: Denied.

REQUEST FOR ADMISSION NO. 60: Admit or Deny that you, or your representative, assisted Howard Kirk in his Answer in the Tarrant County case.

438

RESPONSE: Objection. This request is outside the scope of legitimate discovery. It invades the protections for communications made after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections: Denied.

REQUEST FOR ADMISSION NO. 61: Admit or Deny that you function as a shell entity for Albert.

RESPONSE: Pentex Foundation objects to this request as outside the scope of discovery and is vague. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 62: Admit or Deny that, on or about December 2, 2013, Albert sent Candy Walton and Ken letters stating that Albert, as agent for Pentex and Renhaw, were invoking the right to demand a split of the GWB Trust assets, as you wished to withdraw from GWB Trust.

RESPONSE: Admit that Pentex demanded a split of assets under the CSL.

REQUEST FOR ADMISSION NO. 63: Admit or Deny that Albert has been your Legal Representative up until there was a demand to have Albert deposed.

RESPONSE: Objection. This request is ambiguous with respect to the term "Legal Representative." Subject to this objection, Mr. Danny Unger is the designated representative for Pentex Foundation in this litigation.

REQUEST FOR ADMISSION NO. 64: Admit or Deny that you informed GWB Trust Beneficiaries of all transfers of your interest in GWB Trust each time a transfer was effected.

RESPONSE: Admit that the beneficiaries were informed.

REQUEST FOR ADMISSION NO. 65: Admit or Deny that on December 18, 2013, signing in the capacity of "Legal Representative" of Pentex, you noticed the Estate, including Executor Kenneth Gibbs, and the Estate's (3) three attorneys that a substantial part of GWB's Trust assets must be distributed and made payable to the GBU Trust.

RESPONSE: Pentex Foundation objects to this request as multifarious. Subject to this objection, it is admitted that the document numbered Plaintiff/Intervenor 00035 is authentic and speaks for itself.

REQUEST FOR ADMISSION NO. 66: Admit or Deny that, you are a not-for-profit private foundation established and operated in Panama.

RESPONSE: Admit

REQUEST FOR ADMISSION NO. 67: Admit or Deny that in a very small sentence, at the end of a long tirade of explanations, GWB Trust accounting reflected that 20.04% of the 35.04% of GWB Trust's assets had been transferred to GBU.

RESPONSE: Pentex Foundation objects to this request as argumentative and vague. Subject to this objection, admitted that the document numbered Plaintiff/Intervenor 00035 is authentic and speaks for itself.

REQUEST FOR ADMISSION NO. 68: Admit or Deny that GWB Trust is responsible for paying administrative costs, such as property taxes, for assets assigned to GWB Trust by the Estate and which benefit you.

RESPONSE: Pentex Foundation has made reasonable inquiry and the information known or easily obtainable is insufficient to enable it to admit or deny this request.

REQUEST FOR ADMISSION NO. 69: Admit or Deny that Albert, as your Legal Representative, exerted undue influence over Beverly Miller.

RESPONSE: Objection vague. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 70: Admit or Deny that, although you are based in Panama, the majority of your affairs originate in Texas.

RESPONSE: Pentex Foundation objects to this request as outside the scope of discovery and is vague. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 71: Admit or Deny that Albert, not you, is the one ultimately receiving income out of the Estate.

RESPONSE: Pentex Foundation objects to this request as outside the scope of discovery and is vague. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 72: Admit or Deny that you donate funds to a medical facility that is located outside of the United States, claiming the act to be the primary reason for your existence.

RESPONSE: Pentex Foundation objects to this request as outside the scope of discovery and is vague. Subject to this objection: Denied, other than to admit that Pentex Foundation donates to numerous causes.

440

Exhibit /3
Page 22 of 29

REQUEST FOR ADMISSION NO. 73: Admit or Deny that Albert assisted in calculating the percentages due Heirs from the Estate and that Albert provided the calculations to the attorneys of the Estate.

RESPONSE: Pentex Foundation objects to this request as outside the scope of discovery. Subject to this objection, Pentex Foundation has made reasonable inquiry and the information known or easily obtainable is insufficient to enable it to admit or deny this request.

REQUEST FOR ADMISSION NO. 74: Admit or Deny that neither Ken individually nor Candy individually had or now have the authority or the ability to control the distributions from the Estate to the Heirs.

RESPONSE: Pentex Foundation objects to this request as outside the scope of discovery. Subject to this objection, Pentex Foundation has made reasonable inquiry and the information known or easily obtainable is insufficient to enable it to admit or deny this request.

REQUEST FOR ADMISSION NO. 75: Admit or Deny that Albert assigned John Skotnik a percentage of his interest as detailed in the FSA.

RESPONSE: Objection. The terms of the FSA speak for themselves. Subject to this objection, Pentex Foundation admits that the FSA, as submitted as Plaintiff/Intervenor 00059-122 is authentic and that John Skotnik was assigned a share.

REQUEST FOR ADMISSION NO. 76: Admit or Deny that the subject matter in this case is not in the Fannin County Court's jurisdiction, since land in which GWB Trust holds interest remains in and under the control of the Estate.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 77: Admit or Deny that you drafted and persuaded Howard Kirk Gibbs to file documents in this Cause and in the Fannin County District Court Cause on your behalf.

RESPONSE: Objection *again*. This request is outside the scope of legitimate discovery. It invades the protections for communications made after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections: Denied.

Exhibit 13
Page 23 of 29

REQUEST FOR ADMISSION NO. 78: Admit or Deny that GWB Trust document, not the CSL or the FSA, establishes the exact percentage of interest which Pentex held.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 79: Admit or Deny that Candace Walton and Kenneth Gibbs do not want to sell the Homeplace.

RESPONSE: Pentex Foundation has made reasonable inquiry and the information known or easily obtainable is insufficient to enable it to admit or deny this request.

REQUEST FOR ADMISSION NO. 80: Admit or Deny that the land in which GWB Trust holds interest belongs to the Estate, and therefore GWB Trust issues must be handled as Estate matters.

RESPONSE: Objection. This calls for a pure legal question. Subject to this objection, Pentex Foundation has made reasonable inquiry and the information known or easily obtainable is insufficient to enable it to admit or deny this request.

REQUEST FOR ADMISSION NO. 81: Admit or Deny that you transferred interest in GWB Trust to Renhaw, Inc., because doing so aided Albert in eluding the Internal Revenue Service's collection activities against him.

RESPONSE: Pentex Foundation objects to this request as outside the scope of discovery and is vague. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 82: Admit or Deny that GWB Trust is a legitimate Trust, which was designed to receive interest from the Estate and which has distributed you substantial assets in the past.

RESPONSE: Objection. This calls for a pure legal question. Subject to this objection, Admit that it is a business organization created under the terms of the CSL.

REQUEST FOR ADMISSION NO. 83: Admit or Deny that the FSA is a legitimate and binding contract.

RESPONSE: Admit.

REQUEST FOR ADMISSION NO. 84: Admit or Deny that Albert drafted the CSL.

442

Exhibit /3

Page ͻ4 of ͻͻ

RESPONSE: Objection this calls for a pure legal conclusion. Subject to this objection, admit as to our understanding of that to be the case.

REQUEST FOR ADMISSION NO. 91: Admit or Deny that Candy and Ken are not responsible for any tortious interference between GWB Trust and yourself, as neither Candy nor Ken ever interfered with the appropriate distributions to you of approximately one-quarter (1/4) interest in GWB Trust.

RESPONSE: Object to this request as multifarious and vague. Subject to these objections: Denied.

REQUEST FOR ADMISSION NO. 92: Admit or Deny that Albert breached the FSA.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 93: Admit or Deny that Albert breached the CSL.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 94: Admit or Deny that you are bound by the conditions of the FSA.

RESPONSE: Admit that some of the provisions of the FSA apply to Pentex Foundation and any other successor to the interest originally conveyed to Mr. Barcroft.

REQUEST FOR ADMISSION NO. 95: Admit or Deny that Danny Unger has been your Legal Representative since the inception of this lawsuit.

RESPONSE: Objection. This request is ambiguous with respect to the term "Legal Representative." Subject to this objection, it is admitted that Mr. Danny Unger is the designated representative for Pentex Foundation in this litigation.

REQUEST FOR ADMISSION NO. 96: Admit or Deny that Albert, not Danny Unger, initiated this lawsuit on your behalf.

RESPONSE: Objection. This request is outside the scope of legitimate discovery. It invades the protections for communications made after the anticipation of litigation, the attorney/client privilege and work product communication.

443

Exhibit 15

Page 26 of 29

REQUEST FOR ADMISSION NO. 97: Admit or Deny that on a yearly basis, GWB Trust provided you accountings concerning income and distributions to Beneficiaries.

RESPONSE: Objection. This request is vague. Subject to that objection, it is admitted that only tax returns were submitted.

REQUEST FOR ADMISSION NO. 98: Admit or Deny that you breached the FSL.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 99: Admit or Deny that Scott Smith stated during the July 31, 2014, hearing in Tarrant County, that he received his retainer from beneficiaries of GBU Trust, including Danny Unger.

RESPONSE: Objection. This request is outside the scope of legitimate discovery. Additionally, the transcript of that proceeding would be the best evidence of what was said.

REQUEST FOR ADMISSION NO. 100: Admit or Deny that Scott Smith stated during the July 31, 2014, hearing in Tarrant County, that he took this case because, he like most attorneys, will take any case that can pay him a retainer.

RESPONSE: Objection. This request is outside the scope of legitimate discovery. Additionally, the transcript of that proceeding would be the best evidence of what was said.

Respectfully submitted,

By: _____

Scott Smith
State Bar Number 18688900
120 South Crockett Street
P.O. Box 354
Sherman, Texas 75091-0354
e-mail smithlaw@airmail.net
Facsimile (903) 870-1446
Telephone (903) 868-8686

444

Exhibit 13
Page 27 of 25

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing document was served, by certified mail, return receipt requested number 7009 2250 0000 2311 4187 toChristy L. Lee, Esq., of Law Offices of Christy Lee, P.C., 777 Main Street, Suite 600, Fort Worth, Texas 76102, and to Howard Kirk Gibbs, Pro Se, at 4360 Western Center Blvd., Suite 203, Ft. Worth, Texas 76137, on this the 3rd day of September, 2014.

Scott Smith

445

Exhibit 13

Page 28 of 29

# Unsworn Delcaration Pursuant to
## TEX. CIV. PRAC. & REM. CODE § 132.001

My name is Danny Unger. My date of birth is _____ *1952* _____. I reside at *General Delivery Copeland, TX 73849* _____. I am the designated representative of Pentex Foundation, that I have read the above and foregoing Answers to Interrogatories and subscribes to the same on behalf of Pentex Foundation; that said responses, subject to inadvertent or undiscovered errors, are based on and therefore limited by the records and information still in existence, presently recollected and this far discovered in the course of the preparation of these responses; that, consequently, I reserve the right to make changes in responses if it appears at any time that omissions or errors have been made therein or that more accurate information is available; and that subject to the limitations set forth herein, the said responses are true and correct and within my personal knowledge. I have been advised that Rule 197.2(d)(2) does not require that I swear to interrogatory answers about persons with knowledge of relevant facts, trial witnesses or legal contentions. Since I am not an attorney, I therefore do not swear to the truth of any interrogatory answers containing information about persons with knowledge of relevant facts, trial witnesses or legal contentions. I declare under penalty of perjury that the foregoing instrument is true and correct.

Dated: _____ *09/02* _____, 2014

_____ *Danny Unger, Representative* _____
Danny Unger, Declarant



PLAINTIFF'S
EXHIBIT
F

## Statement Given Under Penalty of Perjury

I, Albert Lynn Barcroft, being born on August 20, 1946 in Rotan, Texas, give the following statement under penalty of perjury under the laws of the United States of America.

I am a resident of Guatemala, Central America, and have resided here for more than five (5) years without interruption. I am aware that I have been asked to attend a hearing and other legal proceedings in the United States. I hereby certify and affirm the following for the record:

1. I am not an employee of PENTEX FOUNDATION;

2. I do not receive a salary or other compensation for the services I provide for PENTEX FOUNDATION;

3. PENTEX FOUNDATION does not, and cannot, control my activities, time or movement, nor can it compel me to attend legal matters in the United States;

4. I am currently under doctor's care for heart and arthritic conditions that have recently gotten worse;

5. My doctors has informed me that any extended travel would be life threatening for me; and,

6. While I am still technically an agent for PENTEX FOUNDATION, my duties have been greatly reduced in recent months due to my health, and I am not authorized to give testimony on behalf of PENTEX FOUNDATION at this point in time.

I hereby certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Further, I certify under penalty of perjury under the prevailing laws of the State of Texas that the statements in this document are true and correct, and not intended to mislead.

Executed this 3rd day of September, 2014, in San Marcos, Izabal, Guatemala, Central America.

Albert Lynn Barcroft
Agent/Legal Representative
PENTEX FOUNDATION

447



# Dr. Leonel Antonio Ramírez Montenegro

## MEDICINA INTERNA Y ELECTROCARDIOGRAFIA

**CONSULTORIO**
Clínica Casa de Los Almendros
Calle de Atrás 9-68 Morales Izabal
Tel.: 7823-2060
EMERGENCIAS: 5412-0504 · E-mail:leoram_chey@yahoo.com

El infrascrito Dr. LEONEL ANTONIO RAMIREZ MONTENEGRO, médico y cirujano colegiado activo número ocho mil ciento treinta y cuatro, egresado de la Universdiad de San Carlos de Guatemala CERTIFICA: Que dentro de los archivos de este consultorio aparece registro del señor ALBERT LYNN BARCROFT. Quien padece HIPERTENSION ARTERIAL, FIBRILACION AURICULAR CRONICA Y OSTEOARTROSIS DEGENERATIVA DE RODILLAS, por lo que no puede viajar debido su codicíon de salud, la cual le impide movilizarse por si mismo, así como tambien representa riesgo para su vida dado que problema cardiovascualar he emperado en los últimos meses. A solicitud de la parte interesada se extiende la presente al veintiocho de Agosto del dos mil catorce.

Dr Leonel Ramirez
UEDICO INTERNISTA
Col 5 134

Dr. Leonel Ramirez Montenegro
Medicina Interna
Col. 8,134



PLAINTIFF'S
EXHIBIT

D

PENGAD 800-631-6989

Although an exact interpretation from Spanish to English of a document of this sort is virtually impossible, below is a general interpretation into English of the foregoing medical report and evaluation for your convenience:

The undersigned Dr. LEONELANTONIO MONTENEGR RAMIREZ, physician and surgeon gives active number eight thousand one hundred thirty-four, graduated in the University of San Carlos De Guatemala CERTIFY that within the files of this office record appears Mr. Albert Lynn Barcroft who suffers HYPERTENSION, CHRONIC ATRIAL FIBRILLATION AND KNEE OSTEOARTHRITIS DEGENERATIVE therefore he is not able travel due to his health condition, this condition makes it difficult for him to move himself, and also this represents a life risk because the cardiovascular problem has worsened in recent months. At the request of the interested party present at the August 28 of two thousand fourteen runs.

Exhibit "C"

http://edition.channel5belize.com/archives/29963

Mar 23, 2010

## Great escape owner faked heart attack and wreckage wreaking havoc



The Great Escape, the luxury yacht, that damaged Belize's pristine barrier reef on November thirtieth, 2009 is gone but not forgotten. There were reports that it was leaking fuel into the sea and that it would have been moved. Well, the yacht is no longer at the site where it grounded. It wasn't a salvage company, but Mother Nature herself and currents have drifted the wreckage towards Punta Manabique. Boaters in the Bay of Honduras have been advised to be on the lookout because it could cause an accident. When we last reported on the incident, the Department of Environment indicated the owner of the vessel, Albert Barcroft, had suffered heart failure and had to be rushed to Guatemala to seek treatment. However, according to Roy McNett, the editor of an online newspaper in Rio Dulce, Guatemala, Al Barcroft has taken up residence in Rio Dulce and has admitted that he faked his heart attack so he wouldn't be taken to Belize City. McNett said that at the website's blog,
Barcroft has indicated that the authorities in Belize have not held him responsible for the grounding.

Via Phone: Roy McNett, Editor, Rio Dulce Chisme Vindicator

450

Exhibit ___
Page ___ of 3



*"We are located in Rio Dulce and there is quite a large boating community out here, probably close to four hundred boats that are here. And many of the boaters here are upset about what happened. Of course there's always rumors that perhaps he did it intentionally to collect the insurance. That has not been verified at all."*

Jose Sanchez

*"The last we heard of Albert Barcroft, he had a heart attack and he went to Guatemala and left there. What do you actually know?"*

Via Phone: Roy McNett

*"He told me he faked the heart attack so he wouldn't have to go onto Belize City."*

Jose Sanchez

*"So he didn't have a heart attack?"*

Via Phone: Roy McNett

*"He did not have a heart attack."*



Jose Sanchez

Exhibit E
Page 2 of 3


"And what has become of the boat. It's no longer where it was near the Sapodilla Cayes where it landed on the reef?"

Via Phone: Roy McNett

*"That's the sad thing about it. The boat is now floating with the tide between Belize and Guatemala. There's a photo on our website that shows the boat out there. It's a navigation hazard, it's very dangerous to be left there."*

Jose Sanchez

"Since you spoke to Mister Barcroft, has he accepted responsibility for landing his boat on the reef?"

Via Phone: Roy McNett

*"He's written in the blog that he has no fines at all, during the inquiries, he was not held responsible or negligent."*

Jose Sanchez

"So would you be surprised then to find out the investigation is not complete and it is a legal matter? So nothing has been resolved as yet."

Via Phone: Roy McNett

*"We are surprised that Belize has not as yet fined him for the damage to the reef. He is here in Rio Dulce and he's buying some land here now."*

We have been unable to reach Martin Alegria, Chief Environmental Officer, for comment. However, the editor of Rio Dulce Chisme Vindicator happily provided us with Albert Barcroft's email address. So if the authorities or anyone would like to express their feelings about the incident, the Great Escape's owner can be reached at AlBarcroft@leonardonline.net

Be Sociable, Share!

Viewers please note: This Internet newscast is a verbatim transcript of our evening television newscast. Where speakers use Kriol, we attempt to faithfully reproduce the quotes using a standard spelling system.

**Exhibit** E

**Page** 3 **of** 3

452

| | | |
|---|---|---|
| PENTEX FOUNDATION | ) | IN THE DISTRICT COURT |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | 336TH JUDICIAL DISTRICT |
| | ) | |
| KENNETH VERN GIBBS; AND | ) | |
| CANDACE GIBBS WALTON; AND | ) | |
| HOWARD KIRK GIBBS, | ) | |
| DEFENDANTS. | ) | FANNIN COUNTY, TEXAS |

## THE STATE OF TEXAS SUBPOENA DUCES TECUM FOR ORAL DEPOSITION

TO: Angelli Martha Polanco Carrasco, President, Chairman, and Director of Pentex Foundation c/o Scott Smith, 120 South Crockett Street, Sherman, Texas 75091-0354.

YOU ARE COMMANDED by the State of Texas to appear at 120 South Crockett Street, Sherman, Texas 75091-0354, on the 13th day of October, 2014, at 10 o'clock a.m., to attend and give testimony at a deposition. Angelli Martha Polanco Carrasco is be deposed to her personal knowledge of the following: (1) the incorporation of Pentex Foundation, (2) daily activities of Pentex Foundation, (3) all monies received from the Estate of Bert Gibbs, and GWB Family and Friends Trust, (4) the board minutes on or about August 4, 2014, in which you agreed to file suit against Kenneth Gibbs and Candace Gibbs in Fannin County, and (5) Albert Barcroft's and Danny Unger's legal authority to act on Pentex Foundation's behalf.

The deposition will be stenographically recorded by Merit Court Reporters, 307 West 7th Street, Ste. 1350, Fort Worth, Texas 76102, (817) 336-3042, or such other qualified court reporter as may be designated. Such deposition when taken will be used in evidence upon the trial of this cause. The deposition will continue from day to day until completed. All counsel and parties are invited to attend and cross-examine as they may deem proper.

THE STATE OF TEXAS SUBPOENA
PENTEX FOUNDATION VS. GIBBS, ET AL.

453

CAUSE NO. CV-14-41665
-1-

Exhibit F

Page 1 of 3

## ENFORCEMENT OF SUBPOENA

Pursuant to Texas Rules of Civil Procedure No. 176.8, failure by any person without adequate excuse to obey a subpoena upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.

## DUCES TECUM

YOU ARE FURTHER COMMANDED to produce and permit inspection and copying of documents or tangible things in your custody or control as follows (if not otherwise noted, the date is since the inception of Pentex Foundation, November 1, 2008):

1. A true and correct copy of all incorporation paperwork and annual board meeting minutes for Pentex Foundation.

2. A true and correct copy of your resume.

3. A true and correct copy of your professional certificates and qualifications to be a president, chairman, and board member of an international entity.

4. A true and correct copy of all documents showing Albert Barcroft's and Danny Unger's legal authority to act on Pentex Foundation's behalf.

5. True and correct copies of all drafts of the Contract for Sale of Land, Mineral Rights and Royalties and all other Assets or Monies Received from the Estate of Bert Hughes Gibbs, Kathryn G. Gibbs, and/or the Mary L. Houseworth Trust(s) or "The Kathryn Houseworth Gibbs Irrevocable Trust" (the "CSL") since January 1, 2005.

6. True and correct copies of the assignments of the CSL to and from Pentex Foundation.

THE STATE OF TEXAS SUBPOENA
PENTEX FOUNDATION VS. GIBBS, ET AL.

CAUSE NO. CV-14-41665
-2-

Exhibit F

454

Page 2 of 3

The subpoena is prepared and issued for Defendants Kenneth Gibbs and Candace Walton, by Counsel, in accordance with Rule 176 of the Texas Rules of Civil Procedure.

Issued on September, 2, 2014.

LAW OFFICES OF CHRISTY LEE, P.C.

Christy L. Lee
Texas State Bar No. 24052302
777 Main Street, Suite 600
Fort Worth, TX 76102
Office: (817) 504-6075
Fax: (800) 437-7901
clee@christyleelaw.com

ATTORNEY FOR KENNETH GIBBS
AND CANDACE WALTON

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was delivered, pursuant to Texas Rules of Civil Procedure and Rule 11 Agreement, to the following parties on this 2nd day of September, 2014:

Pentex Foundation *and*                        Via fax and email
GBU Friends and Associates Trust
c/o Scott Smith, Attorney of Record
120 South Crockett Street
Sherman, TX 75091-0354

Howard Kirk Gibbs                               Via mail and email
9929 Crawford Farm Drive
Fort Worth, TX 76244

Christy L. Lee

THE STATE OF TEXAS SUBPOENA
*PENTEX FOUNDATION VS. GIBBS, ET AL.*

CAUSE NO. CV-14-41665
-3-
Exhibit F

Page 3 of 3

455

CAUSE NO. CV-14-41665

| | | |
|---|---|---|
| PENTEX FOUNDATION | ) | IN THE DISTRICT COURT |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | 336TH JUDICIAL DISTRICT |
| | ) | |
| KENNETH VERN GIBBS; AND | ) | |
| CANDACE GIBBS WALTON; AND | ) | |
| HOWARD KIRK GIBBS, | ) | |
| DEFENDANTS. | ) | FANNIN COUNTY, TEXAS |

## NOTICE OF HEARING

COME NOW, Candace Walton and Kenneth Gibbs, Defendants, by and through their counsel of record, Law Offices of Christy Lee, P.C., and notice you of a hearing scheduled concerning Defendants' Motion for Leave of Court to File Third-Party Petition. This hearing is set for **September 30, 2014, from 8:30 AM to 12 PM,** in 336th Judicial District Court of Fannin County, Texas.

Respectfully submitted,

LAW OFFICES OF CHRISTY LEE, P.C.

Christy L. Lee
Texas State Bar No. 24052302
777 Main Street, Ste. 600
Fort Worth, Texas 76102
(817) 504-6075
(800) 437-7901 - Fax
clee@christyleelaw.com

NOTICE OF HEARING
*PENTEX FOUNDATION V. GIBBS, ET AL.*

CAUSE NO. CV-14-41665
-1-



## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above Notice of Hearing was delivered, pursuant to Texas Rules of Civil Procedure, to the following parties on this 19th date of September, 2014:

| Party: | Via: |
|---|---|
| Howard Kirk Gibbs<br>4360 Western Center Blvd., No. 205<br>Fort Worth, TX 76157 | Mail<br>Email: hkgibbs@gmail.com |
| Pentex Foundation **and**<br>GBU Family and Friends Trust<br>c/o Scott Smith, Attorney<br>120 South Crockett Street<br>Sherman, TX 75091-0354 | Mail<br>Email: smithlaw@airmail.net |

Christy L. Lee

457

CAUSE NO. CV-14-41665

PENTEX FOUNDATION ) IN THE DISTRICT COURT
    PLAINTIFF, )
)
VS. ) 336TH JUDICIAL DISTRICT
)
KENNETH VERN GIBBS; AND )
CANDACE GIBBS WALTON; AND )
HOWARD KIRK GIBBS, )
    DEFENDANTS. ) FANNIN COUNTY, TEXAS

## DEFENDANTS' MOTION TO COMPEL DISCOVERY FROM GBU FRIENDS AND ASSOCIATES TRUST

Come now, Defendants Kenneth "Ken" Vern Gibbs and Candace "Candy" Walton, through their Counsel of Record, Law Offices of Christy Lee, P.C., and file this Motion to Compel Discovery from GBU Friends and Associates Trust ("GBU Trust"), Intervenor. Ken served GBU Trust his First Request for Discovery on August 12, 2014. Attached as Exhibit A is Joshua Unger, Trustee's Response to Discovery from Kenneth Gibbs ("Ken").

## II. MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS AND RESPONSES TO INTERROGATORIES AND ADMISSIONS BY JOSHUA UNGER, AS TRUSTEE

### Production of Documents.

1. GBU Trust served incomplete documentation to Ken on September 3, 2014. GBU Trust objected to the allowable production of information crucial to Ken's defense. GBU Trust indicated that it would supplement documentation as found. To date, no amended documentation has been produced. Ken seeks an Order overruling the objections of Joshua Unger, as Trustee of GBU Trust, and compelling discovery as follows:

> Request for Production Nos. 2, 4 – 5, 7, 9 – 11, 14 – 18, 21 – 25, 33, 36, 38 – 39, 41 – 54, 57 – 59, 62, 64, and 68 – 72.

458



Ken appeals to the Court because GBU Trust's objections to production requests were not appropriate, as follows:

2. GBU Trust objected to Request for Production Nos. 2, 7, 9 – 11, 14 - 18, 21, 23 – 25, 41 – 54, 57 – 59, 62, and 68, based on the joint defense doctrine. The documentation requested is not covered by the joint defense doctrine, as none of the involved parties are argued or proven to be allied litigants. *In re XL Specialty Insurance Company and Cambridge Integrated Services, Group, Inc.*, 2012 WL 2476851 (Tex. June 29, 2012). The documentation requested involves evidence relating to the following:

A. Pentex Foundation as the Beneficiary to GWB Trust;
B. Albert Barcroft's involvement with GWB Trust;
C. Danny Unger's involvement with GWB Trust;
D. Danny Unger's involvement with GBU Trust as relates to this Cause;
E. Danny Unger's involvement as it relates to Pentex Royalty Trust;
F. Albert Barcroft's knowledge of the distributions of the attorneys' fees by the Estate of Bert Hughes Gibbs ("the Estate");
G. Albert Barcroft's involvement with Pentex Royalty Trust;
H. Albert Barcroft's communications concerning distributions from the Estate and distributions of attorneys' fees by the Estate;
I. Albert Barcroft's communications concerning Pentex;
J. Communications with Ken concerning distributions of the Estate's attorneys' fees;
K. Communications with Beverly Miller concerning this lawsuit, Tarrant County Probate Court No. 2 Cause No. 2005-0000146-2-D, Pentex, GBU Trust, GWB Trust, distributions from the Estate, distributions of attorneys' fees by the Estate, distributions from GWB Trust, and Albert Barcroft;
L. Communications with Howard Kirk Gibbs concerning GBU Trust, Pentex, Pentex Trust, GWB Trust, the Heirs to the Estate, distributions from the Estate, distributions of attorneys' fees by the Estate, and this lawsuit; and
M. Communications with Danny Unger concerning Pentex, distributions from the Estate, attorneys' fees distributed by the Estate; and communications involving transfers in which Albert Barcroft engaged on behalf of Pentex, Pentex Royalty Trust, Renhaw, Inc., GBU Trust, and any other entity.

3. Request for Production Nos. 4 and 64 are allowable and not protected from discovery. Albert Barcroft, creator of Pentex Foundation, Pentex Royalty Trust, GWB Trust, and GBU Trust, and Joshua Unger, Trustee of GBU Trust, are both known tax protesters. GBU Trust was fraudulently created in order to avoid paying federal income taxes and continue their tax fraud schemes. Tax returns and information relevant to tax returns are discoverable when they are relevant to the cause or when they are likely to lead to relevant information concerning the cause. *Hall v. Lawlis*, 907 S.W.2d 493 (Tex. 1995); *Chamberlain v. Cherry*, 818 S.W.2d 201 (Amarillo 1991). Crime, including fraud, is an exception to the assertion of client-attorney

459



privilege. Plaintiff and Counsel are engaged in fraud before this Court, and Plaintiff is committing tax fraud. The objection to No. 64 as overly broad is ridiculous. No. 64 specifically asks, "Produce any copy of any payments you made to the Internal Revenue Service of Department of Treasury," and No. 4 states, "Produce a copy of your IRS Form 1041 for 2013."

4.    The objection of invasion of privacy and harassment to Request for Production Nos. 5, and 69 - 72 is not appropriate, and frankly ridiculous. *Axelson, Inc. v. McIlhany*, 798 S.W.2d 500, 553 (Tex. 1990). The Request seeks information about income to GBU Trust, which was established solely to receive distributions from GWB Trust. GBU Trust states that it has not received the money from GWB Trust to which it is entitled. Defendants strongly object to this assertion and lawsuit. Defendants are entitled to know how much money GBU Trust has received. All related discovery, including GBU Trust's distributions to members, is allowable, as the discovery is likely to lead to discovery relevant to this Cause. Again, the objection to "outside scope of legitimate discovery" is not an appropriate objection.

5.    The objection of overly broad categories to Request for Production Nos. 5, 22, 33, 36, 38, 39, and 64 is not appropriate. The Requests posit that the information requested is to date back to the inception of GBU Trust (November 1, 2013). Again, the objection to "outside scope of legitimate discovery" is not an appropriate objection. Also, see No. 4 above. In addition, in response to No. 22 ("produce all documents upon which you base the claims that you are the 'real party in interest in this suit . . .'"), the response was, "objection as it is overly broad and invades work product [and protected]." What? How is this overly broad? And even more confusing, why is GBU Trust refusing to provide information concerning its declaration that it is the real party in interest in this litigation? Defendants are entitled to this information, as it is likely to be a crucial element in their defense.

6.    The objection of work product and client-attorney privilege to Request for Production Nos. 22, and 38 - 39 is not appropriate. Such an objection points to furtherance of fraud. *Jim Walter Homes, Inc. v. Foster*, 593 S.W.2d 749, 752 (Tex. Civ. App. – Eastland 1979, no writ). Texas Rules of Evidence Rule No. 503(d)(1). As Intervenor, GBU Trust must provide evidence of the claims to the assets currently under dispute. Joshua Unger, as Trustee of GBU Trust, was not involved with the Estate's calculations for the attorneys' fees in dispute. No client-attorney privilege or work product privilege can attach. Also, see No. 5 above.

7.    The objection of falling outside the scope of legitimate discovery to Request for Production Nos. 6, 64, and 69 – 72 is not an appropriate objection to discovery, and all information should be produced immediately, as that information promises to lead to discovery highly relevant to this Cause.

**Responses to Interrogatories.**

8.    The objections to Interrogatory No. 2 and 4 as being outside the scope of permissible discovery and overly broad and assuming facts not in evidence are not appropriate. The Interrogatories ask for specific information concerning GBU Trust's relationship to the CSL



and FSA, and GBU Trust's intervention in this lawsuit. The answers to the Interrogatories promise to lead to relevant information concerning this lawsuit. Facts presented in the Interrogatories are not assumed, but evidenced by information provided by GBU Trust.

## Responses to Admissions.

9.  The response to Request for Admission No. 50 is not appropriate. GBU Trust claims to have made reasonable inquiry concerning calculations for percentages due Heirs from the Estate, as calculated by Albert Barcroft, but GBU Trust was unable to obtain the information. Counsel for GBU Trust admitted to having repeated contact with Albert Barcroft and could easily respond with an admission or denial.

10.  The objection to Request for Admission No. 65 is not appropriate. The Request addresses the creation of the CSL, which Plaintiff argues is crucial to this lawsuit. The Request does not fall outside the scope of legitimate discovery, as an Admission or Denial promises to lead to relevant discovery.

## II. PRAYER TO THE COURT.

Ken respectfully prays that the Court:

11.  Compel GBU Trust and its Trustee, Joshua Unger to comply with this discovery request;

12.  GBU Trust should pay all attorney fees associated with the drafting and presentation of this Motion; and

13.  And any other relief the Court finds appropriate.

Respectfully submitted,

LAW OFFICES OF CHRISTY LEE, P.C.

Christy L. Lee
Texas State Bar No. 24052302
777 Main Street, Ste. 600
Fort Worth, Texas 76102
(817) 504-6075
(800) 437-7901 - Fax
clee@christyleelaw.com

DEFENDANTS' MOTION TO COMPEL DISCOVERY
FROM GBU FRIENDS AND ASSOCIATES TRUST
PENTEX FOUNDATION V. GIBBS, ET AL.

CAUSE NO. CV-14-41665
-4-

ATTORNEY FOR CANDACE WALTON AND
KENNETH GIBBS

## CERTIFICATE OF CONFERENCE

This document was provided to Scott Smith on September 22, 2014, concerning the production of discovery as requested in Kenneth Vern Gibbs's First Request for Discovery to GBU Friends and Associates Trust. Scott Smith did not comply with any of the request in this document, nor responded to my email, and refused to take my phone call. Agreement could not be reached; therefore, it is presented to the Court for determination.

_____
Christy L. Lee

## FIAT

This Motion to Compel Discovery from GBU Friends and Associates Trust is set for hearing on the _____ day of _____, 2014, in the 336th Judicial District Court of Fannin County, Texas, at _____ ____M.

_____
Judge Presiding

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above Defendants' Motion to Compel Discovery from GBU Friends and Associates Trust was delivered, pursuant to Texas Rules of Civil Procedure, to the following parties on this 25th date of September, 2014:

Party:                              Via:

Howard Kirk Gibbs                   Mail
4360 Western Center Blvd., No. 205  Email: hkgibbs@gmail.com
Fort Worth, TX 76157



Pentex Foundation, **and**
GBU Friends and Associates Trust
c/o Scott Smith, Attorney of Record
120 South Crockett Street
Sherman, TX  75091-0354

Email: smithlaw@airmail.net
Fax:


_____
Christy L. Lee

463



| PENTEX FOUNDATION, | § | IN THE DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| V. | § | |
| | § | FANNIN COUNTY, TEXAS |
| | § | |
| KENNETH VERN GIBBS, CANDACE | § | |
| GIBBS WALTON and HOWARD | § | |
| KIRK GIBBS, *Defendants* | § | 336th JUDICIAL DISTRICT |

## JOSHUA UNGER, TRUSTEE'S RESPONSE
## TO DISCOVERY FROM KENNETH GIBBS

TO: Kenneth Vern Gibbs, by and through his attorney of record.

COMES NOW, Joshua Unger, Trustee of the GBU Friends and Associates Trust, Intervenor, files this its response to the First Request for Discovery received on August 12, 2014, and would show as follows:

### GENERAL OBJECTION

The discovery was served upon "GBU Friends and Associates Trust", when in reality the Intervenor is Joshua Unger, Trustee of the GBU Friends and Associates Trust. Intervenor assumes this is an oversight, and will respond in his capacity as Intervenor.

Intervenor objects to the Instructions and Definitions to the extent they enlarge the responsibilities of a litigant under the Texas Rules of Civil Procedure. The Intervenor will respond subject to the Rules.

Intervenor objects to producing any documents in the offices of counsel. To the extent there are documents to be produced, they will be produced at the offices of counsel for the responding party.

Submitted herewith are documents marked as Plaintiff/Intervenor 00001-000257.

### RESPONSE TO DISCOVERY REQUESTS

REQUEST FOR PRODUCTION NO. 1: Produce all documents dating back to September 1, 2008, that you have in your possession concerning the GWB Trust.

RESPONSE: None

JOSHUA UNGER, TRUSTEE'S RESPONSE TO DISCOVERY FROM KENNETH GIBBS     .     Page 1



Exhibit A

Page 1 of 31

REQUEST FOR PRODUCTION NO. 2: Produce all documents dating back to May 1, 2008, that you have in your possession concerning Pentex.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections, see, the Pentex Foundation organization papers and the demand that assigned its share of the Contract to GBU Trust. Plaintiff/Intervenor 000001-000022, 000027-000033, 000035-000040, 000135-000256.

REQUEST FOR PRODUCTION NO. 3: Produce all documents proving your existence and validity, including a true and correct copy of the original Trust document, names of all Trustees who have served since your inception, and names of your members and beneficiaries.

RESPONSE: See, Plaintiff/Intervenor 000041-000049.

REQUEST FOR PRODUCTION NO. 4: Produce a copy of your IRS Form 1041 for 2013.

RESPONSE: Objection, the request is made merely to harass and no other purpose, as tax returns are generally not discoverable, see *Hall v. Lawlis*, 907 SW2d 493 (Tex. 1995); *Chamberlain v. Cherry*, 818 SW2d 201 (Amarillo 1991).

REQUEST FOR PRODUCTION NO. 5: Produce a copy of all monthly statements from all bank accounts (or any accounts owned through other financial institutions) owned by GBU Trust from the date of your inception to the present.

RESPONSE: Intervenor objects to this request as outside the scope of legitimate discovery, invasive of privacy, and overly broad.

REQUEST FOR PRODUCTION NO. 6: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with any representative of ConocoPhillips concerning you yourself, Albert, GWB Trust, Pentex, Pentex Trust, or the Estate as it relates to GWB Trust or GWB Trust.

RESPONSE: The Intervenor is searching for documents, if any, which may be responsive to this request. If any such documents are located this response will be supplemented.

465

Exhibit A

Page 2 of 3

REQUEST FOR PRODUCTION NO. 7: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Albert concerning GWB Trust.

 RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections, no such documents exist.

REQUEST FOR PRODUCTION NO. 8: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Howard Kirk concerning GWB Trust.

 RESPONSE: No such documents exist.

REQUEST FOR PRODUCTION NO. 9: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Danny Unger concerning GWB Trust.

 RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections, no such documents exist.

REQUEST FOR PRODUCTION NO. 10: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Danny Unger concerning GBU Trust.

 RESPONSE: Intervenor objects to any such communications initiated after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, Intervenor is searching for any responsive documents and if they are located this response will be supplemented.

REQUEST FOR PRODUCTION NO. 11: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Danny Unger concerning Pentex Trust.

 RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767

466

Exhibit A

Page 3 of 3

S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections, no such documents exist except as may be indetified in response to Request for Production number 2.

REQUEST FOR PRODUCTION NO. 12: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Ken concerning GWB Trust.

RESPONSE: No such documents exist.

REQUEST FOR PRODUCTION NO. 13: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Ken concerning Pentex Trust.

RESPONSE: No such documents exist.

REQUEST FOR PRODUCTION NO. 14: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Albert concerning the Estate's distributions of assets and the calculations of the Heirs' attorneys' fees related to services involving the settlement of the Estate.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections, no such documents exist.

REQUEST FOR PRODUCTION NO. 15: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Albert concerning Pentex Trust.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections, no such documents exist.

REQUEST FOR PRODUCTION NO. 16: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had from Albert concerning distributions from the Estate.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections, no such documents exist.



REQUEST FOR PRODUCTION NO. 17: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Albert concerning Pentex.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections, no such documents exist.

REQUEST FOR PRODUCTION NO. 18: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Ken, individually, as having any authority or influence on the distributions of the Estate attorney fees.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections, no such documents exist.

REQUEST FOR PRODUCTION NO. 19: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Candy, individually, as having any authority or influence on the distributions of the Estate attorney fees.

RESPONSE: No such documents exist.

REQUEST FOR PRODUCTION NO. 20: Produce all documents related to Pentex Trust's interest in the Estate and GWB Trust, and dating back to the date of your inception, including, but not limited to, documents verifying GWB Trust's existence, letters, emails, bank records, correspondence, and accountings.

RESPONSE: No such documents exist.

REQUEST FOR PRODUCTION NO. 21: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Beverly Miller involving Pentex.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections, no such documents exist.

REQUEST FOR PRODUCTION NO. 22: Produce all documents upon which you base the claims that you are the "real party in interest in this suit," including, but not limited to, correspondence, contracts, agreements, assignments of interest, and transfers.

Exhibit

Page 5 of

RESPONSE: Intervenor objects as overly broad and invade the work product exemption from discovery and the attorney/client privilege. Whether a document relates to a legal contention made in the pleadings is plainly a determination made by legal counsel, or at best, a determination made by and between counsel and client. Absent a rule to the contrary, these determinations are protected information. TEX. R. CIV. P. 197.1 allows "contention" interrogatories: "An *interrogatory* may inquire whether a party makes specific legal or factual contentions . . .. (emphasis added). Thus, for interrogatories, by rule there can be no objection that contention interrogatories invade the attorney/client or work product exemption. There is no such corresponding rule for requests for production. Subject to this objection, see Plaintiff/Intervenor 000040-000049.

REQUEST FOR PRODUCTION NO. 23: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Beverly Miller concerning GBU Trust.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections, no such documents exist.

REQUEST FOR PRODUCTION NO. 24: Produce any communications dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Beverly Miller concerning GWB Trust.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections, no such documents exist.

REQUEST FOR PRODUCTION NO. 25: Produce any communications dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Beverly Miller concerning Albert.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to these objections, no such documents exist.

REQUEST FOR PRODUCTION NO. 26: Produce all documents and communications dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Rickey Brantley concerning the Estate's distributions to Heirs and the calculations of the Heirs' attorneys' fees.

RESPONSE: No such documents exist.

Exhibit A

Page 6 of 31

469

REQUEST FOR PRODUCTION NO. 27: Produce all documents and communications dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Scott Pelley concerning the Estate's distributions to Heirs and the calculations of the Heirs' attorneys' fees.

RESPONSE: No such documents exist.

REQUEST FOR PRODUCTION NO. 28: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with any representative of JW Operating Company concerning you yourself, Albert, GWB Trust, Pentex Trust, Pentex, or the Estate as it relates to distributions to GWB Trust.

RESPONSE: No such documents exist.

REQUEST FOR PRODUCTION NO. 29: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with any representative of Trio Consulting and Management, LLC, concerning you yourself, Albert, GWB Trust, Pentex Trust, GBU Trust, or the Estate as it relates to distributions to GWB Trust.

RESPONSE: No such documents exist.

REQUEST FOR PRODUCTION NO. 30: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with any representative of Devon Energy concerning you yourself, Albert, GWB Trust, Pentex Trust, Pentex, or the Estate as it relates to distributions to GWB Trust.

RESPONSE: No such documents exist.

REQUEST FOR PRODUCTION NO. 31: Produce all documentation dating back to the date of your inception, which you have concerning Renhaw, Inc., including the transfer of rights of the CSL to Pentex, letters, emails, tape recordings, and any other records involving Renhaw, Inc.

RESPONSE: No such documents exist.

REQUEST FOR PRODUCTION NO. 32: Produce all documentation dating back to May 1, 2008, which is in your possession relating to the Estate's calculations of the Heirs' attorneys' fees and the method by which the attorneys' fees were distributed.

RESPONSE: No such documents exist except as may be indetified in response to Request for Production number 2.

REQUEST FOR PRODUCTION NO. 32: Produce all documentation dating back to May 1, 2008, which is in your possession relating to GWB Trust.

470



Exhibit A

Page 7 of 31

RESPONSE: No such documents exist except as may be indetified in response to Request for Production number 2.

REQUEST FOR PRODUCTION NO. 33: Produce all documentation dating back to May 1, 2008, which is in your possession relating to Pentex.

RESPONSE: Objection. This request is overly broad. Subject to this objection, see the documents produced in response to Request for Production 2.

REQUEST FOR PRODUCTION NO. 34: Produce all documentation dating back to September 1, 2005, which is in your possession relating to the CSL.

RESPONSE: The Intervenor has a copy of the CSL.

REQUEST FOR PRODUCTION NO. 35: Produce all documentation dating back to May 1, 2008, which is in your possession relating to the FSA.

RESPONSE: The Intervenor has a copy of what is believed to be the FSA.

REQUEST FOR PRODUCTION NO. 36: Produce all documentation dating back to May 1, 2008, which is in your possession relating to Pentex Foundation.

RESPONSE: Objection. This request is overly broad. Subject to this objection, see the documents produced in response to Request for Production 2.

REQUEST FOR PRODUCTION NO. 37: Produce all contracts with the gas companies with whom you do business and in whose contracts with you in which Ken allegedly tortuously interfered, as claimed in your Petition in Intervention.

RESPONSE: Intervenor is searching for any responsive documents and will supplement if they become available.

REQUEST FOR PRODUCTION NO. 38: Produce all evidence, including calculations, records, accountings, books, and other documents upon which you base your claim that the Estate deducted contingent attorneys' fees owing by Defendants prior to making distributions to GWB Trust.

RESPONSE: Objection. This request is overly broad and fails to direct Plaintiff to any class or type of documents. *See, Loftin v. Martin*, 766 S.W.2d 145 (1989). Additionally, this invades the work product exemption and attorney client privilege, as the determination of evidence is one made by counsel in consultation with the client.

REQUEST FOR PRODUCTION NO. 39: Produce all evidence, including calculations, records, accountings, books, and other documents upon which you base your claim that Candy and Ken individually are responsible for the distributions to

471

Exhibit A

Page 9 of 31



Beneficiaries by GWB Trust.

RESPONSE: Objection. This request is overly broad and fails to direct Plaintiff to any class or type of documents. *See, Loftin v. Martin,* 766 S.W.2d 145 (1989). Additionally, this invades the work product exemption and attorney client privilege, as the determination of evidence is one made by counsel in consultation with the client.

REQUEST FOR PRODUCTION NO. 40: Produce all documents that you have in your possession related to the Estate's distributions to GWB Trust as related to royalties from oil and gas companies.

RESPONSE: No such documents exist.

REQUEST FOR PRODUCTION NO. 41: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Howard Kirk concerning GBU Trust.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales,* 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, no such documents exist.

REQUEST FOR PRODUCTION NO. 42: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Howard Kirk concerning Pentex.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales,* 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, no such documents exist.

REQUEST FOR PRODUCTION NO. 43: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Howard Kirk concerning this lawsuit.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales,* 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding).

REQUEST FOR PRODUCTION NO. 44: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Beverly Miller or Sharron Cox concerning this lawsuit.

RESPONSE: Intervenor objects to any such documents created after the

472

Exhibit ___

Page ___9___ of ___3___

anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, no such documents exist.

REQUEST FOR PRODUCTION NO. 45: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Howard Kirk concerning Pentex Trust.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, no such documents exist.

REQUEST FOR PRODUCTION NO. 46: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Howard Kirk concerning the Estate as it concerns its distributions to GWB Trust or to the Heirs.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, no such documents exist.

REQUEST FOR PRODUCTION NO. 47: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Beverly Miller or Sharron Cox concerning Pentex Trust.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, no such documents exist.

REQUEST FOR PRODUCTION NO. 48: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Danny Unger concerning Pentex.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, no such documents exist except as may be indetified in response to Request for Production number 2.

REQUEST FOR PRODUCTION NO. 49: Produce any communication dating back to

473



**Exhibit**

Page __10__ of __3I__

the date of your inception, including letters, tape recordings, or emails, that you have had with Beverly Miller or Sharron Cox concerning distributions from the Estate.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, no such documents exist.

REQUEST FOR PRODUCTION NO. 50: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Danny Unger concerning distributions from the Estate.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, no such documents exist.

REQUEST FOR PRODUCTION NO. 51: Produce any communication dating back to the date of your inception, including letters, tape recordings, or emails, that you have had with Howard Kirk concerning distributions from the Estate.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, no such documents exist.

REQUEST FOR PRODUCTION NO. 52: Produce any communication dating back to May 1, 2008, including letters, tape recordings, or emails, that you have had with Danny Unger concerning attorney fee distributions from the Estate.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, no such documents exist.

REQUEST FOR PRODUCTION NO. 53: Produce any communication dating back to May 1, 2008, including letters, tape recordings, or emails, that you have had with Albert concerning attorney fee distributions from the Estate.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, no such documents exist.

474



REQUEST FOR PRODUCTION NO. 54: Produce any communication dating back to May 1, 2008, including letters, tape recordings, or emails, that you have had with Howard Kirk concerning attorney fee distributions from the Estate.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, no such documents exist.

REQUEST FOR PRODUCTION NO. 55: Produce any communication dating back to May 1, 2008, including letters, tape recordings, or emails, that you have had with Ken concerning attorney fee distributions from the Estate.

RESPONSE: No such documents exist.

REQUEST FOR PRODUCTION NO. 56: Produce any communication dating back to May 1, 2008, including letters, tape recordings, or emails, that you have had with Candy concerning attorney fee distributions from the Estate.

RESPONSE: No such documents exist.

REQUEST FOR PRODUCTION NO. 57: Produce any communication dating back to May 1, 2008, including letters, tape recordings, or emails, that you have had with Beverly Miller or Sharron Cox concerning attorney fee distributions from the Estate.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, no such documents exist.

REQUEST FOR PRODUCTION NO. 58: Produce any communication dating back to May 1, 2008, including letters, tape recordings, or emails, that you have had with Beverly Miller or Sharron Cox concerning the distribution of GWB Trust assets.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, no such documents exist.

REQUEST FOR PRODUCTION NO. 59: Produce any communication dating back to May 1, 2008, including letters, tape recordings, or emails, that Pentex has had with Beverly Miller or Sharron Cox concerning the distribution of GWB Trust assets.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine"

475

Exhibit A
Page 12 of 3


recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, no such documents exist.

REQUEST FOR PRODUCTION NO. 60: Produce any communication dating back to May 1, 2008, including letters, tape recordings, or emails, that you have had with the Estate or its representatives concerning the FSA.

RESPONSE: No such documents exist.

REQUEST FOR PRODUCTION NO. 61: Produce any communication dating back to May 1, 2008, including letters, tape recordings, or emails, that you have had with the Estate or its representatives concerning the CSL.

RESPONSE: No such documents exist.

REQUEST FOR PRODUCTION NO. 62: Produce any communication dating back to May 1, 2008, including letters, tape recordings, or emails, relevant to transfers of GWB Trust interest in which Albert engaged, either on his own behalf, or on behalf of Pentex; Pentex Trust; Renhaw, Inc.; GBU Trust; or any other entity in which he was an interested party.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, see the response to Request for Production number 2.

REQUEST FOR PRODUCTION NO. 63: Produce all documentation in your possession dating back to May 1, 2008, regarding the FSA.

RESPONSE:See the response to request for production 35.

REQUEST FOR PRODUCTION NO. 64: Produce a copy of any payments you made to the Internal Revenue Service or Department of Treasury.

RESPONSE: Intervenor objects to this request as outside the scope of legitimate discovery, invasive of privacy, and overly broad.

REQUEST FOR PRODUCTION NO. 65: Produce all documents in your possession dating back to May 1, 2008, regarding the CSL.

RESPONSE: See the response to Request for Production number 34.

REQUEST FOR PRODUCTION NO. 66: Produce all communication and documents you have had with Ken regarding distribution of Estate funds for attorney fees on behalf of Ken, Candy, or Howard Kirk.

476



RESPONSE: No such documents exist.

REQUEST FOR PRODUCTION NO. 67: Produce all communication and documents you have had with Rickey Brantley or Scott Pelley regarding distribution of Estate funds for attorney fees on behalf of Ken, Candy, or Howard Kirk.

RESPONSE: No such documents exist.

REQUEST FOR PRODUCTION NO. 68: Produce all communication and documents you have had with Beverly Miller or her attorney Sharron Cox with regards to this lawsuit or the Tarrant case.

RESPONSE: Intervenor objects to any such documents created after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding). Subject to this objection, no such documents exist.

REQUEST FOR PRODUCTION NO. 69: Produce all documentation concerning transfers and distributions to/from GBU Trust assets dating from its inception to the present, including assignments of interest and distributions to all beneficiaries and other parties of monies, real property, and personal properties.

RESPONSE: Intervenor objects as this is outside the scope of legitimate discovery, and submitted solely for the purpose of invasion of privacy and harassment.

REQUEST FOR PRODUCTION NO. 70: Produce an inventory of all assets held by GBU Trust, dating back to its inception.

RESPONSE: Intervenor objects as this is outside the scope of legitimate discovery, and submitted solely for the purpose of invasion of privacy and harassment.

REQUEST FOR PRODUCTION NO. 71: Produce documentation concerning membership interest in GBU Trust.

RESPONSE: Intervenor objects as this is outside the scope of legitimate discovery, and submitted solely for the purpose of invasion of privacy and harassment.

REQUEST FOR PRODUCTION NO. 72: Produce documentation concerning any and all monies you have received from the oil and gas companies.

RESPONSE: Intervenor objects as this is outside the scope of legitimate discovery, and submitted solely for the purpose of invasion of privacy and harassment.

477



Exhibit A

Page 14 of 31

REQUEST FOR PRODUCTION NO. 73: Produce documentation or communication in which Albert transferred any and all interest in the CSL to Renshaw, Pentex, Pentex Trust, and GBU Trust.

    RESPONSE: Except as was produced in response to Request for Production number 2, no such documents exist within the possession of Intervenor.

REQUEST FOR PRODUCTION NO. 74: Produce documentation or communication in which Albert transferred any and all interest in the FSA to Renshaw, Pentex, Pentex Trust, and GBU Trust.

    RESPONSE: Except as was produced in response to Request for Production number 2, no  such documents exist within the possession of Intervenor.

REQUEST FOR PRODUCTION NO. 75: Produce documentation or communication in which Renshaw transferred any and all interest in the CSL to Albert, Pentex, Pentex Trust, and GBU Trust.

    RESPONSE: Except as was produced in response to Request for Production number 2, no such documents exist within the possession of Intervenor.

REQUEST FOR PRODUCTION NO. 76: Produce documentation or communication in which Renshaw transferred any and all interest in the FSA to Albert, Pentex, Pentex Trust, and GBU Trust.

    RESPONSE: Except as was produced in response to Request for Production number 2, no such documents exist within the possession of Intervenor.

REQUEST FOR PRODUCTION NO. 77: Produce documentation or communication in which Pentex transferred any and all interest in the CSL to Albert, Renshaw, Pentex Trust, and GBU Trust.

    RESPONSE: Except as was produced in response to Request for Production number 2, no such documents exist within the possession of Intervenor.

REQUEST FOR PRODUCTION NO. 78: Produce documentation or communication in which Pentex transferred any and all interest in the FSA to Albert, Renshaw, Pentex Trust, and GBU Trust.

    RESPONSE: Except as was produced in response to Request for Production number 2, no such documents exist within the possession of Intervenor.

REQUEST FOR PRODUCTION NO. 79: Produce documentation or communication in which GBU Trust transferred any and all interest in the CSL to anyone or any entity.

    RESPONSE:    No such documents exist.

478

Exhibit _A_

Page _15_ of _31_

REQUEST FOR PRODUCTION NO. 80: Produce documentation or communication in which GBU Trust transferred any and all interest in the FSA to anyone or any entity.

      RESPONSE:     No such documents exist.

INTERROGATORY NO. 1: Fully detail and explain your claim that you are the "real party in interest in this suit," rather than Pentex, the Original Plaintiff, including how you arrived at the status of being the "real party in interest in this suit" and explain in detail your reasoning for not being the Original Plaintiff in this suit, while Pentex, whom you deny is the "real party in interest," initiated this suit.

      ANSWER:   Intervenor objects to this interrogatory as outside the scope of permissible discovery and overly broad. Interrogatories may be used to ascertain basic legal and factual claims and defenses, but may not be used to force a party to marshal evidence." *See*, Rule 197 of the Texas Rules of Civil Procedure, at comment 1. Subject to this objection, Intervenor answers as follows:

      GBU Trust accepted the contribution from Pentex Foundation as one of the settlors to GBU Trust. As such, GBU Trust has full ownership at this point of time of the interests Pentex Foundation did hold in the "Contract for Sale of Land, Mineral Rights and Royalties, and all other Assets or Monies Received from the Estate of Bert Hughes Gibbs, Kathryn G. Gibbs, and/or the Mary L. Houseworth Trust(s)", referred to herein throughout as "Contract". The fact that GBU Trust should have been a co-plaintiff in this suit from the beginning was an oversight by the original attorney, John Skotnik, which was later corrected.

INTERROGATORY NO. 2: Explain your rationale for entering a lawsuit as Intervenor, when you believe that you are not bound by the agreement previously established by the parties of GWB Trust, the CSL, and the FSA, agreements which form the basis for your intervention, including your relationship to each of the parties you deem to be interested parties to the matter at hand, including explaining why you believe yourself to have interest in the Estate, and why you believe that attorneys' fees belonging to Defendants were being deducted from your alleged share of the Estate.

      ANSWER:   Intervenor objects to this interrogatory as outside the scope of permissible discovery and overly broad. Interrogatories may be used to ascertain basic legal and factual claims and defenses, but may not be used to force a party to marshal evidence." *See*, Rule 197 of the Texas Rules of Civil Procedure, at comment 1. Intervenor further objects that this interrogatory states incorrect and false premises, and as such is incapable of being answered. The trustee of the GBU Trust has never stated that it was not bound by the Contract or the FSA.

INTERROGATORY NO. 3: Provide calculations upon which you base your claim

479

that you are owed in excess of $1 million because of payments due you which were reduced by the amount of attorneys' fees, when GWB Trust was not aware of your alleged existence until November or December 2013 and had never incurred such debt to you.

> ANSWER: The Barcroft share of the Contract was 30% of the shares of the inheritance received by Ken, candy and Howard. Ken, Candy and Howard collectively received 75% of the entire estate; therefore, Pentex Foundation owned 22.5% of the entire estate (75% X 30% = 22.5%). 2.46% of the Pentex share was taken out at the estate level to pay John Skotnik the fees Barcroft owed him, leaving 20.04% being owned by Pentex Foundation. For the first 5 years of distribution, Pentex Foundation has only been receiving 10.02%. That means that Pentex Foundation should have received double what it was paid by GWB Trust. That is over a million dollars. GBU Trust now owns the rights to everything that Pentex Foundation previously owned, including the payment of underpayment of distributions. The only attorney fees that were supposed to reduce the Barcroft share of the Contract are those paid to John Skotnik. See also the computation of damages submitted as Plaintiff/Intervenor 00255-256.

INTERROGATORY NO. 4: Explain why you claim to be entitled to 30% of all proceeds arising from any lawsuit involving Defendants, under the terms of the Contract, when you deny being held to the terms of the Contract; and explain why you request the Court to declare the Contract valid and enforceable if in fact, you cannot be bound by the terms of the Contract; and explain your reasoning for filing the Plaintiffs and Intervener's Motion for Partial Summary Judgment in conjunction with Pentex, revealing a lack of clarity as to which party actually holds interest in GWB Trust.

ANSWER: Intervenor objects to this interrogatory as outside the scope of permissible discovery and overly broad. Interrogatories may be used to ascertain basic legal and factual claims and defenses, but may not be used to force a party to marshal evidence." *See*, Rule 197 of the Texas Rules of Civil Procedure, at comment 1. Intervenor further objects that this interrogatory states incorrect, argumentative, and false premises, and as such is incapable of being answered. The trustee of the GBU Trust has never stated that it was not bound by the Contract or the FSA.

INTERROGATORY NO. 5: Explain your statement that you and Defendants have a long history, when Candy and Ken deny knowing of your existence until late 2013; and

> ANSWER: (Assuming that there should be a period after 2013), the "long history" is with the predecessors, Albert Barcroft and Pentex Foundation; the position that Intervenor now holds.

INTERROGATORY NO. 6: Explain the reasoning behind aligning with Pentex in its claim against Defendants while you yourself insist that you are entitled to the

JOSHUA UNGER, TRUSTEE'S RESPONSE TO DISCOVERY FROM KENNETH GIBBS

480

Exhibit A

Page 17 of 31



exact same assets that Pentex claims from Defendants.

> ANSWER: GBU Trust owns the Pentex Foundation share. Pentex Foundation is simply the settlor of that share, but it does have an interest in the proper collection of that share. The amount is owed only to GBU Trust.

REQUEST FOR ADMISSION NO. 1: Admit or deny that Howard Kirk is a party holding interest in you.

> RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 2: Admit or Deny that Howard Kirk has paid money to Scott Smith or GBU Trust on your behalf in this lawsuit.

> RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 3: Admit or Deny that you were formed in part because discord developed among the members of GWB Trust in 2013.

> RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Subject to this objection: Admit.

REQUEST FOR ADMISSION NO. 4: Admit or Deny that you distribute benefits to Albert.

> RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 5: Admit or Deny that you distribute benefits to Howard Kirk or his immediate family members.

> RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 6: Admit or Deny that you distribute benefits to Danny Unger.

> RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 7: Admit or Deny that at the time of your formation, there was at least one (1) Federal Tax Lien filed against Pentex and that a transfer of GWB Trust interest from Pentex to you might ultimately allow the flow of GWB Trust funds to Albert to continue without substantial interruption.

> RESPONSE: The Intervenor objects to this request as outside the scope of

481

Exhibit A

Page 18 of 37

legitimate discovery, and multifarious. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 8: Admit or Deny that on or around March 17, 2014, Danny Unger called Julie Walker at JW Operating Company and professed to Julie Walker that Danny Unger was the Trustee of GBU Trust.

RESPONSE: Deny that Danny Unger was ever trustee. The Intervenor cannot admit or deny the balance as beyond GBU Trust knowledge.

REQUEST FOR ADMISSION NO. 9: Admit or Deny that you are an alter ego for Albert.

RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 10: Admit or Deny that Albert claimed to be, and served, as your Legal Representative in November and December 2013.

RESPONSE: Deny that Albert was ever our representative, cannot admit or deny the balance as beyond GBU Trust knowledge.

REQUEST FOR ADMISSION NO. 11: Admit or Deny that your suit against Howard Kirk, Heir to the Estate, is a sham, designed to legitimize allegations against Ken individually, as an Heir to the Estate.

RESPONSE: Intervenor objects to this request as argumentative. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 12: Admit or Deny that GWB Trust is a legitimate entity and has distributed to you assets original to the Estate.

RESPONSE: Admit that GWB Trust transferred mineral rights to GBU Trust that were owned by the estate at one time in the distant past, cannot admit or deny as to the legitimacy of GWB Trust.

REQUEST FOR ADMISSION NO. 13: Admit or Deny that you were entitled to demand 57.19% of GWB Trust assets.

RESPONSE: Deny that GBU trust demanded 57.19% of the GWB Trust assets.

REQUEST FOR ADMISSION NO. 14: Admit or Deny that you are a party to the FSA.

RESPONSE: Admit that GBU Trust holds the interests of a party to the estate.

REQUEST FOR ADMISSION NO. 15: Admit or Deny that you intervened in this

482

suit as the "real party in interest" because Pentex's suit against Defendants had no legitimate basis in fact or law.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 16: Admit or Deny that you were established after Candy and Ken demanded an accounting of GWB Trust.

RESPONSE: Admit to the time frame, deny that there was any relevance to the coincidence.

REQUEST FOR ADMISSI ON NO. 17: Admit or Deny that, according to the GWB Trust document, you hold no interest in GWB Trust.

RESPONSE: The Intervenor has made reasonable inquiry and the information known to him or easily obtainable to him is insufficient with which to either admit or deny this request.

REQUEST FOR ADMISSION NO. 18: Admit or Deny that Albert drafted the GBU Trust agreement.

RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 19: Admit or Deny that the GWB Trust owns 35.04% of the assets that are still left in the estate, including real estate.

RESPONSE: Objection. This is a purely legal question which needs to be answered by a court. Subject to this objection, the Intervenor has made reasonable inquiry and the information known to him or easily obtainable to him is insufficient with which to either admit or deny this request.

REQUEST FOR ADMISSION NO. 20: Admit or Deny that you have received assets in excess of the 57.19% interest in GWB Trust which Beverly Miller assigned to you.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 21: Admit or Deny that the Estate was responsible for calculating Defendants' attorneys' fees prior to distributions of Estate assets.

RESPONSE: the Intervenor has made reasonable inquiry and the information known to him or easily obtainable to him is insufficient with which to either admit or deny this request.

REQUEST FOR ADMISSION NO. 22: Admit or Deny that because Candy and Ken individually were, and are, not responsible for the distributions from the Estate

483

Exhibit A

Page 20 of 31

to GWB Trust, Candy and Ken individually are not culpable parties in this case.

RESPONSE: Objection. This request assumes legal conclusions which have not been established and is multifarious.

REQUEST FOR ADMISSION NO. 23: Admit or Deny that your Beneficiaries profit, or have profited, from GWB Trust.

RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 24: Admit or Deny that you have a right to specific performance of the CSL and FSA, even though you allege that you are not bound by the CSL.

RESPONSE: The Intervenor objects to this request as multifarious and asserts facts as true which are not so. The GBU Trust ever alleged that it was not bound by the CSL.

REQUEST FOR ADMISSION NO. 24: Admit or Deny that the in or around November 2013, you, or Albert acting on your or Pentex's behalf, demanded the GWB Trust Trustee, Beverly Miller, to transfer 57.19% of the existing GWB Trust assets into a newly created trust, the GBU Trust.

RESPONSE: Objection to this request as multifarious. Admit that Pentex Foundation demanded a transfer of its contribution to GWB Trust which equaled 57.19% of the assets of GWB Trust.

REQUEST FOR ADMISSION NO. 25: Admit or Deny that you, or Albert acting on your behalf, informed Beverly Miller that, if she did not transfer 57.19% of GWB Trust assets into the GBU Trust, she would be held personally liable for any losses.

RESPONSE: Objection to this request as multifarious. Deny that GBU Trust informed Beverly Miller of anything, cannot admit or deny what Albert did or did not do.

REQUEST FOR ADMISSION NO. 26: Admit or Deny that upon your instructions, or upon instructions from Albert acting on your behalf, Beverly Miller transferred 57.19% interest from GWB Trust to GBU Trust.

RESPONSE: Objection to this request as multifarious. Deny GBU Trust gave any instructions, deny Albert acted on behalf of GBU trust

REQUEST FOR ADMISSION NO. 27: Admit or Deny that you breached the FSA.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 28:. Admit or Deny that your lawsuit against Candy and Ken was filed in part as revenge because of their inquiries into the administration of GWB Trust.

RESPONSE: Intervenor objects to this interrogatory as argumentative. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 29: Admit or Deny that any assignee of Albert's interest in GWB Trust would be entitled to only the amount of interest which he himself held at the time of the assignment.

RESPONSE: Objection. This is a purely legal question which needs to be answered by a court.

REQUEST FOR ADMISSION NO. 30: Admit or Deny that the Estate is responsible for the flow of cash to GWB Trust, which in turn flows to the Beneficiaries.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 31: Admit or Deny that Candy does not have the authority to control the Estate's distributions to the Heirs.

RESPONSE: Intervenor has made reasonable inquiry and the information known to him or easily obtainable to him is insufficient with which to either admit or deny this request.

REQUEST FOR ADMISSION NO. 32: Admit or Deny that Ken does not have the authority to control the Estate's distributions to the Heirs.

RESPONSE: Intervenor has made reasonable inquiry and the information known to him or easily obtainable to him is insufficient with which to either admit or deny this request.

REQUEST FOR ADMISSION NO. 33: Admit or Deny that Howard Kirk cooperated with your intervention in this suit.

RESPONSE: Objection. This request is ambiguous. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 34: Admit or Deny that that you consulted with Danny Unger concerning the Estate's distributions to the Heirs and the Heirs' obligations toward legal fees and that you obtained information from Danny Unger which thus should be confidential, as Danny Unger performed accounting services to GWB Trust.

RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO.35: Admit or Deny that Albert, Beverly Miller, Howard Kirk, Danny Unger, and yourself worked together to transfer 57.19% of GWB Trust assets to GBU Trust.

485

Exhibit A

Page 22 of 31

RESPONSE: Objection. This request is ambiguous. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 36: Admit or Deny that you worked together with Danny Unger to remove 57.19% of the assets from the GWB Trust without authorization.

RESPONSE: Objection. This request is ambiguous. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 37: Admit or Deny that you worked together with Beverly Miller to remove 57.19% of the assets from the GWB Trust without authorization.

RESPONSE: Objection. This request is ambiguous. Subject to this objection: Denied.

REQUEST FOR ADMISSI ON NO. 38: Admit or Deny that you are paying, or have paid, Beverly Miller to cooperate with your instructions concerning GWB Trust.

RESPONSE: Denied.

REQUEST FOR ADMISSI ON NO. 39: Admit or Deny that Candy and Ken are not responsible for any tortious interference between GWB Trust and yourself, as neither Candy nor Ken ever interfered with the appropriate distributions of Albert's approximately one-quarter (1/4) interest in GWB Trust.

RESPONSE: Objection. This request is multifarious. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 40: Admit or Deny that, according to the FSA, Albert is responsible for paying his own attorneys' fees.

RESPONSE: Objection. This request assumes pure legal conclusions which have not been established and would need to be determined by a court.

REQUEST FOR ADMISSION NO. 41: Admit or Deny that that you have a true and correct copy of the FSA.

RESPONSE: Admit that Intervenor thinks he does.

REQUEST FOR ADMISSION NO. 42: Admit or Deny that CSL is not a legally binding document.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 43: Admit or Deny that the Estate's calculations concerning the percentages of the Heirs' interest in the Estate impact GWB Trust.

RESPONSE: Intervenor has made reasonable inquiry and the information known to him or easily obtainable to him is insufficient with which to either

486

admit or deny this request.

REQUEST FOR ADMISSION NO. 44: Admit or Deny that the Estate is being mismanaged.

RESPONSE: Intervenor has made reasonable inquiry and the information known to him or easily obtainable to him is insufficient with which to either admit or deny this request.

REQUEST FOR ADMISSION NO. 45. Admit or Deny that Howard Kirk's wife is a beneficiary interest in GBU Trust.

RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 46: Admit or Deny that the FSA is a legitimate and binding contract.

RESPONSE: Admit

REQUEST FOR ADMISSION NO. 47: Admit or Deny that GWB Trust document, not the CSL or the FSA, establishes the exact percentage of interest which was held by Pentex, and which was allegedly reassigned to you.

RESPONSE: Objection. This request assumes that there is a valid GWB Trust document, which is contested. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 48: Admit or Deny that you drafted, or instructed to be drafted, documents for Howard Kirk to file that you hoped would benefit you in this Cause.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 49: Admit or Deny that Albert assigned John Skotnik a percentage of his interest as detailed in the FSA.

RESPONSE: Intervenor has made reasonable inquiry and the information known to him or easily obtainable to him is insufficient with which to either admit or deny this request.

REQUEST FOR ADMISSION NO. 50: Admit or Deny that it was Albert that provided the calculations for the percentages due Ken, Candy, and Howard Kirk from the Estate and that Albert provided the calculations to the attorneys of the Estate.

RESPONSE: Intervenor has made reasonable inquiry and the information known to him or easily obtainable to him is insufficient with which to either admit or deny this request.

REQUEST FOR ADMISSION NO. 51: Admit or Deny that you, along with Howard Kirk, Danny Unger, Joshua Unger, Albert, and Beverly Miller, all worked together

487

Exhibit A
Page 24 of 31

with the specific intent to deprive GWB Trust of its assets.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 52: Admit or Deny that by you and Howard Kirk Gibbs cooperated and worked with each other to secure assets from GWB Trust to which you were not entitled.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 53: Admit or Deny that your purpose is to receive Albert's distributions from the Estate.

RESPONSE: Admit that one of our purposes is to receive the share of the estate originally owned by Barcroft under the Contract and to have justice served.

REQUEST FOR ADMISSION NO. 54: Admit or Deny that on December 18, 2013, signing in the capacity of "Legal Representative" of Pentex, Albert noticed the Estate, including Ken as independent Administrator of the Estate and the Estate's (3) three attorneys that 30% of GWB's Trust assets must be distributed and made payable to the GBU Trust.

RESPONSE: Intervenor has made reasonable inquiry and the information known to him or easily obtainable to him is insufficient with which to either admit or deny this request.

REQUEST FOR ADMISSION NO. 55: Admit or Deny that Albert is your Legal Representative.

RESPONSE: Denied.

EQUEST FOR ADMISSION NO.56: Admit or Deny that you function as a shell entity for Albert.

RESPONSE: This request is objectionable as it is argumentative. Subject to this request: Denied.

REQUEST FOR ADMISSION NO. 57: Admit or Deny that you, or your representative, assisted Howard Kirk in his Answer and his Admission responses in this case.

RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 58: Admit or Deny that Admit your inclusion of Howard Kirk as a Defendant in this Cause is a smoke screen designed to deflect

488



from the fact that Howard Kirk is cooperating with you in this lawsuit and in the lawsuit filed in Tarrant County, which involves Albert, Howard Kirk, Candy, and Ken.

> RESPONSE: The Intervenor objects to this request as argumentative, and outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 59: Admit or Deny that, under the terms of the FSA, a party who disputes the terms can lose his or her interest in the Estate.

> RESPONSE: This request is objectionable, as the terms of the FSA speak for themselves. Subject to this objection, the Intervenor denies that a dispute to the terms is a cause for loss of interest.

REQUEST FOR ADMISSION NO. 60: Admit or Deny that you worked with Joshua Unger or Danny Unger to remove 57.19% of the assets from GWB Trust without authorization.

> RESPONSE: This request does not make sense, in that Joshua Unger is answering these admissions. Denied.

REQUEST FOR ADMISSION NO. 61: Admit or Deny that Albert is not an attorney.

> RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Subject to this objection: Admit.

REQUEST FOR ADMISSION NO. 62: Admit or Deny that Albert is a member of GBU Trust.

> RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 63: Admit or Deny that Danny Unger is a member of GBU Trust.

> RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 64: Admit or Deny that Howard Kirk is a member of GBU Trust.

> RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 65: Admit or Deny that Albert drafted the CSL.

489

Exhibit _A_

Page _2 6_ of _3 1_



RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 66: Admit or Deny that the name "Albert Barcroft" does not appear on Albert's birth certificate.

RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Intervenor has made reasonable inquiry and the information known to him or easily obtainable to him is insufficient with which to either admit or deny this request.

REQUEST FOR ADMISSION NO. 67: Admit or Deny that Joshua Unger has a criminal history.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 68: Admit or Deny that Danny Unger is a tax protestor.

RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. It is also argumentative, vague and ambiguous.

REQUEST FOR ADMISSION NO. 69: Admit or Deny that Albert is a tax protester.

RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. It is also argumentative, vague and ambiguous.

REQUEST FOR ADMISSION NO. 70: Admit or Deny that GBU Trust was formed to aid Albert's avoidance of having to pay federal taxes in the United States.

RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. It is also argumentative, vague and ambiguous. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 71: Admit or Deny that Albert was Legal Representative for Pentex at the time this lawsuit was initiated, and that he consulted with Scott Smith regarding this lawsuit, but that he deliberately avoided having his name appear in this lawsuit.

RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. It is also argumentative, vague and ambiguous.

REQUEST FOR ADMISSION NO. 72: Admit or Deny that Danny Unger was the initial Trustee of GBU Trust.

490

Exhibit A

Page 27 of 31

RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Subject to this objection: Denied.

REQUEST FOR ADMISSION NO. 73: Admit or Deny that Ken as independent Administrator of the Estate is the person who determined how attorney fees for Ken, Candy, and Howard Kirk were distributed.

RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. Intervenor has made reasonable inquiry and the information known to him or easily obtainable to him is insufficient with which to either admit or deny this request.

REQUEST FOR ADMISSION NO. 74: Admit or Deny that Judge Ferchill during the July 31, 2014, hearing stated that only Ken as independent administrator had the authority to determine how attorney fees for Ken, Candy, and Howard Kirk were distributed.

RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. In addition, even if it was a discoverable fact, a transcript would be the best evidence of what was said in open court as opposed to the vagaries of memory.

REQUEST FOR ADMISSION NO. 75: Admit or Deny that Judge Ferchill during the July 31, 2014, hearing stated that Ken and Candy as individuals had no authority to determine how attorney fees for Ken, Candy, and Howard Kirk were distributed.

RESPONSE: The Intervenor objects to this request as outside the scope of legitimate discovery. In addition, even if it was a discoverable fact, a transcript would be the best evidence of what was said in open court as opposed to the vagaries of memory.

REQUEST FOR ADMISSION NO. 76: Admit or Deny that Albert breached the FSA.

RESPONSE: Intervenor has made reasonable inquiry and the information known to him or easily obtainable to him is insufficient with which to either admit or deny this request.

REQUEST FOR ADMISSION NO. 77: Admit or Deny that Howard Kirk breached the FSA.

RESPONSE: Intervenor has made reasonable inquiry and the information known to him or easily obtainable to him is insufficient with which to either admit or deny this request.

REQUEST FOR ADMISSION NO. 77: Admit or Deny that Howard Kirk sent back Admissions provided from you or Pentex in less than five (5) hours.

491

Exhibit
Page __28__ of __31__


RESPONSE: The Intervenor objects to this request as multifarious and outside the scope of legitimate discovery.

REQUEST FOR ADMISSION NO. 78: Admit or Deny that you or your attorney has consulted with Sharron Cox, the attorney for Beverly Miller.

RESPONSE: Objection. This request is multifarious. It invades the work product exemption from discovery. It invades the attorney/client privilege. It invades the protections for communications made after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding).

REQUEST FOR ADMISSION NO. 79: Admit or Deny that Beverly Miller is a beneficiary of the GBU Trust.

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 80: Admit or Deny that Beverly Miller received some type of benefit when she transferred 57.19% interest to you.

RESPONSE: Objection. This request is vague in that it does not specify from whom she may have a received a benefit, if any. Deny that any benefit was furnished by GBU Trust.

REQUEST FOR ADMISSION NO. 81: Admit or Deny that Beverly Miller or her attorney Sharron Cox has provided you with assistance with this lawsuit or the Tarrant case.

RESPONSE: Objection. This request is multifarious. It invades the work product exemption from discovery. It invades the attorney/client privilege. It invades the protections for communications made after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding).

REQUEST FOR ADMISSION NO. 82: Admit or Deny that you have provided Beverly Miller or her attorney Sharron Cox with assistance in this lawsuit or the Tarrant case.

RESPONSE: Objection. This request is multifarious. It invades the work product exemption from discovery. It invades the attorney/client privilege. It invades the protections for communications made after the anticipation of litigation and/or protected pursuant to the "joint defense doctrine" recognized in TEX. R. EVID. 503(b)(1) and such cases as *Ryals v. Canales*, 767 S.W.2d 226, 228 (Tex. App.—Dallas 1989, orig. proceeding).

Exhibit A

Page 29 of 31

492

Respectfully submitted,



By: _____

Scott Smith
State Bar Number 18688900
120 South Crockett Street
P.O. Box 354
Sherman, Texas 75091-0354
e-mail smithlaw@airmail.net
Facsimile (903) 870-1446
Telephone (903) 868-8686

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing document was served, by certified mail, return receipt requested number 7009 2250 0000 2311 4187 toChristy L. Lee, Esq., of Law Offices of Christy Lee, P.C., 777 Main Street, Suite 600, Fort Worth, Texas 76102, and to Howard Kirk Gibbs, Pro Se, at 4360 Western Center Blvd., Suite 205, Ft. Worth, Texas 76137, on this the 3rd day of September, 2014.

_____
Scott Smith

493

Exhibit 4

Page 30 of 31

## Unsworn Delcaration Pursuant to
## TEX. CIV. PRAC. & REM. CODE § 132.001

My name is Joshua Unger. My date of birth is _3/30/1985_ . I reside at _410 Anderson County road 154, Palestine, TX_ . I am the trustee of the GBU Friends and Associates Trust, Intervenor, that I have read the above and foregoing Answers to Interrogatories and subscribes to the same on behalf of the GBU Friends and Associates Trust, Intervenor; that said responses, subject to inadvertent or undiscovered errors, are based on and therefore limited by the records and information still in existence, presently recollected and this far discovered in the course of the preparation of these responses; that, consequently, I reserve the right to make changes in responses if it appears at any time that omissions or errors have been made therein or that more accurate information is available; and that subject to the limitations set forth herein, the said responses are true and correct and within my personal knowledge. I have been advised that Rule 197.2(d)(2) does not require that I swear to interrogatory answers about persons with knowledge of relevant facts, trial witnesses or legal contentions. Since I am not an attorney, I therefore do not swear to the truth of any interrogatory answers containing information about persons with knowledge of relevant facts, trial witnesses or legal contentions. I declare under penalty of perjury that the foregoing instrument is true and correct.

Dated: _9/01/2014_ , 2014

_Joshua Unger, Trustee_
Joshua Unger, Trustee of the GBU Friends and Associates Trust, Declarant

| | |
|---|---|
| PENTEX FOUNDATION<br>        PLAINTIFF, | )<br>)<br>) |
| VS. | )<br>) |
| KENNETH VERN GIBBS; AND<br>CANDACE GIBBS WALTON; AND<br>HOWARD KIRK GIBBS,<br>        DEFENDANTS. | )<br>)<br>)<br>)<br>) |

IN THE DISTRICT COURT

336TH JUDICIAL DISTRICT

FANNIN COUNTY, TEXAS

## KEN GIBBS AND CANDACE WALTON'S RESPONSE TO PLAINTIFF'S AND INTERNVOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Come now, Defendants Kenneth "Ken" Vern Gibbs and Candace "Candy" Walton, through their Counsel of Record, Law Offices of Christy Lee, P.C., and, in response to Plaintiff's and Intervenor's Motion for Partial Summary Judgment, request that the Court deny the Motion, and would show the Court the following:

### I. SUMMARY OF MOTION

1.      Although muddily drafted, it appears that the Motion seeks traditional summary judgment pursuant to Tex. R. Civ. Pro. 166a(b).  The Motion did not specify whether a traditional or a no-evidence summary judgment is sought.

2.      Contrary to their mutual assertion, the facts presented in Pentex Foundation ("Pentex") and GBU Friends and Associates Trust's ("GBU Trust") Motion are highly disputed.

3.      Although Pentex and GBU Trust are suing Howard Kirk Gibbs, the Motion excluded Howard Kirk in its mention of the parties supposedly "taking actions" inconsistent with the Contract for Sale of Land ("the CSL").  No clarifying point was made for this omission.

KEN GIBBS'S AND CANDACE WALTON'S RESPONSE TO PLAINTIFF'S
AND INTERVENOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT
*PENTEX FOUNDATION V. GIBBS, ET AL.*

CAUSE NO. CV-14-41665

-1-

495

4. In large part, Pentex and GBU Trust based their Motion, including legal interpretation of various agreements, upon Admissions by Howard Kirk. On receipt of GBU Trust's Request for Admissions, Howard Kirk responded within fewer than five (5) hours, evidence of collusion among Plaintiff, Intervener, and Defendant. The preponderance of the purported facts in the Motion ignored Admissions from Ken and Candy in favor of Admissions from Howard Kirk, and relied very heavily on Howard Kirk's Admissions concerning his lay interpretation of provisions in the Family Settlement Agreement ("the FSA"). Pentex and GBU Trust's Motion ignored all Admissions from Ken and Candy which controverted Admissions from Howard Kirk.

5. The Motion cited no statutes and no case law upon which Pentex and GBU Trust based their argument.

6. Since the CSL, there have been subsequent dealings and subsequent agreements, including the FSA.

7. As Movants for summary judgment, Pentex and GBU Trust bear the burden of proof of the facts argued.

## II. UNDISPUTED FACTS.

8. The number of undisputed facts is small indeed.

9. Albert Barcroft was and is not licensed to practice law.

10. Albert drafted the CSL, with the parties signing on May 10, 2005.

11. The FSA was executed on or about September 5, 2008. *See* Exhibit A.

12. GWB Family and Friends Trust ("GWB Trust") agreement was executed on November 7, 2008. *See* Exhibit B.

KEN GIBBS'S AND CANDACE WALTON'S RESPONSE TO PLAINTIFF'S
AND INTERVENOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT
*PENTEX FOUNDATION V. GIBBS, ET AL.*

CAUSE NO. CV-14-41665

-2-

496

13. The issue of the CSL's validity was addressed most recently on August 20, 2014, at a hearing in Tarrant County Probate Court No. 2. Cause No. 2005-0000126-2-D, *Walton and Gibbs vs. Miller, et al.* As was established at the hearing, the CSL was drafted in 2005 by Albert, who has portrayed himself repeatedly to multiple parties as the Legal Representative of Pentex and GBU Trust.

14. Judge Ferchill of the Tarrant County Probate Court No. 2 stated:

> **[Albert] cannot enforce a contract that he participated in. He cannot get money for – or unjust enrichment for committing what is a criminal misdemeanor, at least, in Texas.** p. 105

> **[Albert] is practicing law without a license, and he cannot enforce a contract that brings money into his pocket for violating the law, period.** p. 106

(Emphasis added.)

*See* Exhibit C. (excerpts of the hearing.)[1]

15. Albert was a party to the CSL, as were Ken, Candy, and Howard Kirk Gibbs. The CSL contained provisions which greatly benefited Albert. Albert advised Ken and Candy that as he went to law school he was able to draft legal contracts. *See* Exhibit D.

16. Ken and Candy have raised concerns numerous times over the validity of the Contract for Sale of Land ("CSL"), including in the Motion to Show Authority, Motion for Change of Venue, Original Answer, Affirmative Defenses, Original Counterclaim, and Rule 13 Motion for Sanctions, and the subsequent Amended Motion.[2] Ken and Candy observed that

---

[1] Only excerpts of the hearing are provided, as the transcript, with exhibits, is over 200 pages.
[2] Although the Original Answer observed that John Skotnik drafted the CSL, Ken and Candy amended the Answer, stating that Albert drafted the CSL without authority and that there existed a question concerning its validity.

KEN GIBBS'S AND CANDACE WALTON'S RESPONSE TO PLAINTIFF'S
AND INTERVENOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT
*PENTEX FOUNDATION V. GIBBS, ET AL.*

CAUSE NO. CV-14-41665

-3-

497

they were not represented by counsel concerning the CSL. Discovery Requests from Ken to Pentex and GBU Trust also contained queries about the enforceability of the CSL.

## IV. Law.

17. As a general rule, an agreement simply to enter into negotiations for a contract later does not create an enforceable contract. *Scott v. Ingle Brothers Pacific, Inc.*, 489 S.W.2d 554 (Tex. 1972).

18. "Unconscionability" has no precise legal definition, and it is to be determined on a case-by-case basis. In general, "unconscionability" describes a contract that is unfair because of its overall one-sidedness or the gross one-sidedness of its terms. *Arthur's Garage, Inc. v. Racal-Chubb SEC, Systems, Inc.*, 997 S.W.2d 803 (Tex. App. 1999).

19. Unconscionable contracts are unenforceable under Texas law. Whether a contract is unconscionable at the time it is formed is a question of law. *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 562 (Tex. 2006).

20. The practice of law includes "preparing or negotiating, in whole or in part, a will, trust, contract, conveyance, pleading, or other instruction to the extent such preparation or negotiation is performed or offered explicitly or implicitly to provide legal advice or legal representation." Tex. HS. Code Ann. § 81.101.

21. A person practicing law without a license commits a Class A misdemeanor. Tex. Pen. Code § 38.123.

22. To prevail on a motion for traditional summary judgment, the movant must show that there are no genuine issues of material fact and that it is entitled to judgment as a matter of

KEN GIBBS'S AND CANDACE WALTON'S RESPONSE TO PLAINTIFF'S
AND INTERVENOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT
*PENTEX FOUNDATION V. GIBBS, ET AL.*

CAUSE NO. CV-14-41665
-4-

498

law. Tex. R. Civ. P. 116a(c). *Nixon v. Mr. Property Management Co., Inc.*, 690 SW2d 546, 548-49 (Tex. 1985).

## II. Exhibits in Support.

23.    In support of Ken and Candy's response to Pentex and GBU Trust's Motion for Partial Summary Judgment, the following Exhibits are presented:

  A.  Family Settlement Agreement.

  B.  GWB Family and Friends Trust.

  C.  Excerpts from Reporter's Record of Motion Hearing. Cause No. 2005-0000126-2-D, Tarrant County Probate Court No. 2, August 20, 2014.

  D.  Candy's Affidavit in Support of Response.

## IV. Summation of Argument.

24.    Summary judgment approving Pentex and GBU Trust's Motion is not justified. As movants for partial summary judgment, Pentex and GBU Trust bear the burden of proof of material facts presented. Pentex and GBU Trust failed in this regard. They failed to provide evidence of their claims, and they failed to provide statutes or case law supporting their claims.

25.    The facts alleged by Pentex and GBU Trust are not, contrary to their mutual claim, uncontested. The dispute concerning the validity is well-documented, the facts pertaining to the CSL have been reviewed by the Court, and the CSL has been determined null and void.

26.    It is an established fact that Albert drafted the CSL, and per law, Albert (a.k.a. Pentex, a.k.a. GBU Trust) cannot enforce its terms, as he drafted and provided advice concerning an agreement which profited him. Pursuant to public policy, Albert cannot enjoy gains from the illegal activity of engaging in the practice of law without a license.

Ken Gibbs's and Candace Walton's Response to Plaintiff's
and Intervenor's Motion for Partial Summary Judgment                    Cause No. CV-14-41665
*Pentex Foundation v. Gibbs, et al.*

499

27. The evidence upon which Pentex and GBU Trust relied in the Motion is primarily derived from Admissions from Howard Kirk, although Admissions to the contrary from Ken and Candy are on record. Only in the rare instances of agreement among the parties do Pentex and GBU Trust recognize Ken and Candy's Admissions. Pentex and GBU Trust offered no explanation for their straightforward, unquestioning acceptance of Howard Kirk's Admissions over Ken and Candy's, nor did Pentex and GBU Trust's Motion seek to resolve the discrepancies, other than to promote Howard Kirk's Admissions. Pentex and GBU Trust's approach was simply to pretend that inconsistencies and disputes relative to the CSL do not exist.

### V. PRAYER FOR RELIEF.

Ken and Candy ask the Court for the following relief:

28. That Pentex and GBU Trust's Motion be denied in all aspects;

29. That the CSL be declared null, void, and enforceable;

30. Dismissal of the case with prejudice; and

31. An award of attorney's fees to Ken and Candy.

Respectfully submitted,

LAW OFFICES OF CHRISTY LEE, P.C.

Christy L. Lee
Texas State Bar No. 24052302
777 Main Street, Ste. 600
Fort Worth, Texas 76102
(817) 504-6075
(800) 437-7901 - Fax
clee@christyleelaw.com

KEN GIBBS'S AND CANDACE WALTON'S RESPONSE TO PLAINTIFF'S
AND INTERVENOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT
*PENTEX FOUNDATION V. GIBBS, ET AL.*

CAUSE NO. CV-14-41665
-6-



ATTORNEY FOR CANDACE WALTON AND
KENNETH GIBBS

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above Ken Gibbs and Candace Walton's Response to Plaintiff's and Intervenor's Motion for Partial Summary Judgment was delivered, pursuant to Texas Rules of Civil Procedure, to the following parties on this 25th date of September, 2014:

Party:

Via:

Howard Kirk Gibbs
4360 Western Center Blvd., No. 205
Fort Worth, TX 76157

Mail
Email: hkgibbs@gmail.com

Pentex Foundation, **and**
GBU Friends and Associates Trust
c/o Scott Smith, Attorney of Record
120 South Crockett Street
Sherman, TX 75091-0354

Email: smithlaw@airmail.net
Fax:


_____
Christy L. Lee

Ken Gibbs's and Candace Walton's Response to Plaintiff's
and Intervenor's Motion for Partial Summary Judgment
Pentex Foundation v. Gibbs, et al.

Cause No. CV-14-41665
-7-





CAUSE NO. GA 2001-00196

| | | |
|---|---|---|
| IN RE GUARDIANSHIP OF | ) | IN THE PROBATE COURT |
| ESTATE OF KATHRYN H. GIBBS, | ) | OF |
| AN INCAPACITATED PERSON | ) | DENTON COUNTY, TEXAS |

AND

CAUSE NO. 05-126-2

| | | |
|---|---|---|
| IN RE: THE ESTATE OF | § | IN THE PROBATE COURT |
| | § | |
| BERT HUGHES GIBBS, | § | NO. TWO OF |
| | § | |
| DECEASED | § | TARRANT COUNTY, TEXAS |

## FAMILY SETTLEMENT AGREEMENT

**THIS FAMILY SETTLEMENT AGREEMENT** (this "Agreement" or "FSA") is made and entered into by and among the following persons, both individually and in the fiduciary capacities described below:

I. Kenneth Vern Gibbs ("Ken"), Individually and as Independent Executor of the Estate of Bert Gibbs, Deceased and in all capacities listed under his signature line below;

2. Candace Gibbs Walton ("Candy"), Individually and in all capacities listed under her signature line below;

3. Kip Hughes Gibbs ("Kip"), Individually and in all capacities listed under his signature line below;

4. Howard Kirk Gibbs ("Howard Kirk"), Individually and in all capacities listed under his signature line below;

5. Kathryn Houseworth Gibbs ("Kathryn"), Individually and in all capacities listed under her signature line below;

6. Sandra Faye Gibbs ("Sandra"), Individually and in all capacities listed under her signature line below;

FAMILY SETTLEMENT AGREEMENT - Page 1
c:\cases\Gibbs\FSA 82508-final

KVG    CGW    HKG    KHG    SFG    KHG

Exhibit A

Page 1 of 45

and the respective heirs, personal representatives, executors, administrators, successors, agents, attorneys and assigns of each of them, as evidenced by their signatures affixed hereto. The preceding persons are sometimes collectively referred to herein as **"the Parties"** and individually referred to as **"a Party."**

## Article I
## Definitions

1.1     The Parties to this Family Settlement Agreement are defined as follows:

a.     The term **"Ken"** shall mean Kenneth Vern Gibbs, individually, as Independent Executor of and as an heir and/or beneficiary of the Estate of Bert H. Gibbs, Deceased, and as a potential heir and/or beneficiary of the Estate of Kathryn H. Gibbs, Individually and/or as an Incapacitated Person, and as a contingent beneficiary of the Mary L. Houseworth Revocable Trust ("**Houseworth Trust**") and the Kathryn Houseworth Gibbs Irrevocable Trust ("**Kathryn Gibbs Trust**"), and as the virtual representative and next friend of his children, and their successors, plus those minor, unborn, unascertained, and contingent beneficiaries of the Estates of either Bert H. Gibbs, Deceased, and/or the Estate of Kathryn H. Gibbs, Individually and/or as an Incapacitated Person.

b.     The term **"Candy"** shall mean Candace Gibbs Walton, individually, as an heir and/or beneficiary of the Estate of Bert H. Gibbs, Deceased, and as a potential heir and/or beneficiary of the Estate of Kathryn H. Gibbs, Individually and/or as an Incapacitated Person, and as a contingent beneficiary of the Mary L. Houseworth Revocable Trust ("**Houseworth Trust**") and the Kathryn Houseworth Gibbs Irrevocable Trust ("**Kathryn Gibbs Trust**"), and as the virtual representative and next friend of her children, and their successors, plus those minor, unborn, unascertained, and contingent beneficiaries of the Estates of either Bert H. Gibbs, Deceased, and/or the Estate of Kathryn H. Gibbs, Individually and/or as an Incapacitated Person.

c.     The term **"Kip"** shall mean Kip Hughes Gibbs, individually, as an heir and/or beneficiary of the Estate of Bert H. Gibbs, Deceased, and as a potential heir and/or beneficiary of the Estate of Kathryn H. Gibbs, Individually and/or as an Incapacitated Person, and as the Temporary Co-Guardian of the Estate of Kathryn H. Gibbs, an Incapacitated Person, and as a contingent beneficiary of the Mary L. Houseworth Revocable Trust ("**Houseworth Trust**") and the Kathryn Houseworth Gibbs Irrevocable Trust ("**Kathryn Gibbs Trust**"), and as the virtual representative and next friend of his children, and their successors, plus those minor, unborn, unascertained, and contingent beneficiaries of the Estates of either Bert H. Gibbs, Deceased, and/or the Estate of Kathryn H. Gibbs, Individually and/or as an Incapacitated Person.

d. The term "**Howard Kirk**" shall mean Howard Kirk Gibbs, individually, as an heir and/or beneficiary of the Estate of Bert H. Gibbs, Deceased, and as a potential heir and/or beneficiary of the Estate of Kathryn H. Gibbs, Individually and/or as an Incapacitated Person, and as the former Independent Executor of the Estate of Bert H. Gibbs, Deceased, and as a contingent beneficiary of the Mary L. Houseworth Revocable Trust ("**Houseworth Trust**") and the Kathryn Houseworth Gibbs Irrevocable Trust ("**Kathryn Gibbs Trust**"), and as the virtual representative and next friend of his children, and their successors, plus those minor, unborn, unascertained, and contingent beneficiaries of the Estates of either Bert H. Gibbs, Deceased, and/or the Estate of Kathryn H. Gibbs, Individually and/or as an Incapacitated Person.

e. The term "**Kathryn**" shall mean Kathryn Houseworth Gibbs, individually, as an heir and/or beneficiary of the Estate of Bert H. Gibbs, Deceased, and as the primary beneficiary of the Mary L. Houseworth Revocable Trust ("**Houseworth Trust**") and the Kathryn Houseworth Gibbs Irrevocable Trust ("**Kathryn Gibbs Trust**"), and as the Ward of the Temporary Guardianship Estate of Kathryn H. Gibbs, an Incapacitated Person.

f. The term "**Sandra**" or "**Sandy**" shall mean Sandra Faye Gibbs, individually, and as the Temporary Co-Guardian of the Estate of Kathryn H. Gibbs, an Incapacitated Person.

1.2 The terms "**Affiliate**" or "**Affiliates**" of the person or entity designated shall mean such person's spouse (including a former or future spouse), assigns, trustees, employees, directors, officers, shareholders, children, descendants, their spouses (including a former or future spouse), assigns, agents, (including without limitation, attorneys, accountants, and investment advisors) trustees, legal representatives and all general and limited partnerships of which the person or entity is a partner, firms or corporations or any other entities directly or indirectly controlling such entity or directly or indirectly controlled by such person or entity (except as otherwise expressly provided herein). It is expressly provided, however, that a reference to an Affiliate shall not include:

a. Compass Bank, and/or any predecessor trustee, in their capacities as trustees of either the Houseworth Trust and/or the Kathryn Gibbs Trust.

b. Either Ralph Kenneth Evans, Charles C. Gumm III, Lewis R. Daniel, Freddie C. Rodgers, Lewis Mohr (a.k.a. Lewis-Thompson, Family of Mohr), or any other person or entity to whom conveyances were made by either Bert H. Gibbs and/or Kathryn Houseworth Gibbs in an attempt to establish a trust or trusts for themselves, or in an attempt to transfer any assets to any unincorporated entity for any purpose.

1.3 The term "**Family Settlement Agreement**" or "**Settlement Agreement**" or "**Agreement**" or "**FSA**" shall refer to this Family Settlement Agreement, including all Exhibits attached hereto./

FAMILY SETTLEMENT AGREEMENT - Page 3
c:\cases\Gibbs\FSA 8'25'08-final

*KVG   CHW   HKG   KHG   SFG   KHG*

504

1.4 The term "**Bert H. Gibbs, Deceased**" and/or "**Decedent**" shall refer to Bert H. Gibbs, the deceased husband of Mrs. Kathryn H. Gibbs; and the testator with regard to the Last Will and Testament of Bert H. Gibbs, Deceased, dated December 6, 2004, which was admitted on November 14, 2006, to probate in Cause No. 05-0126-2, in the Probate Court No. 2 in and for Tarrant County, Texas, and styled: "Estate of Bert Hughes Gibbs, Deceased."

1.5 The term "**Kathryn H. Gibbs, an Incapacitated Person**" or "**Ward**" shall refer to Kathryn H. Gibbs, the surviving spouse of Bert H. Gibbs, Deceased, and the testator with regard to the holographic Last Will and Testament of Kathryn H. Gibbs, dated November 4, 2003, and the Ward in the Temporary Guardianship proceedings pending in the Probate Court of Denton County, Texas, in Cause No. GA 2001-196, styled: In Re Guardianship of the Estate of Kathryn H. Gibbs, an Incapacitated Person."

1.6 The term "**Claims**" and/or "**Proceedings**" shall refer to and include any and all claims, causes of action, debts, demands, actions, costs, expenses, losses, damages, charges, challenges, contests, liabilities, promises, agreements, deceptive practice claims, claims in equity, suits, and all other obligations and liabilities of whatsoever nature KNOWN and UNKNOWN, fixed or contingent, liquidated or unliquidated, anticipated or unanticipated, at law or in equity, for any type of relief or redress, including but not limited to money damages, whether founded on contract, tort (including but not limited to tortious interference with inheritance rights, conversion, fraud, tax issues, undue influence, false representation, conscious indifference, reckless disregard, and/or malicious conduct), fiduciary duty, negligence, gross negligence, intentional infliction of emotional distress, reimbursement, breach of fiduciary duty to disclose material information, indebtedness, fraudulent inducement, and any other ground, whether or not asserted, which any person has, may have, or have had against the released and/or indemnified party, now existing or arising in the future, including the claims brought or which could have been brought by, between or among the Parties through the effective date of the Agreement, save and except for the warranties and representations under this Agreement. THE PARTIES AGREE THAT THE DEFINITION OF "CLAIMS" IS AND SHALL BE AS BROAD AS THE LAW WILL ALLOW, including the claims brought or which could have been brought by, between or among the Parties through the effective date of the Agreement relating to the following:

A. Cause Number GA 2001-196 in the Probate Court of Denton County, Texas, styled: "In Re Guardianship of the Estate of Kathryn H. Gibbs, An Incapacitated Person" (hereinafter referred to as the "**Guardianship Proceeding**") and the Appeal currently pending in the Second Court of Appeals in Fort Worth, Cause Number 02-05-00460-CV (the "**460 Appeal**" or the "**Guardianship Appeal**" or the "**Administrative Appeal**"). An appeal of the Second Court of Appeals ruling in the 460 Appeal is now pending in the Texas Supreme Court under Cause No. 08-0501 (the "**501 Appeal**").

B. Any proceedings concerning the marriage of Bert and Kathryn, including Cause Number GA 2001-196-01 in the Probate Court of Denton County, Texas, styled: "In the Matter of

the Marriage of Kathryn Houseworth Gibbs and Bert H. Gibbs." (Hereinafter referred to as the "**Divorce Proceeding.**"). This proceeding was originally filed in the 362nd Judicial District Court of Denton County, Texas, and thereafter transferred to and made an ancillary proceeding to the Guardianship Proceeding. There is also an equitable bill of review proceeding pending in the Divorce Proceeding (the "**Bill of Review**") in Cause No. 2001-196-08.

C.      Cause Number GA 2001-196-02 in the Probate Court of Denton County, Texas, styled: "Kip H. Gibbs, As Next Friend for Kathryn Houseworth Gibbs vs. Candace Gibbs Walton, Et Al." (hereinafter referred to as the "**Y2K Proceeding**"). This proceeding was originally filed in the Probate Court of Denton County, Texas, as Cause No. TI-2002-01-108, and was thereafter transferred to and made an ancillary proceeding to the Guardianship Proceeding. There is also an appeal pending in the Second Court of Appeals in Fort Worth, Cause Number 02-05-00143-CV (the "**143 Appeal**" or the "**Trust Appeal**"). An appeal of the Second Court of Appeals ruling in the 143 Appeal is now pending in the Texas Supreme court under Cause No. 08-521 (the "**521 Appeal**").

D.      The following actions have also been filed ancillary or incidental to the Guardianship Proceeding:

      1.      J-W Operating Company v. Kathryn G. Gibbs, et al., in Cause No. 2004-11103-16, in the 16th Judicial District Court of Denton County, Texas.

      2.      Burlington Resources Oil & Gas Company v. Kip Hughes Gibbs, et al., in Cause No. 2001-196-05, in the Probate Court of Denton County, Texas.

      3.      Any dispute with Devon Energy regarding oil and gas revenues which have been and currently are being held in suspense, including, but not limited to Devon Energy Production LP v. Kip Hughes Gibbs, et. al., pending in Cause No. 05-126-2-A in the Probate Court No. 2 of Tarrant County, Texas.

      4.      Any dispute with J-W Gathering Company.

      5.      Cause No. 096-225949-07, pending in the 96th Judicial District Court of Tarrant County, Texas, styled Kenneth Gibbs, et. al., v. Wells Fargo Bank, N. A. et. al.

E.      There is a dispute between the Parties relating to the "Will of the Ward", which remains unresolved and will, in all likelihood, result in a Will Contest being filed following the death of Kathryn and the same is anticipated by all Parties (the "**Kathryn's Will Contest Proceeding**").

F.      There is a dispute between the Parties relating to the "Will of the Decedent", which remains unresolved and will, in all likelihood, result in a Will Contest being filed, and the same is anticipated by all Parties (the "**Bert's Will Contest Proceeding**").

FAMILY SETTLEMENT AGREEMENT - Page 5
\Gibbs\FSA 8'25'08-final

KVG   CGW   HKG   KHG   SFG   KHG

506

Exhibit

1.7     The term "**Effective Date**" of this Agreement means the date the last party signs this Agreement. However, this FSA will not be binding upon each respective Party until all Parties have signed this Agreement, at which time the Agreement shall immediately be binding upon each respective Party signing this Agreement.

1.8     The terms "**the Parties**" or "**the Parties hereto**" shall collectively refer to Ken, Candy, Kip, Howard Kirk, Sandra, and Kathryn.

1.9     The term a "**Party**" shall refer to any one of Ken, Candy, Kip, Howard Kirk, Sandra, and Kathryn, who shall be referenced specifically.

1.10     The terms "**Predecessor**" or "**Predecessors**" shall refer to any person or entity serving prior in time as a fiduciary to the fiduciary in question.

1.11     The terms "**Successor**" or "**Successors**" shall refer to the heirs, devisees, descendants, legatees, executors, appointees under any power of appointment, personal representatives, successor trustees, and any successors of a Successor or Successors.

1.12     The term "**Transactions**" shall mean the following events:

      a.     Any and all acts, transactions, and proceedings (including any failure to act) of any of the Parties, the Decedent, the Ward, and their Affiliates on or before the Effective Date; and

      b.     The negotiation and consummation of this Agreement.

1.13     The term "**Guardians**' and/or "**Guardian**" shall mean Kip Hughes Gibbs and Sandra Faye Gibbs, either as Temporary Guardians and/or as the purportedly currently appointed and duly acting Guardians of the Estate of Kathryn H. Gibbs.

1.14     The term "**Executor**" shall mean Kenneth Vern Gibbs, as the currently appointed and duly qualified Independent Executor of the Estate of Bert Hughes Gibbs, Deceased. Kenneth Vern Gibbs was appointed as the Independent Executor of the Estate of Bert Gibbs, Deceased on November 14, 2006. The term "**Executor**" shall include both the singular and the plural and shall mean the executor or executors acting hereunder at any time, whether one or more.

1.15     The terms "**Guardianship Estate,**" "**Temporary Guardianship Estate,**" and/or "**Kathryn's Estate**" shall refer and include all properties, real or personal, however and whenever acquired, and any income there from, which may belong to the Ward, Kathryn H. Gibbs.

1.16     The term "**Probate Estate**" shall refer and include all properties, real or personal, however and whenever acquired, and any income there from, which may belong to the Decedent, Bert Hughes Gibbs, Deceased.

FAMILY SETTLEMENT AGREEMENT - Page 6
c:\cases\Gibbs\FSA 8'25'08-final

KVG    CGW    HKG    KHG    SFG    KHG

**Exhibit**

**Page** ___ **of** ___

1.17 The term "**Will of Decedent**" shall refer to the Last Will and Testament of Bert Hughes Gibbs, Deceased, dated December 6, 2004, which has been admitted to probate in Cause No. 05-0126-2 on November 14, 2006, in the Probate Court No. 2 in and for Tarrant County, Texas, and styled: "Estate of Bert Hughes Gibbs, Deceased" along with any codicils which may exist, as well as any prior Wills of the Decedent.

1.18 The term "**Will of the Ward**" shall refer to the Last Will and Testament of Kathryn H. Gibbs, which may exist as of the Effective Date, which would include the holographic Last Will and Testament of Kathryn H. Gibbs, dated November 4, 2003, along with any codicils thereto, as well as any prior Wills of the Ward or any new and additional Wills of the Ward, which might come into existence in the future.

1.19 The terms "**child**," "**children**," "**descendant**," "**descendants**," and other words of like import shall include both natural children and descendants and those legally adopted into the line of descent.

1.20 All references to "**Internal Revenue Code**" shall be to the Internal Revenue Code of 1954, as it exists at the time of execution of this will or as amended from time to time thereafter unless otherwise designated, or to its successor statute.

1.21 As used in this Agreement, the word "**trustee**" shall mean the respective Trustees of the Mary L. Houseworth Revocable Trust and the Kathryn Houseworth Gibbs Irrevocable Trust, and/or any and all other trusts created by either Bert H. Gibbs and/or Kathryn Houseworth Gibbs, and/or any trusts created by the terms of this Agreement, and shall include any and all trustees from time to time serving under such trusts and shall include and refer to both the original trustee, as well as any successor or substitute trustee or trustees of any such trust and/or trusts, regardless of their validity.

1.22 The term "**personal representative**" shall include an executor, independent executor, administrator, independent administrator, and/or temporary administrator, together with their successors.

1.23 All references to the "**Kathryn H. Gibbs 867 Management Trust**" shall mean that certain 867 Management Trust created by this FSA for the sole benefit of Ward and created pursuant to §867 of the Texas Probate Code.

1.24 As used in this settlement agreement, the masculine, feminine and neuter genders shall each be deemed to include the others unless the context requires otherwise. The singular shall include the plural and the plural shall include the singular wherever the context of this settlement agreement permits.

FAMILY SETTLEMENT AGREEMENT - Page 7
...ases\Gibbs\FSA 8'25'08-final

508

KVG   CGW   HKG   KHG   BPG   KHG

Exhibit
Page___7___ of __45__

## Article II

### Recitals

WHEREAS, the Decedent, Bert Hughes Gibbs, and Kathryn H. Gibbs, were married on June 9, 1951;

WHEREAS, to the marriage of the Decedent and Kathryn were born four children (the "Gibbs Children"), all of whom are adults and Parties to this Agreement, and who are:

Kenneth Vern Gibbs who was born on February 7, 1952;

Candace Gibbs Walton who was born on September 16, 1953;

Kip Hughes Gibbs who was born on March 3, 1960; and

Howard Kirk Gibbs who was born on September 7, 1962; and

WHEREAS, the Decedent, Bert Hughes Gibbs, died on December 31, 2004, in Dallas, Dallas County, Texas, at the age of 75 years, and was domiciled at the time of his death in Tarrant County, Texas;

WHEREAS, prior to, at the time of, and subsequent to the death of the Decedent, the following cases or disputes involving the Decedent, the Ward, their property and the Parties were pending and continue to remain unresolved and in dispute (collectively, the "Proceedings"):

A. The Guardianship Proceeding and the Guardianship Appeal.;

B The Divorce Proceeding.

C. The Y2K Proceeding and the Trust Appeal.

D. The Interpleader Actions.

E. The Will Contest Proceeding of Ward.

F. The Will Contest Proceeding of Decedent.

WHEREAS, the "Will of Decedent" which refers to the Last Will and Testament of Bert Hughes Gibbs, Deceased, dated December 6, 2004, which has been admitted to probate in Cause No. 05-0126-2 on November 14, 2006, in the Probate Court No. 2 in and for Tarrant County, Texas, provides that with the exception of a specific bequest to Kip in the amount of $100.00, all other property of the Decedent is to be divided in equal shares among Ken, Candy, and Howard Kirk;

FAMILY SETTLEMENT AGREEMENT - Page 8
C:\cases\Gibbs\FSA 8'25'08-final

KVG    CGW    HKG    KHG    SJG    KHG

509

Exhibit A

Page 3 of 45

WHEREAS, there also exists a purported "Will of Kathryn" which shall refer to any Last Will and Testament of Kathryn H. Gibbs, which may exist as of the Effective Date, along with any codicils thereto, as well as any prior Wills of Kathryn or any new and additional Wills of Kathryn, which might come into existence in the future, which by its terms will attempt to dispose of the assets and Estate of Kathryn, by either conveying the same entirely to Kip, to the exclusion of Ken, Candy, and Howard Kirk; and/or otherwise in a manner inconsistent with the terms of this Family Settlement Agreement.

WHEREAS, at a minimum, disputes exist between the Parties as stated in the Proceedings and as to:

A. The validity of the Guardianship Proceeding and the authority of Kip Hughes Gibbs and Sandra Faye Gibbs to act as Permanent Guardians of the Estate of the Ward, as well as their accountability and liability for having acted as such;

B. The validity of the judgment entered in the Divorce Proceeding;

C. The validity of the judgment entered in the Y2K Proceeding;

D. The validity of the testamentary instruments executed by the Decedent and the Ward; and

E. The liability of the Parties to each other for various alleged wrongdoings.

WHEREAS, it is believed that certain of the Parties are or were in possession of assets of the Ward's and/or Decedent's Estates that have not been delivered to either the Temporary Guardians of the Ward and/or the Executor of the Decedent to date, and each party acknowledges that the issues regarding the real and personal property assets shall be finally disposed of with the signing of, and in accordance with, this FSA;

WHEREAS, the Parties survived the Decedent by the statutory period and are Parties to this Agreement;

WHEREAS, issues and disputes exist between the Parties regarding the amounts and/or assets due the Ward's and/or Decedent's Estate;

WHEREAS, the Parties wish to resolve all differences and disputes between them in order to end the Proceedings and to avoid further litigation and expense and to make peace;

WHEREAS, by executing this Agreement no Party hereto concedes any legal or factual contentions of any other Party or makes any admissions but, rather, each Party denies any contrary contention made by any other Party and enters into this Agreement solely to terminate and settle their differences in an effort to minimize costs, expenses, and ongoing attorney's fees.

FAMILY SETTLEMENT AGREEMENT - Page 9
...Gibbs\FSA 8\25\08-final

KVG    CGD    HKG    KHG    SJB    KHG

510

Exhibit

Page 9 of 45

## Article III

### Agreements

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, including the mutual agreements, understandings, stipulations, representations, and releases set forth herein, the sufficiency of such consideration being hereby acknowledged and confessed by each of the Parties hereto, make the following representations and agreements:

3.1 **Will Probated and Portions of Will Superseded.** The Parties agree that the Last Will and Testament of Bert Gibbs, although admitted to probate, shall be superseded by this Agreement to the extent that if any term of it conflicts with or contradicts this Agreement then, in that event, this Agreement and only this Agreement shall control, including, but not limited to determining how, when and to whom Bert's Estate should be distributed.

3.2 **Approval of FSA.** This FSA shall be submitted for approval by the Statutory Probate Court of Denton County, Texas, with all parties agreeing to a contemporaneously filing of a joint application to appoint Jimmy Walker, of Houston, Texas, as the Permanent Guardian of the Estate of Kathryn. This Application will be filed in the Statutory Probate Court of Denton County, Texas, in a new cause number. All Parties agree to join in any motion necessary to:

    a.    seek the recusal of Judge Don Windle as the probate judge presiding; and

    b.    seek the appointment of Judge John Hutchison as the probate judge to preside over these new permanent guardianship proceedings for Kathryn; and

    c.    seek the appointment of S. Camille Milner of Denton, Texas, as the Attorney Ad Litem;

    d.    seek the ratification and approval of this FSA by the probate court in the permanent guardianship proceeding; and

    e.    seek the approval of the creation of the Kathryn Houseworth Gibbs 867 Management Trust in the form of **Exhibit "A"**, attached hereto and made a part hereof (which is hereby ratified and approved by all Parties as a part of the approval of this FSA) by Jimmy Walker in his role as Guardian of the Estate.

All Parties agree to execute any agreements necessary to waive the necessity for any service and by agreement voluntarily enter their appearance in the new permanent guardianship proceedings, in order to resolve these disputes and to also obtain the judicial approval of this FSA by the Court in the new permanent guardianship proceedings.

FAMILY SETTLEMENT AGREEMENT - Page 10
C:\...\Gibbs\FSA 872508-final

KVG   CGW   HKG   KHG   SFG   KHG

511

Exhibit A

Page 10 of 45

Further, the Parties agree that as a part of the Attorney Ad Litem's review of the propriety of this Settlement Agreement, that the Attorney Ad Litem shall select the psychiatrist, arrange with, and cause to be performed a mental and/or psychiatric evaluation upon Kathryn by a psychiatrist having the ability to do so, to determine the current mental capacity of Kathryn, and more specifically whether or not she has the mental capacity to enter into this Settlement Agreement and carry out all of its terms. The psychiatrist so chosen must be approved by the Proposed Guardian of the Estate before any examination is performed. If the Proposed Guardian of the Estate does not give his approval, then the Attorney Ad Litem will select another psychiatrist until a psychiatrist is approved by the Proposed Guardian of the Estate. The Parties agree that Dr. James Shupe will not be selected. The cost of this mental evaluation will be borne by Kathryn's Estate.

3.3    **Separate Property of Kathryn.** The Parties agree that the Separate Property of Kathryn is described as follows:

    (a)    The Mary L. Houseworth Trust;

    (b)    The Kathryn Houseworth Gibbs Irrevocable Trusts;

    (c)    The Kathryn H. Gibbs 867 Management Trust contemplated by this FSA;

    (d)    The Kansas property inherited by Kathryn shall be transferred to and made a part of the Mary L. Houseworth Trust;

    (e)    Prepaid Funeral Contract with Mount Olivet Cemetery Association;

    (f)    Approximately 56 shares of stock in Chevron Texaco Corporation; and

    (g)    Any and all items of personal property presently in Kathryn's possession on the Effective Date of this FSA

The above described Separate Property of Kathryn shall belong to and remain the Separate Property of Kathryn to the exclusion of Bert and all future claims of separate property outside of the above described property, are hereby forever waived and released.

3.4    **Division of Separate and/or Community Property of Bert and Kathryn.** The Separate and/or Community Property of Bert and Kathryn Gibbs shall be divided and allocated as follows:

    a.)    The sum of One Million Dollars ($1,000,000.00) shall be distributed to Kathryn from the funds held in the Registry of the Court in Cause No. 2004-11103-16 styled "J. W. Operating Company v. Kathryn H. Gibbs, et al." filed in the 16th Judicial District Court of Denton County, Texas. Said sum shall be paid to the Kathryn H. Gibbs 867 Management Trust for the use and benefit of Kathryn for and during her lifetime.

    b.)    An undivided One-fourth (1/4) surface estate interest only in and to the 532 acres, more or less, known as the "**Gibbs' Homeplace**" (more particularly described in Exhibit "B" attached hereto and by reference incorporated herein, shall be allocated to Kathryn). The interest shall be transferred to a "**867 Management Trust**" for the use and benefit of Kathryn for and

FAMILY SETTLEMENT AGREEMENT - Page 11
\cases\Gibbs\FSA 82508 final

512

KVG    COW    HKG    KHG    SFG    KHG

Exhibit A

Page 11 of 45

during her lifetime. Further, it is the agreement of the Parties that all of the surface estate of the 532 acres will immediately be placed on the market for sale at a current market price.

c.) All items of personal property presently in the possession of Kathryn are awarded to Kathryn, and

d.) Save and except for Kathryn's separate property contained in the Mary L. Houseworth Trust, the Kathryn Houseworth Gibbs Irrevocable Trust; the Kathryn H. Gibbs 867 Management Trust contemplated by this FSA; the Kansas property to be made a part of the Mary L. Houseworth Trust, a prepaid Funeral Contract with Mount Olivet Cemetery Association; approximately 56 shares of stock in Chevron Texaco Corporation, to be transferred to the Mary Houseworth Revocable Trust; all items of personal property presently in Kathryn's possession on the Effective Date of this FSA, the sum of $1,000,000.00, and an undivided one-fourth (1/4) fractional surface estate interest in the Gibbs' Homeplace assigned to the Kathryn H. Gibbs 867 Management Trust, all other property belonging to either Bert and/or Kathryn, whether the same be separate and/or community, real, personal, and/or mixed, or a combination of the same, is by agreement of the Parties transferred, assigned and conveyed to the Bert Gibbs Estate.

3.5 **Clearing Title.** All Parties represent that they will use their best efforts to obtain the agreement of any person or entity that may have or claim an interest in any property of Bert and/or Kathryn to agree to forever release said interest by conveying the same to the Estate of Bert, and work toward resolving any issues that could in any way have or create a cloud on title to any property of Bert and Kathryn.

However, if the agreement(s) and release(s) cannot be obtained from such third persons and/or entities on a voluntary basis, then, in that event, all parties authorize both the Executor of Bert's Estate and the Permanent Guardian of Kathryn's Estate to take whatever actions that may be necessary to rightfully obtain full interest and/or to clear title to said properties.

The attorneys compensated pursuant to contingent fee agreements with the Parties, as provided in Paragraph 3.15, agree that any work they perform to marshal and clear title to property as provided in this Paragraph will be performed pursuant to their respective contingent fee agreements and not as an additional expense of administration of any estate provided for in this Agreement.

3.6 **Distribution/Payment of Kathryn's Share.** No part of Kathryn's share of the Estates shall be subject to administration in the Estate of Bert Gibbs and it shall never be subjected to the expense of such administration. Kathryn's funds of $1,000,000.00, shall be transferred to the Kathryn H. Gibbs 867 Management Trust within 30 days from the

entry of the final Order in Cause No. 2004-11103-16 styled "J. W. Operating Company v. Kathryn H. Gibbs, et al." filed in the 16th Judicial District Court of Denton County, Texas or within 10 days from the creation of the 867 Management Trust, whichever is later. Kathryn's undivided one-fourth (1/4) interest in the surface estate of the Gibbs' Homeplace shall be transferred to the Kathryn H. Gibbs 867 Management Trust at the same time as the $1,000,000.00 is transferred, by Special Warranty Deed to the Trustee of said 867 Management Trust.

3.7    **Ultimate Division of Bert's and Kathryn's Property.** The Property of both Bert Gibbs and Kathryn Gibbs, following her death, shall ultimately be divided as follows (the "Distribution Shares"):

a)    Bert Gibbs' Estate.  By this Family Settlement Agreement (which supersedes and overrides in every way the terms of any Will of the Decedent, Bert Gibbs, regarding the distribution of his Estate), the net property in Bert Gibbs' Estate, after distributing Kathryn's share per this Agreement and paying all Estate administrative expenses, shall be divided into four equal shares to be distributed outright and free of trust or any encumbrance as follows:

(i)     Ken – twenty-five percent (25%);
(ii.)    Candy – twenty-five percent (25%);
(iii)    Kip – twenty-five percent (25%); and
(iv)    Howard Kirk – twenty-five percent (25%).

In the event that any child should not survive the execution of this agreement, then, in that event, his or her share of the Bert Gibbs Estate shall pass pursuant to the terms and provisions of such child's last will and testament. In the event that the deceased child does not have a last will and testament, then, in that event, his or her share of the Bert Gibbs Estate shall pass per stirpes, and not per capita, to the child's descendants.

b)    Kathryn Gibbs' Estate.  Upon her death, by this Family Settlement Agreement (which supersedes and overrides in every way any Will of Kathryn Gibbs, regarding distribution of her Estate), the net property in Kathryn Gibbs' Estate, and/or Trusts, after paying all Estate administrative expenses and administrative expenses of the Mary L. Houseworth Trust, the Kathryn Houseworth Trust, the Kathryn H. Gibbs 867 Management Trust and upon termination and complete wrap-up of both Kathryn's Estate and the Kathryn H. Gibbs 867 Management Trust, shall be divided into four equal shares to be distributed outright and free of trust or any encumbrance as follows:

i.     Ken – twenty-five percent (25%);
ii.     Candy – twenty-five percent (25%);
iii.    Kip – twenty-five percent (25%); and
iv.    Howard Kirk – twenty-five percent (25%).

In the event that any child should not survive Kathryn Gibbs, then, in that event, his or her share of the Kathryn H. Gibbs Estate shall pass pursuant to the terms and provisions of such child's last will and testament. In the event that the deceased child does not have a last will and testament, then, in that event, his or her share of the Kathryn H. Gibbs Estate shall pass per stirpes, and not per capita, to the child's descendants.

3.8   **Decedent's Testamentary Instruments.** Each Party represents to every other Party that he or she is not aware of any testamentary instruments executed or alleged to have been executed by Decedent that remained in existence at the time of his death other than the Last Will and Testament of Bert Hughes Gibbs, Deceased, dated December 6, 2004, which has been admitted to probate in Cause No. 05-0126-2, in the Probate Court No. 2 in and for Tarrant County, Texas, and styled: "Estate of Bert Hughes Gibbs, Deceased." The Parties agree that, if there are any other testamentary instruments of Bert Gibbs in existence, the December 6, 2004 Will shall remain probated to the exclusion of all others and ownership of the property of Bert's Estate shall be determined solely by the terms of this FSA, which shall supersede the dispositive provisions in the Will of Decedent.

3.9   **Ward's Testamentary Instruments.** Each Party represents to every other Party that notwithstanding the terms of any testamentary instruments executed or alleged to have been executed by the Ward and that may remain in existence at the time of her death, that the terms and provisions of this Family Settlement Agreement as to the disposition and administration of the Ward's assets and estate, will contractually control and supersede any terms contained in such testamentary instruments. In the event that the psychiatric evaluation of Kathryn establishes that she is competent and has the necessary testamentary capacity to execute a Will, then, in that event, Kathryn agrees to execute contemporaneous with the execution of this Agreement, a new contractual Will (hereinafter referred to as the "Contractual Will of Kathryn"), which provides that upon Kathryn's death all of her estate will be devised and conveyed in equal shares to Kip, Candy, Kenneth and Howard Kirk, if living, and if not living then to their respective descendants, per stirpes and not per capita. Further, all Parties agree to produce prior to the execution of this Settlement Agreement, copies of any Wills of Kathryn, which the Party purports to be the current Last Will and Testament of Kathryn. Failure to produce any such Will, will serve as an additional contractual prohibition against the Party and/or the Affiliates of the Party from later offering for probate such instrument as a Will.

The Parties agree that no matter what testamentary instruments of Kathryn Gibbs may exist, the Contractual Will of Kathryn (if executed by a competent Kathryn) shall be probated in a Probate Court of Denton County, Texas, without contest or objection, to the exclusion of all other Wills of Kathryn which might exist, and the ownership of the property in Kathryn's Estate shall be determined solely by the terms of this FSA and the identical provisions of the Contractual Will of Kathryn, which terms and provisions shall supersede the dispositive provisions of any other Will of the Ward. All Parties agree that for convenience, venue over Kathryn's Estate shall be in Denton County, Texas.

3.10   **Existence of Marriage of Decedent and Ward.** Each party agrees that notwithstanding

FAMILY SETTLEMENT AGREEMENT - Page 14
z:\casca\Gibbs\FSA 8'15'08-final

515

KUG   CWD   W

Exhibit A
Page 14 of 15

the terms and provisions of any Orders, Judgments, or Decrees to the contrary issued by the Probate Court of Denton County, Texas, in the Divorce Proceeding, including, but not limited to the Amended Decree of Divorce dated November 18, 2003, and based on the ruling by the Second Court of Appeals wherein the Denton County Probate Court lacked jurisdiction to transfer the divorce proceeding to the Statutory Probate Court, that the Decedent and the Ward were and continued to be married as of the date of the Decedent's death, resulting in the Ward being the Decedent's surviving spouse and widow. Further, the Parties agree that any and all other Orders, Judgments, and/or Decrees issued by the Court dealing with the status of the marriage of Bert and Kathryn Gibbs are or shall be vacated and are to be treated as if they are null, void, and nonexistent.

### 3.11. Certain Previously-Conveyed Assets

A. The Parties agree that subject to paragraph 3.11 D. below, they will fully account for any real property, oil and gas, mineral, royalty and other real property interests, and any cash received by them on account of any real property, oil and gas, mineral, royalty and any other real property interests, previously conveyed to them, or an associate of theirs, including but not limited to any alias, or alter ego of theirs, or used by them at anytime, whether trusts, corporations, unincorporated business organizations, or any other entity controlled in whole or in part by any of them, Bert and/or Kathryn. If such asset is currently under the ownership and control of a Party or an associate of the Party, including but not limited to any alias, or alter ego of theirs, or used by them at anytime, whether trusts, corporations, unincorporated business organizations, or any other entity controlled in whole or in part by them, then, in that event the real property interest and cash so received shall be transferred to the Estate of Decedent, within 30 days of the approval of this FSA.

B. Format of Disclosure. Each party agrees that within 30 days of the full execution of this Family Settlement Agreement that each party will attach to this Agreement a full and complete list of any gifts and/advancements of real property, oil and gas, mineral, royalty, and any cash from real property, oil and gas, mineral, or royalty interests, received by the Party and/or an Affiliate of the Party, including but not limited to any alias, or alter ego of theirs, or used by them at anytime, whether if trusts, corporations, unincorporated business organizations, or any other entity controlled in whole or in part by them, from either the Decedent and/or the Ward. The failure of any Party or Parties to comply with this Paragraph shall not affect the enforceability of this Family Settlement Agreement, but rather shall be a breach of this Agreement.

C. One hundred percent of all real property, oil and gas, mineral, royalty and any cash disclosed in A. and B. above shall be conveyed in kind or by Special Warranty Deed or other appropriate document of conveyance to the Estate of Decedent

FAMILY SETTLEMENT AGREEMENT - Page 15
F:\Cases\Gibbs\FSA 8'15'08-final

516

KU C C&W W

Exhibit A

Page 15 of 15

within 30 days from the date of this Family Settlement Agreement, or, if not returned to the Estate of the Decedent in that manner, treated as an advancement toward the future distributions due that party under this Agreement. Any non-cash asset not so returned will be appraised by an independent appraiser, and the fair market value determined by the appraiser shall be the amount of the advancement. Any tax liability created by returning the property to Bert's Estate, chargeable to any party, shall be paid by Bert's Estate, which will indemnify such Party for such liability

D.  Notwithstanding any other provision or provisions of this Agreement, the Parties agree that they have reviewed the Orders and Accountings from all the Guardianship Proceedings, and that no proceeds accounted for as a part of those proceeding or used for the maintenance and support of Kathryn during the pendency of those proceedings are required to be disclosed or conveyed to Decedent's estate as a part of this Agreement.

3.12  **Administration of Decedent's Estate.** Kenneth Vern Gibbs, as Independent Executor of the Decedent's Estate, will have sole authority over and responsibility for the administration of the Decedent's estate including, but not limited to, the preparation and filing of any of Decedent's income and gift tax returns, all death tax returns and all fiduciary income tax returns, as may be due, and the collection and distribution of the assets of the Decedent.

Kenneth Vern Gibbs, as Independent Executor of the Decedent's Estate represents that he will properly file all returns and provide for the payment of any related taxes. All Parties hereby agree to INDEMNIFY, DEFEND and HOLD HARMLESS, the Independent Executor from any and all liability (save and except for liability arising out of negligent acts or breach of fiduciary duties), transferor, transferee or otherwise, (i) relating to his serving as personal representative of Decedent's Estate, including any and all past, current or future federal or state income, gift or death taxes, and any related interest and penalties which may be claimed, or assessed, relating to Decedent's Estate, (ii) relating to any and all past, current or future federal or state income, gift or death taxes, including any interest, and penalties, imposed by reason of the distributions provided for in this Agreement, and (iii) arising from all claims, costs, expenses, including but not limited to attorney's fees and expenses, accountant fees and expenses, experts, litigation costs and bond premiums, relating to any attempt by the Internal Revenue Service or other persons or entities to assess, collect or enforce any claims, demands, assessments or judgments against the Estates of the Decedent and/or Ward, or their personal representatives, for past, current or future federal or state income, gift or estate taxes, and any related penalties and interest. Any past income taxes, penalties, and interest will be borne by Bert's Estate, unless it is shown that the income was attributable to a separate estate asset of Kathryn, in which event the tax liability will be apportioned.

All parties acknowledge and agree that the Independent Executor has filed an Estate Tax Return for the Decedent, along with an application for discharge from personal

FAMILY SETTLEMENT AGREEMENT - Page 16
c:\copies\Gibbs\FSA 8'15'08-final

517

KVG  CBW  VJ

Exhibit

Page ___16___ of ___44___

liability for the Estate's tax obligations, pursuant to section 2204(a) of the Internal Revenue Code, more than 9 months ago.

3.13  **Administration of Ward's Estate.** Kip Hughes Gibbs, as Independent Executor of the Ward's Estate, will have sole authority over and responsibility for the administration of the Ward's estate including, but not limited to, the preparation and filing of any of Ward's income and gift tax returns, all death tax returns and all fiduciary income tax returns, as may be due, and the collection and distribution of the assets of the Ward.

Kip Hughes Gibbs, as Independent Executor of the Ward's Estate represents that he will properly file all returns and provide for the payment of any related taxes. All Parties hereby agree to INDEMNIFY, DEFEND and HOLD HARMLESS, the Independent Executor from any and all liability (save and except for liability arising out of negligent acts or breach of fiduciary duties), transferor, transferee or otherwise, (i) relating to his serving as personal representative of Ward's Estate, including any and all past, current or future federal or state income, gift or death taxes, and any related interest and penalties which may be claimed, or assessed, relating to Ward's Estate, (ii) relating to any and all past, current or future federal or state income, gift or death taxes, including any interest, and penalties, imposed by reason of the distributions provided for in this Agreement, and (iii) arising from all claims, costs, expenses, including but not limited to attorney's fees and expenses, accountant fees and expenses, experts, litigation costs and bond premiums, relating to any attempt by the Internal Revenue Service or other persons or entities to assess, collect or enforce any claims, demands, assessments or judgments against the Estates of the Decedent and/or Ward, or their personal representatives, for past, current or future federal or state income, gift or estate taxes, and any related penalties and interest. Any past income taxes, penalties, and interest will be borne by Ward's Estate prior to distribution of Ward's Estate.

3.14  **Administration and Distribution of Estate Assets.** The Parties agree that all of the Decedent's property, being all real and personal property the Decedent had an interest in or claim to at the time of his death, and all of the Ward's property, being all real and personal property the Ward had an interest in or claim to at the time of the Effective Date of this Agreement, including but not limited to her Separate Property interests, her interest in the Houseworth Trusts and her Community Property interests, shall pass subject to the terms of this Agreement. The Decedent's and Ward's Estate's shall be administered and distributed as follows:

A.  Payment of Debts and Expenses of Decedent's Estate. All of the Decedent's legally enforceable debts, funeral expenses, expenses of the administration, and all federal and state estate, inheritance and succession taxes (except any generation-skipping tax imposed by Section 2601 of the Internal Revenue Code or similar provision of any state law), including interest and penalties thereon, imposed upon the Decedent's estate or any beneficiary thereof by reason of the Decedent's death, including the portion of any such tax as is attributable to the proceeds of policies of insurance on Decedent's life or other property not

constituting a part of Decedent's probate estate, be paid out of Decedent's residuary estate, without reimbursement from any person. The above direction with respect to payment of debts shall not be construed to require the payment of any debt before it is due, and Decedent's executor is specifically given the authority to pay and keep current out of funds in the Estate any debt or charge existing at the time of Decedent's death, including any mortgage and/or loan which may in fact exist. Similarly, Decedent's executor shall have the right and power to incur indebtedness and to borrow money for the purpose of paying any or all of the aforesaid debts, expenses and taxes. No policy loan against a policy of life insurance owned by Decedent on Decedent's life or on the life of any other person shall be treated as a debt to be paid out of the residue of Decedent's estate but rather any such policy loan against a policy of life insurance owned by Decedent on Decedent's life shall be paid out of the proceeds of the policy and any policy of life insurance owned by Decedent on the life of any other person shall be distributed to the person or entity entitled thereto subject to any such policy loan.

B. <u>Payment of Debts and Expenses of Ward's Estate</u>. All of the Ward's legally enforceable debts, funeral expenses, expenses of the administration, and all federal and state estate, inheritance and succession taxes (except any generation-skipping tax imposed by Section 2601 of the Internal Revenue Code or similar provision of any state law), including interest and penalties thereon, imposed upon the Ward's estate or any beneficiary thereof by reason of the Ward's death, including the portion of any such tax as is attributable to the proceeds of policies of insurance on Ward's life or other property not constituting a part of Ward's probate estate, be paid out of Ward's residuary estate, without reimbursement from any person. The above direction with respect to payment of debts shall not be construed to require the payment of any debt before it is due, and Ward's executor is specifically given the authority to pay and keep current out of funds in the Estate any debt or charge existing at the time of Ward's death, including any mortgage and/or loan which may in fact exist. Similarly, Ward's executor shall have the right and power to incur indebtedness and to borrow money for the purpose of paying any or all of the aforesaid debts, expenses and taxes. No policy loan against a policy of life insurance owned by Ward on Ward's life or on the life of any other person shall be treated as a debt to be paid out of the residue of Ward's estate but rather any such policy loan against a policy of life insurance owned by Ward on Ward's life shall be paid out of the proceeds of the policy and any policy of life insurance owned by Ward on the life of any other person shall be distributed to the person or entity entitled thereto subject to any such policy loan.

Notwithstanding the foregoing, if any tax, including interest and penalties thereon, is imposed on property includable in Ward's gross estate by reason of Section 2044 of the Internal Revenue Code or a similar provision of any state law, the Parties direct the Executor to recover the tax attributable to that property from the person or entity in possession of or receiving the property as provided in Section 2207A of the Internal Revenue Code or a similar provision of state law. In any event, all Parties authorize payment of any such tax as soon as practicable in order

FAMILY SETTLEMENT AGREEMENT - Page 18
\Keller\Gibbs\FSA 8'15'08-final

519

KVG CDW WJ

Exhibit
Page 18 of 415

to avoid further charge of interest or penalties on any owed taxes.

C. <u>Division of Personal Property of Decedent's Estate.</u> All of Decedent's household furniture and furnishings, books, pictures, objects of art, silverware, jewelry, clothing and other such personal effects (save and except for automobiles), Decedent may have owned at the time of Decedent's death, are to be owned by the child and/or spouse currently in possession of the same.

D. <u>Division of Personal Property of Ward's Estate.</u> Upon the death of Kathryn all of her personal items and effects shall be distributed equally to the four Gibbs Children in accordance with the terms of this provision. The Executor and/or Trustee shall work with the four Gibbs Children to come to an agreement about the remaining personal items and effects that each Gibbs Child receives, save and except for the following specific items of personal property, which are to be distributed to the person designated:

| Description of Item | Name of Child |
| --- | --- |
| "Candy's Hope Chest" (presently in the possession of Kathryn H. Gibbs) | Candy |
| Grandmother Gibbs Bedroom Suite (not in the possession of Kathryn H. Gibbs, Kip Gibbs, and/or Sandy Gibbs) | Ken |

If the Executor/Trustee and the four Gibbs Children cannot reach an agreement with regard to the remaining items, the personal items and effects shall be divided pursuant to the following procedure:

<u>Division Procedure.</u> After twenty days (20) notice, by certified mail, to the Four Gibbs Children, at their last known address, regarding the place and time of this division of this property, there shall be a drawing held to determine the order each of the four Gibbs Children shall choose a personal item or effect. The order will apply to the "first round" of choosing personal items. The order shall be reversed with the fourth child in the first round, picking first in the second round. The "third round" will again be reversed back to the order of the "first round." This alternating order shall be continued until all of the personal items and effects are divvied up among the four Gibbs Children. The four Gibbs Children hereby specifically agree that this procedure is fair and shall be implemented in the event no agreement can be reached and the division shall stand and be binding upon all of the four Gibbs Children, regardless of the items or value of the items that each Gibbs Child may ultimately receive. Each of the four Gibbs Children explicitly agree that all complaint, objection or cause of action in relation to this procedure or its ultimate result is hereby waived and forever released and that no cause of action shall exist for any discrepancy in the value or items actually received by any of the four Gibbs Children, respectively. The items each receives, per this procedure, shall be theirs for all time, outright, free of any encumbrance or claim

FAMILY SETTLEMENT AGREEMENT - Page 19
\Cases\Gibbs\FSA 8'15'08-final

520

KUG CHW HJ

Exhibit A
Page 1 of 445

of any other Party.

If there is any personal item or effect that are not picked by one of the Four Gibbs Children than that item or effect shall be abandoned by the Executor.

E.   Time for Distribution of Decedent's Estate. The Parties agree that the Executor of Decedent's Estate shall use diligence in the administration of Bert's Estate and that he shall, make distributions as soon as possible in accordance with this agreement, that he shall make all distributions equally and at the same time, to all beneficiaries when applicable and that he shall do the following:

1.   Distribute to the Kathryn H. Gibbs 867 Management Trust the sum of $1,000,000.00 within 30 days of entry of the Final Order in Cause No. 2004-11103-16, styled "J-W Operating Company v. Kathryn G. Gibbs, et al.," filed in the 16th Judicial District Court of Denton County, Texas, or within 10 days of creation of the 867 Management Trust;

2.   Distribute to the Kathryn H. Gibbs 867 Management Trust the undivided one-fourth 1/4 interest in the surface estate only of the Gibb's Homeplace (as described in Exhibit "B") within 30 days from the date this FSA is approved by a Statutory Probate Court, by Special Warranty Deed or within 10 days from the date the 867 Management Trust is created;

3.   In exchange for an agreement of indemnification of the Executor of Decedent's Estate for any claims, the Parties authorize and agree that the Executor is authorized and obligated to make partial distributions to the parties in the shares and proportions agreed to above of the existing cash assets only of the estate (save and except for a minimum cash reserve of $200,000 to be retained and maintained by the Executor to be used if necessary for any ongoing administrative expenses pending final distribution of the estate).

4.   Additionally, the Executor is authorized to distribute any mineral interests to the parties upon resolving any known or anticipated issues with third parties concerning the same.

5.   It is the desire and agreement of the Parties that the Executor of the Estate is authorized to liquidate and sell all real property assets, save and except for any mineral interests in such properties, with the Parties agreeing that all mineral interests are to be reserved and retained unless otherwise agreed to in writing by all the Parties.

6.   Unless otherwise agreed to by all Parties, the final distribution of Bert's Estate shall be within 60 days of the Executor's completion of (1) the full and complete liquidation of all surface real property estate assets; and (2) either the receipt of the Estate Tax Closing Letter from the Internal Revenue Service, or the running of the limitations period for any additional

tax assessments.

7. When the Executor makes either a partial and/or final distribution, the Parties agree to execute an instrument entitled Receipt, which is to be executed and returned by each party in exchange for the distribution to them of their share of the estate as established by this agreement.

8. Further, all Parties agree that so long as any asset of the Estate remains in the possession and control of the Executor, that the Estate and the Executor shall hold such property in trust and for the benefit of each party to the extent of their interests therein. Each trust created hereunder is a spendthrift trust. Accordingly, no party/beneficiary shall have the power to anticipate, encumber, or transfer his interest in any trust estate in any manner, save and except for any transfers and/or assignments entered into by the various Parties with their respective attorneys as of the effective date of this FSA. No part of any trust estate shall be liable for or charged with any debts, contracts, liabilities, or torts of a beneficiary or subject to seizure or other process by any creditor of a beneficiary. Each Party has willingly and voluntarily waived any such rights and have agreed to this spendthrift provision.

F. Time for Distribution of Ward's Estate. The Parties agree that the Executor of Ward's Estate shall use diligence in the administration of Ward's Estate and that he shall:

1. Distribute all of Ward's Estate pursuant to this FSA after approval of the Inventory, Appraisement and List of Claims has been entered, the Notice to Creditors filed, payment of debts, and any other administration necessary to close all of the trusts, any filing of tax returns, and if applicable, receipt of the closing letter from the IRS,

2. Nothing in this FSA shall preclude the Executor of Ward's Estate from making partial distributions from the Ward's Estate.

3. When the Executor makes either a partial and/or final distribution, the Parties agree to execute an instrument entitled Receipt, which is to be executed and returned by each party in exchange for the distribution to them of their share of the estate as established by this agreement.

4. Further, all Parties agree that so long as any asset of the Estate remains in the possession and control of the Executor, that the Estate and the Executor shall hold such property in trust and for the benefit of each party to the extent of their interests therein. Each trust created hereunder is a spendthrift trust. Accordingly, no party/beneficiary shall have the power to anticipate, encumber, or transfer his interest in any trust estate in any manner, save and except for any transfers and/or assignments entered into

FAMILY SETTLEMENT AGREEMENT - Page 21
S:\...\Gibbs\FSA 8'15'08-final

522

KbG CbD M

Exhibit A
Page 21 of 15

by the various Parties with their respective attorneys as of the effective date of this FSA. No part of any trust estate shall be liable for or charged with any debts, contracts, liabilities, or torts of a beneficiary or subject to seizure or other process by any creditor of a beneficiary. Each Party has willingly and voluntarily waived any such rights and have agreed to this spendthrift provision.

3.15    **Attorney's Fees Affecting Distributions.**

A.    **Attorney's fees of Ken, Candy and Howard Kirk.** Parties acknowledge and agree that Ken, Candy and Howard have incurred with their attorneys, attorney's fees and expenses based upon a contingency fee contract of 50% of the amounts recovered and distributed to them as beneficiaries of the Estates of the Decedent and the Ward. The Parties agree that all attorneys' fees paid or owed by Ken, Candy and Howard Kirk shall be borne by and shall be the sole obligation of Ken, Candy and Howard Kirk and shall be paid solely by them, and Kip shall never be obligated to pay said attorneys' fees and expenses in any way. These Attorney's fees will only be paid out of the percentage share allocated to Ken, Candy and Howard at the time of actual distribution to them. All parties stipulate and agree that such attorney's fees have been essential to the proper settlement of the Estates.

Further, the amount of the Attorney Fees payable to the Attorneys representing Ken, Candy, and Howard Kirk, will proportionately reduce each of their fractional shares, when calculating each of their shares of Bert's and Kathryn's Estates for purposes of both the calculation of Estate and Inheritance Taxes, and for the calculation of partial and final distributions to each of them.

The Executor (as hereinafter provided) may at his election, (1) add the amount of the Attorney Fees paid to the Attorneys for Ken, Candy, and Howard Kirk, as a part of the "Attorney Fees" to be deducted on Schedule J, Part B, Line 2—Attorney Fees, when filing an Estate Tax Return, for the reason that the services provided by the attorneys have benefitted the general estate in reaching a fair and correct distribution of the Estate assets, or (2) use such fees as an income tax deduction.

Further all parties acknowledge that had this settlement agreement not been entered into by all parties, the Counsel for Ken, Candy, and Howard Kirk were prepared to defend the Will of the Decedent previously admitted to probate, would have had to and were prepared to pursue the Proceedings and claims on behalf of the Estate against other persons or entities for the recovery of property and would have been entitled under the Texas Probate Code to recover attorney fees from the Estate, if the Court was to determine that the Will was offered and defended in good faith or that the claims were properly and correctly pursued.

B.    **Attorneys Fees of Kip.** The Parties acknowledge and agree that Kip, has both individually and in his capacity as Temporary Guardian, and Permanent Guardian

523

KOG CBW     W

incurred attorney's fees and expenses. These fees and expenses are now based upon a contingency fee arrangement of a percentage of the amounts recovered and distributed to him as a beneficiary of the Estates of the Decedent and the Ward. The Parties agree that all attorneys' fees paid and owed by Kip individually and in his capacity as Temporary Guardian, and Permanent Guardian, shall be borne by and shall be the sole obligation of Kip, and shall be paid solely by him out of his share when his share is distributed to him, and Ken, Candy and Howard Kirk shall never be obligated to pay said attorneys' fees and expenses in any way. All parties stipulate and agree that such attorney's fees have been essential to the proper settlement of the Estates.

Further, Kip agrees to be solely responsible for and will indemnify the Estates for any attorney's fees and expenses that may be claimed to be due, unpaid, and outstanding by David Bouschor, Kevin Spencer, and Jeff Springer as a part of the Guardianship and appellate proceedings. Further, David Bouschor, Kevin Spencer, and Jeff Springer, acknowledge and agree by their approval of this FSA, that they will look solely to Kip's distributive share of the Estates to satisfy any such claims for attorney's fees.

Further, the amount of the Attorney Fees payable to the Attorneys representing Kip will proportionately reduce his fractional share, when calculating his share of Bert's and Kathryn's Estates for purposes of both the calculation of Estate and Inheritance Taxes, and for the calculation of partial and final distributions to him.

Unless otherwise previously taken as an income tax deduction, the Executor (as hereinafter provided) may add the amount of the Attorney Fees previously paid to the Attorneys for Kip, Sandy, Kathryn and/or the Trusts, as a part of the "Attorney Fees" to be deducted on Schedule J, Part B, Line 2--Attorney Fees, if necessary, or use such amounts as well as any contingency attorney's fees paid by Kip out of his distributive share if necessary when dealing with any Estate Tax and/or Income Tax Return issues for Bert's Estate, for the reason that the services provided by the attorneys have benefitted the general estate of Bert in reaching a fair and correct distribution of the Estate assets.

Further all parties acknowledge that had this Family Settlement Agreement not been entered into by all parties, the Counsel for Kip were prepared to offer and defend the Will of the Ward, would have had to and were prepared to pursue the Proceedings and claims on behalf of the Estate against other persons or entities for the recovery of property and would have been entitled under the Texas Probate Code to recover attorney fees from the Estate, if the Court was to determine that the Will was offered and defended in good faith or that the claims were properly and correctly pursued.

C.   **Apportionment of Estate & Inheritance Taxes.** Any Federal Estate Tax or State

FAMILY SETTLEMENT AGREEMENT - Page 23
...es\Gibbs\FSA 8'15'08-final

524

KVC  C,Bw     W

Exhibit  A
Page 23 of 45

of Texas Inheritance Tax due as the result of the death of either the Decedent or the Ward, will be paid out of the net estate to be distributed to the children-beneficiaries, unless otherwise provided for herein. Each of the Children's share of the Net Estate will be responsible on a proportionate basis for their respective share of Federal Estate Tax, and State of Texas Inheritance Tax. As a result, each Beneficiary/Child's share to be distributed upon the completion of the Administration of the Estates, will be further reduced by the applicable amount of taxes attributable to their share of the net estate.

### 3.16 Agreement with Respect to Guardianship.

A. **Access to Kathryn.** The Parties acknowledge that each of them would like to maintain and/or rekindle a relationship with their mother, Kathryn Gibbs, but each hereby agree that the decision to allow visitation or access to Kathryn Gibbs shall be subject to the decision of and made only by Kathryn Gibbs in the event that she should be determined to be competent to make such decisions.

Each Gibbs Child hereby agrees that he or she will respect and follow Kathryn's desire and decision to maintain or rekindle any relationship with any of the Gibbs Children and that she shall not be subjected to any sort of harassment, via phone, e-mail, letter writing or any other type of contact, once her expressed desire denying or against such relationship or contact has been communicated by her to them, either verbally or in writing. The Parties also agree that once Kathryn has communicated her desire of no further contact or communication, and thereafter further contact or communication continues, whether or not it is to the point of harassment, that Kathryn may seek protection from such contact, communication or harassment from a court of law. The cost of any such action, including attorney's fees and expenses, shall be borne and paid for by the party making contact and against whom the action for protection is filed, if protection is granted.

B. **Guardians of Kathryn's Person.** In the event that the psychiatric evaluation of Kathryn concludes that there is a need for a Guardian of her Person, then, in that event, the Parties agree to make a joint application to appoint a third party licenced Professional Guardian in the Nueces County, Texas area with this third party being picked by Kathryn's primary care Physician, as the Guardian of her Person. In the event the first third party cannot or will not serve or continue to serve, then, in that event, Kathryn's then primary care Physician shall designate the alternate or successor Guardian of the Person. No Guardian of the Person of Kathryn will interfere with the reasonable visitation of any Party with Kathryn.

C. **Guardian of Kathryn's Estate.** The Parties agree that any temporary guardianship proceedings ended on December 6, 2004 with the signing of the Order Approving Inventory and Accounting of Temporary Guardianship.

FAMILY SETTLEMENT AGREEMENT - Page 24
...ases\Gibbs\FSA 8'15'08-final

525

K⁴⁄ Cⁱⁱᵂ W

Exhibit A
Page 24 of 45

The Parties agree that if the psychiatric evaluation of Kathryn determines that she is competent to manage both her person and her financial affairs, then, at this time there is no necessity for a court with proper jurisdiction to appoint either a Limited or Permanent Guardianship of the Estate of Kathryn.

In the event that it is determined by the psychiatric evaluation that Kathryn is not competent to manage her Estate, then, in that event, the Parties agree that they will file a joint application to appoint Jimmy Walker as Guardian of Kathryn's Estate, as previously set forth herein. Additionally the Parties will also seek such appointment if it is later determined that there is a necessity for a Guardianship of the Ward's Estate, with the specific authority to transfer any assets of Kathryn's guardianship estate to the 867 Management Trust, which has been created herein.

D. **Final Accounting of Temporary Co-Guardians of Kathryn's Estate.** All Parties ratify and approve of the Denton County Probate Court's Inventory and Accounting of Temporary Co-Guardianship, Order Approving Inventory and Accounting of Temporary Co-Guardianship, and discharge and release from liability of Kip and Sandy as Temporary Co-Guardians and as Permanent Co-Guardians. The Parties acknowledge that there has been monthly distributions directly to or directly for Kathryn's care or for Kathryn's monthly living expenditures, from the Houseworth Trust and the Kathryn Gibbs Trust. Kip and Sandy Gibbs will not have to account for the actual expenditures made by or for Kathryn from these Trusts. The Parties agree that no further fees will be paid to the Temporary Co-Guardians for their services.

E. **Existing Bond.** All parties agree that the bond presently existing in the Probate Court of Denton County, Texas, pursuant to the Order Converting Temporary Guardianship of the Estate to Permanent Guardianship of the Estate, signed on April 27th 2004, posted by Kip and Sandy Gibbs in the amount of One Hundred Thousand and no/100 Dollars ($100,000.00) shall be released and that Kip and Sandy Gibbs, and their attorneys, employees of their attorneys, and/or other of their representatives, are released and discharged from any further or additional accounting or repayment of any then ordered fees or expenses. All parties agree to execute whatever documents are necessary to obtain whatever documents the Bond Company requires in order to get Kip and Sandy Gibbs and Western Surety Company released and discharged from all liability under said Bond #15498959.

3.17 **Agreement with Respect to the Mary L. Houseworth Revocable Trust and the Kathryn Houseworth Gibbs Irrevocable Trust.**

A. Accountings. The Trustees of the Houseworth Trust and the Kathryn Gibbs Trust shall prepare and distribute/disclose to Kathryn and each of the four Gibbs Children an accounting complying with the statutory format for the periods January 1, 1998 through the present. If previous accountings have been prepared

FAMILY SETTLEMENT AGREEMENT - Page 25
...les\Gibbs\FSA 8'15'08-final

526

KUG CWW W

Exhibit
Page 25 of 45

by any prior Trustee for the periods addressed, copies of same shall be provided to Kathryn and each of the four Gibbs Children, unless any of them notify the current Trustee that they have already received such accountings and do not require an additional one.

B.   **No Liability for Y2K.** The Parties agree that no Party shall be held responsible or liable for the return or account of any funds removed or taken from any trust, any loss in value on the sale of the gold coins and/or junk silver, and/or any item, ration, property purchased with funds removed from one or both of the Trusts at the time the sale was ordered or at the time the return of such items was ordered and that no Party shall be held responsible or liable for any loss in value on the sale of the gold coins and/or junk silver and/or any item, ration, property purchased with funds removed from one or both of the Trusts based upon any past value since the sale or return was ordered or based upon current value of said items. No party shall be held responsible or liable for any lack of, or failure to pursue or recover any funds, assets, or value removed from the Trusts. It is expressly provided, however, that neither Wells Fargo Bank and/or First State Bank of Denton, and/or any predecessor trustee, in their capacities as trustees of either the Houseworth Trust and/or the Kathryn Gibbs Trust, are to be released from any liability by this provision.

C.   **Contractual Modification of Houseworth & Kathryn Gibbs Trusts.** The Parties hereby agree any provision in either the Houseworth Trust and/or the Kathryn Gibbs Trust that allows Kathryn or any beneficiary or a collection thereof to take action to request or order either Trustee to make distribution of principal from either Trust is hereby contractually eliminated from those Trusts and will not, and cannot, ever be utilized again by any Party for that stated purpose, pursuant to Tex. Property Code §112.054(a)(5)(B) at a minimum.

D.   **Successor Trustees.** In the event the existing Trustee of the Houseworth Trust, the Kathryn Gibbs Trust, or the contemplated Kathryn Houseworth Gibbs 867 Management Trust, who is or will be Compass Bank, should resign, then, in that event, the Parties agree that the successor Trustee of the Houseworth Trust, the Kathryn Gibbs Trust and the contemplated Kathryn Houseworth Gibbs 867 Management Trust, shall be the Frost Bank. The trustee herein above named or any successor trustee may at any time resign upon giving sixty (60) days written notice of such resignation (unless such notice is waived in writing by all persons entitled thereto) to the Probate Court where the Kathryn Houseworth Gibbs 867 Management Trust was created, the Guardian of the Estate if still acting in said position, or if not, then to the then acting Guardian of the Person. In the event any trustee serving hereunder shall resign, be removed, cease or fail for any reason to serve as trustee, such successor trustee shall be appointed by the Denton County Probate Court pursuant to the terms of this Agreement.

FAMILY SETTLEMENT AGREEMENT - Page 26
\Cases\Gibbs\FSA 8'15'08-final

527

KUG   CBW   W

Exhibit A
Page 26 of 45

E. The Parties agree that the Final Judgment dated January 20, 2005, in Cause Number GA 2001-196-02 in the Probate Court of Denton County, Texas, is to be vacated and is to be treated as if the final judgment is null, void, and nonexistent. Further the parties agree that the decision of the Second Court of Appeals in Fort Worth, Texas, in Cause Number 02-05-00143-CV, in which the Court of Appeals reversed and rendered the decision of the Probate Court, is the final and non-appealable Order in the proceeding, and from which all Parties agree that they will not pursue any further appeal, and will upon the effective date of this Agreement, dismiss any pending motions for rehearing or petitions for review, and request that a mandate of the Court of Appeals be issued.

F. The Parties agree that the trusts are to be administered with the agreement and understanding that the Ward has no power or authority over the assets or the administration of the assets of the trust estates which would result in such assets being made a part of the Ward's Estate for Federal Estate Tax purposes at the time of her death, and that in the event that there are any rights or powers contained in the terms and provisions of either trust instrument, then, in that event, the execution of this Agreement by the Ward and/or her representatives, does hereby result in an Agreement by the Parties that the trusts cannot and are not to be construed in such a manner as to include any assets in the Ward's estate for Federal Estate Tax purposes, with such rights by admission of the Ward, to be deemed as never having existed from the inception of each trust.

G. Any distributions from the Houseworth Trust, the Kathryn Gibbs Trust, or the 867 Management Trust, to the Ward are to be in the sole discretion of the Trustee, pursuant to their respective terms and without threats or interference from the Parties.

3.18 **Provisions Relating to Personal Representatives and Attorneys**
**Estate of Decedent.** The Parties agree that Howard Kirk Gibbs has previously relinquished his right to serve as the independent executor without bond of the Estate of the Decedent and is hereby forever contractually disqualified from serving and shall never seek reappointment. Kenneth Vern Gibbs will administer the assets of the Estate pursuant to the terms and provisions of this Agreement.

**Estates of Decedent and Ward** The Parties agree that no action shall be had in any court respecting the settlement of the Decedent's or Ward's estate other than to file this Family Settlement Agreement as a part of the probate records and, if required, to make, return and record an inventory and appraisement of the Decedent's and Ward's estate and list of claims. During the administration of the Decedent's or Ward's Estate, the Executor shall have, in extension and not in limitation of the powers given by law or the terms of this Family Settlement Agreement, all of the administrative powers and powers of sale granted to a trustee under the Texas Trust Act (or its successor statute governing the powers and responsibilities of trustees), such powers to be exercised without court supervision or control.

FAMILY SETTLEMENT AGREEMENT - Page 27
L:\Files\Gibbs\FSA 8'1508-final

528

KbC    CDW    W

Exhibit 4
Page 27 of 45

The executor shall have full power and authority to make any and all estate, inheritance and income tax elections available to the executor including specifically (i) the date and option, alternative or method which should be selected for the valuation of property in the Decedent's or Ward's gross estate for federal and state estate and inheritance tax purposes and the payment of all such taxes, (ii) whether a deduction shall be taken as an income tax deduction or an estate tax deduction, and (iii) the election to extend the time for the payment of federal and state estate and inheritance taxes and the election to pay any such tax in installments. The executor shall incur no liability to any beneficiary of the Decedent's or Ward's estate on account of making any such election, regardless of the fact that any federal or state estate, inheritance or income tax imposed on the Decedent's or Ward's estate is thereby increased or that there is a change in the proportion in which any beneficiary shares in the Decedent's or Ward's estate. The executor's decisions with respect to such matters shall be binding and conclusive upon all concerned. No compensating adjustments between income or principal or in the amount of any bequest or devise hereunder shall be made as a result of any such decision.

The Parties authorize the executor to distribute the Decedent's and Ward's Estate, respectively, in whole or in part at such time or times as it deems advisable, but in accordance with the terms of this FSA and the Executor is authorized to make such distribution in cash, or in kind, or partly in cash and partly in kind. The Executor is further authorized to distribute the Decedent's or Ward's estate subject to any and all indebtedness incurred by the Decedent or Ward, or by the Executor, which in the opinion of the Executor need not first be paid, and subject to any or all mortgages, deeds of trust or other liens created by the Decedent and/or the Ward or by the Executor, except as otherwise provided by this Agreement.

If any corporate executor should, before or after qualification, change its name, be reorganized, merged or consolidated with another corporation, or assign its trust functions to another corporation, the resulting corporation which succeeds to its fiduciary business shall become an executor hereunder or be eligible for appointment as executor, as the case may be.

**Personal Representative Fees.** For their services as executor hereunder, the executor of either the Decedent's or Ward's estate shall be entitled to reasonable fees commensurate with its duties and responsibilities, taking into account the value and nature of the Decedent's and the Ward's estates and the time and work involved. The Personal Representative Fees shall be determined by application of the statutory fee guidelines for Executors in Section 241. The Parties agree that an hourly fee of $75.00 per hour will be substituted in all instances where either statute calls for a commission of 5%., and shall never exceed 2% of the value of the gross estate, regardless of the statutory guidelines.

**Certain Fiduciary Arrangements with Scott Pelley and/or Rickey J. Brantley.** All parties agree that their relationship with Scott Pelley and/or Rickey J. Brantley, as the Attorneys for the Estate are contractual in nature only, and is to be governed and bound

FAMILY SETTLEMENT AGREEMENT - Page 28
...Cases\Gibbs\FSA 8'15'08-final

529

KVG CBW W

Exhibit A
Page 28 of 45

by the terms and provisions of this Agreement only. Further such parties expressly state that any fiduciary relationship with Scott Pelley and/or Rickey J. Brantley, which would ordinarily arise out of their assumption of the role of Attorneys for the Estate, is hereby expressly waived for all purposes, with each party, acknowledging and contractually agreeing that no fiduciary relationship will be claimed to exist, or in the alternative any fiduciary relationship which is created by the assumption by Scott Pelley and/or Rickey J. Brantley of the role of Attorney of the Estate is hereby expressly waived, with Scott Pelley and/or Rickey J. Brantley being fully released from such fiduciary obligations to any Parties in that capacity and for that purpose.

Additionally, all parties expressly understand that Scott Pelley and/or Rickey J. Brantley will continue to represent the interests of Ken, Candy, and Howard Kirk only, in these probate proceedings, in the event that a necessity for such continued representation should later arise, and each party, after having been advised of such continued representation of Scott Pelley and/or Rickey J. Brantley as attorney for Ken, Candy, and Howard Kirk, expressly waives any right to claim that such continued representation constitutes a conflict of interest, which would prevent Scott Pelley and/or Rickey J. Brantley from their continued representation of Ken, Candy, and Howard Kirk, should the need arise, in these proceedings. All Parties acknowledge and agree that Scott Pelley and/or Rickey J. Brantley have in the past and will continue to have a fiduciary relationship in the future with Ken, Candy, and Howard, based upon their continued representation of them.

Further, the Parties agree that the consideration for waiving any conflict of interest and for renunciating any potential claim of a fiduciary relationship, is the agreement of Scott Pelley and/or Rickey J. Brantley to fulfill the role of Attorney of the Estate, for the purpose of completing the administration of the Estate pursuant to the contractual terms of this agreement.

The Parties expressly state and agree that their only remedy against Scott Pelley and/or Rickey J. Brantley, as attorney for the Estate, in that capacity and for that purpose would be limited to remedies arising out of a breach of the terms of this contractual agreement.

The Parties hereby waive any other types of claims which might ordinarily be available, including, but not limited to claims for breach of what would ordinarily be a fiduciary duty in that capacity and for that purpose.

**Certain Fiduciary Relations with David S. Bouschor, II, Kevin Spencer and/or Jeff Springer.** All parties agree that their relationship with David S. Bouschor, Kevin Spencer and/or Jeff Springer, as the Attorneys for the Estates, Trustees and/or Guardian is contractual in nature only, and is to be governed and bound by the terms and provisions of this Agreement only. Further such parties expressly state that any fiduciary relationship with David S. Bouschor, Kevin Spencer and/or Jeff Springer, which would ordinarily arise out of their assumption of the role of Attorneys for the Estate, Trustee and/or Guardian is hereby expressly waived for all purposes,

FAMILY SETTLEMENT AGREEMENT - Page 29
F:\...\Gibbs\FSA 8'15'08-final

530

KUG  CJW  W

Exhibit A

Page 29 of 45

with each party, acknowledging and contractually agreeing that no fiduciary relationship will be claimed to exist, or in the alternative any fiduciary relationship which is created by the assumption by David S. Bouschor, Kevin Spencer and/or Jeff Springer of the role of Attorney of the Estate is hereby expressly waived, with David S. Bouschor, Kevin Spencer and/or Jeff Springer being fully released from such fiduciary obligations to any Parties in those capacities and for those purposes.

Additionally, all parties expressly understand that David S. Bouschor, Kevin Spencer and/or Jeff Springer will continue to represent the interests of Kip only, in these probate proceedings, in the event that a necessity for such continued representation should later arise, and each party, after having been advised of such continued representation of David S. Bouschor, Kevin Spencer and/or Jeff Springer as attorney for Kip, expressly waives any right to claim that such continued representation constitutes a conflict of interest, which would prevent David S. Bouschor, Kevin Spencer and/or Jeff Springer from their continued representation of Kip, should the need arise, in these proceedings. All Parties acknowledge and agree that David S. Bouschor, Kevin Spencer and/or Jeff Springer have in the past and will continue to have a fiduciary relationship in the future with Kip based upon their continued representation of him.

Further, the Parties agree that the consideration for waiving any conflict of interest and for renunciating any potential claim of a fiduciary relationship, is the agreement of David S. Bouschor, Kevin Spencer and/or Jeff Springer to fulfill the role of Attorney of the Estate, Trustee or Guardian for the purpose of completing the administration of the Estate, Trust and Guardianship pursuant to the contractual terms of this agreement.

The Parties expressly state and agree that their only remedy against David S. Bouschor, Kevin Spencer and/or Jeff Springer, as attorney for the Estate, in that capacity and for that purpose would be limited to remedies arising out of a breach of the terms of this contractual agreement.

The Parties hereby waive any other types of claims which might ordinarily be available, including, but not limited to claims for breach of what would ordinarily be a fiduciary duty in that capacity and for that purpose.

3.19   **Conveyance Documents.** In order to effectuate the conveyance of all of Decedent's and/or Ward's interests in the property passing pursuant to the terms of this Agreement the Parties shall deliver to any other Parties all such requisite executed documentation, deeds, bill of sales and stock transfers as may be necessary to complete the division of the Decedent's and Ward's Estates in compliance with this Agreement. All the Parties shall also cooperate with each other and any personal representatives and/or trustees to facilitate the delivery of any assets to any other Party under the terms of this Agreement.

3.20   **Release.** Each Party, for themselves and their lineal heirs, beneficiaries, assigns representative, agents and descendants, hereby forever release and discharge each other Party, individually, and in all capacities, and their respective heirs, personal

representatives, executors, affiliates, officers, directors, partners, administrators, successors, agents, attorneys, and assigns of and from any and all liabilities, claims, and causes of action including, but not limited to, tortious interference with inheritance rights, tortious interference with contracts, tortious interference with business relations, physical, mental, or emotional distress, any gifts made by Decedent and/or Ward, will contests, claims of conflict of interest, claims against attorneys, accountants, fiduciaries or agents, unjust enrichment, the administration of the Estate or the Guardianship of the Decedent and/or Ward, all claims which were or could have been made in any of the Proceedings or currently pending litigation, fraudulent concealment, rights of reimbursement, exempt property, fraud, fraud on the community, theft, undue influences, misappropriation, breach of fiduciary duty, and any other statutory rights and demands and causes of action of any kind and/or character, whether known or unknown, fixed or contingent, liquidated or unliquidated, whether or not asserted, arising out of or in any way connected with any act, omission or event related to any Party and/or the Decedent's and/or Ward's Estate, the Guardianship of the Ward, and the Revocable and Irrevocable Trusts, save and except for the representations, warranties, and obligations under this Agreement.

3.21    **Release of Temporary Co-Guardians and Permanent Co-Guardians.**  The Parties acknowledge that they have entered into this Agreement to resolve all pending issues regarding each of the Parties interest in both the Decedent's and the Ward's Estates and the assets taken, and/or received by certain Parties but not others.  The Parties hereby forever release Kip and Sandra as Temporary Co-Guardians of the Estate of Kathryn Gibbs, and as Permanent Co-Guardians of the Estate of Kathryn Gibbs, their attorneys, predecessors, agents, successors, and assigns, including but not limited to Kip and/or Sandy acting as next-friend of Kathryn or as her attorney-in-fact or as her fiduciary in any way and their attorneys, employees of their attorneys, and/or other of their representatives, for any and all claims and/or causes of action that any of them had, have or may have in the future relating to their care of Kathryn and/or actions related to any Guardianship proceedings of the  Estate of Kathryn H. Gibbs, including, but not limited to any accountings and actions described in said accountings.  The Release in the Paragraph immediately above shall apply to all Parties and serve as the full release contemplated by this provision as it relates to Kip and Sandra, individually, and as Temporary Co-Guardians of the Estate of Kathryn Gibbs and Permanent Co-Guardians of the Estate of Kathryn Gibbs, save and except for the representations, warranties, and obligations under this Agreement.

3.22    **Release of Executor and Kathryn's Personal Representatives.**    The Parties acknowledge that they have entered into this Agreement to resolve all pending issues regarding each of the Parties interest in both the Decedent's and the Ward's Estates and the assets taken, and/or received by certain Parties but not others.  The Executor and his successors, if any, and Kathryn's Personal Representative shall rely on this Agreement in settling Decedent's and Ward's Estates and distributing Decedent's and Ward's assets as provided herein and shall be obligated to enforce its terms.  The Parties further release and discharge the Personal Representative from any claims relating to its compliance

FAMILY SETTLEMENT AGREEMENT - Page 31
J:\Cases\Gibbs\FSA 8'15'08-final

532

KUG   CSW   M

Exhibit A

Page 31 of 45

with this Agreement, save and except enforcing its terms, but including but not limited to ceasing collection efforts against any Party to this Agreement regarding property that may be due the Decedent's and/or Ward's Estates, the determination of the assets in any Party's possession or control, and the distribution values determined for Estate assets as same will be determined by the terms of this FSA, save and except for the representations, warranties, and obligations under this Agreement.

3.23 **Dismissal of All Claims.** Upon Court approval and ratification of this FSA or if it cannot be obtained as soon as practicable after completion of the distributions contemplated by this FSA, all Parties agree to and shall dismiss with prejudice and with the effect of *res judicata* as to all claims, legal actions and/or lawsuits presently pending in this or any other jurisdiction, but particularly those filed in the Proceedings or any other action currently pending in any Court between the Parties relating to any claims or potential claims between the Parties or any subject matter referenced in this Agreement or any other matter, which could have been or arguably could have been brought/filed in any of these actions or at the time of this Agreement, including any will contest to the Will of Kathryn, following her death, save and except for the representations, warranties, and obligations under this Agreement.

3.24. **Parties' Attorney's Fees and Expenses.** With regard to each Parties' legal fees and expenses:

(a) Except as otherwise provided in this Agreement, each Party agrees to be responsible for any and all of his/her attorney's fees, costs, and expenses necessary and/or incurred in the effectuation of this Agreement and hereby waives any right to seek further reimbursement from Decedent's and/or Ward's Estates, Personal Representatives, or any other Party.

(b) The Personal Representatives and/or Trustees shall be entitled to reimbursement of his/her/its reasonable and necessary legal fees and expenses from the respective Decedent's and/or Ward's Estate, and/or any Trust being administered pursuant to the terms of this Agreement, but waives any right to seek reimbursement from any other Party.

(c) The Parties further agree that if it becomes necessary to assert any claim to enforce or defend the provisions of this Agreement, the prevailing Party shall be entitled to recover reasonable attorney's fees and other related litigation expenses from the non-prevailing Party. In the event of a dispute, each party is obligated to notify the alleged defaulting party in writing of a claimed default or breach of this settlement agreement as a condition precedent to seeking legal fees and expenses for breach of contract. The notice shall be by certified mail, and shall grant the alleged defaulting party 20 days to cure the alleged default prior to bringing any action for breach.

FAMILY SETTLEMENT AGREEMENT - Page 32
...Sayers\Gibbs\FSA 8'15'08-final

533

KUG   CBW   W

Exhibit

Page 32 of 15

3.25 **Representations.** The Parties to this Agreement make the following representations to such other Parties:

(a) The representing Party is legally competent to execute this Agreement and that this Agreement is valid, binding and enforceable as against himself or herself, any such Party's Successors and Affiliates.

(b) The representing Party believes that neither the Decedent nor the Ward have properly executed any right of survivorship or pay on death agreements or other agreements relating to the creation of non-probate assets and that, if any such agreements exist each respective Party hereby revokes said agreement and returns it to its original title and that any such agreements or contracts are void and of no effect and that any non-probate assets are an asset of either the Decedent's and/or Ward's estate and pass pursuant to the terms of this Agreement.

(c) The representing Party owns the claims released herein and has not assigned, released, waived, relinquished, pledged or in any manner whatsoever, sold or transferred, his or her interest, right, and/or claims to or against the Decedent, Decedent's Estate, Ward, Ward's Estate, except as to his or her attorneys, and or the following persons who will also join in the execution of this Agreement. Ken, Candy, and Howard Kirk represent that they have assigned an interest to Al Barcroft, who approves and ratifies all of the terms and provisions of this Agreement as represented by his execution of this Agreement. The Parties agree that the interest of Kathryn and the interest of Kip, respectively, is not and shall never be affected or reduced in any way because of any assignment of any interest made by Ken, Howard Kirk or Candy to Al Barcroft or any other person and that any such assignment shall only affect or reduce the interest of Ken, Howard Kirk and/or Candy in any Property covered by this FSA.

Further, the Parties agree that the enforcement of the assignment by any Party to any attorney or third party may be secured at the request of such attorney or third party by the filing of an appropriate Security Agreement/Deed of Trust, reflecting the existence of the assignment obligation and the enforcement of the same by the attorneys and/or third party who will be treated as Secured Parties.

(d) **Each Party confirms and agrees that such Party (i) has relied on his or her own judgment and has not been induced to sign or execute this Agreement by promises, agreements or representations not expressly stated herein, (ii) has freely and willingly executed this Agreement and hereby expressly disclaims reliance on any fact, promise, undertaking or representation made by any other Party or Personal Representative, save and except for the express agreements and representations contained in this Agreement, (iii) waives any right to additional information regarding the matters governed and effected**

by this Agreement, save and except for those matters which each Party has an express affirmative obligation to disclose, (iv) was not in a significantly disparate bargaining position with the other party and is not under any form of legal disability or incapacity at the time he or she executes this Agreement, (v) has been represented by competent legal counsel of his or her choosing in connection with the execution and delivery of this Agreement and in any and all matters relating thereto, or has voluntarily waived such right, (vi) has not given consent to this agreement, nor was the same procured , obtained or induced by improper conduct, undue influence, or duress, and (vii) either (1) has knowledge of all relevant and material information and facts and has been fully informed, including by advice of counsel, concerning the existence of potential Claims or any other Party, including other additional affirmative or defensive claims arising from all matters known to him or her and arising during the period of negotiations leading to and culminating in the execution by him or her of this Agreement, in order for him or her to make an informed and considered decision to enter into this Agreement, and/or (2) specifically and after advice of counsel is waiving (a) any right to obtain or demand such information, and (b) any obligation of any other Party.

(e)    Each Party confirms and agrees that Scott Pelley and the law firm of Nall, Pelley & Wynne; Virginia Hammerle and the law firm of Hammerle Finley; Rickey Brantley and the law firm of Jose, Henry, Brantley, Maclean & Alvarado; and Jay Henderson of the law firm of Cruse, Scott, Henderson & Allen, solely represent Ken, Candy, and Howard Kirk, and do not and have never represented any other Party and have not provided any other Party legal advice or services, or made any representation to any other party.

(f)    Each Party confirms and agrees that David S. Bouschor, II of the Law Office of David S. Bouschor, II, P.C.; Jeff Springer of the Springer & Lyle, L.L.P. law firm and Kevin Spencer of the law firm of Spencer & Waterbury, solely represent Kip and Sandra, and do not and have never represented any other Party and have not provided any other Party legal advice or services, or made any representation to any other party, save and except for any possible past representations by David S. Bouschor, II of Kathryn, at any time.

(g)    Each Party confirms and agrees that S. Camille Milner solely represents Kathryn Houseworth Gibbs, as Attorney Ad Litem and does not and has never represented any other Party and has not provided any other Party legal advice or services, or made any representation to any other party. Each Party confirms and agrees that Jimmy Walker solely represents Kathryn Houseworth Gibbs, as Guardian Ad Litem and does not and has never represented any other Party and has not provided any other Party legal advice or services, or made any representation to any other party.

FAMILY SETTLEMENT AGREEMENT - Page 34
Copies\Gibbs\FSA 8'15'08-final

535

KUB    CHW    W

Exhibit A

Page 34 of 45

(h)     Each of the Parties acknowledge and understand that none of the Personal Representatives represent his or her interest in matters relating to the Decedent's and/or Ward's Estates, has not provided to them legal advice and has not made any representations to him or her. Each Party further acknowledges that (i) the Personal Representatives and/or Trustees have suggested that he or she retain counsel if they have any questions regarding the terms or effect of this Agreement, and (ii) each Party is relying on his or her own judgment in entering into this Agreement.

(i)      Each Party understands and agrees that each other Party has relied upon these representations and warranties in entering into this Agreement.

## 3.26    Future Disputes.

(a)     If there is any dispute or controversy among the Parties and/or the Personal Representatives and/or Trustees, or any of them, involving any aspect of this Settlement Agreement and the administration of the Estates of the Decedent and the Ward, the parties to the dispute may agree on the manner of resolution.

(b)     The interest of each Party/beneficiary in either the Estates of the Decedent and Ward, or in any Trust involved in this Family Settlement Agreement, is conditioned on the beneficiary agreeing to and complying with the foregoing provision. If a beneficiary refuses to participate in ADR, and if there is a finding by a Court having jurisdiction, that a beneficiary failed to participate in good faith, the beneficiary's interest in the Estates of the Decedent and Ward, as well as in the Trusts, shall be forfeited and the beneficiary, if an individual, shall be treated as having predeceased the Decedent and the Ward with no surviving issue. If for any reason it is determined by the court having jurisdiction over this Family Settlement Agreement that the foregoing provision for forfeiture is not effective, the Parties to this Family Settlement Agreement authorize the court having jurisdiction over this Family Settlement Agreement and the Estates of the Decedent and the Ward and the Trusts, to award costs and attorney's fees from the beneficiary's share or from other amounts payable to the beneficiary.

(c)     The provisions of subparagraph (b) above shall not apply to the beneficial interests of:

(1)     The Ward, and spouse of the Decedent, to the extent that her interest would otherwise qualify for an estate or gift tax marital deduction;

(2)     any beneficiary, to the extent that the beneficial interest would otherwise qualify for an income, gift, or estate tax deduction for charitable purposes unless and until all such charitable beneficial interests have expired.

If, however, the Ward or any such beneficiary to whom the above forfeiture

FAMILY SETTLEMENT AGREEMENT - Page 35
Gibbs\FSA #15'08-final

536

KDC     CAW     W

Exhibit    A

Page  35  of  45

provisions do not apply nevertheless fails to participate in good faith in alternative dispute resolution as provided in this article, the court having jurisdiction over this Settlement Agreement and the Estates of the Decedent and the Ward and the Trusts, is authorized to award costs and attorney's fees from that person's beneficial share.

(d) The acceptance of the Trust or Trusts established by this Family Settlement Agreement by any trustee or co-trustee constitutes the trustee's or co-trustee's agreement to comply with subparagraph (a) above. If a trustee or co-trustee fails to comply, it shall be deemed that the trustee has resigned, and the Parties authorize the court having jurisdiction over this Trust to surcharge the trustee for costs and attorney's fees. [The personal representative's consent to act constitutes his, her, or its agreement to comply with subparagraph (a) above. If a personal representative fails to comply, it shall be deemed that the personal representative has resigned, and the Parties authorize the court having jurisdiction over this Family Settlement Agreement and the Estates of the Decedent and the Ward and the Trusts, to surcharge the personal representative for costs and attorney's fees.]

(e) All parties waive his or her right to seek a jury trial on any issues relating to the Family Settlement Agreement.

3.27 **Entire Agreement.** The provisions of this Agreement constitute the entire Agreement between the Parties, and supersede all previous negotiations and documents. No oral modification shall be binding upon either Party. The terms hereof are contractual in nature and are not mere recitals, and shall be binding upon the heirs, spouses, descendants, executors, administrators, successors, representatives, and assigns of the Parties hereto, upon complete execution by the Parties.

3.28 **Consideration for this Agreement.** The consideration for this Agreement is, at a minimum, the mutual promise of each party to do and act as stated in this Agreement, in addition to the other specific money or property exchanged or promises contained in this Agreement. Any services that either Party may provide to the other or for the benefit of the other are fully compensated by this Agreement. Neither Party shall acquire any right of reimbursement from the other party or any interest in or claim to the present or future property of the other party by virtue of any services or contributions by one party to or for the benefit of the other Party.

3.29 **Modification of Agreement.** This Agreement may not be modified except by subsequent agreement, in writing, signed and acknowledged by all Parties. No amendment or modification of this Agreement shall be effective, unless executed, in writing, by all Parties hereto.

3.30 **Severability.** If any provision of this Agreement is deemed to be invalid or unenforceable, it shall be deemed severed from the remainder of the Agreement. The

FAMILY SETTLEMENT AGREEMENT - Page 36
...\Gibbs\FSA 8'15'08-final

537

KUG    CSW    M

Exhibit A
Page 36 of 45

remainder of the Agreement will continue in full force and effect without being impaired or invalidated in any way and shall remain binding upon all Parties hereto.

3.31 **Document Execution.** The Parties agree to execute all documents and take all further acts necessary to consummate the agreement contained herein, including the releases and necessary pleadings, if any, dismissing the Proceedings within 30 days of the effective date of this FSA.

3.32 **Construction.** All Parties acknowledge and agree that all the Parties have participated in the drafting of this Agreement and no one Party or the Personal Representatives shall be considered the drafter of this Agreement and, therefore, no presumptions shall be made for or against any other Party on the basis that any one Party was the drafter of this Agreement.

3.33 **Multiple Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original for all purposes.

3.34 **Choice of Laws and Venue.** This Agreement shall be construed and interpreted in accordance with the laws of the State of Texas, and appropriate and exclusive venue for any suit arising out of this Agreement is agreed by the Parties to be in the Statutory Probate Court of Denton County, so long as the matter is not presided over by Judge Don Windle. In the event that the matter will be heard by Judge Don Windle, then, in that event, the parties agree that venue shall be in the Probate Court No. 2 in and for Tarrant County, Texas.

3.35 **Assignment.** This Agreement and the rights and obligations of the Parties hereto shall not be assigned or delegated by any Party hereto without the prior written consent of the other Parties hereof.

3.36 **Incorporation.** All Exhibits attached hereto are hereby incorporated by reference in this Agreement for the purposes set forth above.

3.37 **Headings.** The paragraph headings and sub-headings used herein are for descriptive purposes only. The headings have no substantive meaning and the terms of this Agreement shall not be affected by such headings.

EXECUTED on the dates herein after written.

FAMILY SETTLEMENT AGREEMENT - Page 37
C:\Cases\Gibbs\FSA 8'15'08-final

538

KbG ДФD W

Exhibit A
Page 37 of 45

READ, UNDERSTOOD, APPROVED AND
AGREED AS TO FORM, CONTENT
AND SUBSTANCE:

_Kenneth Vern Gibbs_
Kenneth Vern Gibbs, individually, as Independent
Executor of and as an heir and/or beneficiary of the Estate
of Bert H. Gibbs, Deceased, and as a potential heir and/or
beneficiary of the Estate of Kathryn H. Gibbs, both
Individually and/ or as an Incapacitated Person, and as a
contingent beneficiary of the Mary L. Houseworth
Revocable Trust ("Houseworth Trust") and the Kathryn
Houseworth Gibbs Irrevocable Trust ("Kathryn Gibbs
Trust"), and as the virtual representative and next friend of
his children, and their successors, plus those minor, unborn,
unascertained, and contingent beneficiaries of the Estates
of either Bert H. Gibbs, Deceased, and/or the Estate of
Kathryn H. Gibbs, Individually and/or as an Incapacitated
Person.

STATE OF TEXAS                    §
                                  §
COUNTY OF TARRANT                 §

This instrument was signed and acknowledged before me on the __6__ day of
_September_ , 2008, by KENNETH VERN GIBBS, in the above stated capacities, known to
me or whose identity was verified.

CATHIE L SMITH
Notary Public, State of Texas
My Commission Expires
September 04, 2011

Notary Public in and for the State of Texas .

My Commission expires on: _9-4-2011_

539

KVG    CDW    M


READ, UNDERSTOOD, APPROVED AND
AGREED AS TO FORM, CONTENT
AND SUBSTANCE:

*Candace Gibbs Walton*

Candace Gibbs Walton, individually, as an heir and/or
beneficiary of the Estate of Bert H. Gibbs, Deceased, and
as a potential heir and/or beneficiary of the Estate of
Kathryn H. Gibbs, Individually and/or as an Incapacitated
Person, and as a contingent beneficiary of the Mary L.
Houseworth Revocable Trust ("Houseworth Trust") and the
Kathryn Houseworth Gibbs Irrevocable Trust ("Kathryn
Gibbs Trust"), and as the virtual representative and next
friend of her children, and their successors, plus those
minor, unborn, unascertained, and contingent beneficiaries
of the Estates of either Bert H. Gibbs, Deceased, and/or the
Estate of Kathryn H. Gibbs, Individually and/or as an
Incapacitated Person.

STATE OF TEXAS      §
                                §
COUNTY OF TARRANT    §

This instrument was signed and acknowledged before me on the __5__ day of
__September__, 2008, by CANDACE GIBBS WALTON, in the above stated capacities,
known to me or whose identity was verified.

_____
Notary Public in and for the State of Texas

CATHIE L SMITH
Notary Public, State of Texas
My Commission Expires
September 04, 2011

My Commission expires on: __9-4-2011__

FAMILY SETTLEMENT AGREEMENT - Page 39
...ses\Gibbs\FSA 8'15'08-final

KUG    CWW    W

540

Exhibit A
Page __39__ of __5__

**READ, UNDERSTOOD, APPROVED AND
AGREED AS TO FORM, CONTENT
AND SUBSTANCE:**

_Kip Hughes Gibbs_
_____

Kip Hughes Gibbs individually, as an heir and/or
beneficiary of the Estate of Bert H. Gibbs, Deceased, and
as a potential heir and/or beneficiary of the Estate of
Kathryn H. Gibbs, Individually and/or as an Incapacitated
Person, and as the Temporary Co-Guardian of the Estate of
Kathryn H. Gibbs, an Incapacitated Person, and as a
contingent beneficiary of the Mary L. Houseworth
Revocable Trust ("Houseworth Trust") and the Kathryn
Houseworth Gibbs Irrevocable Trust ("Kathryn Gibbs
Trust"), and as the virtual representative and next friend of
his children, and their successors, plus those minor, unborn,
unascertained, and contingent beneficiaries of the Estates
of either Bert H. Gibbs, Deceased, and/or the Estate of
Kathryn H. Gibbs, Individually and/or as an Incapacitated
Person.

STATE OF TEXAS           §
                         §
COUNTY OF _Nueces_       §

   This instrument was signed and acknowledged before me on the _27th_ day of
_August_____, 2008, by KIP HUGHES GIBBS, in the above stated capacities, known to
me or whose identity was verified

_____
Notary Public in and for the State of Texas

My Commission expires on: _10-6-09_

IRENE GARCIA
MY COMMISSION EXPIRES
October 6, 2009

FAMILY SETTLEMENT AGREEMENT - Page 40
...ses\Gibbs\FSA 8'15'08-final

541                          KUG  C#W       W        Exhibit _A_

                                                     Page _40_ of _45_

READ, UNDERSTOOD, APPROVED AND
AGREED AS TO FORM, CONTENT
AND SUBSTANCE:

_____

Howard Kirk Gibbs, individually, as an heir and/or beneficiary of the Estate of Bert H. Gibbs, Deceased, and as a potential heir and/or beneficiary of the Estate of Kathryn H. Gibbs, Individually and/or as an Incapacitated Person, and as the former Independent Executor of the Estate of Bert H. Gibbs, Deceased, and as a contingent beneficiary of the Mary L. Houseworth Revocable Trust ("Houseworth Trust") and the Kathryn Houseworth Gibbs Irrevocable Trust ("Kathryn Gibbs Trust"), and as the virtual representative and next friend of his children, and their successors, plus those minor, unborn, unascertained, and contingent beneficiaries of the Estates of either Bert H. Gibbs, Deceased, and/or the Estate of Kathryn H. Gibbs, Individually and/or as an Incapacitated Person.


STATE OF TEXAS                    §
                                 §
COUNTY OF TARRANT                 §

This instrument was signed and acknowledged before me on the _5_ day of _September_, 2008, by HOWARD KIRK GIBBS, in the above stated capacities, known to me or whose identity was verified.

CATHIE L SMITH
Notary Public, State of Texas
My Commission Expires
September 04, 2011

Notary Public in and for the State of Texas

My Commission expires on: _9-4-2011_



READ, UNDERSTOOD, APPROVED AND
AGREED AS TO FORM, CONTENT
AND SUBSTANCE:

_____

Kathryn Houseworth Gibbs, individually, as an heir and/or
beneficiary of the Estate of Bert H. Gibbs, Deceased, and
as the primary beneficiary of the Mary L. Houseworth
Revocable Trust ("Houseworth Trust") and the Kathryn
Houseworth Gibbs Irrevocable Trust ("Kathryn Gibbs
Trust"), and as the Ward of the Temporary Guardianship
Estate of Kathryn H. Gibs, an Incapacitated Person.


STATE OF TEXAS          §
                        §
COUNTY OF _____    §

     This instrument was signed and acknowledged before me on the _____ day of

_____, 2008, by KATHRYN HOUSEWORTH GIBBS, in the above stated

capacities, known to me or whose identity was verified


                               _____
                               Notary Public in and for the State of Texas


                               My Commission expires on:_____

FAMILY SETTLEMENT AGREEMENT - Page 42
G:\cases\Gibbs\FSA 8'15'08-final

543

KUG    CBW    WD

Exhibit A

Page 42 of 45

READ, UNDERSTOOD, APPROVED AND
AGREED AS TO FORM, CONTENT
AND SUBSTANCE:



Sandra Faye Gibbs, individually, and as the Temporary
Co-Guardian of the Estate of Kathryn H. Gibbs, an
Incapacitated Person.


STATE OF TEXAS          §
                        §
COUNTY OF Nueces        §

    This instrument was signed and acknowledged before me on the 27ᵗʰ day of
__August__, 2008, by SANDRA FAYE GIBBS, in the above stated capacities, known
to me or whose identity was verified

                                  Notary Public in and for the State of Texas

IRENE GARCIA
MY COMMISSION EXPIRES
October 6, 2008

    My Commission expires on: 10-4-09

READ, UNDERSTOOD, APPROVED AND
AGREED AS TO FORM, CONTENT
AND SUBSTANCE:

_____
Al Barcroft-Assignee of Ken, Candy and Howard Kirk


STATE OF TEXAS           §
                         §
COUNTY OF TARRANT        §

This instrument was signed and acknowledged before me on the 5ᵗʰ day of
_September_____, 2008, by AL BARCROFT, in the above stated capacities,
known to me or whose identity was verified

CATHIE L SMITH
Notary Public, State of Texas
My Commission Expires
September 04, 2011

_____
Notary Public in and for the State of Texas

My Commission expires on: 9-4-2011

545                    K6G    OWN    W         Page 44 of 45

Exhibit A

READ, UNDERSTOOD, APPROVED AND
AGREED AS TO FORM, CONTENT
AND SUBSTANCE:

_____

Camille Milner-Attorney Ad Litem for the Ward,
Kathryn H. Gibbs

STATE OF TEXAS       §
                       §
COUNTY OF TARRANT  §

This instrument was signed and acknowledged before me on the _____ day of _____, 2008, by CAMILLE MILNER, in the above stated capacities, known to me or whose identity was verified

_____

Notary Public in and for the State of Texas

My Commission expires on:_____

THE STATE OF TEXAS  §

                     §           **GWB Family and Friends Trust**

COUNTY OF TARRANT  §

## TRUST DECLARATION

This declaration of trust is made this ___ day of November, 2008, between **Kenneth Vern Gibbs**, a resident of Tarrant County, Texas; **Candace Gibbs Walton**, a resident of Parker County, Texas; and **Howard Kirk Gibbs**, a resident of Denton County, Texas, collectively the "Settlor" of this trust agreement, regarding, and intended to distribute, the division of the gross net proceeds due these parties from the **Estate of Bert Hughes Gibbs**.

## ARTICLE I - THE TRUST PURPOSE

1.1 <u>Property in Trust</u>: The beneficiaries of this trust are beneficial owners of real property, including, but not limited to, land, oil and gas royalties, and working interest in oil and gas wells that was passed to them from the Estate of Bert Hughes Gibbs, who is now deceased, under the terms and conditions of his Last Will and Testament.

1.2 <u>Purpose of Trust</u>: The overriding purpose of this trust is to collect and hold all property left to, or accumulated by, the beneficiaries, or any individual beneficiary, hereto, to account for and pay all liabilities pertaining to such property, including, but not limited to income taxes, property taxes, and any other governmental taxes or fees; and then distribute the remaining proceeds to the beneficiaries hereto in a manner commensurate with their beneficial interests, as shown herein.

1.3 <u>Under the Laws of the State of Texas</u>: It is the Settlor's intention that this trust be in full compliance, and organized under, the Texas Trust Code. Any provision found by a court of competent jurisdiction to be in violation of any section of the Texas Property Code, or any law of the State of Texas, shall either be automatically amended to comply with such code or law in such a manner as to keep its original meaning or purpose as closely as possible; or, if no such amendment is possible, that particular provision shall be stricken from the trust agreement. In either case, it shall be deemed to have no effect on the trust agreement in general, or upon any particular provision within the trust agreement.

## ARTICLE II – NAME OF TRUST

The trust shall be know as the GWB Family and Friends Trust.

Exhibit B

Page 1 of 7

## ARTICLE III – BENEFICIARIES

3.1 Beneficiaries: The beneficiaries, and percentage of beneficial interests, are as follows:

| | |
|---|---|
| Kenneth Vern Gibbs: | 25.011614 % of the trust; |
| Candace Gibbs Walton: | 25.011613 % of the trust; |
| Howard Kirk Gibbs: | 25.011613 % of the trust; |
| Pentex Foundation: | 24.96516 % of the trust. |

3.2 Voting Shares: Actions and decisions concerning the trust shall be governed by vote of the beneficiaries hereto. Sixteen (16) votes will represent a majority of the votes on any issue unless specifically set herein at a different vote requirement. Each beneficiary shall have following votes in any matter of the trust for which a vote is called:

| | |
|---|---|
| Kenneth Vern Gibbs: | 5 votes; |
| Candace Gibbs Walton: | 5 votes; |
| Howard Kirk Gibbs: | 5 votes; |
| Pentex Foundation: | 15 votes. |

3.3 Voting Procedures: Votes may be cast at any time and any place agreed upon by at least two (2) of the beneficiaries, and 16 votes will carry any issue. Any beneficiary hereto shall be allowed to call for a vote on any issue. Percentages of beneficial interest, or the method in which distribution are made, in the trust or its proceeds shall require a unanimous vote with all parties voting (30 votes).

## ARTICLE IV – REVOCABLE

This trust shall be revocable.

## ARTICLE V – APPOINTMENT OF TRUSTEE

Settlor hereby appoints Waymond James Walton as the Independent Trustee of this trust. Trustee shall serve without bond or supervision of any court while in conformity with the terms laid out in this trust and its minutes.

## ARTICLE VI – TRUST ESTATE

The Trust Estate shall be comprised of property transferred to the trust in the form of Deeds of Trust assigned to this trust, and filed in the county records of Denton and Wise Counties, the State of Texas; and, royalties due Settlor from the Estate of Bert Hughes Gibbs as per Bert Hughes Gibbs Last Will and Testament. Other property may be brought into the trust, and become Trust Property, through agreement in the manner prescribed herein of 16 votes of the voting shares of this trust. Property may be bought, sold, exchanged, or transferred upon the approval of the beneficiaries by at least 16 votes cast in the manner prescribed herein.

## ARTICLE VII – DISPOSITION OF INCOME AND PRINCIPAL

7.1 Duties of Trustee: The Trustee is hereby commanded to do the following:
1. Pay all bills and liabilities of the trust unless specifically ordered by a 16 vote majority to do otherwise in a specific case;
2. Figure, or have professionally figured if approved by a 16 vote majority, income taxes due on the income of the trust;
3. Pay all income taxes due on any income of the trust;
4. Pay all property tax due (and not paid by other entities) on any property in the trust estate;
5. Pay any other debts of the trust which are brought to his attention (the foregoing is conditioned on sufficient funds being available in the trust account);
6. Keep a sufficient amount of cash (to be decided by a 16 vote majority) in the main trust account for operating expenses and any known liabilities upcoming in the immediate future; and,
7. Divide any overages into proportions equaling the beneficial interests of each party, and deposit the appropriate amount for each specific beneficiary into a an account designated by that beneficiary for private use of that party.

7.2 Disposition of Principal During Life of Trust: No part of the principal may be disposed of during the life of the trust unless first commanded by a written order in which beneficiaries with 30 votes (unanimous) concur and sign ordering such sale or disposal.

## ARTICLE VIII – TERMINATION

8.1 Termination of Trust: The trust will terminate twenty (20) years after the first death of any of the beneficiaries hereto.

8.2 Distribution upon termination: Distribution upon termination shall be made in accordance and in direct proportion with the beneficial ownership interest show herein. In the case of those beneficial owners who are already deceased, distribution of their portion shall be made to their estate, or according to the terms of their will.

## ARTICLE IX – TRUST ADMINISTRATIVE AND PROTECTIVE PROVISIONS

The trust shall be administered expeditiously and consistently with its terms, free of any judicial intervention and without order, approval, or other action by a court, subject only to the jurisdiction of a court which is invoked by the trustee or beneficiary, or as otherwise provided by law.

## ARTICLE X – MODIFICATION OF TRUST

10.1 Modification by Texas court: This trust shall be subject to modification or termination by a Texas court only if such modification or termination would serve to enforce the original intentions of the Settlor, if the intentions of the Settlor are no longer

obtainable, or if the trust is used for illegal purposes; then, and only then, the trustee or any beneficiary hereto may seek modification or termination of the trust through the Texas courts.

10.2 Modification by interested parties: This trust may be modified by a vote of the beneficiaries in which 30 votes (unanimous) are cast for such modification. The trustee is not authorized to modify the trust in any way without a vote among the beneficiaries in which 30 votes are cast in favor of such modification.

10.3 Trust Property not subject to Probate: Any property payable to, or owned by, this trust shall not be subject to the claims against the estate of any beneficiary or interested person hereto following death, nor shall such benefits be subject to the control of the personal representative of the interested party, nor be included in the property administered as part of the probate estate of the interested party. Upon the death of any interested party hereto, the property contained in the trust shall pass as set forth herein, and under no circumstances shall the property in this trust be considered to be part of the probate estate of any beneficiary or other interested party hereto.

10.4 Inalienability: No beneficiary or interested party shall have any right to anticipate, sell, assign, mortgage, pledge, or otherwise dispose of or encumber all or any part of the trust estate, nor shall any part of the trust estate including, but not limited to, income, be liable for the debts or obligations, including, but not limited to, alimony, child support, tax liens, tax assessment or seizure, of any beneficiary or interested party, or be subject to attachment, garnishment, execution, creditor's bill or any other legal or equitable process unless such is first approved by a vote of the beneficiaries in which 30 votes are cast in favor of such action.

## ARTICLE XI – POWERS OF THE TRUSTEE

The trustee shall have such powers as are prescribed to him in the minutes of this trust, and none other. The trustee shall administer this trust to the best of his ability within the powers prescribed to him.

## ARTICLE XII – TRUSTEE SUCCESSION

12.1 Resignation or death of trustee: The trustee may resign by giving 30 days written notice of his intention to do so. In the event of resignation or death of the trustee, a new trustee may be appointed by a vote of the beneficiaries in which 16 votes are cast in favor of the new trustee.

12.2 Right of Beneficiaries to change trustee: The beneficiaries may, at any time, elect to change trustees by a vote in which at least 16 of the beneficiary votes are cast for such change. The vote must include the person who shall be named as the new trustee. A 30 day notice, or payment of 30 days salary or fee, to the trustee being removed must be given.

Exhibit B
Page __4__ of __7__

12.3 No bond: No trustee, or any successor, shall be required to give any bond in any jurisdiction; and if, notwithstanding this direction, any bond is required by any law, statute or rule of court, no sureties shall be required.

## ARTICLE XIII – TAX NUMBER

The "tax identification number" assigned by the Internal Revenue Service to this trust is 26-6630588.

## ARTICLE XIV – DEFINITIONS

"Beneficiary" means a person for whose benefit property is held in trust, regardless of the nature of the interest.

"Court" means a court of appropriate jurisdiction.

"Income" shall be as defined in Section 116.002 of the Texas Trust Code.

"Interested Party(ies)" means a trustee, beneficiary, or any other person having an interest in or a claim against the trust or any person who is affected by the administration of the trust.

"Principal" shall be as defined in Section 116.002 of the Texas Trust Code.

"Property" means any type of property, whether real, tangible or intangible, legal, or equitable.

"Settlor" means a person [or persons] who creates a trust or contributes property to a trustee of a trust. If more than one person contributes property to a trustee of a trust, each person is a settlor of the portion of the property in the trust attributable to that person's contribution to the trust.

"Trust property" means property placed in trust by one of the methods specified in Section 112.001 of the Texas Trust Code or property otherwise transferred to or acquired or retained by the trustee for the trust.

"Trustee" means the person holding the property in trust.

Except as otherwise provided herein, definitions of words and terms in this trust shall be in accordance with the Texas Trust Code, as amended.

## ARTICLE XV – CONSTRUCTION

13.1 Conformity with Statutes: In case of ambiguity or conflict, this trust should be construed in such a manner and shall be deemed to comply with the provisions of the Texas Property Code, Title 9, Trusts, as amended.

Exhibit 13
Page 5 of 7

13.2 Applicable Law: The validity of this trust shall be determined by reference to the laws of Texas. Questions of construction and administration of this trust shall be determined by reference to the laws of Texas.

13.3 Headlines of Articles and Sections: The headings of articles and sections are included solely for convenience of reference, and shall have no significance in the interpretation of this instrument.

Signed by Kenneth Vern Gibbs (Settlor), Candace Walton (Settlor), and Howard Kirk Gibbs (Settlor) who, by their signatures, below indicate their agreement and intent form the above referenced trust and abide by its terms; and Waymond James Walton (Trustee), who, by his signature below accepts the office of Trustee on the date indicated on page 1 of this Trust Agreement.

552

Exhibit 13
Page 6 of 7

## AFFIDAVIT

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

BEFORE ME, the undersigned authority on this day personally appeared Kenneth Vern Gibbs, Candace Gibbs Walton, Howard Kirk Gibbs, Waymond James Walton, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the foregoing instrument for the purposes and consideration therein expressed.

_Kenneth Vern Gibbs_
Kenneth Vern Gibbs

_Candace Gibbs Walton_
Candace Gibbs Walton

_Howard Kirk Gibbs_
Howard Kirk Gibbs

_Waymond James Walton_
Waymond James Walton

SUBSCRIBED AND SWORN TO BEFORE ME on this the 7th day of November, 2008, to certify which witness my hand and seal of office.

_Christel E. Wilson_
Notary Public in and for the
State of Texas

CHRISTEL E. WILSON
Notary Public, State of Texas
My Commission Expires
May 05, 2010

553

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 2005-0000126-2-D

| | |
|---|---|
| IN RE: ESTATE OF BERT HUGHES GIBBS, DECEASED; | ) IN THE PROBATE COURT |
| | ) |
| CANDACE WALTON AND KENNETH GIBBS, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| VS. | ) COURT NO. 2 |
| | ) |
| BEVERLY MILLER, INDIVIDUALLY, AND AS TRUSTEE OF THE GWB FRIENDS AND FAMILY TRUST, ALBERT BARCROFT, INDIVIDUALLY AND AS LEGAL REPRESENTATIVE OF PENTEX ROYALTY TRUST AND PENTEX FOUNDATION, DANNY UNGER, AS TRUSTEE OF GBU FRIENDS AND ASSOCIATES TRUST, AND HOWARD KIRK GIBBS, | ) |
| | ) |
| Defendants. | ) TARRANT COUNTY, TEXAS |

*****
***MOTION HEARING***
*****

On the 20th day of August, 2014, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Patrick Ferchill, Judge presiding, held in Fort Worth, Tarrant County, Texas;

Proceedings reported by machine shorthand.

Exhibit C

Page 1 of 5

MOTION HEARING - August 20, 2014

Q. Okay. Let's change gears and talk about --

MS. LEE: Objection, your Honor. I'm just wondering what the relevance of this document.

THE COURT: Yeah, I do, too.

MR. GIBBS: Well, the relevance is, your Honor, this is original contract that was between myself, my siblings and Al Barcroft, that allowed for the 30 percent to be paid to Al Barcroft for his --

THE COURT: And it was drawn up by Mr. Barcroft?

MS. LEE: Yes, your Honor.

THE COURT: Right?

MR. GIBBS: No, I did not say that --

THE COURT: No, I'm asking you. It was drawn up by Mr. Barcroft?

MR. GIBBS: It's my understanding that an attorney helped Mr. Barcroft draw it up. That's what my --

THE COURT: And is that -- that attorney's name on this agreement or anything connected?

MR. GIBBS: I don't believe it's anywhere on the agreement. But it was Mr. Barcroft's attorney, John Skotnik. He had been his attorney for a very long time. So it's my understanding that Mr. Skotnik was involved with this but --

Exhibit
Page ___ of ___

## MOTION HEARING - August 20, 2014

THE COURT: But it's at issue?

MR. GIBBS: Excuse me.

MS. LEE: Yes, your Honor.

THE COURT: I think it's conflicting testimony as to what we know, Mr. Barcroft is not an attorney.

MR. GIBBS: He hired an attorney -- from what I have been told, he hired --

THE COURT: And who -- which one of these people met with Mr. Skotnik and discussed it?

MR. GIBBS: I did not meet with Mr. Skotnik. It's my understanding that Mr. Skotnik met with Mr. Barcroft and they're the ones that drafted this document. That's the best of my understanding.

THE COURT: Barcroft, but Mr. Skotnik would have no privity of contract with these people. I mean -- and Mr. Barcroft, if he did, in fact, practice law without a license, he cannot enforce a contract that he participated in. He cannot get money for -- or unjust enrichment for committing what is a criminal misdemeanor, at least, in Texas.

MR. HARGRAVE: Your Honor, I believe that what Mr. Howard is saying --

THE COURT: I'm not sure -- but if she's relying on a contract drawn up by someone who's not an

CRC for Wells Reporting
817-524-6644

556

93528a42-9517-4327-8

Exhibit

Page 3 of 5

**MOTION HEARING - August 20, 2014**

attorney, without consulting an attorney before she relies on this, don't you think that's sort of a problem?

MR. GIBBS: But --

MR. HARGRAVE: Objection, your Honor. What he's saying is, it's his understanding that Mr. Barcroft had an attorney to assist him. Others have testified to the contrary, but he's --

MS. LEE: But he's not testifying.

MR. HARGRAVE: Not --

THE COURT: Mr. Barcroft is not here.

MR. GIBBS: But why has Mr. Barcroft not been served, your Honor.

THE COURT: I have no idea. I'm not running your case -- Or this case, sir. I'm just telling you --

MR. GIBBS: Your Honor, I'm not the one --

THE COURT: -- the law. He is practicing law without a license, and he cannot enforce a contract that brings money into his pocket for violating the law, period.

MR. GIBBS: Well, your Honor, what I'm saying is that I have been told is, Mr. Skotnik was an attorney that worked --

MS. LEE: I object to the relevance.

CRC for Wells Reporting
817-524-6644
93528a42-9517-4327-

557

Exhibit C

Page 4 of 5

THE STATE OF TEXAS)

COUNTY OF TARRANT)

I, Ashlee Wells, Official Court Reporter in and for the Probate Court No. 2 of Tarrant County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $ 1296.25 and was paid/will be paid by   Christy Lee   .

WITNESS MY OFFICIAL HAND this the 15th day of September, 2014.

/s/ Ashlee R. Wells
ASHLEE WELLS, Texas CSR 8684
Expiration Date:  12/31/15
Official Court Reporter,
Probate Court Number 2
Tarrant County, Texas
Fort Worth, Texas

558

CRC for Wells Reporting
817-524-6644
93528a42

Exhibit C
Page 5 of 5

CAUSE NO. CV-14-41665

| | | |
|---|---|---|
| PENTEX FOUNDATION | ) | IN THE DISTRICT COURT |
|     PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | 336TH JUDICIAL DISTRICT |
| | ) | |
| KENNETH VERN GIBBS; AND | ) | |
| CANDACE GIBBS WALTON; AND | ) | |
| HOWARD KIRK GIBBS, | ) | |
|     DEFENDANTS. | ) | FANNIN COUNTY, TEXAS |

### AFFIDAVIT OF CANDACE WALTON IN SUPPORT
### OF RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Candace Walton, having been first duly sworn, state the following:

1.    I am over the age of eighteen (18) years. I am Defendant in this Matter before the Court. I confirm that all of the following facts are true and correct and undisputed.

2.    Albert Barcroft drafted the Contract for Sale of Land ("the CSL") without assistance. Albert provided legal advice to Ken Gibbs and myself concerning the CSL.

3.    Albert is not a licensed attorney, but Albert stated that as he went to law school he was able to draft up legal contracts and agreement.

4.    The legitimacy of the CSL was in dispute prior to the onset of this litigation.

5.    Since the execution of the CSL, there have been subsequent relevant dealings and agreements.

Further the Affiant saith not.

*Candace Walton*
Candace Walton

SUBSCRIBED AND SWORN TO before me by Candace Walton on this 2 4 day of September, 2014, to attest witness my hand and seal of office.

Notary Public in and for the State of Texas
My Commission expires: April 25 2016



ROBERT JUSTIN MOORE
MY COMMISSION EXPIRES
April 25, 2016

**Exhibit** D
**Page** 1 of 1

559

## NO. CV-14-41665

| | | |
|---|---|---|
| PENTEX FOUNDATION,<br>*Plaintiff* | § § § | IN THE DISTRICT COURT OF |
| V. | § § | |
| KENNETH VERN GIBBS, CANDACE<br>GIBBS WALTON and HOWARD<br>KIRK GIBBS, *Defendants* | § § § § | FANNIN COUNTY, TEXAS<br><br>336th JUDICIAL DISTRICT |

## OBJECTIONS TO RESPONSE TO
## MOTION FOR SUMMARY JUDGMENT

COME NOW, Pentex Foundation, Plaintiff, and Joshua Unger, Trustee of the GBU Friends and Associates Trust, Intervenor, file these their objections to the Response to the Motion for Partial Summary Judgment, and, would show the honorable court as follows:

1.      Plaintiff and Intervenor object to the response as a whole for not being timely filed. The motion, which in substance is only six pages long, was filed on August 12, 2014. Due notice was given that the motion would be heard on September 30, 2014. Defendants' response, if any, was due seven days prior to the hearing. TEX. R. CIV. P. 166a. Defendants did not serve their response until after-hours on September 25, 2014.[1] It is not timely and should be stricken in its entirety.

2.      Specifically, Plaintiff and Intervenor object to Defendant's Exhibit

---

[1]      See, Plaintiff's Exhibit "A" attached hereto. The Response was also sent by facsimile after 5:00 p.m.

OBJECTIONS TO RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT .... PAGE 1



"C". This exhibit purports to be a transcript of a hearing. The hearing did not involve Plaintiff or Intervenor, was not before this Court, and is interlocutory. It is not a final, unappealed order which might then potentially have some *res judicata* or collateral estoppel effect. It is additionally hearsay.[2]

3.      Plaintiff and Intervenor object to the following portions of the Affdavit of Candace Walton:[3]

A.     "Albert provided legal advice to Ken Gibbs and myself concerning the CSL." This contains no factual foundation and is conclusory. With respect to Ken Gibbs, hearsay.

B.     "Albert is not a licensed attorney, but Albert stated that he went to law school he was able to draw up legal contracts and agreement." This is hearsay.

C.     "The legitimacy of the CSL was in dispute prior to the onset of this litigation." This contains no factual foundation and is conclusory.

D.     "Since the execution of the CSL, there have been subsequent relevant dealings and agreements." This contains no factual foundation and is conclusory.

An affidavit must be made on personal knowledge, setting forth facts that would be admissible in evidence and affirmatively show that the affiant is competent to



[2]     Frankly, this is irrelevant. What Defendants appear to be doing is blaming someone else for their own failure to get a lawyer. A lay person may represent himself. *Am. Home Assur. Co. v. Unauthorized Practice of Law Comm.*, 121 S.W.3d 831, 839 (Tex. App. Eastland 2003), *modified*, 261 S.W.3d 24 (Tex. 2008).

[3]     It was submitted as Defendant's Exhibit "D". For convenience a copy is attached hereto as Plaintiff's Exhibit "B".



testify on the matters stated in the affidavit.[4] A conclusory statement is a statement that does not provide the underlying facts to support the conclusion.[5] A legal conclusion stated in an affidavit must state facts which would be admissible in evidence.[6] It is clear that each of the above statements by Ms. Walton are mere conclusory statements, and are not competent summary judgment evidence.

WHEREFORE, PREMISES CONSIDERED, Plaintiff and Intervenor pray that the Court sustain the objections set forth above.

Respectfully submitted,

By: _____
Scott Smith
State Bar Number 18688900
120 South Crockett Street
P.O. Box 354
Sherman, Texas 75091-0354
e-mail smithlaw@airmail.net
Facsimile (903) 870-1446
Telephone (903) 868-8686

---

[4] TEX. R. CIV. P. 166a(f); *AMS Construction Co. v. Warm Springs Rehab. Foundation, Inc.*, 94 S.W.3d 152, 156-67 (Tex. App. – Corpus Christi 2002)(holding that affidavit of construction company president was conclusory and not competent evidence when it was not based on the president's knowledge but rather on what he had been told by other people.)

[5] *Haynes v. City of Beaumont*, 35 S.W.3d 166, 178 (Tex. App. – Texarkana 2000).

[6] *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984); *Chhim v. University of Houston*, 76 S.W.3de 210, 216 (Tex. App. – Texarkana 2002).

OBJECTIONS TO RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT .... PAGE 3



## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing document was served, by email pursuant to agreement compliant with TEX. R.CIV. P. 11, upon Christy L. Lee, Esq., of Law Offices of Christy Lee, P.C., 777 Main Street, Suite 600, Fort Worth, Texas 76102, and to Howard Kirk Gibbs, Pro Se, at 4360 Western Center Blvd., Suite 205, Ft. Worth, Texas 76137, on this September 29, 2014.

Scott Smith

**Scott Smith**

| | |
|---|---|
| **From:** | "Laura Hogins" <lhogins@christyleelaw.com> |
| **To:** | <hkgibbs@gmail.com>; <smithlaw@airmail.net> |
| **Sent:** | Thursday, September 25, 2014 5:19 PM |
| **Attach:** | Signed Response to Motion for Partial Summary Judgment (Gibbs).PDF |
| **Subject:** | Response to Motion for Partial Summary Judgment |

Hello,

Attached is Ken Gibbs and Candace Walton's Response to Plaintiff's and Intervenor's Motion for Partial Summary Judgment, which we are filing in the matter of Pentex Foundation vs. Gibbs, et al.

Please let me know if you have any questions.

Thanks.

Laura

---------------------------------------------
LAW OFFICES OF CHRISTY LEE, P.C.
Laura Hogins, Paralegal
225 East Fireweed Lane, Suite 200
Anchorage, AK  99503
(907) 339-9931 Office
(800) 437-7901 Fax
lhogins@christyleelaw.com

PLAINTIFF'S
EXHIBIT

A

10-29-14

564

9/27/2014



CAUSE NO. CV-14-41665

PENTEX FOUNDATION,                 )        IN THE DISTRICT COURT
        PLAINTIFF,                 )
                                   )
VS.                                )        336TH JUDICIAL DISTRICT
                                   )
KENNETH VERN GIBBS; AND            )
CANDACE GIBBS WALTON; AND          )
HOWARD KIRK GIBBS,                 )
        DEFENDANTS.                )        FANNIN COUNTY, TEXAS

### AFFIDAVIT OF CANDACE WALTON IN SUPPORT OF RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Candace Walton, having been first duly sworn, state the following:

1.    I am over the age of eighteen (18) years. I am Defendant in this Matter before the Court. I confirm that all of the following facts are true and correct and undisputed.

2.    Albert Barcroft drafted the Contract for Sale of Land ("the CSL") without assistance. Albert provided legal advice to Ken Gibbs and myself concerning the CSL.

3.    Albert is not a licensed attorney, but Albert stated that as he went to law school he was able to draft up legal contracts and agreement.

4.    The legitimacy of the CSL was in dispute prior to the onset of this litigation.

5.    Since the execution of the CSL, there have been subsequent relevant dealings and agreements.

Further the Affiant saith not.

*Candace Walton*
Candace Walton

SUBSCRIBED AND SWORN TO before me by Candace Walton on this 24 day of September, 2014, to attest witness my hand and seal of office.



Notary Public in and for the State of Texas
My Commission expires: April 25, 2016



ROBERT JUSTIN MOORE
MY COMMISSION EXPIRES
April 25, 2016

PLAINTIFF'S
EXHIBIT
B
10-29-14

565

Exhibit D
Page 1 of 1

CAUSE NO. CV-14-41665

| | | |
|---|---|---|
| PENTEX FOUNDATION | ) | IN THE DISTRICT COURT |
|     PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | 336TH JUDICIAL DISTRICT |
| | ) | |
| KENNETH VERN GIBBS; AND | ) | |
| CANDACE GIBBS WALTON; AND | ) | |
| HOWARD KIRK GIBBS, | ) | |
|     DEFENDANTS. | ) | FANNIN COUNTY, TEXAS |

## NOTICE OF WITHDRAWAL OF MOTION TO DISMISS

TO THE HONORABLE JUDGE OF THE COURT:

COME NOW, KENNETH "Ken" GIBBS and CANDACE "Candy" WALTON, Defendants, by and through their Counsel of Record, Law Offices of Christy Lee, P.C., and notice the Court of the following:

Ken and Candy now withdraw their Motion to Dismiss, filed in this matter on June 23, 2014.

Respectfully submitted,

LAW OFFICES OF CHRISTY LEE, P.C.

Christy L. Lee
Texas State Bar No. 24052302
777 Main Street, Ste. 600
Fort Worth, Texas 76102
(817) 504-6075
(800) 437-7901 - Fax
clee@christyleelaw.com

ATTORNEY FOR KENNETH GIBBS AND
CANDACE WALTON

566



## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was delivered, pursuant to Texas Rules of Civil Procedure, to the following parties on this 26th day of September, 2014:

Pentex Foundation **and**
GBU Friends and Associates Trust
c/o Scott Smith
120 South Crockett Street
Sherman, TX 75091

Via email per Rule 11 Agreement
Via fax

Howard Kirk Gibbs
9929 Crawford Farm Drive
Fort Worth, TX 76244

Via email per Rule 11 Agreement

_____
Christy L. Lee

| | | |
|---|---|---|
| PENTEX FOUNDATION | ) | IN THE DISTRICT COURT |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | 336TH JUDICIAL DISTRICT |
| | ) | |
| KENNETH VERN GIBBS; AND | ) | |
| CANDACE GIBBS WALTON; AND | ) | |
| HOWARD KIRK GIBBS, | ) | |
| DEFENDANTS. | ) | FANNIN COUNTY, TEXAS |

## FIRST SUPPLEMENT TO MOTION TO SHOW AUTHORITY

TO THE HONORABLE JUDGE OF THE COURT:

COME NOW, KENNETH "Ken" VERN GIBBS and CANDACE "Candy" GIBBS WALTON, Defendants, by and through their Counsel of Record, Law Offices of Christy Lee, P.C., and file this First Supplement to their Motion to Show Authority, and would show the Court, as follows:

### I. ADDITIONAL FACTS.

1.      On July 8, 2014, Scott Smith, Attorney for Pentex Foundation ("Pentex") emailed counsel the English version of Pentex's Articles of Incorporation. *See* Exhibit A.

2.      On July 31, 2014, a hearing on Ken and Candy's Motion to Show Authority was held before Tarrant County Probate Court No. 2, in Cause No. 2005-0000126-2-D. *Walton and Gibbs vs. Miller, et al.* Scott denied recalling who tendered payment of his initial $10,000 retainer; denied ever speaking to Mario Guilermo, the alleged agent of Pentex who purportedly retained him; denied having copies of the Minutes of Pentex's board meetings; denied speaking or communicating with anyone from Pentex; and stated, ". . . like most attorneys, I said, if it will pay me, I will do it." *See* Exhibit B, transcript of the proceedings, p. 11-12; p. 22 -23.

3.      On August 5, 2014, Scott advised the Court that the retainer had been paid in



equal sums of $5,000 each by Pentex Royalty Trust and Albert Barcroft. *See* Exhibit C, p. 1.

4.     Attached to Scott's letter to the Court was a copy of the alleged Minutes of the Board of Directors' Meeting of Pentex Foundation, which addressed the alleged authorization of Scott's engagement in this matter. The Minutes were dated August 4, 2014, more than four (4) months after Pentex began litigation in this matter, and three (3) months after Scott began representing Pentex. *See* Exhibit C, p. 2-3.

5.     On August 6, 2014, Tarrant Probate Court No. 2 ruled that the Motion to Show Authority would be continued, pending further information. See Exhibit D. To date, there has been no final judgment.

6.     As of September 25, 2014, according to the Texas Comptroller of Public Accounts, the following are not registered as entities in the State of Texas: Pentex Foundation; Pentex Royalty Trust; Renhaw, Inc.; and GBU Friends and Associates Trust. *See* Exhibit E.

7.     An Affidavit in Support of Motion to Show Authority. *See* Exhibit F.

Respectfully submitted,
LAW OFFICES OF CHRISTY LEE, P.C.

Christy L. Lee
Texas State Bar No. 24052302
777 Main Street, Ste. 600
Fort Worth, Texas 76102
(817) 504-6075
(800) 437-7901 - Fax
clee@christyleelaw.com

ATTORNEY FOR KENNETH GIBBS AND
CANDACE WALTON

First Supplement Motion to Show Authority
*Walton and Gibbs vs. Miller, et al.*

Cause No. CV-14-41665
-2-

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was delivered, pursuant to Texas Rules of Civil Procedure, to the following parties on this 26th day of September, 2014:

Pentex Foundation and
GBU Family and Friends Trust
c/o Scott Smith, Attorney of Record
P.O. Box 354
Sherman, TX 75418

Via email per Rule 11 Agreement
Via fax

Howard Kirk Gibbs
9929 Crawford Farm Drive
Fort Worth, TX 76244

Via email per Rule 11 Agreement

Christy L. Lee

FIRST SUPPLEMENT MOTION TO SHOW AUTHORITY
WALTON AND GIBBS VS. MILLER, ET AL.

CAUSE NO. CV-14-41665
-3-

PUBLIC DEED NUMBER NINE THOUSAND SEVEN HUNDRED SEVENTY SEVEN- - - - -
- - - - - - - - - - - - - - - - - - - - - - - - (9,777). - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WHEREBY the ARTICLES OF INCORPORATION of the Private Interest Foundation named

**PENTEX FOUNDATION** is registered.- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

- - - - - - - - - - - - - - - - - - - - - - Panama, May 21ª, 2008.- - - - - - - - - - - - - - - - - - - - - - - - -

In the city of Panama, Capital of the Republic, and Headquarters of the Notarial Circuit of the same

name on this twenty first (21ª) day of the month of May of the year two thousand and eight (2008),

there appeared before me, MARIO VELASQUEZ CHIZMAR, Second Notary Public of the Notarial

Circuit of Panama, holder of personal identity card number eight – one hundred seventy six – four

hundred twenty two (8-176-422), there appeared personally **IRINA ABREGO DE ESPINOSA**,

female, Panamanian, of legal age, married, resident of this city, holder of personal identity card

number eight - seven hundred and two—one thousand three hundred and seventy two (8-702-1378),

acting on behalf of **PANAMA FOUNDERS SERVICES INC.**, Panamanian corporation duly

registered under Microjacket six hundred eight thousand two hundred and sixteen (608216),

Document one million three hundred eleven thousand two hundred and eighty (1311280) who I

know. She presented the necessary documentation to certify the above, and that she can sign in the

name and on behalf of the foundation. Duly empowered for this act, he requested me to issue this

public deed to spread upon the record, as in effect I am doing, that the appearing party represents a

Private Interest Foundation, as per Law Twenty Five (25) of June twelve (12) of the year one

thousand nine hundred ninety five (1995), of the Republic of Panama, and for that purpose they grant

these Articles of Incorporation for the Private Interest Foundation named **PENTEX**

**FOUNDATION.** - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The requested registration has been completed and copies will be issued as requested by the interested

parties. informed to the appearing party that a copy of this Public Deed must be registered.- - - - - - -

This Deed having been read to the appearing party before me and in the presence of the attesting

witnesses. **ALEXI GUERRA MORALES**, with personal identity number four-one hundred seventy

five-one hundred seventy two (4-175-172), and **ZORAIDA DE VERGARA**, with personal identity

card number eight-one hundred thirty seven-three hundred one (8-137-301), both of legal age,

residents of this city, persons who I know, and are fit for the post, they found it in agreement, gave

their approval, and in evidence it is signed by all before me, the Notary who attests. - - - - - - - - - - - -

571

PUBLIC DEED NUMBER NINE THOUSAND SEVEN HUNDRED SEVENTY SEVEN - - - - -
- - - - - - - - - - - - - - - - - - - - - - - (9,777). - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

(Sgd) **IRINA ABREGO DE ESPINOSA** by **PANAMA FOUNDERS SERVICES INC.**- - -
Alexi Guerra Morales (Witness). - - - - Zoraida de Vergara (Witness)- - - - MARIO VELASQUEZ
CHIZMAR, Second Notary Public of the Circuit of Panama.- - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - **ARTICLES OF INCORPORATION** - - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - **OF THE PRIVATE INTEREST FOUNDATION NAMED** - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - - - - **PENTEX FOUNDATION** - - - - - - - - - - - - - - - - - - - - - - - - -
The undersigned, **IRINA ABREGO DE ESPINOSA**, female, Panamanian, of legal age, married,
resident of this city, holder of personal identity card number eight - seven hundred and two—one
thousand three hundred and seventy two (8-702-1378) acting on behalf of **PANAMA FOUNDERS
SERVICES INC.**, Panamanian corporation duly registered under Microjacket six hundred eight
thousand two hundred and sixteen (608216), Document one million three hundred eleven thousand
two hundred and eighty (1311280). Acting as founder of the Private Interest Foundation named
**PENTEX FOUNDATION**, hereinafter referred to as **THE FOUNDATION**, by this means
incorporates a Private Interest Foundation as a corporation in accordance with Law Twenty Five (25)
of June twelve (12) of the year one thousand nine hundred ninety five (1995), of the Republic of
Panama, with the following characteristics:- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
FIRST: **NAME.** The name of the foundation is **PENTEX FOUNDATION**. - - - - - - - - - - - - - -
SECOND: **INITIAL CAPITAL.** The initial capital of the Foundation is **TEN THOUSAND
DOLLARS (US$10,000.00)**, legal tender of the United States of America. The Foundation
endowment may be increased at any time by the Founder or by any other person.- - - - - - - - - - - - -
THIRD: **THE FOUNDATION COUNCIL.** The Foundation Council shall be solely composed
by: **MANUEL GONZALEZ (PRESIDENT), GINA KARINA CELEMIN (SECRETARY),
ANA LAURA OVALLE HORNA (TREASURER)**, all of them domiciled at Aquilino De La
Guardia Avenue and forty seven (47) street, seven (7) suit, Panamá, Republic of Panamá. - - - - - - - -
From the By-laws of the Foundation Council: - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
a. The Foundation Council is the supreme authority of the Foundation. - - - - - - - - - - - - - - - - - - - -
b. The Foundation Council may be composed of natural or legal persons. - - - - - - - - - - - - - - - - - -

c. The members of the Foundation Council are designated initially by the Founder. The election or replacement of a member of the Foundation Council, whether principal or alternate, due to resignation, disability or death, will require a simple majority of the votes of the rest of the members of the Council. If there wasn't any other member in the Foundation Council, or the rest of the members were disabled, the Protector shall have the right to appoint the new members of the Foundation Council. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

d. The Foundation Council shall exercise its functions for a period of ten (10) years. - - - - - - - - - - - - -

e. The Foundation Council shall be in charge of the administration and representation of the Foundation, without limits, before third parties and especially before national and foreign administrative and judicial authorities - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

f. The Foundation Council could delegate to one or various of its members or to a third party, its Powers to issue the Regulations of the Foundation, as well as its administrative and representation Powers for specific purposes, in which case, it will grant power to sign and oblige the Foundation.

g. If the Foundation Council is composed of more than one member, it shall be constituted in its own right and it shall elect a President, a Secretary and any other officer. Its agreements will be valid if all of the members have been properly notified and if the majority of members are present. The agreements of the Foundation Council shall be approved with the simple majority of the members present. In case of equality, the President shall have the decisive vote. - - - - - - - - - - - - - - - - - - - - - - -

h. If the Foundation Council is composed of two members, its agreements shall require a unanimous decision. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

i. If the Foundation Council is composed of one member only, he/ she shall make the decisions and issue resolutions on his/ her own. The person designated for that purpose by the Board of Directors of this sole member should sign said resolutions. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

j. The agreements of the Foundation Council shall be stated in Minutes, which shall be signed by the Secretary of the meeting who will write it. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

k. The Foundation Council shall meet at the request of the President, in the domicile of the Foundation or in any other place which the Foundation Council may determine. - - - - - - - - - - - - - - - -

l. The agreements of the Foundation Council could also be determined by means of a circular letter, in which case the decision should be unanimous. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**FOURTH: DOMICILE.** The domicile of the Foundation is Avenida Aquilino De La Guardia and

calle cuarenta y siete (47), Ocean Business Plaza Building, fifteenth (15) floor, office seven (7), City of Panama, Republic of Panama. By means of an agreement of the Foundation Council, the domicile of the Foundation may be moved, at any moment to another place in Panama or abroad. All legal relationships derived from the constitution or existence of the Foundation will be subject to the laws in effect on the location of its domicile. The legal courts in the location of its domicile shall rule the Foundation. In the event of a domicile transfer to another place, the Foundation shall continue subject to the provisions of the Private Interest Foundation Law of the Republic of Panama, insofar as in the new domicile does not exist legal provisions which expressly state another legal regime for Private Interest Foundations which are transferred to said jurisdiction. - - - - - - - - - - - - - - - - - - - - - - -

**FIFTH**: **RESIDENT AGENT.** The Resident Agent of the Foundation is **CARLES-BARRAZA ABOGADOS**, practicing lawyers, who accept the office, domiciled at Avenida Aquilino De La Guardia and calle cuarenta y siete (47), Ocean Business Plaza Building, fifteenth (15th) Floor, Office seven (7), City of Panama, Republic of Panama. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**SIXTH**: **PURPOSES.** The purpose of the Foundation is to hold assets, manage and administer the assigned patrimony according to the existing terms and regulations. It could also pay for educational expenses, sustenance, preparation and assistance, as well as support in general, or other similar help, of one or various members of one or various families by means of scholarships or programs of study determined in the Regulations. The Foundation may benefit natural or legal persons or organizations of any nature and it may take all the necessary provisions for the ordered succession of its equity. To accomplish its purposes, the Foundation should preserve, manage and invest the patrimony properly. The Foundation could not pursue profit. However, it may carry out commercial activities on a non-customary basis, or exercise its rights on titles representing capital in the mercantile corporations that belong to the patrimony of the Foundation, as long as the results or economic product of such activities will be exclusively dedicated to the purposes of this Foundation. It may also dedicate to any other licit activity allowed to this type of entities, as the Founder or the Foundation Council may determine. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**SEVENTH**: **BENEFICIARIES.** (A) The Founder, at the moment of instituting the Foundation, or subsequently the Foundation Council, may create a private document named "Regulations" whereby the beneficiaries are designated and all matters concerning them are determined. The Foundation Council shall assign the patrimony or the product of the Foundation, totally or partially to

574

one or another of the beneficiaries, or to several of them, in accordance to what is stated in the Regulations. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

(B) The distribution to one or several designated beneficiaries, as well as the time and the amount of this distribution shall be subject to what is established in the Regulations. - - - - - - - - - - - - - - - - - - - - -

(C) It is expressly stipulated that the beneficiaries are not owners or creditors of the Foundation, so they cannot claim any other rights than those conferred in the Foundation Charter, the Regulations and/or the Agreements of the Foundation Council. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EIGHTH: AMENDMENTS TO THE FOUNDATION CHARTER. The Foundation Council may amend the Foundation Charter as follows: - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Only the Foundation Council may amend, remove or declare inapplicable one or more dispositions of the Foundation Charter; change or eliminate all or any of the beneficiaries, name or add new beneficiaries, increase, diminish or in any other way modify the benefits of all or any of the beneficiaries, add new assets to the patrimony of the foundation or reform in any other way the Foundation Charter. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

NINTH: DURATION. The Foundation shall be perpetual and it may only be dissolved in accordance with the Foundation Council or based on the termination of the Foundations Law.

TENTH: DISTRIBUTION OF THE BENEFITS. The Foundation Council may distribute the capital or interests earned of this Foundation in compliance with what is established in the Regulations, which may be modified at any time by the Founder or the Foundation Council. - - - - - - -

ELEVENTH: ANNUAL REPORT. The Foundation Council shall render an annual report on their administration to: - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

(a) The Founder, as long as he/ she exists. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

(b) The beneficiary or beneficiaries, when the Founder has died. - - - - - - - - - - - - - - - - - - - - - - - - -

(c) The protector, if any. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

If the annual report is not objected within a ninety-day (90) term period, counted from the date it is received, it shall be considered approved. After said period or approval of the report, the members of the Foundation Council shall be exempted of any responsibility for their administration. But said approval shall not exempt them from any damage to the beneficiaries or third parties with an interest in the Foundation, due to negligence or fraud in their administration of the Foundation. - - - - - - - - - -

575

**TWELFTH: REMOVAL OF THE FOUNDATION COUNCIL.** The Founder or the Protector, if any, may remove the Foundation Council. Furthermore, the Founder or the Protector may designate or add new members to the Foundation Council. - - - - - - - - - - - - - - - - - - - - - - - - - -

**THIRTEENTH: OBLIGATIONS AND DUTIES OF THE FOUNDATION COUNCIL.** The Foundation Council will have the following obligations and duties: - - - - - - - - - - - - - - - - - - - - - -

a. Manage the assets of the Foundation in accordance with these Foundation Charter or its regulations. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

b. Execute acts, contracts or legal business that are adequate or necessary to accomplish the purposes of the Foundation; include in said contracts, covenants and other instruments or obligations all the clauses and conditions that are necessary or convenient to adjust to the purposes of the Foundation, which shall not be against the law, the moral, good habits or the public peace. - - - - - - - - - - - - - - - -

c. Inform the beneficiaries of the Foundation about the condition of the patrimony of the Foundation, as it may be established in the Foundation Charter or its Regulations. - - - - - - - - - - - - - -

d. Transfer to the beneficiaries of the Foundation the assets or resources that had been instituted in their favor in the Foundation Charter or its Regulations. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

e. Carry out all acts or contracts that are allowed to the Foundation, in accordance with Law 25 of June 12th, 1995, and other applicable legal dispositions or regulations. - - - - - - - - - - - - - - - - - - - - -

**FOURTEENTH: PROTECTOR - PROFESSIONAL ADVISOR - AUDITORS.** The Foundation Council may appoint in the regulations an entity of control, formed either by natural or legal persons. which may be called Protector, Professional Advisor, Auditor or a similar name, which may carry out any of the following attributions: - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

a) Overlook that the Foundation Council complies with the purposes of the Foundation and that the rights and interests of the beneficiaries are being protected; - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

b) Demand an account report from the Foundation Council; - - - - - - - - - - - - - - - - - - - - - - - - - - -

c) Modify the purposes or objectives of the Foundation, when these are impossible or very difficult to meet; - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

d) Designate new members to the Foundation Council due to temporary, permanent or accidental absence, or due to the extinction of the term period for which they were appointed; - - - - - - - - - - - - -

e) Appoint new members to replace those existing in case of temporary or accidental absence; increase or reduce the number of members of the Foundation Council; - - - - - - - - - - - - - - - - - - - - - - -

Exhibit 4

Page 6 of 9

f) Countersign the actions taken by the Foundation Council, in accordance with the Foundation Charter or its Regulations; - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

g) Protect the assets of the Foundation and supervise that they are used according to the purposes and objectives stated in the Foundation Charter. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**FIFTEENTH: LIQUIDATION AND DISSOLUTION. A)** The Foundation Council is authorized to dissolve the Foundation and to appoint one or more liquidators if they deem it necessary. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**(B)** In the event of dissolution of the Foundation, and after having paid all its debts or obligations, liquidation will continue in accordance with the dispositions established in the Regulations regarding the beneficiaries. The resolution issued by the Foundation Council to dissolve it shall be duly registered in the Public Registry of the Republic of Panama. - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The Foundation may also be dissolved due to the following causes: - - - - - - - - - - - - - - - - - - - - - - - - -

a) Due to non-compliance with the purposes for which it was established or because it is impossible to carry them out; - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

b) Due to insolvency, interruption of payments or for having judicially declare the meeting of creditors; - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

c) Due to the loss or total extinction of the assets of the Foundation. - - - - - - - - - - - - - - - - - - - - - -

**SIXTEENTH: THE REGULATION.** The Founder and the Foundation Council are authorized to issue the Regulations of the Foundation at the time the Foundation is created or later. It should include: - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

1. The manner in which the assets of the foundation will be administered. - - - - - - - - - - - - - - - - - - - -

2. The benefits of the Foundation. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3. The manner in which the beneficiaries may be excluded or added. - - - - - - - - - - - - - - - - - - - - - - -

4. The benefits that will correspond to the beneficiaries. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

5. The manner in which the Foundation Council shall inform the beneficiaries about the patrimony of the Foundation. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

6. The manner in which the beneficiaries shall be given the assets or goods that had been established in their favor. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

7. The faculties of the Foundation Council, specific or complementary, to accomplish their purposes.

8. The appointment of a Protector or any other entities of control. - - - - - - - - - - - - - - - - - - - - - - - - -

9. The manner in which liquidation of the patrimony of the Foundation shall be carried out in case of dissolution of the Foundation. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**SEVENTEENTH: NOTICES.** Notifications required by law or the Regulations shall be made in any newspaper of broad circulation in the Republic of Panama. - - - - - - - - - - - - - - - - - - - - - - - - - - -

**EIGHTEENTH: LEGAL REPRESENTATIVE.** If the Foundation Council is composed of more than one member, the Legal Representative shall be the President. The Secretary may also hold that representation in the absence of the President, or any other natural or legal person that the Foundation Council may designate for that purpose. If the Foundation Council is composed of one sole member, the Legal Representative shall be that member. The Legal Representative shall be appointed and removed by the Foundation Council. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**NINETEENTH: OBLIGATIONS TOWARD THIRD PARTIES.** The signature of the Legal Representative of the Foundation, when the Foundation Council is composed of only one corporation, or the joint signature of any two (2) members of the Foundation Council when it is composed of more than one person will bind the Foundation in connection with any act, transaction or business, without detriment to the formalities described in Article Third of these Foundation Charter. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**TWENTIETH: ARBITRATION.** Controversies of any kind, coming from or in relation to the Foundation, these Foundation Charter or its regulations, as well as its interpretation, application, execution and termination, shall be resolved by arbitration. This arbitration shall comply with the regulations of the Conciliatory and Arbitration Center of the Chamber of Commerce, Industry and Agriculture of Panama. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**TWENTY-FIRST: CHANGE OF JURISDICTION.** When the Foundation Council or the Protector, if any, consider it necessary, they could, at their own discretion, transfer the Foundation to the jurisdiction of another country after complying with the necessary legal requirements. - - - - - - - -

**TWENTY-SECOND: LIQUIDATION.** In the event of liquidation, the assets will return to the patrimony of the Founder or in his/ her absence to the person designated in the regulations or its amendments. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**TWENTY-THIRD: SEAL.** The Foundation could, if it deems it necessary, adopt its own Foundation seal. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This document has been signed by the Founder this twenty first (21ˢᵗ) day of May of the year two thousand and eight (2008). - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

(Signed) **IRINA ABREGO DE ESPINOSA** by **PANAMA FOUNDERS SERVICES INC.,** Founder.- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Document prepared and countersigned by **CARLES-BARRAZA ABOGADOS**, practicing lawyers.

**THE ABOVE TALLIES** well and faithfully with its original. I issue these presents which I seal, sign and mark in the city of Panama this twenty first (21ˢᵗ) day of May of the year two thousand and eight (2008). - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

OFFICE OF THE PUBLIC REGISTRY PANAMA

The present document was presented at the Public Registry of Panama

| | |
|---|---|
| Province: Panama | Date and Hour: 2008/05/28  18:11:20:9 |
| Volume: 2008 | Entry: 99638 |
| Presented by: IDANIA ZOTO | ID Card: 8-348-91 |
| Liquidation No.:7008472866 | Fees: 60.00 |
| Admitted by: THAL | |

(Sgd.) There appears a signature.

(There appears the seal of the Public Registry)

**THE FOREGOING DOCUMENT WAS REGISTERED AT THE PUBLIC REGISTRY**

**Microfilm Section (Mercantile)**

| | |
|---|---|
| **Microjacket** | **29536** |
| **Document** | **1354893** |
| **Fees B/.** | **60.00** |

**Panama, May 30ᵗʰ, 2008.**

**(Sgd.) There appears a signature.**

579

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 2005-0000126-2-D

| | |
|---|---|
| IN RE: ESTATE OF BERT HUGHES GIBBS, DECEASED; ) | IN THE PROBATE COURT |
| ) | |
| CANDACE WALTON AND KENNETH GIBBS, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| VS. ) | COURT NO. 2 |
| ) | |
| BEVERLY MILLER, INDIVIDUALLY, AND AS TRUSTEE OF THE GWB FRIENDS AND FAMILY TRUST, ALBERT BARCROFT, INDIVIDUALLY AND AS LEGAL REPRESENTATIVE OF PENTEX ROYALTY TRUST AND PENTEX FOUNDATION, DANNY UNGER, AS TRUSTEE OF GBU FRIENDS AND ASSOCIATES TRUST, AND HOWARD KIRK GIBBS, ) | |
| ) | |
| Defendants. ) | TARRANT COUNTY, TEXAS |

\* \* \* \* \*
\* \* \*EXCERPT\* \* \*
\* \* \*MOTION HEARING\* \* \*
\* \* \* \* \*

On the 31st day of July, 2014, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Patrick Ferchill, Judge presiding, held in Fort Worth, Tarrant County, Texas;

Proceedings reported by machine shorthand.

A P P E A R A N C E S


Ms. Christy Lee                          Ms. Sharron Cox
Attorney at Law                          MOSS & COX
SBOT NO. 24052302                        SBOT NO. 24006599
225 East Fireweed Lane                   518 Main Street
Suite 200                                Bonham, Texas 75418
Anchorage, Alaska 99503                  Phone:   (903) 583-3101
Phone:   (907) 339-9931                  ATTORNEY FOR DEFENDANT
ATTORNEY FOR PLAINTIFFS                   BEVERLY MILLER



                  -AND-
Mr. Thomas Scott Smith
Attorney at Law
SBOT NO. 18688900
P.O. Box 354
Sherman, Texas 75091
Phone:   (903) 868-8686
ATTORNEY FOR PENTEX
FOUNDATION

581

CRC for Wells Reporting
817-524-6644

Exhibit B
Page 2 of 59

e28bd4ed-9dff-4753-b322-14a0a6ee179a

```
                         I N D E X
                       VOLUME 1
                 (EXCERPT MOTION HEARING)
                                      Page    Vol.

JULY 31, 2014

Beginning of Proceedings . . . . . . . .    4      1

Opening statement by Mr. Smith              8      1
PLAINTIFFS' WITNESSES

                        Direct                    Vol.

SCOTT SMITH               9                         1


Court's Ruling. . . . . . . . . . . . . .   58     1

End of Excerpt. . . . . . . . . . . . .     58     1

Court Reporter's Certificate. . . . . . .   59     1
```

CRC for Wells Reporting
817-524-6644

Exhibit *B*

Page 3 of 59

e28bd4ed-9dff-4753-b322-14a0a6ee179a

P R O C E E D I N G S

THE COURT: All right. Ashlee, we're going to go on the record in Cause No. 2005-000126-2-D. And this is an ancillary lawsuit, and the particular style as it was originally filed is, Candace Walton and Kenneth Gibbs, plaintiffs, versus Beverly Miller, individually, and as a trustee of GWB Family and Friends Trust, Albert Barcroft, individually, and as a legal representative of Pentex Royalty Trust and Pentex Foundation, Danny Unger, as trustee of GBU Friends -- is that supposed to be GRU or GBU?

MS. LEE: It's GBU, your Honor.

THE COURT: GBU Friends and Associates Trust, and Howard Kirk Gibbs, defendants.

And let's get everybody's name who's appearing -- who's appearing here at our counsel tables. Will you begin, sir, over here to the left?

MR. GIBBS: Yes, sir, I'm Howard Gibbs.

MS. COX: I'm Sharron Cox, representing Beverly Miller, the trustee.

MR. SMITH: Your Honor, my name is Scott Smith, I'm here appearing for the special appearance, Pentex Foundation.

MS. LEE: And, your Honor, I'm Christy Lee. I'm here for Candace Walton and Kenneth Gibbs

Exhibit *B*

Page 4 of 52

individually, as well as Kenneth Gibbs, the independent administrator of the estate of Bert Gibbs.

THE COURT: Now, Ms. Lee, at our last meeting, we postponed a lot of things in order to, I believe, the issue was substituted service?

MS. LEE: Yes, your Honor.

THE COURT: And that's all been complete?

MS. LEE: Yes, you Honor. The publication's taking a little bit longer, but all of the other -- the other things you requested for substituted service have been completed.

THE COURT: Okay. And, again, for our record, and I hate to be redundant, but this is one of the most convoluted and complicated matters I've seen in all the years I've been on the bench. It makes all my previous suggestions that cases looked like bar a exam question look puny.

MS. LEE: Yes, your Honor.

THE COURT: So in order -- it may take a while, but in order for the Court to get this down in an orderly manner, I do want to begin with your original petition. And I have read that and it's quite lengthy and it has a lot of allegations.

And you have filed -- this is a lawsuit that's going to go forward in this court, regardless of

**Exhibit** _B_

EXCERPT MOTION HEARING - July 31, 2014

all the other things orbiting around our lawsuit.

MS. LEE: Yes, your Honor.

THE COURT: And it's on behalf of, again, your clients. Are they here today?

MS. LEE: Yes, your Honor, Ken Gibbs --

THE COURT: Stand up for me. You're Ken Gibbs.

MS. LEE: And Ms. Walton.

THE COURT: And Ms. Walton. And then in the capacity of administrator, also.

MS. LEE: Not on this current case, your Honor. It's concerning the motion to transfer the case from Fannin county.

THE COURT: And it's in connection with this original lawsuit that I now have before me not only your order, which you have substituted a -- a second one that you said was more -- that clarified or was more appropriate. The motion for the injunctive relief is in connection with this original file?

MS. LEE: Yes, your Honor.

THE COURT: So do you think that that is what we should hear first today?

MS. LEE: If you want to. I was thinking that we would hear -- Mr. Scott Smith has come all the way from -- far away, and I thought that's the only

Exhibit B

585

**EXCERPT MOTION HEARING - July 31, 2014**

motion he's here for.

THE COURT: And we -- he has a special appearance?

MS. LEE: Well, not him individually --

THE COURT: Somebody filed a motion to challenge his authority.

MS. LEE: That would be me. That's the first thing I think should be heard, is the motion to show authority, and then the motion to transfer the Fannin county case to this Court.

But if you would like to hear the injunctive relief first, we do have a stipulation with one of the parties who's agreed to -- agreed to the injunctive relief for the -- for our petition, so we already have one person on board. That would be Beverly Miller, the trustee of the GWB Trust.

MS. COX: Your Honor, that's not entirely correct. That is only as to the trust assets --

MS. LEE: No, no --

THE COURT: Yeah, I realize there was a request for injunctive relief on personal assets. Also, and the Court had already -- had already considered that that may be a little past its reach today. So...

MS. COX: And, your Honor, that would only be if the Court retained jurisdiction of the case.

Exhibit B
Page 7 of 59

586

THE COURT: Of course. Well, then, should I give the floor to your, sir?

MR. SMITH: I appreciate that, your Honor, but I think --

THE COURT: You may stand or be seated or whatever makes you more comfortable.

MR. SMITH: I'm kind of a wanderer. I'll try and stay right here.

I do think jurisdiction is the first issue we should take up, because if you were to determine this does not have -- this Court does not have a jurisdiction, everything else becomes moot. So I think that's an important issue and I'd like to address it now, if I could.

THE COURT: On whose behalf, though?

MR. SMITH: I filed a special appearance on behalf of Pentex Foundation, who is the plaintiff in the Fannin county suit that involves this Mr. Gibbs, that Mr. Gibbs and that Mr. Gibbs, revolving around the same conduct.

MS. LEE: Well, first of all, I never received a special appearance from Mr. Smith. If you filed one, you did not -- receive one. Did you file a special appearance?

MR. SMITH: Mr. John Skotnik filed the

Exhibit B

Page 8 of

special appearance. It's in the Court's file and I'm appearing on behalf of Pentex Foundation.

THE COURT: But under whose -- the problem I was having is some -- what authority, by whose authority do you appear?

MR. SMITH: By the authority of Pentex Foundation. I have my fee agreement with me, I have the corporate documents, which I've given to counselor. I have the documents sufficient to establish authority --

THE COURT: Well, if that's the first order of business, do you want him to take the witness stand and be subject your examination?

MS. LEE: Yes, your Honor, that would be great.

THE COURT: All right. Come around here, sir.

MR. SMITH: Thank you.

THE COURT: Please raise your right hand.

(Witness sworn)

THE COURT: Be seated please.

And, Ms. Lee?

SCOTT SMITH,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. LEE:

Exhibit B

e28bd4ed-9dff-4753-b322-14a0a6ee17b5

Q.   State your name for the record.

A.   Scott Smith.

Q.   And you are professing that you have been retained by Pentex Foundation?

A.   Yes.

Q.   And who was the individual that hired you?

A.   Pentex Foundation.

Q.   Okay.

A.   I was not hired by an individual.

Q.   Who is the legal representative for Pentex Foundation?

A.   Danny Unger.

Q.   Danny Unger.  Was he the individual --

A.   He was the -- let me put it this way, he's the designated representative for litigation.  The legal representative is a broader term, so -- but there's several individuals who are on the board and I've got my fee agreement, if you'd like to see who signed.

Q.   Yeah, I'd like to see the fee agreement.

MS. LEE:  Your Honor, may I please, approach.

THE COURT:  Yes, you may.

THE WITNESS:  I think it would be appropriate to mark that as an exhibit --

THE COURT:  You may, this would

Exhibit *B*

Page 10 of 59

be -- Pentex 1, perhaps?

Q. (BY MS. COX) I see no signature. I see a fee agreement with a name, but no signature. Is that how you do your --

A. There's three pages. Did I only print two?

Q. Wait, hold on. My mistake, my mistake.

So a Mario Guilermo, you spoke to this individual?

THE WITNESS: Your Honor, my conversations with my client are privileged, I prefer not to say.

THE COURT: Well, she didn't ask you for the conversation, she asked you whether or not you spoke to him.

THE WITNESS: I did not speak to him.

Q. (BY MS. LEE) who did you speak to?

THE WITNESS: Your Honor, can I be instructed not to answer that on the basis of privilege?

THE COURT: Overruled.

THE WITNESS: Al Barcroft.

Q. (BY MS. LEE) So Al Barcroft was the legal -- who's the legal representative of Pentex Foundation, correct?

A. He has in the past represented himself as such, yes.

Q. Okay. So he's the one that called you, and

Exhibit _B_

Page _11_ of _59_

590

CRC for Wells Reporting
817-524-6644

e28bd4ed-9dff-4753-b322-14a0a6ee179a

your fee agreement was signed by somebody else?

A. Yes.

Q. Okay. And when you received your retainer, who paid you?

A. That, I don't -- I don't recall.

Q. You don't know what the check looked like?

A. There were two checks came from two different sources.

Q. What were they?

A. Four thousand each.

Q. Who from?

A. I don't remember.

Q. You don't remember who your free agreement was from --

A. My fee agreement was from Pentex --

Q. I'm sorry. You don't -- you don't recall -- you remember the amount, you don't recall --

A. The checks were not from Pentex Foundation.

THE COURT: Give him a second to answer.

Q. (BY MS. LEE) So when Al Barcroft called you, on behalf of Pentex Foundation, did he give you any board minutes?

A. That's not really correct. I was first contacted by John Skotnik.

Q. Okay. So John Skotnik contacted you?

Exhibit B
Page 12 of 59

591

A.   Yes, he did.

Q.   And what did you two discuss?

A.   We discussed the fact that he had some sort alleged conflict of interest and he was familiar with my work and asked me if I'd be willing to take on the case.

Q.   And so you said yes, obviously?

A.   Eventually, yes.

Q.   And then the next person you spoke to was Al Barcroft?

A.   That's correct.

Q.   Did you ever speak to this Mario individual?

A.   No.

Q.   Did you ever speak to anybody else besides Al Barcroft concerning the engagement of legal services?

A.   Speak to, no.

Q.   You -- get an e-mail from anybody?

A.   That, I don't know.  There's been a lot of e-mails.

Q.   So you're representing an entity, Pentex Foundation, correct?

A.   Correct.

Q.   Do you have board minutes?

A.   I don't have the minutes, no.  I don't -- when a -- when a corporation hires me, I don't look for their board minutes.

Exhibit B

Page 13 of 59

e28bd4ed-9dff-4753-b322-14a0a6ee179a

Q.   Do you know that that is the way that you are hired by a corporation is through the board, and you do not have those minutes?

A.   It may be the board, it may be the President of the company that has authority to do it, maybe the company's representative.  There's lots of ways that companies can hire lawyers.  They don't have to have a board resolution to do that.

Q.   Actually, that's untrue.  You need to have board resolutions, if you're a corporation.  Are you aware of Panama law?

A.   No.

Q.   Are you aware that Panama law is almost identical to U.S. law concerning corporations?

A.   No.

Q.   Do you understand that they have a board?

A.   No.

Q.   Did you not understand that Pentex Foundation had a board?

A.   I don't understand Panama law, no.

Q.   No -- so you didn't realize that Pentex Foundation had a board?

A.   No --

Q.   So you never received --

A.   Let me back up --

Exhibit $\beta$

Page 14 of 59

EXCERPT MOTION HEARING - July 31, 2014

THE COURT: Give me a second.

THE WITNESS: I do believe there is a board, I do believe there are board members. How that construct is done under Panama law, I do not know.

Q. (BY MS. LEE) Okay. So is this the only document that you have that shows authority that you're here for Pentex Foundation?

A. No.

Q. Okay. What other documents do you have?

A. Well, as I previously produced to you, I have the e-mail that I sent you on June 13th with the articles, I believe, from Panama. Which I would like to go ahead and mark as Pentex 2.

MS. LEE: May I?

THE COURT: Yes, ma'am.

THE WITNESS: Which is the e-mail and the attachments.

I also have the e-mails and attachments that I sent you on July 8th, which contains the translation and a certificate of -- I think it's called certificate of authority from the country of Panama. I'd offer that as Pentex 3.

Q. (BY MS. LEE) Okay. So, in fact, what these documents state is that it's an actual corporation, correct?

Exhibit *B*

Page *15* of *59*

594

**EXCERPT MOTION HEARING - July 31, 2014**

A. It states it's an entity under the laws of Panama. If it's a corporation, or a foundation, I'm not sure. I don't --

Q. Right. Okay. So both of these documents, one in Spanish one in English, only states it's an incorporated entity?

A. And that it's in existence.

Q. Okay. But, again, nothing showing me that you had any authority to file a special appearance for Pentex Foundation, correct?

A. You got my fee agreement.

Q. So you have a fee agreement from a person who I don't know, who says that you can represent Pentex Foundation in this lawsuit, and you -- you just went with this?

A. Yeah, I just went with that.

Q. Nothing else?

A. Nothing else. I don't usually challenge my clients when they want to hire me.

MS. LEE: Okay. Your Honor, I don't have any further questions, I would --

THE COURT: Would you like to continue to, say, testifying, as it were, whatever you want to tell the Court from the witness stand?

MR. SMITH: Yes, sir, I would.

Exhibit B

Page 16 of 59

595

**CRC for Wells Reporting**
**817-524-6644**

e28bd4ed-9dff-4753-b322-14a0a6ee179a

THE COURT: I guess what I was looking at something earlier and it seemed to be that only the president or the vice president or the secretary of the so-called entity had authority to engage in litigation, engage with counsel, am I -- did I misread?

MS. LEE: Your Honor --

MR. SMITH: That may be what counsel represented. I don't believe that to be the case.

MS. LEE: Your Honor, I've been practicing business law, tax law for many, many years, and when -- as an officer of the Court, I will tell you that you're required, when an entity decides to fire a -- to file a lawsuit, it is a board resolution. So the board has to make the resolution to sue anyone.

There is no board minutes here. And Panama is concurrent. It's not completely identical, but it is concurrent with the U.S. way of entities. And so there should be board minutes, something showing me.

And he's been on notice since April that I needed something to show, including board minutes, and he, still today, is not producing anything.

THE COURT: Would you like to answer that, sir?

MR. SMITH: Well, number one, I would like the Court look at what I did produce.

Exhibit $\beta$

The first response I had is, when I saw this motion, I looked at Rule 12, because this is the first time I've ever been challenged, in 30 years of practicing law, to show that my client actually has hired me --

THE COURT: Well, maybe the client has the authority to hire you. That's the issue, is it not?

MR. SMITH: I don't know that you can go behind the engagement of the lawyer to challenge that basis, as an opponent. I mean, it seems awkward.

What I was going to say was, when I looked at Rule 12 --

THE COURT: The individual could just -- could be a rogue board member or an interloper, so to speak, or even stranger. I mean, you don't -- you say you haven't met this person, right?

THE WITNESS: Here's the reason I didn't, your Honor. The motion was never sworn like it's suppose to be. Rule 12 is like a sworn motion, so it's not proper to consider. I didn't get a chance to say that earlier, but that was really my first response, is I didn't go pull up all these minutes, because I didn't have a sworn motion.

More to the point, the motion is really two parts. It challenges the existence of Pentex, which

Exhibit $\beta$

Page 18 of 59

we -- that's the reason we sent those e-mails and sent the supporting documents months ago, and then challenges my authority. That's why I sent her -- or had available my fee agreement.

I did not sit and compare the names on the documents from Panama with the names of the individuals that signed my fee agreement. It may be the same. I probably need to compare that, if you think that would answer the question.

MS. LEE: No, your Honor, to go to -- concerning the -- the verification, this exact, almost identical, motion to show authority has been filed in Fannin county with a verification affidavit stating that he does not have authority.

MR. SMITH: This isn't Fannin county.

MS. LEE: If it was inadvertently not put on, if he's been on notice.

And I would also show for the record, as he stated erroneously, I've never seen the fee agreement. So he said he had e-mailed that to me, I never received it.

MR. SMITH: I referenced I sent you the -- the incorporation documents and the certificate of authority that are exhibits two and three. I did not send you the fee agreement.

Exhibit ß
Page 19 of 59

## EXCERPT MOTION HEARING - July 31, 2014

MS. LEE: Well, I have my clients who signed the affidavit, who would be more than happy to get on the stand to state exactly what the affidavit provides.

THE WITNESS: That's not procedure.

THE COURT: So if I assume that you are here representing Pentex Foundation only or Pentex Royalty or is that one and the same?

THE WITNESS: Pentex Foundation. I don't know who Pentex Royalty is.

THE COURT: And whether or not we have service on Pentex Foundation, you are only here for a special appearance on behalf of Pentex Foundation.

THE WITNESS: That is correct.

THE COURT: That special appearance, I've seen, but for the most part is that that there's not sufficient ties?

THE WITNESS: No, the special appearance is based upon the question of jurisdiction and the dominant jurisdiction of the Fannin County District Court --

THE COURT: Because there is one agreement, as I recall, that had, in Fannin county, as a --

THE WITNESS: Right. The original agreement referenced venue in Fannin county.

THE COURT: Right. Because we do that with

Exhibit B

Page 20 of 59

## EXCERPT MOTION HEARING - July 31, 2014

our management trusts when we do a bank here and we do a trust for kids, we never know where they're going move and so we tend to make the jurisdiction and venue in Tarrant County, by my -- usually by my request.

THE WITNESS: And this doesn't address jurisdiction, it just addresses venue. My question on jurisdiction is whether this Court has incident jurisdiction to this case, because it's not out of -- what it pertains to is assets that have already been distributed.

THE COURT: I know. That's what bothers me about this case as well.

THE WITNESS: And that's really what I want to speak about --

THE COURT: But we're not going to get into that right now.

MS. LEE: Yeah --

THE WITNESS: And with respect to the secondary component of the motion to Rule --

MS. LEE: Again, your Honor, I would like to focus on the motion to show authority.

THE WITNESS: That's what I'm talking about.

THE COURT: Well, he said the Rule 12 motion, the second part.

Exhibit B

Page 21 of 59

THE WITNESS: The second part was whether Pentex existed. And I don't know if that's still an issue or not --

MS. LEE: No, your Honor.

THE WITNESS: -- then I'll just rest.

MS. LEE: Yes, he has provided me the documentation for that.

THE COURT: Just once again, and it will be repeating yourself, but tell me, again, the scenario -- I remember the other attorney, is he from Sherman possibly --

THE WITNESS: Bonham.

THE COURT: Bonham.

MR. SMITH: I'm from Sherman.

THE COURT: I can't remember everything about every case, but I do try to retain -- okay. But now he's been here before. How do you pronounce his name?

THE WITNESS: Skotnik.

THE COURT: Skotnik. So he's the one that initially called you, initially recommended you or you're not sure?

THE WITNESS: He called me because he knew he was -- or he was afraid he had a conflict of interest, and he voluntarily withdraw. Called me and

Exhibit B

601

e28bd4ed-9dff-4753-b322-14a0a6ee179a

asked if I'd be interested in the case, explained part of the details of the case, and like most attorneys, I said, if it will pay me, I'll do it.

THE COURT: A retainer is usually the next thing --

THE WITNESS: It was, it was. I didn't enter an appearance until I had the retainer. I do have a case for you, your Honor --

THE COURT: It's a little disingenuous to not remember, isn't it -- I mean, you get that many $5,000 checks?

THE WITNESS: I don't remember the names. I want to say one of them was Mr. Unger --

THE COURT: You're under oath and you don't want to be -- commit perjury.

THE WITNESS: -- it wasn't the name of the client. I'd be more than happy to look and I'd be more than happy to supplement my answer, but I don't remember that --

THE COURT: So you received two different -- two different -- for a total retainer of $10,000, is that what I understood?

THE WITNESS: Yes, sir. I think I can explain this and maybe it will make a some sense. The asset that Pentex had is assigned to a GBU Trust. And I

Exhibit B

Page 23 of 52

think some beneficiaries of that trust are the ones that actually paid the fees. Because they're the ones with the financial interest.

And I want to say one was Mr. Unger. And I just don't remember who the other check came from. It could have been Mr. Barcroft. I just don't know.

THE COURT: So Mr. Barcroft is the one who mailed you the agreement paperwork?

THE WITNESS: I get it via e-mail.

THE COURT: That's what you printed off and provided for opposing counsel?

THE WITNESS: Yes, sir. Your Honor, I found one case and it's the Patton Children's Trust case out of Amarillo. It's not published, but it does talk specifically about Rule 12. And I've got a single copy. I'm sorry, I didn't bring extras.

And says, typically, the response to a Rule 12 motion, an attorney satisfies his or her burden to establish the authority to prosecute or defend a suit through an affidavit from the client indicating the attorney was retained and/or through testimony of the attorney.

And that's all it says you have to do to satisfy the burden. And that's all we've done, your Honor.

Exhibit B

Page 24 of 59

e28bd4ed-9dff-4753-b322-14a0a6ee179a

MS. LEE: One thing, your Honor. Was that a corporation? Was that case a corporation?

THE WITNESS: I think it was a trust.

MS. LEE: It's very different than a corporation.

THE WITNESS: Well, it just says the attorney has to give his testimony. That's what I've done. And I'll submit that for the Court.

THE COURT: Additional questions, Ms. Lee?

MS. LEE: No, your Honor.

THE COURT: You may step down at this time.

THE WITNESS: Thank you.

THE COURT: It's a very interesting question posed, because usually what our motion -- we have motions to show authority all time in this Court, because it's probate court and often persons who are alleged to be incapacitated tend to show up with private attorneys or private attorneys show up and tend to claim they're representing the incapacitated person. So those cases are one in which we have a threshold of showing that the person has at least the capacity to engage an attorney.

So while we are accustomed to Rule 12 agreements, this is -- or Rule 12 objections or motions, rather, this is -- this is unique, like everything else

Exhibit 13

more or less, in this case.

So it's your motion, tell me why I should -- why I should grant your motion, what proof he hasn't supplied. I mean, he has come under oath and stated that he believes he's the attorney.

MS. LEE: I know, your Honor --

THE COURT: And he's gotten payment from someone.

MS. LEE: But he didn't get it from Pentex Foundation, your Honor. He got it from two individuals who have nothing to do, reportedly, with Pentex Foundation. He hasn't met these -- he hasn't any of the people from Pentex Foundation, Incorporated. It's a corporation. It's very different.

He's been on notice since April that we have questioned his authority. He could have obtained a resolution from the board. We specifically asked for that, and he provided us with just that it's a corporation, which does satisfy that it's a Panamanian corporation.

But still, he has no proof that he's been -- and it's exactly what you stated earlier, your Honor, how do I know that -- there are plenty of cases, I apologize I don't have them on me, where cases have been thrown out, where the board -- because a

605

CRC for Wells Reporting
817-524-6644

Exhibit

Page 26 of 59

e28bd4ed-9dff-4753-b322-14a0a6ee179a

shareholder would say, I was at the board meetings, and the board never resolved, ever, why I was there in order to sue somebody. And that case would get thrown out, as not having authority -- as the attorney not having the authority.

I don't think he did his due diligence. Again, he received two checks from two individuals, which are not associated with Pentex Foundation. And signed from a lady who he -- a gentleman who's he's never met, via e-mail.

THE COURT: Doesn't sound very good when she says it. But you, obviously, have a different version.

MR. SMITH: I used to do insurance defense. Insurance companies paid me all the time. They weren't the client. The client was the individual I was representing.

THE COURT: But I suppose nobody challenged whether or not the insurance company existed or whether or not the proper route or road map was taken between the powers that be and your ultimate appearance in the courtroom.

MR. SMITH: That is true. I was never challenged. No one would ever think to do that.

THE COURT: She has challenged, apparently

Exhibit B

from the beginning.

MR. SMITH: Well, with an unsworn motion not properly before the Court. And so I brought what I had. I did not get an authorization. And the case that I gave you says that the remedy is to give us more time.

THE COURT: Excuse me?

MR. SMITH: I believe the case that I gave you, it's over there on the corner of the bench, I believe they said the remedy is not to dismiss our position, but to give us more time to find an attorney or demonstrate authority. So it seems like --

MS. LEE: He's been on notice since April. It's now July 31st.

THE COURT: Well, he does have a point. It is supposed to be a sworn motion. That can be fatal.

MS. LEE: Your Honor, if I can --

THE COURT: Does it not say that in the --

MS. LEE: No, he -- he is accurate. Oh, actually, your Honor, there is one.

MS. SMITH: There's an affidavit --

MS. LEE: There's an affidavit of counsel, myself, that I signed in support, stating that everything in here was true and accurate. So there is an affidavit in support of this motion.

MR. SMITH: Which --

Exhibit B
Page 28 of 65

e28bd4ed-9dff-4753-b322-14a0a6ee179a

**EXCERPT MOTION HEARING - July 31, 2014**

MS. LEE: So, yes, it is there.

MR. SMITH: Which motion?

MS. LEE: It's this motion -- the amended motion to transfer cause of action and motion requesting counsel to show authority. It is -- it's on there.

MR. SMITH: The --

THE COURT: The one filed on 7/7.

MR. SMITH: The one I received doesn't have it.

MS. LEE: Your Honor, it was all sent together. It's directly after --

MR. SMITH: Thank goodness you have (inaudible), but mine says page 25 of 25. I don't see it --

MS. LEE: It's after the fifth page --

THE COURT: Yeah, here it is.

MS. LEE: And I sent it via e-mail, your Honor.

THE COURT: Yeah, it's there. It came with the original, I beg your pardon. Ms. Lee, it's attached to your original petition.

MR. SMITH: I will stand corrected, your Honor, it is sworn.

THE COURT: And also attached to that motion, what do you have here about the -- it looks li**Exhibit** /5

Exhibit C, this Quinto, agente residente?

MS. LEE: Your Honor, that was the document that Mr. Smith filed as, I believe, Exhibit 2. It was the foreign -- incorporation documents for the Pentex Foundation. At the time I filed this motion, he had only sent me the Spanish version.

THE COURT: Okay.

MS. LEE: And I did receive an English version from him.

THE COURT: Well, I was looking -- I've got some notes here. I'm not -- I don't pretend to be a translator.

MR. SMITH: Your Honor, we got the translation here.

THE COURT: Well, what does it say, then, Ms. Lee, about hiring counsel?

MS. LEE: I don't believe it says anything about hiring counsel.

THE COURT: So there's nothing in the agreement itself. Your reference was to the Panamanian statutes, which you say are similar to Texas or United States --

MS. LEE: Yes, your Honor. There's -- there's a -- I apologize, I don't remember the name. There's an international type of organization

Exhibit 13

Page

that the U.S. agrees with, as well as Panama does.  And they agree with the same type of service, as well as lawsuits and --

THE COURT:  And when and how did you notify him that you were expecting to have more formal documentation than in the usual Rule 12 motion -- you know, Rule 12 show authority?

MS. LEE:  I believe the first time was April 25, 2014.  I sent multiple e-mails as well, asking who is the representative of Pentex Foundation, and he has stated he would get back to me.  Today is the first day.

I sent him another e-mail on June 20, 2014 requesting who is the legal representative for Pentex Foundation and, again, today is the first day he's actually given me a name.  That lawsuit was filed, I believe, that was the end of March or maybe the beginning of April.

THE COURT:  Well, it appears to me that I may have to agree with the Amarillo court in the sense that, I'm reading between the lines that your -- your allegation is that there might not be proper authorization, even though this man has allegedly been hired and paid --

MS. LEE:  Yes, your Honor.

Exhibit $B$

Page 31 of 59

e28bd4ed-9dff-4753-b322-14a0a6ee179a

THE COURT: -- that there's an underpinning or prerequisite that is required in order for him to show the type of authority that you are requesting, if not demanding. Is that a fair statement?

MS. LEE: Yes, your Honor.

THE COURT: And you believe that you've given him notice. And I don't suppose you have those e-mails here or anything --

MS. LEE: No, your Honor. But I would be more than happy to supplement. Yes, I have given him ample notice. And in the other motion --

THE COURT: And even though he has never had this happen before, you know, there's always a first time for everything in law, and this is what you're demanding?

MS. LEE: Yes, your Honor.

THE COURT: Well, I see -- I see no other alternative than to continue this and give you, like he said, time to -- to reappear here. And you, by that time, will have the cases in the law and then he will be -- he will comply if that is what's required.

MS. LEE: We have waited four -- three months to have this hearing. We have waited many months. It's been cancelled three times. He has been full aware --

Exhibit B

Page 32 of 36

611

**CRC for Wells Reporting**
**817-524-6644**

e28bd4ed-9dff-4753-b322-14a0a6ee179a

THE COURT: I'm not sure that the cancellations were his fault. They may have been my own --

MS. LEE: No, two of them were other individuals' fault. No, they've never been -- No, never been Mr. Scott -- I didn't mean to imply that, at all. This has nothing to do with Mr. Scott.

THE COURT: Well, I'm sorry -- you know, Ms. Lee, I'm just simply not prepared, I mean, I owe him a courtesy as a fellow member of the bar, just as I owe you, however I understand why you want more than he's prepared to provide today, so --

MS. LEE: Can --

THE COURT: -- I have a choice of either, you know, overruling your motion and going forward, when in fact, you may be correct. If he does not show the proof that's necessary, I would grant your motion. But I can't do any of that today.

I guess we could hear his -- we could take testimony on his special exception or hear his argument on his plea and abatement or special appearance, conditioned upon the Court, ultimately, finding that he had the authority -- the requisite authority to make it.

MS. LEE: That is perfectly fine with me.

THE COURT: And then if he -- if that co

e28bd4ed-9dff-4753-b322-14a0a6ee179a

to pass, then we won't have to do the motion again.

MS. LEE: I -- I would prefer that. Is that agreeable with you --

THE COURT: You're prepared to argue that today, are you not?

MR. SMITH: I am, sir.

THE COURT: Well, then let's go forward on that basis, then. The Court will take under advisement, pending further testimony and exhibits, et cetera, as to whether or not Ms. Lee's motion to show authority should be granted.

And now as I told -- you know, we usually have somebody from the Florida who says they've never been to Texas and the long arm statute and all that, but your special appearance is a different kind of cat, so to speak, right?

MR. SMITH: Yes, yes, sir.

THE COURT: You want to tell me about your special appearance?

MR. SMITH: Yes, sir. And it really goes to the Court's jurisdiction. And I'm certain this Court is for more educated on probate court jurisdiction than I am. I come from a county with courts of general jurisdiction, so we have different sets of issues. So I had to research this and I have --

Exhibit B

THE COURT: Well, it changes every legislative session. So you may know more about it than I.

MR. SMITH: My analysis starts with the SWEPI case. I'm not sure -- are you familiar with that or not?

THE COURT: I am, indeed.

MR. SMITH: Okay. And what that tells us and teaches us -- I have a copy, if you like, or I can give it to counsel.

MS. LEE: Your Honor, I'm -- I'm --

THE COURT: Is this more on your motion to transfer or your special appearance?

MR. SMITH: It goes to jurisdiction, which is the foundation of the special appearance. The jurisdictional question is which court has dominant jurisdiction. And if this Court case doesn't have exclusive probate jurisdiction, then I'm going to argue that Fannin county has dominant jurisdiction, by virtue of being filed first. That's why I'm going to SWEPI first.

THE COURT: But you're arguing not a special appearance before the Court, aren't you arguing the main issue of transfer?

MR. SMITH: That was the reason we made the

Exhibit B

special appearance.

THE COURT: So you wish to -- you wish to appear on behalf of their motion to transfer, in a special appearance, and argue on the merits of whether or not the Court should consolidate or transfer?

MR. SMITH: Yes, sir.

THE COURT: As opposed to a special appearance as to whether or not this Court has jurisdiction over the person or the corporation itself --

MR. SMITH: Exactly.

THE COURT: -- we're talking about lawsuit -- or the cause of action.

MR. SMITH: Yes, sir.

THE COURT: Or alleged cause of action.

MR. SMITH: Yes, sir.

THE COURT: Well --

MR. SMITH: Because it affects us, if you were to assume jurisdiction from Fannin county, that directly affects Pentex, who filed suit in Fannin county.

THE COURT: All right. Ms. Lee, I'm going to go ahead and, again, I'm to go -- we're going to go ahead and hear this. And it's still conditioned upon him, ultimately, showing authority. But let's go ahead

Exhibit B

and get to meat of that.

MS. LEE: Your Honor, with all due respect, it's my motion --

THE COURT: It's your motion.

MS. LEE: Can I give first --

THE COURT: You can go first. That's a good point.

MS. LEE: Okay. Thank you, your Honor.

THE COURT: Because I'm really concerned -- here's the thing that bothers me. It seems like assets were distributed from an estate, and the people, for better or worse, made a bed they don't like lying in.

MS. LEE: Your Honor, it's very different than that. It's --

THE COURT: And so it really may not have anything to do with this Court, at all.

MS. LEE: I respectfully disagree. And --

THE COURT: All right. Now, notwithstanding the trustee and alleged actions of the trustee are going to be the -- the petition that I mentioned originally, that's our trial petition that we're going to go forward on, come hell or high water.

MS. LEE: Yes, your Honor. But I'm talking about a case in Fannin county. And I think the

Exhibit B

big -- the big thing that's up for discussion here is they believe these two cases are one and the same.

The current case that's in this jurisdiction, that you said, come hell or high water, we're going to move forward, and the case in Fannin county. They aren't the same, at all.

My first -- my two clients, Ken and Candy, they have asked for this Court to transfer into the estate of Bert Gibbs, this case. Ken and Candy are two of the four heirs of the estate of Bert Gibbs. Bert Gibbs had four heirs. Howard Kirk, who's the gentleman over there, he's number three.

These three individuals went to bed with Al Barcroft, AKA Pentex Foundation, and signed a contract, which, by the way, your Honor, Al Barcroft drafted the contract on his own accord, on his own behalf, and inside the jurisdiction in Fannin county.

THE COURT: And it appears he was practicing law without a license.

MS. LEE: Yes, your Honor. And pursuant to the Texas Estate Code 34.001, you have the authority that you may, not required, but you may transfer to your Court from a district court, and that's where that court is, any cause of action related to probate proceedings pending in another court or cause of action in which the

Exhibit B

personal representative of the estate pending in this Court is a party. And you can consolidate these cases.

THE COURT: True.

MS. LEE: Well. Okay. What happened is when this lawsuit was filed, it was filed specifically stating that it was for Pentex Foundation not getting attorney fees that it was entitled to from -- from -- from the estate of Bert Gibbs.

Your Honor, you have to keep in mind, even though it does look like these are assets that have been transferred out of the estate, there are assets that aren't transferred out of the estate. There currently is a $6.1 million offer on a piece of property, to pay in full, or a $8.5 million installment agreement over the next five years, that will come to the estate of Bert Gibbs.

There is a lot of money out there. My clients -- my two clients own 25 percent of the estate. So if they own 25 percent, they are potentially going to get $2 million. Al Barcroft owns a percentage and Howard Kirk Gibbs also owns -- he owns 12.5 percent. So we have a lot of assets for the estate of Bert Gibbs.

And we filed an amended answer in the Fannin county case, because what they allege -- and -- what they allege is exactly what

Exhibit 13

Page 39 of 52

CRC for Wells Reporting
817-524-6644

618

e28bd4ed-9dff-4753-b322-14a0a6ee179a

**EXCERPT MOTION HEARING - July 31, 2014**

Mr. Smith states, which is it's attorney fees. In their -- they sent admissions to my clients, 85 admissions. Of 85, over 20 only included Ken as executor.

So when I objected, and said I'm not -- this is for harassment purposes only, Ken, as the executor of the estate, is absolutely irrelevant. I have an e-mail June 26th from Mr. Smith that states that the attorney fees --

MR. SMITH: Your Honor, I'm afraid I have to object. And that's why I was going to tell you about the SWEPI case. You determine jurisdiction based on the pleadings. We're getting into a lot of ancillary stuff here, that are not relevant to the pleadings on file , so I would object to her introducing --

THE COURT: I'm going to overrule the objection for now.

MS. LEE: So he says requests 68 and 69 are the core issues of our case in Fannin county, our core issues. 68, subsequent to the execution of the family settlement agreement, Ken, as executor, has used funds for the estate of Bert Gibbs to pay attorney fees that were owed by Candy.

69, subsequent to the execution of the family settlement agreement, Ken, as executor, has used

Exhibit *B*

Page ___ of ___

funds for the -- from the estate of Bert Gibbs, deceased, to pay attorney fees that were owed to Ken.

We have pulled in -- you know, it's very difficult, your Honor, that my client is Ken, individually, and as the independent administrator of the estate. When we filed our supplemented answer, we stated that they have a defect in legal capacity. They have admitted, in these documents and other documents, that it is at the core, over 20 questions which Mr. Smith -- Pentex Foundation has already filed a motion to compel stating that they wanted -- that those were paramount issues concerning his fiduciary duty as the trustee.

His conditions of the home place for self-dealing. What does that have to do with a contract -- what does my client, Ken, have to do -- as independent administrator, have to do with the contract that they're suing for in Fannin county? They're suing the wrong individual.

Ultimately, Ken -- Ken, as executor of this estate, is going to be pulled in.

THE COURT: And a resident of Tarrant County?

MS. LEE: Yes, your Honor, a resident Tarrant County. So is Howard Kirk Gibbs.

Exhibit *13*

THE COURT: Okay.

MS. LEE: So, your Honor, this is what I've been able to determine --

THE COURT: But he's being sued in his capacity as an executor --

MS. LEE: No, your Honor. Right now, he's being sued as an individual, because there's a family settlement agreement that was filed in this Court in 2008. And, specifically, it states that the four players, all four, Al Barcroft, Howard Kirk, Ken and Candy, if they sue the executor, sue the estate in any capacity, they have a potential for forfeiting all their inheritance.

THE COURT: So it's kind like an in terrorem clause in a will?

MS. LEE: Yes, that's exactly -- so they didn't want to sue Ken --

THE COURT: In his capacity as executor.

MS. LEE: As executor. But as Mr. Smith states in his e-mail, core issue goes to how the attorney fees were distributed.

That's exactly -- Pentex Foundation is suing my clients, stating that the attorney fees --

THE COURT: They can't -- individually, he has no --

Exhibit *B*

Page 42 of 59

MS. LEE: Exactly --

THE COURT: -- he has no responsibility for attorneys fees.

MS. LEE: Exactly. We have an affidavit that we have attached, saying you're suing me in the wrong capacity. So that lawsuit is going --

THE COURT: That's something you should argue up there, is it not, that he's suing in the wrong capacity?

MS. LEE: We have filed that, your Honor, but we're trying to -- judicial economy. With this case -- as you've already stated, this case -- the estate of Bert Gibbs has been going on since 2005.

If this installment agreement gets signed for the sale of the property, this case will stay open until 2020, and I'm sorry to tell you that. It's a five-year installment agreement to sell a big piece of property.

THE COURT: But it's independent administration --

MS. LEE: Yes --

THE COURT: -- so I don't really have any say so over who buys what.

MS. LEE: Exactly, your Honor. But it's still in this Court, so this Court is still going to

Exhibit B

CRC for Wells Reporting
817-524-6644

Page 43 of

622

e28bd4ed-9dff-4753-b322-14a0a6ee179a

hear disputes. It's not the first time these individuals have had disputes, it's probably not going to be the last.

THE COURT: They have a settlement agreement they filed with this Court, if they have another dispute.

MS. LEE: Exactly, your Honor, and we are pursuing that on one avenue. But we -- with judicial economy, you know, this Court is allowed to hear cases or transfer a case over, if this considers probate proceedings. And that case specifically concerns probate proceedings concerning the administration of the estate of Bert Gibbs.

THE COURT: Not if he's been filed incorrectly against him.

MS. LEE: Correct, your Honor. But if we file that over there and do a motion to dismiss, which we've already filed, we've got to go to Fannin county, hear all that, have it all done. It's going to cost a lot of money --

THE COURT: Right.

MS. LEE: -- how much money my clients have paid so far, just to get to this phase --

THE COURT: Right.

MS. LEE: -- so all that money to have t

Exhibit *B*

re-file over in this county, because I can assure you, they will re-file. So why not have it moved here, switch out the players, and move forward with the lawsuit.

They're sitting right here, you can ask them. They're not going to drop the lawsuit. I've tried to settle with them. They're not going to drop it. But we can do all that, but we're going to be back here in January, six months later, fighting -- having the exact same petition that they filed and Ken and Candy's name, individually, is going to be x-ed out and the estate of Bert Gibbs is going to be in there.

THE COURT: But as I was telling your opposing counsel here, you know, actually the first case under 5B is out of this court. It's called Lagrone v. Henry. The very first one ever reported, and it had to do with a trust that -- the trustee was in -- up there in the panhandle and our beneficiary was down here.

Be that as it may, that was the first reported case. And ever since that case, the legislature and the Supreme Court and other courts have made 5A and 5B decisions. 5B -- it's a new Estates Code decision, but have made these decisions. Every legislature comes in and changes it and the Supreme Court changes it and it gets really complicated about

Exhibit B

Page 45 of

whether or not the court -- and the one that you're speaking of, Counsel, where they drug in an entire hospital staff and everything all the way down to Harris County to have a trial, was that -- that was one of the abuses of this consolidation.

One of the ones that caused one of the more recent restrictions on these transfers was where somebody went down the Houston and got a guardianship, and then sued the doctor and the hospital in Midland for causing damages. And the whole hospital and everybody, the lawyers, and all had to move down to Harris County for trial and that's one of the last ones where the legislature said enough is enough.

So I'm very, let's say, proactive in consolidating cases from down the street, from my sisters and brethren who are in district courts and we have something that's clearly linked to the estate. In fact, in 30 years, I've only had one of those ever challenged by the judge, himself.

But be that as it may, when we start dragging stuff across county lines, the Court is more reluctant. I know you also read the cases that say it's entirely my discretion if I choose not to do it. There's no appeal from choosing not to do it. You can certainly appeal me choosing to do it wrongly.

Exhibit *13*

EXCERPT MOTION HEARING - July 31, 2014

Aren't we just, though, missing a step, the fact that he hasn't been sued, as you say that's all they're -- but then doesn't that invoke this so-called nuclear provision, if they sued him as an executor?

MS. LEE: Right. But for judicial economy, your Honor -- and it would be, bring the case over here, and we could -- we don't have to start anew. This has been going on since, basically, November of last year, not in your court, but with --

THE COURT: But that's nothing for litigation, as you well know.

MS. LEE: I know. But there's other issues as well. Pentex Foundation, which I have not mentioned yet, has sent demand letters to all the -- to the estates and to the attorney, for the permanent guardian of the decedent's wife, demanding that any more proceeds from the estate be sent to them directly, instead of what the contract states, which is to the GWB -- I mean the --

THE COURT: Is that why people do interpleaders and put money in registry of the Court?

MS. LEE: That would be great, but I don't know if people are going to do that.

THE COURT: That's their issue, I guess.

MS. LEE: The issue with the family

Exhibit 13

Page 47 of 55

settlement agreement as well, which is filed with this Court, and also, I believe it's filed with the recorders direct. It specifically states anything concerning -- anything concerning the estate is in this Court, not just Tarrant County, but it says Tarrant County, Probate Court No. 2.

MR. SMITH: That's an abject misrepresentation.

MS. LEE: No, it's not.

THE COURT: I've got the excerpt of the family settlement agreement and what it says, verbatim --

MS. LEE: Is it 3.34?

MR. SMITH: 3.34, appropriate and exclusive venue for any suit arising out of this agreement is agreed by the parties to be in the statutory probate court of Denton county, so long as the matter is not presided over by Judge Don Windle.

MS. LEE: Continue reading please.

MR. SMITH: In the event the matter will be heard by Don Windle, then in that event, the parties agree that probate should be in this court.

But Don Windle is not on the bench --

THE COURT: He's been gone for a while, actually.

**Exhibit** *B*

MS. LEE: Well, originally, I'll have to look at my copy. If I misrepresented, I apologize. But second of all, lots of copies go around when it concerns these individuals, so I'm not sure --

MR. SMITH: Here's a copy for the Court.

THE COURT: Do you want me -- I could, I guess, appoint a receiver and that receiver could sell this property --

MS. LEE: Well, that's not the problem --

THE COURT: -- keep the money until we decide who was entitled to get it.

That's not an issue?

MS. LEE: No, it's actively being sold, we have -- there is a potential buyer. But, yes, there's going to be a lot of property, there's a lot of issues concerning that.

THE COURT: Okay. But then that's -- so how did we get here to -- how did we get here to me, then, if Don Windle -- he's been off the bench long enough for Bonnie what's-her-face to be elected once, at least --

MS. LEE: Well, regardless -- regardless of --

MR. SMITH: I brought her profile if you need it, but, yes, she --

Exhibit 13

Page 49 of 89

THE COURT: When did she first go on the bench?

MR. SMITH: I don't know. It just shows she's presently the judge. Court, take judicial notice of that.

THE COURT: That's true. She may have been -- in 2005, he may have still been on bench, but I don't know the day he left, he retired.

MR. SMITH: It doesn't matter. It talks about when you have a dispute, at that time you look and see who's on the bench.

MS. LEE: But according 34.001, you are allowed to transfer cases that are probate proceedings that are related to the estate. And that's why we're asking for this to be brought over -- transferred over here for judicial economy. You know the players.

Just to even get started over in Fannin county, I -- without exaggeration, I'll need two days, full, just to -- with charts and diagrams. This has been going on since 2005. This is very complicated stuff.

And you have the authority --

THE COURT: But that -- but I don't have the authority to move it, because it's a complicated case.

Exhibit B

Page 50 of

MS. LEE: No, your Honor, I didn't mean it like that --

THE COURT: I know you know that. But I'm just saying, I can be sympathetic to your situation, but still not feel like I have the authority to do it.

MS. LEE: Correct, your Honor. It is the Pentex Foundation lawsuit is suing my clients and Howard Kirk Gibbs for attorney fees that were paid inappropriately through the estate. That's exactly what the lawsuit is. Through the estate of Bert Gibbs, this estate, in this Court. They're suing my clients --

THE COURT: But the estate is not a party.

MS. LEE: Correct. Because they won't --

THE COURT: Doesn't that say it all, though?

MS. LEE: Well, I can't even put him in as a third-party defendant, because Ken is going to sue himself? Then he violates the family settlement agreement. It's the family settlement agreement that they're trying to avoid.

I did request the Court that the -- that he's not being sued in his proper capacity. So if I go to Fannin county, have that, have that heard --

THE COURT: If you don't get your relief, you may have to appeal it, because clearly, I don't -- I

mean, I don't know the underlying facts, but it's hard to see how he, individually, could be, you know -- I'm not going to go into that now.

I'm going to give you another opportunity --

MR. SMITH: Okay. I didn't get started. She went first --

THE COURT: I know, I know.

MR. SMITH: I think you hit the nail right on the head when you those assets have already been distributed.

If you look -- and what SWEPI teaches us, is you look at pleadings. If you look at their pleadings, there's not a hint that the estate is involved in this. It is involved a GWB Trust, which was an entity created --

THE COURT: To receive from the estate.

MR. SMITH: -- and so it had absolutely nothing to do with the estate. And that's what SWEPI had -- what happened in SWEPI. On page five of that case, I know I didn't give you a copy, but the Court --

THE COURT: I read SWEPI, I just don't remember the -- I mean, everybody -- it's referred to a lot, that and Huie v. DeShazo, SWEPI, there's a bunch of them, there's a number of them.

Exhibit 13

MR. SMITH: It was a mandamus case out of the Supreme Court. And what they found was the interest had passed to the decedents. And they said the fact no partnership property or partnership interests are currently held by the estate also distinguishes it from prior authority. Here's the case, your Honor.

So the first question is, does this, in a jurisdictional analysis, looking at their pleading, which they conceded doesn't involve the estate, is the controlling issue settlement petitioner distribution of an estate? No, it's not, because that's already happened.

And so if that is the case, this Court does not have exclusive jurisdiction. That's the teaching of SWEPI. And SWEPI was cited a little bit later, but I don't know if I can pronounce it right, Puig, is the Court familiar with this case?

THE COURT: It doesn't ring a bell, right this minute.

MR. SMITH: Okay. And there's another Supreme Court case a couple of years back and they cited SWEPI. And what they said was, what you then do, if you don't have exclusive jurisdiction, you do the dominant jurisdiction analysis. And that's where we believe Fannin county, by being virtue of the first filed sui

Exhibit B

Page 53 of 59

632

e28bd4ed-9dff-4753-b322-14a0a6ee179a

has now got dominant jurisdiction over the proceedings.

And even though the issues are different, the guide for this Court is whether parties could be joined and, if feasible, under the compulsory counterclaim.

In other words, if you could add the parties and make it a complete proceeding, then the first filed suit is the one that's dominant.

And I don't know mean to insult the Court, but I got a Fort Worth case out of 1995 Dallas Fire Insurance versus Davis, and what it tells -- what its holding is, is that when the principle of dominant jurisdiction applies, the trial court in the second action has no discretion to refuse to abate, and the first court has no discretion to abate the suit to the second court.

So it sounds mandatory, to me, that if this Court doesn't have exclusive jurisdiction, if it's got concurrent jurisdiction, and that's arguably what they're saying by virtue of 34.001, we then lead to our dominant jurisdiction analysis. And under the cases we've given you, you have to abate this case, in its entirety, to the Fannin county proceedings.

That's the position of Pentex Foundation. And I can go into some of the facts, but I think if you

Exhibit

Page 54 of 59

CRC for Wells Reporting
817-524-6644

633

e28bd4ed-9dff-4753-b322-14a0a6ee179a

read the pleading, which you're supposed to do, that's all you do. You don't get into evidence. You just look at pleadings, what they pertain to, if it's exclusive, if not, if there's dominant jurisdiction in another Court. Here, there is. It goes to Fannin county.

THE COURT: Your motion, your final word?

MS. LEE: Well, your Honor, the cases that he cites -- we definitely are arguing two different things. The one -- the last one he spoke about, the Puig, it talks about comparing county courts of law with probate courts. And it's not concerning transferring the case with the authority to go into the estate of Bert Gibbs or transferring a case for probate proceedings into another -- into the probate court.

The other case, SWEPI, again, they're talking -- it's not --

THE COURT: It just seems like SWEPI fits, though.

MS. LEE: I don't -- it doesn't have -- this has to do with oil and gas rights. Here's the big difference, there is still $8.1 million that our clients are going to be fighting over --

THE COURT: Wouldn't the executor distribute it according to the --

MS. LEE: Oh, no, your Honor, because

Exhibit $B$

that's the issue. What happened when 2000 --

THE COURT: Well, maybe he'd have to come to court to get a declaratory judgment on how he's to distribute the fees, maybe, but I mean, all this happened after the property was distributed.

I mean, that's the way I read it -- I understand -- your pleading --

MS. LEE: I understand --

THE COURT: -- they got together and did this GWB especially to receive this property --

MS. LEE: GWB doesn't have anything to do with this case in Fannin county. It's about a contract for sale. It's a contract --

THE COURT: But the estate is not party in Fannin county.

MS. LEE: But again --

THE COURT: I just don't see how in the world I can drag a case all the way down from Fannin county when the estate is not a named party.

MS. LEE: They should have been. They were not sued in a legal capacity. I mean, you've already stated, your Honor, that my clients, individually, had no authority to determine attorney fees.

Again, they're running -- this is judicial economy to have it all heard in one court.

Exhibit 13

Page 56 of

**EXCERPT MOTION HEARING - July 31, 2014**

THE COURT: That's one of the cornerstones of the creation of statutory probate courts in metropolitan areas and the specific drafting of what I call 5A and 5B, more particularly 5B, which has been superceded with a new number that I haven't memorized yet, was, indeed, so that there would be -- and it stems from a famous Texas case, Sarita Kenedy East, and she was a wealthy south Texas woman.

And her -- her, I think she died in 50-something and I don't think her estate was settled until '69, '70, '72, because there were so many different -- it was in litigation 20-something years, because it went back and forth between county courts that did not have jurisdiction, to district courts that did, and then each issue was appealed to appellate courts, all the way through the appellate courts to the Texas Supreme Court.

And it went on and on for years and in 1979, I believe it was, in response to that case, in particular, and by the way, it was a name like Trejo (phonetic) or something, they came up with the idea that we judges here in metropolitan area have a law degree, why should we be any different than a district court judge in terms of hearing matters that district court ordinarily would hear.

**Exhibit** B

Page 57 of 59

So there is rhyme and reason between why there are statutory probate courts in metropolitan counties. And to continue my lecture, I think thing there are 18 of us now, in Texas.

But be that as it may, judicial economy is one of the -- a driving force, but it's not the only -- it's not the only consideration.

So I'm going to make a ruling that I'm going to deny the transfer of anything, without prejudice, at this point in time.

As far as your motion your show authority, I think you've been put on notice, you ever come back to this Court, you're going to need to comply or going to need show in more detail why you don't need to comply with more detail and strict predicate to your -- to your hiring. So --

MR. SMITH: Your Honor, I intend to continue to with comply your request.

(End of excerpt)

Exhibit B

Page 58 of 58

THE STATE OF TEXAS)

COUNTY OF TARRANT)

I, Ashlee Wells, Official Court Reporter in and for the Probate Court No. 2 of Tarrant County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $ 1296.25 and was paid/will be paid by   Christy Lee   .

WITNESS MY OFFICIAL HAND this the 15th day of September, 2014.

/s/ Ashlee R. Wells
ASHLEE WELLS, Texas CSR 8684
Expiration Date:  12/31/15
Official Court Reporter,
Probate Court Number 2
Tarrant County, Texas
Fort Worth, Texas

Exhibit B

Page 59 of 59

638

93528a42-9517-4327-8286-4abdbefabbbe

# SCOTT SMITH
## ATTORNEY AND COUNSELOR AT LAW

E-MAIL: smithlaw@airmail.net
FACSIMILE: (903) 870-1446
TELEPHONE: (903) 868-8686

120 SOUTH CROCKETT STREET
P.O. BOX 354
SHERMAN, TEXAS 75091-0354

August 5, 2014

Honorable Pat Ferchill
Judge, Tarrant County Probate
    Court Number Two
The Old Courthouse
100 W. Weatherford, Room 220A
Fort Worth, Texas 76196

    RE:  *Candace Walton, et al. v. Beverly Miller, Trustee, et al.*; Cause Number 2005-0000126-2-D in the Probate Court Number Two of Tarrant County, Texas.

Dear Judge Ferchill:

As you may recall, I appeared for a special appearance on behalf of Pentex Foundation on July 31, 2014. In connection therewith, I testified regarding a motion to show my authority to represent Pentex Foundation. At that time, I was unsure of the source of payment of my initial retainer. I have reviewed my records and the payments were each in the sum of $5,000 from Pentex Royalty Trust and Mr. Albert Barcroft. I am also attaching a copy of a resolution from Pentex Foundation regarding my engagement as their counsel. I thank you for your attention to this matter.

Yours very truly,

T. Scott Smith

TSS/bhs

cc:    Christy L. Lee, Esq.; Howard Kirk Gibbs, Pro Se.

639

Exhibit C

Page 1 of 3

## MINUTES OF THE BOARD OF DIRECTORS'
## MEETING OF PENTEX FOUNDATION

A meeting of the Foundation Council of PENTEX FOUNDATION, organized according to the laws of the Republic of Panama and registered to microjacket twenty nine thousand five hundred and thirty six (29536), document one million three hundred fifty four thousand eight hundred ninety three (1354893) of the Mercantile Section of the Public Registry, it was celebrated in the city of Panama, Republic of Panama on the fourth day (4ᵗʰ) of August of the year two thousand and fourteen (2014) at 10 o'clock in the morning (10 a.m.).

It was a meeting of all the known Directors:
Mrs. ANGELLI MARTHA POLANCO CARRASCO,
Mr. CARLOS ALBERTO RIVADENEIRA ESCUDERO and
FERNANDO ELIAS BARAHONA PEREZ who had prior waived the call.

The Chairman was Mrs. ANGELLI MARTHA POLANCO CARRASCO, and the Secretary Mr. CARLOS ALBERTO RIVADENEIRA ESCUDERO, both as holders of said positions.

The quorum having been confirmed, the Chairman opened the meeting stating that a question has emerged as to the authority of Mario Guilermo Hurtarte Arrivillaga, the Managing Director, Legal Affairs of PENTEX FOUNDATION, to hire legal counsel in the United States for affairs requiring litigation. Specifically, the hiring of one Scott Smith, Attorney at Law, to represent PENTEX FOUNDATION in ongoing litigation involving PENTEX FOUNDATION in Fannin County, Texas, U.S.A.

Upon motion presented, duly seconded, the following resolution was unanimously approved:

### IT IS HEREBY RESOLVED:

That the Board of PENTEX FOUNDATION verifies that Mario Guilermo Hurtarte Arrivillaga is authorized to hire legal counsel on behalf of PENTEX FOUNDATION to litigate any necessary legal matters that might arise in the United States. Further, it is resolved that Mario Guilermo Hurtarte Arrivillaga, as Managing Director, Legal Affairs of PENTEX FOUNDATION, was authorized to sign the "AGREEMENT FOR LEGAL SERVICES" hiring Scott Smith, Attorney At Law, to represent and provide legal services to PENTEX FOUNDATION on May 5, 2014, in Cause Number CV-14-41665 in Fannin County, Texas, U.S.A. Further, by this resolution, PENTEX FOUNDATION confirms Scott Smith, Texas State Bar Number 18688900, as its attorney in Cause Number CV-14-41665 in Fannin County, Texas , U.S.A.; and, that Scott Smith has represented PENTEX FOUNDATION in Cause Number CV-14-41665 in Fannin County, Texas, U.S.A., since May 5, 2014.

By this resolution, it is further resolved that Mario Guilermo Hurtarte Arrivillaga, the Managing Director, Legal Affairs of PENTEX FOUNDATION, is authorized until further notice to make any further necessary changes in legal representation for PENTEX FOUNDATION in any legal proceedings in the United States, and to make any decisions affecting PENTEX FOUNDATION in any of those legal matters. The authority granted Mario Guilermo Hurtarte Arrivillaga is concurrent with, and does not limit or change, the authority granted Danny R. Unger through a Limited Power of Attorney from PENTEX FOUNDATION in a preceding resolution.

There not being any other matter to attend the meeting was adjourned at eleven (11:00) a.m. on the above mentioned date.

*[signature]*

The President, ANGELLI MARTHA POLANCO CARRASCO,

640

**Exhibit** C

**Page** 2 **of** 3

_[signature]_

_____
The Secretary, **CARLOS ALBERTO RIVADENEIRA ESCUDERO.**

The undersigned, Secretary of the foundation named **PENTEX FOUNDATION** by this means certifies that the above minutes is a true copy of its original. It agrees with each and every one of its parts as the one that remains in the Book of Minutes of the foundation.

_[signature]_

_____
The Secretary, **CARLOS ALBERTO RIVADENEIRA ESCUDERO.**

641

**Exhibit** C

**Page** 3 of 3

Filters Used:

**1 Tagged Record**

# Email Report

Form Format

Date Printed: **9/26/2014**
Time Printed: **12:45PM**
Printed By: **LAURA**

Date     8/06/2014     Time     6:20AM     6:20AM     Duration     0.00 (hours)     Code
Subject     **Judge Ferchill - July 31st hearing**                                    Staff     **Christy L Lee**
Client     **Walton, Candace L.**          MatterRef **Trust Termination - GWB Family and** MatterNo
From     **LCMorrisett@TarrantCounty.com**
To          **hkgibbs@gmail.com; mossandcoxattorneys@Hotmail.com; Christy Lee; jhskotnik@gmail.com**
CC To     **Patrick Ferchill; Tina Clay**
BCC To
Reminders                         (days before) Follow  **N**  Done  **N**  Notify  **Y**  Hide  **N**  Trigger  **N**  Private  **N**  Status

Custom1                                             Custom3
Custom2                                             Custom4

To:     Howard Gibbs, Pro Se
Scott Smith, Esq.,
Christy Lee, Esq.,
John Skotnik, Esq.
Fr: On behalf of, the Honorable Patrick Ferchill,
RE: Cause Number: Motion to Transfer, Motion to Abate, and Motion to Show Authority


Dear Counsel and Parties Pro Se,

        Having taken the above mentioned Motions under consideration, the
Court is of the opinion, and rules that:

1)     The Plaintiff's Motion to Transfer is Denied;
2)     The Defendents' Motions to Abate are Denied;
3)     The Plaintiff's Motion to Show Authority is continued, pending provision
of further information and in the hope that it may now be rendered moot in light
of the above rulings.

Ms. Cox, Ms. Lee, Mr. Smith, please exchange orders amongst yourselves and with
Mr. Gibb, and hopefully provide the Court with orders, agreed as to form. If such
orders can't be agreed upon, set a hearing with Ms. Tina Clay to resolve any issues.

Ms. Cox, Ms. Lee, Mr. Smith and Mr. Gibb, please go to our Website
http://www.tarrantcounty.com/ePC02/site/default.asp, and go to the "Decedents Estate Forms" button,
the "Contested Estate
Litigation" portion, and pull up our scheduling order. General procedure in our Court is
for the parties to come to an agreed scheduling order to be signed by me. If you
can't agree on the dates in question, please set a scheduling conference with me
sometime next week by calling Chevron Pollard (817) 884 2794.

Since this is a complex case, and since our normal scheduling would put trial
it right in the holiday season, I would request you not set final trial on the
merits during the last two weeks of the year. Accordingly, please call Tina Clay for
a pre-trial hearing and trial date in which avoids the last week of December.
This paragraph is not to be interpreted as having any impact on the scheduling of
restraining orders, injunctive relief, and other time sensitive matters, if any.

Finally, this Court has not ordered mediation in, I believe, three cases in

Exhibit _D_
___1___ of___2___

642                                             1

Filters Used:

**1 Tagged Record**

# Email Report

Form Format

Date Printed: **9/26/2014**
Time Printed: **12:45PM**
Printed By: **LAURA**

over 30 years. I sincerely doubt yours will be the fourth. Accordingly, note that the scheduling order gives you a date by which the parties will pick a mediator, mediate, and report back to the Court. If this date is not met, the Court will take these actions on your behalf.

Please call me if you have any questions,

Lin Morrisett,
Associate Judge,
Probate Court #2,
Tarrant County

Exhibit 1

643

2

Page 1 of 2



**Window on State Government**       Susan Combs Texas Comptroller of Public Accounts

<u>Taxable Entity Search</u>

**Business Name Pentex Foundation was not found.**

You may also call the Business Information Line at 1-800-252-1386.
Should you require assistance concerning the taxable entity information presented,
please contact <u>tax.help@cpa.state.tx.us</u>.

texas.gov    Statewide Search from the Texas State Library    State Link Policy    Texas Homeland
Security
**Susan Combs**, Texas Comptroller • Window on State Government • Contact Us
Privacy and Security Policy    Accessibility Policy    Link Policy    Public Information Act    Compact
with Texans

**Exhibit** E

**Page** 1 of 4

644



**Window on State Government**          Susan Combs Texas Comptroller of Public Accounts

Taxable Entity Search

### Business Name Pentex Royalty Trust was not found.

You may also call the Business Information Line at 1-800-252-1386.
Should you require assistance concerning the taxable entity information presented,
please contact tax.help@cpa.state.tx.us.

texas.gov    Statewide Search from the Texas State Library    State Link Policy    Texas Homeland
Security
**Susan Combs**, Texas Comptroller • Window on State Government • Contact Us
Privacy and Security Policy    Accessibility Policy    Link Policy    Public Information Act    Compact
with Texans

**Exhibit** E

Page 2 of 4

645



**Window on State Government**          Susan Combs Texas Comptroller of Public Accounts

<u>Taxable Entity Search</u>

**Business Name Renhaw, Inc. was not found.**

You may also call the Business Information Line at 1-800-252-1386.
Should you require assistance concerning the taxable entity information presented,
please contact <u>tax.help@cpa.state.tx.us</u>.

texas.gov    Statewide Search from the Texas State Library    State Link Policy    Texas Homeland
Security
**Susan Combs**, Texas Comptroller • Window on State Government • Contact Us
Privacy and Security Policy    Accessibility Policy    Link Policy    Public Information Act    Compact
with Texans

Exhibit *E*

Page ___3___ of ___4___

646



Window on State Government        Susan Combs Texas Comptroller of Public Accounts

<u>Taxable Entity Search</u>

**Business Name GBU Friends and Associates Trust was not found.**

You may also call the Business Information Line at 1-800-252-1386.
Should you require assistance concerning the taxable entity information presented,
please contact <u>tax.help@cpa.state.tx.us</u>.

texas.gov    Statewide Search from the Texas State Library    State Link Policy    Texas Homeland
Security

**Susan Combs**, Texas Comptroller • Window on State Government • Contact Us
Privacy and Security Policy    Accessibility Policy    Link Policy    Public Information Act    Compact
with Texans

**Exhibit** E
**Page** 4 of 4

647

| | | |
|---|---|---|
| CANDACE WALTON, AND | ) | IN THE PROBATE COURT |
| KENNETH GIBBS, | ) | |
|     PLAINTIFFS, | ) | |
| | ) | |
| VS. | ) | NO. 2 |
| | ) | |
| BEVERLY MILLER, INDIVIDUALLY AND AS | ) | |
| TRUSTEE OF GWB FAMILY AND FRIENDS TRUST,) | | |
| ET AL. | ) | |
|     DEFENDANTS. | ) | TARRANT COUNTY, TEXAS |

## AFFIDAVIT OF COUNSEL IN SUPPORT OF
## MOTION TO SHOW AUTHORITY

| | |
|---|---|
| STATE OF ALASKA | ) |
| | ) |
| THIRD JUDICIAL DISTRICT | ) |

I, Christy Lee, being first duly sworn upon oath, depose and state as follows:

1.    I am Counsel of Record for Candace Walton and Kenneth Gibbs in this matter.

2.    On April 25, 2014, Candace Walton and Kenneth Gibbs filed their Motion to Show Authority ("Motion").

3.    I affirm that the Motion to Show Authority and the First Supplement and its Exhibits accompanying the First Supplement Motion present true and correct copies of correspondence and other documents produced by Pentex Foundation ("Pentex"); a correct copy of the Transcript from the July 31, 2014, hearing in Tarrant County Probate Court No. 2; and notification from the Texas Comptrollers of Public Accounts.

Further the Affiant saith not.

AFFIDAVIT OF COUNSEL IN SUPPORT OF
MOTION TO SHOW AUTHORITY
*Walton and Gibbs vs. Miller, et al.*

CAUSE NO. 2005-0000126-2-D

-1-

648

Exhibit F

Page 1 of 2

_____
Christy L. Lee

SUBSCRIBED AND SWORN TO before me by Christy L. Lee on this 26th day of September, 2014, to attest witness my hand and seal of office.



_____
Notary Public in and for the State of Alaska
My Commission expires: June 15, 2015

AFFIDAVIT OF COUNSEL IN SUPPORT OF
MOTION TO SHOW AUTHORITY
*Walton and Gibbs vs. Miller, et al.*

CAUSE NO. 2005-0000126-2-D

-2-

Exhibit F

649

Page 2 of 2

CAUSE NO. CV-14-41665

<table>
<tr><td>PENTEX FOUNDATION<br>    PLAINTIFF,</td><td>)<br>)<br>)</td><td>IN THE DISTRICT COURT</td></tr>
<tr><td>VS.</td><td>)<br>)</td><td>336TH JUDICIAL DISTRICT</td></tr>
<tr><td>KENNETH VERN GIBBS; AND<br>CANDACE GIBBS WALTON; AND<br>HOWARD KIRK GIBBS,<br>    DEFENDANTS.</td><td>)<br>)<br>)<br>)<br>)</td><td>FANNIN COUNTY, TEXAS</td></tr>
</table>

## ORDER APPROVING KENNETH GIBBS AND CANDACE WALTON'S MOTION TO CHANGE VENUE

On the 30th day of September, 2014, came to be heard Kenneth "Ken" Gibbs and Candace "Candy" Walton's Motion to Change Venue. Having reviewed the Motion, and upon consideration of all facts presented, the Court has determined that proper venue for the matter is Tarrant County, Texas.

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that:

1.    The Motion to Change Venue is approved;

2.    This matter shall be transferred to _Tarrant_ County, Texas; and

SIGNED this _30_ day of _Sept_, 2014.

_____
Laurine Blake, Presiding Judge

650



## SEPTEMBER 30, 2014 DOCKET

1. Motion to Show Authority, Motion for Change of Venue, Original Answer, Affirmative Defenses, Original Counterclaim, and Rule 13, Motion for Sanctions of Kenneth Vern Gibbs and Candace Walton Gibbs. (filed 4-23-14)

   A. Response to Motion to Transfer Venue (filed 9-4-14)
   B. First Supplement to Motion to Show Authority

2. Plaintiff's Motion to Compel (filed 7-18-14)

3. Plaintiff and Intervenor's Motion for Partial Summary Judgment (filed 8-12-14)

   A. Response to Motion
   B. Objections to Response (filed 9-29-14)

4. Motion to Quash or for Protective Order Relating to Subpoenas and Deposition Notices (filed 9-4-14)

   A. Defendants' Motion to Compel Appearance and Testimony of Angelli Carrasco at Hearing on September 30, 2014 (filed 9-15-14)

   B. Defendants' Motion to Compel Appearance and Testimony of Albert Barcroft at Hearing on September 30, 2014 (filed 9-15-14)

   C. Objections by Gibbs and Walton

5. Defendants' Motion for Leave of Court to File Third-Party Petition (filed 9-15-14)

651



No. CV-14-41665

| | | |
|---|---|---|
| PENTEX FOUNDATION | § | IN THE DISTRICT COURT OF |
|   Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| KENNETH VERN GIBBS, | § | FANNIN COUNTY, TEXAS |
| CANDACE GIBBS WALTON, & | § | |
| HOWARD KIRK GIBBS, | § | |
|   Defendants | § | 336TH DISTRICT COURT |

FILED FOR RECORD
FANNIN COUNTY, TEXAS
2014 SEP 30
DISTRICT COURT CO
DISTRICT YOUNG
BY
DEPUTY CLERK

## MOTION FOR PROTECTION FROM AND OBJECTION TO SUBPOENA

TO THE HONORABLE COURT:

John Skotnik, hereafter referred to as MOVANT, timely objects and moves this Court for an order protecting movant from the provisions of a subpoena and subpoena duces tecum ordering movant to testify and produce documents in this matter. In support of this request, movant and shows:

1. On or about September 4, 2014 Ken & Candy Gibbs served a subpoena on movant, ordering movant to appear and testify at a hearing scheduled for September 30, 2014 at the courtroom of this Honorable Court, there to give testimony and produce documents and communications. A true and correct copy of that subpoena is attached as Exhibit "A" to this motion, and incorporated by reference.

2. Movant specially appears is not voluntarily appearing for purposes of questioning or examination, rather he is appearing out of deference to this Court to present this Motion.

3. Movant further avers that he is not a party to this cause and is not current counsel for any party herein, he previously represented the plaintiff in this cause, thus any information or testimony sought would be protected by attorney client privilege. TRE 503.

4. Movant further avers that he is barred by the Rules of the State Bar of Texas from disclosing privileged attorney client information.

5. Movant avers that TRCP 12 by its language envisions only the current counsel of record as "challenged attorney" for a party to be subject of a Motion to Show Authority.

6. Movant avers that TRCP 12 by its language mandates that a Motion to Show Authority must be sworn and served upon the "challenged attorney" (i.e. counsel of record) at least 10 days before the hearing.

7. Movant avers that there is not a properly sworn motion under TRCP 12 that has been on file for 10 days prior to the hearing before this Court referenced herein, therefore Movant should not be required to appear and testify.

652

8. Movant avers that hearings on a properly filed TRCP 12 motion would be limited to exactly what the rule covers, that is the attorney's authority to act on behalf of the client, and nothing else.

9. Movant avers that there is no endorsement of or by whoever served the subpoena. TRCP 16

10. Movant avers that there is no return on the subpoena showing who served the subpoena and whether that person was authorized to serve under TRCP 103 or 106(a)(2).

11. Movant avers that there is no proper proof of service on file with the Court. TRCP 176.5(b)

12. Movant avers that he was not provided a witness fee at the time of purported service and the failure to provide the fee renders the service and subpoena void. CPRC 22.001; TRCP 176.5(a); DM -0342

13. Movant avers that the subpoena referenced herein is a discovery subpoena.

14. Movant avers that he is not aware of any court order for him to appear or produce discovery.

15. Movant objects to the subpoena and further requests that the court quash the subpoena impose the limitations, restrictions, and modifications to the subpoena as sought herein, because the subpoena is improper or unreasonable and oppressive and compliance would result in serious and irreparable harm to movant.

16. The testimony sought and the documents requested in the subpoena are not relevant to the issues in this action and are protected from compulsory disclosure by the work product and attorney client privilege and is not governed by any exceptions therein. TRE 503.

WHEREFORE, movant requests that this Court hear this motion and make an order quashing the subpoena and awarding movant the reasonable costs of this motion, including attorney's fees, together with other relief as the Court may find appropriate.

Respectfully submitted,

John Skotnik, sbn 18475150
P.O. Box 727
Bonham, Texas 75418
(903)640-4300 * FAX 640-4344
Attorney and Movant

### Certificate of Service

This is to certify that a true and correct copy of the foregoing Motion for Protection and Objection to Subpoena was served on all parties of record this day in accordance with the applicable rules of procedure.

30 Sep 2014

John Skotnik

653

# VERIFICATION

*State of Texas* § *County of Fannin*

On this day, John Skotnik appeared before me, the undersigned notary public, and after I administered an oath to him, upon his oath, he said that he read the foregoing Motion for Protection and Objection to Subpoena and that the facts in it are within his personal knowledge and true and correct.



_____
John Skotnik, Affiant

SWORN TO and SUBSCRIBED before me by John Skotnik on the 30th day of September, 2014.

**TINA CASHION**
Notary Public, State of Texas
My Commission Expires
**September 29, 2015**

_____
Notary Public in & for the State of Texas



# Exhibit "A"

655



| | | |
|---|---|---|
| PENTEX FOUNDATION | ) | IN THE DISTRICT COURT |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | 336TH JUDICIAL DISTRICT |
| | ) | |
| KENNETH VERN GIBBS; AND | ) | |
| CANDACE GIBBS WALTON; AND | ) | |
| HOWARD KIRK GIBBS, | ) | |
| DEFENDANTS. | ) | FANNIN COUNTY, TEXAS |

## THE STATE OF TEXAS SUBPOENA

TO:     John Skotnik, attorney, 301 E. 5th Avenue, Bonham, Texas 75418.

YOU ARE COMMANDED by the State of Texas to appear before the 336th Judicial District Court, Fannin County, at 101 E. Sam Rayburn Drive, Suite 200, Bonham, Texas 75418, on the 30th day of September, 2014, at 8:30 o'clock a.m., to attend and give testimony on Defendant's Motion to Show Authority.

### ENFORCEMENT OF SUBPOENA

Pursuant to Texas Rules of Civil Procedure No. 176.8, failure by any person without adequate excuse to obey a subpoena upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.

### INSTRUCTIONS

A.     If you object or otherwise decline to respond to any portion of a request, provide all documents for that portion of the request to which you do not object or decline to respond.

B.     If you object to a request on the grounds that it is too broad (i.e., that it calls for both relevant and irrelevant information), provide such documents which are

656



concededly relevant.

C.     If you object to a request on the grounds that it would constitute an undue burden, provide such requested documents as can be supplied without undertaking an undue burden.

D.     If you object to any portion of a request because of a claim of privilege, identify all persons to whom such documents were disclosed, the general nature of such documents, the nature of the privilege asserted, and the dates of any communications or documents from which such privilege is asserted. You are further directed to redact and disclose any portion of such document that is concededly not privileged.

## DUCES TECUM

1.    You are hereby requested to make available the documents listed below at the above-mentioned time and place.

A. A true and correct copy of all documents, including tape recordings, and emails showing that you had the legal authority on behalf of Pentex Foundation to file a lawsuit in Fannin County against Defendants.

B. A true and correct copy of all documents, including tape recordings, and emails in which you had communication with the Directors of Pentex Foundation concerning filing this lawsuit in Fannin County.

C. A true and correct copy of all documents, including tape recordings, and emails in which you had communication with Albert Barcroft concerning filing this lawsuit in Fannin County.

D. A true and correct copy of cancelled checks you received from Pentex Foundation or on behalf of Pentex Foundation to pursue this lawsuit in Fannin

E.  A true and correct copy of the engagement letter with Pentex Foundation.

2.    The subpoena is prepared and issued for Defendants Kenneth Gibbs and Candace Walton, by Counsel, in accordance with Rule 176 of the Texas Rules of Civil Procedure.

Issued on August 28, 2014.

LAW OFFICES OF CHRISTY LEE, P.C.

Christy L. Lee
Texas State Bar No. 24052302
777 Main Street, Suite 600
Fort Worth, TX  76102
Office:  (817) 504-6075
Fax:  (800) 437-7901
clee@christyleelaw.com

ATTORNEY FOR DEFENDANTS

658

659

LAW OFFICES OF

*Christy Lee* P.C.

225 E. FIREWEED LANE STE. 200
ANCHORAGE, ALASKA 99503



CERTIFIED MAIL™

7014 0510 0000 1381 9167

JOHN SKOTNIK
301 E 5TH St
BONHAM TX 75418-4002

$6.480
US POSTAGE
FIRST-CLASS
FROM 99503
AUG 28 2014
stamps



FILED FOR RECORD
NANCY YOUNG DISTRICT CLERK
FANNIN COUNTY, TEXAS
2014 OCT -3 PM 12:
BY_____ DEPUTY

## NO. CV-14-41665

| | | |
|---|---|---|
| PENTEX FOUNDATION, | § | IN THE DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| V. | § | |
| | § | FANNIN COUNTY, TEXAS |
| KENNETH VERN GIBBS, CANDACE | § | |
| GIBBS WALTON and HOWARD | § | |
| KIRK GIBBS, *Defendants* | § | 336th JUDICIAL DISTRICT |

## MOTION TO RECONSIDER
## ORDER TO TRANSFER VENUE

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Pentex Foundation, Plaintiff, and Joshua Unger, Trustee of

the GBU Friends and Associates Trust, Intervenor, in the above entitled and

numbered cause, file this Motion to Reconsider the Order Granting the

Defendants' Motion to Transfer Venue, and in support of the order shows:

### INTRODUCTION

1. Venue is mandatory in Fannin County, Texas, as the case arises from

a contract involving a major transaction. This year the Supreme Court reaffirmed

the application of these rules in *In Re Fisher*, 433 S.W.3d 523 (Tex. 2014),

making it very clear that the Court has no discretion to transfer venue. Mandamus

relief is available, but movants would prefer to request this Court to reconsider its

660



ruling first.[1]

## FACTUAL BACKGROUND

2.     This case concerns and arises from contract entered into between the defendants and the predecessor in interest to Plaintiff and Intervenor.[2] The Contract itself, at paragraph 4 of the contract references a buyout and liquidated damages provision of $5,000,000, as follows:

> It is understood and agreed that Gibbs may cancel or nullify this contract only under the following conditions:  a) If Gibbs pays over to Barcroft the sum of five million dollars ($5,000,000.00 US) in full, in addition to any money received prior to said one time payment, as liquidated damages and full settlement of all consideration on Gibbs part.

Contract ¶ 4 (emphasis original).  The present dispute involves allegations that in excess of a million dollars were not distributed pursuant to the terms of the Contract.  Paragraph 37 of the Plaintiff's Original Petition in this case alleges:

> Plaintiff has had over a million dollars of money rightfully due Plaintiff taken by Ken, Candy and Howard to pay the attorney fees that were due to be paid only by Ken, Candy and Howard under

---

[1]     Mandamus relief is specifically authorized to enforce a statutory mandatory venue provision. TEX. CIV. PRAC. & REM. CODE § 15.0642.  See also, *Fisher*, 433 S.W.3d at 528. A copy of the opinion in *Fisher* is attached hereto as Plaintiff's Exhibit 1.

[2]     A true and correct copy of that contract was attached to the Response to Motion to Transfer Venue, filed on September 4, 2014, as Plaintiff's Exhibit "A".  It shall be referred to as the "Contract."  It's authenticity is not in dispute.  Also attached to the Response was Plaintiff's Exhibit "B" is a copy of a portion of the Response to a Request for Admissions, by which the Contract is acknowledged in Response to Request for Admission number 1.

661



written agreement, i.e. the Contract here.[3]

The prayer in the Plaintiff's Original Petition requests, "All actual damages; but, in any case, no less than one million dollards [$1,000,000.00];."

3.    Importantly the Contract addressed venue in a very direct and forceful manner in paragraph 9:

> Notwithstanding any other provisions of the law, it is expressly agreed that this contract shall be performable <u>only</u> in Fannin County, Texas; and, any dispute(s) will be resolved in the Courts of Fannin County, Texas.

(Emphasis original).

4.    A copy of the Contract was attached to the Plaintiff's Original Petition; the existence of the Contrac was asserted; the specific agreement for venue to be exclusively in Fannin County, Texas was described; and the amount of damages sought were all specifically pleaded venue facts that were not denied by the Defendants.[4]

---

[3]    The Petition was filed on April 1, 2014. A copy of excerpts of Plaintiff's Original Petition is attached hereto as Plaintiff's Exhibit 2.

[4]    TEX. R. CIV. P. 87(3)(a)("properly pleaded" venue facts taken as true unless specifically denied by adverse party.); *Maranatha Temple, Inc. v. Enter. Products Co., et. al.*, 833 S.W.2d 736 (Tex. App. – Hou. [1st Dist.] 1992, writ denied)





## THE LAW

5.      Contractual venue provisions are mandatory and enforceable.  Section 15.020 of the Texas Civil Practices and Remedies Code applies to a "major transaction," which is defined as a transaction evidenced by a written agreement and which involves $1 million or more:

> (c) Notwithstanding any other provision of this title, an action arising from a major transaction may not be brought in a county if:
>
> > (1) the party bringing the action has agreed in writing that an action arising from the transaction may not be brought in that county, and the action may be brought in another county of this state or in another jurisdiction; or
> >
> > (2) the party bringing the action has agreed in writing that an action arising from the transaction must be brought in another county of this state or in another jurisdiction, and the action may be brought in that other county, under this section or otherwise, or in that other jurisdiction.

TEX. CIV. PRAC. & REM. CODE § 15.020.  It is the firm and well-established policy in this State to give force and effect to forum selection clauses:

> In general, forum-selection clauses should be given full effect, and subjecting a party to trial in a forum other than the contractually chosen one amounts to "'clear harassment' . . . injecting inefficiency by enabling forum-shopping, wasting judicial resources, delaying adjudication on the merits, and skewing settlement dynamics . . . ."

*In re AutoNation*, 228 S.W.3d 663, at 667-68 (Tex. 2006).



6. This is a major transaction as defined by law. A "major transaction" is a transaction evidenced by a written agreement under which a person pays or receives, or is obligated to pay or entitled to receive, consideration with an aggregate stated value equal to or greater than one million. Accordingly, the Contract constitutes a "major transaction" for purposes of section 15.020 because it expressly provides – in paragraph 4 – for the payment of "consideration with an aggregate stated value" of more than $ 1 million. Although movants assert that their damages directly relate to the Contract, associated claims trigger the mandatory venue if they "arise" from a major transaction.

> We concluded that the forum selection clause itself applied more broadly than to mere sales transactions because it applied to "any dispute arising out of" the agreement and the trial court erred in refusing to enforce the forum selection clause.

*Fisher*, 433 S.W.3d at 530, citing *Lisa Laser*, 310 S.W.3d 880, 887 (Tex. 2010).

## NO FINDINGS

7. Finally, the Defendants only requested that venue be changed pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002. Although it is clear that mandatory venue provisions trump permissive ones, there is a want of required findings.[5] The Court did not enter or render any findings in support of the

---

[5] *Airvantage, L.L.C. v. TBAN Properties # 1, L.T.D.*, 269 S.W.3d 254, 257 (Tex. App.-Dallas 2008, no pet.) (citing *Wichita County v. Hart*, 917 S.W.2d 779, 781 (Tex. 1996). Further, section 15.020(c) provides in pertinent part that, when applicable, section 15.020

MOTION TO RECONSIDER ORDER TO TRANSFER VENUE ... PAGE 5

664



transfer. To order the transfer pursuant to § 15.002, the court must make all of the following findings:

1.  Maintenance of the action in the county of suit would work an injustice to the movant considering the movant's economic and personal hardship.

2.  The balance of interests of all the parties predominates in favor of the action being brought in the other county.

3.  The transfer would not work an injustice to any other party.

TEX. CIV. PRAC. & REM. CODE § 15.002(b).

WHEREFORE, Pentex Foundation, Plaintiff, and Joshua Unger, Trustee of the GBU Friends and Associates Trust, Intervenor request that the Court reconsider and upon such reconsideration deny the motion to transfer venue, and other and further relief to which movants may be entitled.

Respectfully submitted,

By: _____
Scott Smith
State Bar Number 18688900
120 South Crockett Street
P.O. Box 354
Sherman, Texas 75091-0354
e-mail smithlaw@airmail.net
Facsimile (903) 870-1446
Telephone (903) 868-8686

---

controls over other venue statutes in title 2 of the Civil Practice and Remedies Code. See TEX. CIV. PRAC. & REM. CODE § 15.020(c). In *In Re Railroad Repair*, 2009 Tex. App. LEXIS 8404 (Tex. App. – Dallas, 11-9-09), the Court specifically found that venue under section 15.002, a permissive venue statute, must yield to the mandatory venue provision in section 15.020.

MOTION TO RECONSIDER ORDER TO TRANSFER VENUE ... PAGE 6

665



## CERTIFICATE OF CONFERENCE

On October 2, 2014, the undersigned conferred with Christy Lee, counsel for Defendants, concerning the relief requested by this Motion. Ms. Lee was not in agreement.

_____
Scott Smith

## FIAT

The above and foregoing motion shall be heard by the Court on the _____ day of _____, 2014, at _____ o'clock, ____.m.

_____
JUDGE OR CLERK OF THE COURT

### CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing document was served, by certified mail, return receipt requested number 7009 2250 0000 2311 4217 toChristy L. Lee, Esq., of Law Offices of Christy Lee, P.C., 777 Main Street, Suite 600, Fort Worth, Texas 76102, and to Howard Kirk Gibbs, Pro Se, at 4360 Western Center Blvd., Suite 205, Ft. Worth, Texas 76137, on this the 3rd day of September, 2014.

_____
Scott Smith

MOTION TO RECONSIDER ORDER TO TRANSFER VENUE ... PAGE 7

666



433 S.W.3d 523, *; 2014 Tex. LEXIS 379, **;
57 Tex. Sup. J. 504



IN RE MARK FISHER AND REECE BOUDREAUX, RELATORS

NO. 12-0163

SUPREME COURT OF TEXAS

*433 S.W.3d 523; 2014 Tex. LEXIS 379; 57 Tex. Sup. J. 504*



October 10, 2013, Argued
February 28, 2014, Opinion Delivered

**NOTICE:**

PUBLICATION STATUS PENDING. CONSULT STATE RULES REGARDING PRECEDENTIAL VALUE.

**SUBSEQUENT HISTORY:** Rehearing denied by *In re Fisher*, 2014 Tex. LEXIS 369 (Tex., May 2, 2014)

**PRIOR HISTORY:** *In re Fisher*, 2014 Tex. LEXIS 164 (Tex., 2014)

**COUNSEL:** For Mike Richey, Real Party in Interest; Allen Linn Williamson, Derrick S. Boyd, Simpson Boyd & Powers PLLC, Decatur TX; Brian Scott Stagner, David E. Keltner, Derek Lee Montgomery, Jason Chad Nash, Mary H. Smith, Kelly Hart & Hallman LLP, Fort Worth TX.

For Mark Fisher, Reece Boudreaux, Relators: Pamela Stanton Baron, Attorney at Law, Austin TX; Steven K. Hayes, Law Office of Steven K. Hayes, Fort Worth TX; Thomas J. Sims, Parrott Sims & McInnis PLLC, Houston TX.

**JUDGES:** [**1] JUSTICE JOHNSON delivered the opinion of the Court.

**OPINION BY:** Phil Johnson

**OPINION**

[*525] ON PETITION FOR WRIT OF MANDAMUS

After Nighthawk Oilfield Services, Ltd. acquired Richey Oilfield Construction, Inc. from Mike Richey, the business did not go as well as the parties had hoped and Richey filed suit in Wise County against two Nighthawk executives. In this mandamus proceeding we consider whether the trial court abused its discretion by failing to enforce venue selection clauses in the acquisition documents. Concluding that it did, we conditionally grant relief.

**I. Background**

On May 3, 2007, Mike Richey sold his interest in Richey Oilfield Construction, Inc. (Richey Oil), an oilfield services company that he founded and operated, to Nighthawk Oilfield Services, Ltd. (Nighthawk) for $33 million. NOSGP, L.L.C. was Nighthawk's general partner and Mark Fisher and Reece Boudreaux were limited partners. The transaction resulted in Richey Oil becoming a wholly-owned Nighthawk subsidiary, with Richey remaining employed as president of Richey Oil and becoming a limited partner in Nighthawk.

The primary agreements regarding the transaction were a Stock Purchase Agreement, an agreement for the purchase of Richey Oil's goodwill [**2] (the Goodwill Agreement), and a Promissory Note. Each contained a clause naming Tarrant County as the venue for state court actions.

In the Stock Purchase Agreement, NOSROC, Inc.[1] agreed to pay Richey $13 million in cash for Richey Oil's issued and outstanding stock. That agreement contained the following provision:

Jurisdiction; Service of Process. Any proceeding arising out of or relating to this Agreement may be brought in the courts of the State of Texas, Tarrant County, or if it has or can acquire jurisdiction, in the United States District Court for the Northern District of Texas, and each of the parties irrevocably submits to the non-exclusive jurisdiction of each such court in any such proceeding,



waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in [*526] respect of the proceeding may be heard and determined in any such court and *agrees not to bring any proceeding arising out of or relating to this Agreement in any other court.* (Emphasis added)

1 The Stock Purchase Agreement was executed between Richey, as the seller, and NOSROC, INC., as the purchaser. An affidavit executed by Fisher explains that NOSROC, INC. was "a corporation [**3] formed for tax reasons, which then immediately conveyed the stock to Nighthawk pursuant to an agreement between the transaction parties."

In the Goodwill Agreement, Richey sold his goodwill interest to Nighthawk. That interest was defined as his "right, title and interest in and to all of [Richey's] knowledge, experience and rights relating to the Business, and [Richey's] personal relationships and experience with the customers of the Business and further including the trade name 'Richey' to the extent and as used in conjunction with the Business." The Goodwill Agreement provided that Richey would receive $7 million in cash, a $6.5 million promissory note, and $6.5 million in Nighthawk limited partnership interest units. The Goodwill Agreement contained the same venue selection clause as the Stock Purchase Agreement.

The $6.5 million promissory note (the Note) was signed by Fisher as president of Nighthawk. It provided that "[Nighthawk]. . . irrevocably agrees that any legal proceedings in respect of this note . . . or other writing relating hereto shall be brought in the district courts of Tarrant County, Texas, or the United States District Court for the Northern District of Texas."

A [**4] month after Nighthawk purchased Richey Oil, Nighthawk made a $20 million "special distribution" to its partners. The distribution was contemplated in the Goodwill Agreement, which provided: "[I]t has been represented to [Richey] that a distribution to the owners or holders of all units of [Nighthawk] is anticipated to be made contemporaneously with or subsequent to the Closing and [Richey] shall participate in such distribution on a pro rata basis."

Six months later, Richey paid $1 million to Nighthawk at Fisher's request. According to Richey, Fisher related that he was seeking similar amounts from all the limited partners, Nighthawk would treat the money as loans, and in six months the loans plus ten percent would be paid back. Fisher claims that the other limited partners made similar contributions totaling $3.9 million, but they agreed that those contributions would be treated as equity, not loans.

Richey asserts that when he asked Fisher to repay the $1 million as agreed, Fisher denied his request and claimed the money was a capital contribution for which Richey would receive preferred equity units. Richey has never been repaid the $1 million.

In connection with the acquisition, Nighthawk [**5] opened a controlled-disbursement account so Richey Oil could access Nighthawk's revolving line of credit. As part of that process, Richey and Fisher executed a Deposit Account Signature Card at Bank of America that gave Richey check signing authority. In May and June 2009, Fisher authorized Richey to pay Richey Oil vendors from the account. However, when Richey did so, Bank of America rejected several of the checks for insufficient funds in the account. According to Richey, Fisher told some payees of the rejected checks that Richey created the problem. Several payees referred their returned checks to collection agencies, attorneys, and authorities, who sent demand letters threatening civil and criminal prosecution. Shortly thereafter, Nighthawk and Richey Oil filed for bankruptcy.

Richey soon sued Fisher and Boudreaux in Wise County where Richey resided. He sued both of them for breach of fiduciary duty, common law fraud, statutory fraud, and violations of the Texas Securities Act. He sued Fisher separately for defamation, common law fraud, negligent misrepresentation, and interference with prospective [*527] business relations related to the statements Fisher allegedly made to him about availability [**6] of money in the Richey Oil account and communications made to third parties regarding the returned checks. He sued Boudreaux separately for aiding and abetting Fisher's breaches of fiduciary duty, acts of fraud, and violations of the Texas Securities Act.

Fisher and Boudreaux responded by moving the trial court to transfer venue to Tarrant County or dismiss the suit pursuant to the mandatory venue selection clauses in the Stock Purchase Agreement and the Goodwill Agreement. They also argued that Richey lacked standing to recover damages to his reputation or goodwill because he had conveyed those rights to Nighthawk in the Goodwill Agreement and many of his other claims belonged to Nighthawk and could only be brought by the Nighthawk bankruptcy trustee.

The trial court denied Fisher's and Boudreaux's motions and pleas to the jurisdiction. They then sought, but were denied, mandamus relief from the court of appeals. *433 S.W.3d 574, 2012 Tex. App. LEXIS 890 (Tex. App.--Fort Worth 2012, orig. proceeding).* In this Court Fisher and Boudreaux (collectively, Relators)



argue that Richey lacks standing because his claims actually belong to Richey Oil or Nighthawk and must be brought by the bankruptcy trustee; some of Richey's [**7] claims seek recovery of debts owed to him by Nighthawk and must be filed as claims against Nighthawk in bankruptcy court; and the trial court abused its discretion by failing to enforce the mandatory venue agreement under the major transaction statute, *Texas Civil Practice and Remedies Code § 15.020.* We will address the contentions in turn, beginning with any challenging jurisdiction. *See Rusk State Hosp. v. Black, 392 S.W.3d 88, 95 (Tex. 2012)* (noting that if a court does not have jurisdiction, its opinion addressing any issues other than jurisdiction is advisory).

## II. The Standing Challenge

Relators argue that Richey's claims regarding mismanagement of Nighthawk's financial affairs belong to Nighthawk and Richey does not have standing to assert them because the bankruptcy trustee must bring the claims on Nighthawk's behalf so as to preserve assets for the benefit of all partners. Richey counters that mandamus review is not available on the issue of standing because Relators cannot show they lack an adequate remedy by appeal, but even if mandamus review is available, he has standing because he suffered personal damages unique to him.

Relators rely on *Hall v. Douglas, 380 S.W.3d 860, 873 (Tex. App.--Dallas 2012, no pet.),* [**8] in which the court of appeals noted that "[a] limited partner does not have standing to sue for injuries to the partnership that merely diminish the value of that partner's interest." But as that court recognized, a partner who is "personally aggrieved" may bring claims for those injuries he suffered directly. *Id. at 872.*

Richey's pleadings asserted that he made a $1 million payment to Nighthawk, the other limited partners failed to make similar payments, and he suffered damages including "loss of earning capacity, lost profits, loss of income, damage to credit reputation, lost investments," and "other losses." He also alleged that he sustained injury to his character and suffered mental anguish.

When a plea to the jurisdiction is based on the pleadings, the pleadings are to be construed liberally in favor of the plaintiff. *Tex. Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 226 (Tex. 2004).* Richey's allegations do not affirmatively negate his having been "personally aggrieved." [*528] Thus, given his allegations, we need not decide whether mandamus review is available to Relators as to Richey's standing to assert claims based on his $1 million payment because even if it is, the record [**9] before us does not demonstrate that Relators are entitled to mandamus relief.

Relators also claim that Richey does not have standing to bring defamation claims based on the bank's refusal to honor Richey Oil checks. They posit that only Richey Oil has standing to bring those claims, and since Richey is not the owner of Richey Oil, he cannot bring the claims on the company's behalf. *See Neely v. Wilson, 418 S.W.3d 52, 72 (Tex. 2013)* (noting that a corporate entity may maintain a suit for libel). But Richey's defamation claims are that Fisher made defamatory statements about Richey personally by telling payees of the returned checks that Richey caused the insufficient funds problems. Richey claimed those false statements subjected him to criminal and civil prosecution, financial loss, and injury to his personal reputation. Thus, he alleged injury personal to himself and has standing to bring the claims.

## III. Claims Against Nighthawk

Relators next assert that the trial court abused its discretion in refusing to dismiss for lack of subject matter jurisdiction because Richey's claims for deferred consideration and the unpaid $1 million loan are claims for a debt owed by Nighthawk, they must [**10] be filed against Nighthawk in bankruptcy court. But the trial court does not lack jurisdiction over Richey's claims against Relators. Whether those claims should have been brought against another party (Nighthawk) is not a question of jurisdiction requiring dismissal, but is a question of liability. Relators did not argue in the trial court that they were the incorrect parties for Richey to bring the claims against. Relators have not shown themselves entitled to mandamus relief on this ground.

Relators also argue that "proceeding with the debt claims against Nighthawk in the Wise County suit violates the automatic stay in bankruptcy." But Nighthawk is not a defendant in the Wise County suit and the automatic bankruptcy stay does not extend to non-debtors. *Reliant Energy Servs., Inc. v. Enron Canada Corp., 349 F.3d 816, 825 (5th Cir. 2003)* (noting that by its terms, the automatic stay applies only to the debtor); *Texas-Ohio Gas, Inc. v. Mecom, 28 S.W.3d 129, 144 (Tex. App.--Texarkana 2000, no pet.)* (holding that the bankruptcy stay does not extend "to separate legal entities such as corporate affiliates, partners in debtor partnerships or to codefendants in pending litigation." (quoting [**11] *Patton v. Bearden, 8 F.3d 343, 349 (6th Cir. 1993)*); *see also In re Pegasus Funds, 345 S.W.3d 175, 176 (Tex. App.--Dallas 2011, orig. proceeding).* Relators argue that the bankruptcy stay should extend to them because the stay applies to a non-debtor "when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *See A.H. Robins Co. v. Piccinin, 788*



*F.2d 994, 999 (4th Cir. 1986).* Relators have not shown that this is the situation here.

## IV. The Venue Selection Clauses

We next consider whether the trial court abused its discretion by refusing to transfer Richey's claims pursuant to venue selection clauses in the agreements under *Texas Civil Practice and Remedies Code § 15.020.* Mandamus relief is specifically authorized to enforce a statutory mandatory **[*529]** venue provision. TEX. CIV. PRAC. & REM. CODE § 15.0642.

### A. *Section 15.020*--Major Transactions

Relators assert that by its plain language -- "Notwithstanding any other provisions of this title"-- *Texas Civil Practice and Remedies Code § 15.020* overrides other venue **[**12]** provisions and required the trial court to enforce the venue agreements. *Section 15.020* applies to a "major transaction," which is defined as a transaction evidenced by a written agreement and which involves $1 million or more:

> (c) Notwithstanding any other provision of this title, an action arising from a major transaction may not be brought in a county if:

>> (1) the party bringing the action has agreed in writing that an action arising from the transaction may not be brought in that county, and the action may be brought in another county of this state or in another jurisdiction; or

>> (2) the party bringing the action has agreed in writing that an action arising from the transaction must be brought in another county of this state or in another jurisdiction, and the action may be brought in that other county, under this section or otherwise, or in that other jurisdiction.

*Id. § 15.020(c).* Richey argues that *section 15.020* and the venue selection clause in the Goodwill Agreement do not apply for the following reasons: (1) his tort claims do not "arise from" the purchase of Richey Oil; (2) the only

agreement that relates to Richey's claims is the Partnership Agreement which has no forum or venue **[**13]** selection clause; (3) the contractual venue selection clause is permissive, not mandatory; and (4) venue is mandatory in Wise County under the statutory provision requiring a suit for libel or slander to be brought in the county where the plaintiff resided at the time of the accrual of the cause of action. *See id. § 15.017.* We address the arguments in turn.

### B. Does *Section 15.020* Apply?

The parties do not dispute that the Richey Oil acquisition, which included the sale of Richey's goodwill, constitutes a "major transaction" as defined by *section 15.020.* Richey urges, however, that *section 15.020* does not apply because his claims against Relators are not claims "arising from" the purchase of Richey Oil; rather, he asserts, his claims arise from the operation or management of Nighthawk. We have not previously addressed when an action "arises from" a major transaction under *section 15.020,* but we have previously addressed similar issues as to forum selection agreements.

In *In re International Profit Assocs., 274 S.W.3d 672 (Tex. 2009)* (per curiam), we analyzed whether a forum selection clause in a contract applied to tort claims between the contracting parties. In determining whether the **[**14]** claims were within the scope of the clauses, we called for a "common-sense" examination of the substance of the claims made to determine if they "arise" from the contract. *Id. at 677.* We explained that a court should consider whether a claimant seeks a direct benefit from a contract and whether the contract or some other general legal obligation establishes the duty at issue. *Id.* We concluded that no matter how the claimant characterized or pleaded the claims, the tort claims in that case--including fraud and negligent misrepresentation--"arise from the contractual relationship between the parties, not from obligations imposed by law." *Id. at 678.*

In *Lisa Laser, 310 S.W.3d 880,* we applied the same type of analysis to determine the scope of a forum selection clause **[*530]** and whether it applied to the plaintiffs' contract claims. In that case, HealthTronics had a contract with Lisa Laser for exclusive distribution rights of certain medical devices. *Id. at 882.* The agreement also provided HealthTronics with rights of first refusal to distribute new products if certain requirements were met. *Id.* An exhibit to the agreement provided that the terms and conditions that followed, including a California **[**15]** forum selection clause that applied to "any dispute arising out of this agreement," applied to sales by Lisa Laser to HealthTronics. *Id.* HealthTronics sued Lisa Laser in Travis County for breach of contract, alleging that Lisa Laser breached its



obligation to afford HealthTronics the first right to distribute new products, and for tortious interference with a contract. *Id.* Lisa Laser sought mandamus relief after the trial court denied its motion to dismiss based on the forum selection clause. *Id. at 882-83.* HealthTronics argued that the forum selection clause only applied to part of the contract, that is, sales transactions between it and Lisa Laser. *Id. at 884.* Applying the reasoning from *International Profit Associates,* we concluded that Lisa Laser's obligation, if any, to inform HealthTronics of new products and to offer it a right of first refusal to distribute those products "only arises from the Distribution Agreement." *Id. at 884-86.* The obligations were not imposed under general law, they would not exist but for the agreement, and therefore they arose out of the agreement. *Id. at 886.* We concluded that the forum selection clause itself applied more broadly than to mere sales [**16] transactions because it applied to "any dispute arising out of" the agreement and the trial court erred in refusing to enforce the forum selection clause. *Id. at 887.*

Turning to the case at hand, we see no reason to deviate from the type of analysis we used in *International Profit Associates* and *Lisa Laser.* Similarly to our method of analysis in those cases, we will use a common-sense examination of the substance of the claims to determine whether the statute applies. *See Int'l Profit Assocs., 274 S.W.3d at 677.*

Richey alleged in his live pleadings that "[a] substantial part of the acquisition was deferred consideration in the form of a $6,500,000 Promissory Note." He further alleged that he suffered substantial damages caused by Relators' authorization of the $20 million special distribution and that "[t]he effect of the distribution was to severely impair [Nighthawk's] ongoing operations and ultimately to render [Nighthawk] insolvent and incapable of continuing its business and affairs." Richey brought a claim for breach of fiduciary duty related to that $20 million distribution of Nighthawk assets. He alleged that his damages included "benefit of the bargain losses." And in a response [**17] to Relators' supplemental motion to dismiss in the trial court, he explained that he sought damages for "the loss of the promissory note issued [to] him individually."

Applying a common-sense analysis, we conclude that Richey in substance is seeking to recover the $6.5 million owed to him under the Note and for actions flowing directly from the acquisition and actions anticipated to flow from it.

First, the Note was consideration for his transfer of goodwill and was specifically provided for under the Goodwill Agreement. His claim for Nighthawk's failure to pay the Note, regardless of whether it is labeled as a breach of fiduciary duty claim or otherwise, arises from that major transaction. *See id.* (considering the substance of claims such as breach of the duty of good faith and fair dealing to determine whether a forum selection clause applied). Richey's complaint that he lost the benefit [*531] of his bargain depends on the Goodwill Agreement and Nighthawk's agreement in it to pay part of the purchase price by means of the $6.5 million note. *See Lisa Laser, 310 S.W.3d at 886* (holding that a forum selection clause applied to a claim that would have no basis but for the agreement containing [**18] the clause). Because Richey's claims substantively arise from commitments in the Goodwill Agreement, we disagree with his claim that the only agreement that relates to his claims is the Partnership Agreement.

Richey asserts that his claims actually arise from Relators' post-acquisition conduct and, therefore, do not "arise from or relate to the Note." Rather, he argues that the Note is merely a source of reference for measuring his damages. He also argues that because he did not sign the Note, he is not bound by the venue selection clause in it. We disagree that these assertions mean *section 15.020* is inapplicable. First, *section 15.020* does not require that an action arise out of a specific agreement. Rather, it applies to an action "arising from a major *transaction*" if the party bringing the action has agreed in writing that the action will be brought in a certain jurisdiction. TEX. CIV. PRAC. & REM. CODE § 15.020(a) (emphasis added). And as set out above, Richey signed the Goodwill Agreement specifying that claims arising out of or relating to it would be brought in Tarrant County. Richey's claim based on the unpaid note arises out of that major transaction regardless of whether [**19] Richey signed the Note or whether his claim "arises" specifically out of the Note.

Second, we disagree with Richey's claim that he merely references the Note to measure his damages. Richey cites *Carr v. Main Carr Development, LLC, 337 S.W.3d 489, 498 (Tex. App.--Dallas 2011, pet. denied),* in which the court held that a non-signatory cannot be compelled to arbitrate when his claims merely "touch matters" covered by a contract containing an arbitration clause, yet the claims do not actually rely on the contractual terms. *Id.* In that case the court of appeals explained that claims must be brought on a contract if liability must be determined by reference to the contract, and the determination of whether a party seeks the benefit of a contract turns on the substance of the claim. *Id.* (citing *In re Weekley Homes, L.P., 180 S.W.3d 127, 131-32 (Tex. 2005)).*

Here, Richey's claims do more than "touch matters" included in the Goodwill Agreement and the Note. Liability for failure to pay him on the Note must be determined by reference to those agreements. *See id.* And when an injury is to the subject matter of a contract, the action is ordinarily "*on the contract.*" *Sw. Bell Tel. Co. v. DeLanney, 809 S.W.2d 493, 494 (Tex. 1991)* [**20]

671



(emphasis added).

## C. Is the Venue Selection Clause Mandatory?

Richey next argues that even assuming his claims arise from Nighthawk's purchase of Richey Oil, *section 15.020* is inapplicable because he did not agree in writing that an action arising from the transaction "must" be brought in Tarrant County or "may not be brought" in Wise County. He claims that the acquisition documents and the Note include permissive, not mandatory venue selection clauses. He references the Goodwill Agreement's provisions that "any proceeding arising out of or relating to this Agreement *may* be brought in the courts of the State of Texas, Tarrant County, or if it has or can acquire jurisdiction, in the United States District Court for the Northern District of Texas" and that the parties "submit[] to the *non-exclusive* jurisdiction of each such court," and "the proceeding [*532] *may* be heard and determined in any such court." (Emphasis added). Richey argues that this permissive language controls over the mandatory language providing that each of the parties "agrees not to bring any proceeding arising out of or relating to this Agreement in any other court." He asserts that finding the clause mandatory would render [**21] all of the permissive language meaningless. Relators counter that the permissive language applies to consent to jurisdiction, but the mandatory language applies to require venue. We agree with Relators.

The beginning of the jurisdiction clause at issue here provides that "[a]ny proceeding arising out of or relating to this Agreement may be brought in the courts of the State of Texas, Tarrant County . . . and each of the parties irrevocably submits to the non-exclusive jurisdiction of each such court in any such proceeding." Objections to personal jurisdiction may be waived, so a litigant may consent to the personal jurisdiction of a court through a variety of legal arrangements. *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 n.14, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985).* For example, a contractual "consent-to-jurisdiction clause" subjects a party to personal jurisdiction, making an analysis of that party's contacts with the forum for personal jurisdiction purposes unnecessary. *RSR Corp. v. Siegmund, 309 S.W.3d 686, 704 (Tex. App.--Dallas 2010, no pet.)* (concluding a contract provision that claims "may be heard" in Dallas courts was a "consent-to-jurisdiction" clause and the trial court erred by granting the defendant's [**22] special appearance); *see Ramsay v. Tex. Trading Co., 254 S.W.3d 620, 629 (Tex. App.-- Texarkana 2008, pet. denied)* (explaining that a permissive forum selection clause is one under which the parties consent to the jurisdiction of a particular forum but do not require suit to be filed there); *see also Granados Quinones v. Swiss Bank Corp. (Overseas), S.A., 509 So. 2d 273, 274 (Fla. 1987)* ("Permissive clauses constitute nothing more than a consent to jurisdiction and venue in the named forum.").

The provision here providing that the parties irrevocably submit to the non-exclusive jurisdiction of the courts in Tarrant County is a consent-to-jurisdiction clause. But the parties not only submitted themselves to jurisdiction of the Tarrant County courts, each party also "irrevocably . . . agree[d] not to bring any proceeding arising out of or relating to this Agreement in any other court." Our primary goal in construing this contractual language is to determine the parties' intent as reflected by the language they used. *El Paso Field Servs., L.P. v. Mastec N. Am., Inc., 389 S.W.3d 802, 805 (Tex. 2012).* The contract reflects intent that the parties submit to the jurisdiction of the state or [**23] federal courts in Tarrant County *and* that they will not file suit "arising out of or relating to this Agreement" anywhere else. The requirement that if the parties file suit it will be in Tarrant County is not diluted by their agreement to submit to jurisdiction there, and we disagree with Richey's position that construing the venue selection clause as mandatory would render his agreement to submit to personal jurisdiction in Tarrant County meaningless. Simply put, Richey clearly agreed in the Goodwill Agreement that an action arising from that transaction must be brought in Tarrant County. *See TEX. CIV. PRAC. & REM. CODE § 15.020(c).*

Richey also asserts that when a venue provision such as the one involved here includes the term "non-exclusive," it is not mandatory, even if the provision includes other language reflecting that it is mandatory. Richey cites two cases in support of his assertion that use of the phrase "non-exclusive [*533] jurisdiction" makes a venue selection clause only permissive. *See Sauder v. Rayman, 800 So. 2d 355, 359 (Fla. Dist. Ct. App. 2001); W. Ref. Yorktown, Inc. v. BP Corp. N. Am. Inc., 618 F. Supp. 2d 513, 520-21 (E.D. Va. 2009).* But in neither of those cases did [**24] the courts' holdings rely exclusively on the phrase "non-exclusive." In *Sauder*, the court held that the phrase "non-exclusive jurisdiction" in a forum selection clause was permissive while the phrase "all actions . . . shall be litigated" in the same clause was mandatory. *800 So. 2d at 359.* Because the entire clause did not foreclose multiple interpretations, the court concluded the trial court's order finding the provision permissive was not clearly erroneous. *Id.* And in *Western Refining Yorktown*, the forum selection clause did not contain the phrase non-exclusive jurisdiction. Rather, the clause provided that an action to enforce the contract "shall" be brought in "the federal or state courts located in Cook County in the State of Illinois on a non-exclusive basis." *618 F. Supp. 2d at 519.* The phrase "non-exclusive basis," the court held, meant that filing suit in the courts in Cook County was not mandatory. *Id. at 523.*

We do not consider these cases determinative.



Rather, we conclude that where the phrase "non-exclusive jurisdiction" is in a venue selection clause that also includes language reflecting intent that the venue choice is mandatory, the non-exclusive language does not [**25] necessarily control over the mandatory language. We agree with the court's decision in *Muzumdar v. Wellness International Network, Ltd., 438 F.3d 759, 762 (7th Cir. 2006)* where the court rejected a party's contention that the phrase "non-exclusive jurisdiction"--which the court noted required the parties to submit to personal jurisdiction--rendered a forum selection clause permissive. There the court concluded that it could not "find that a provision which requires appellants to submit to the 'non-exclusive' jurisdiction of Texas courts somehow undermines a very strongly worded forum selection clause containing mandatory language: 'SHALL BE PROPER ONLY' or 'SHALL BE PROPER' in Dallas County, Texas." *Id.* Similarly, the phrase "non-exclusive jurisdiction" in the Goodwill Agreement does not control over the plainly worded mandatory language.

## D. Venue in Wise County

Finally, Richey argues that venue in Wise County is proper even if it is not mandatory, so the trial court did not err by denying Relators' motion to dismiss. First, Richey points to *Texas Civil Practice and Remedies Code § 15.017* which provides that:

> A suit for damages for libel, slander, or invasion of privacy shall be brought [**26] and can only be maintained in the county in which the plaintiff resided at the time of the accrual of the cause of action, or in the county in which the defendant resided at the time of filing suit, or in the county of the residence of defendants, or any of them, or the domicile of any corporate defendant, at the election of the plaintiff.

*TEX. CIV. PRAC. & REM. CODE § 15.017.* He asserts that because he resided in Wise County at the time his cause of action for defamation accrued, this mandatory provision applies.

We have already concluded that *section 15.020* applies, mandating that Richey's actions must be brought in Tarrant County. Venue may be proper in multiple counties under mandatory venue rules, and the plaintiff is generally afforded the right to choose venue when suit is filed. *Wilson v. Tex. Parks & Wildlife Dep't, 886 S.W.2d 259, 260 (Tex. 1994).* But in this case, the language of [*534] *section 15.020* applies to an action arising from a major transaction "[n]otwithstanding any other provision of this title." *TEX. CIV. PRAC. & REM. CODE § 15.020(c).*

This indicates that the Legislature intended for it to control over other mandatory venue provisions. *See Molinet v. Kimbrell, 356 S.W.3d 407, 413-14 (Tex. 2011)* [**27] (holding that the phrase "notwithstanding any other law" indicates a legislative intent that the provision prevail over conflicting law).

Next, Richey alternatively argues that if *section 15.017* does not apply, venue is proper in Wise County under the general venue statute because a substantial part of the events giving rise to his claim occurred there. *See TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1)* (providing that a lawsuit shall be brought in various enumerated places including "in the county in which all or a substantial part of the events or omissions giving rise to the claim occurred"). He cites *Acker v. Denton Publishing, 937 S.W.2d 111, 115 (Tex. App.--Fort Worth 1996, no writ)* for the proposition that if a plaintiff's choice of venue is proper, it is reversible error for a trial court to transfer venue even if the county of transfer would also have been proper if chosen by the plaintiff. But *Acker* did not address whether a case should be transferred when a mandatory venue provision for a different county was applicable. And we long ago explained that "[i]f the plaintiff's chosen venue rests on a *permissive* venue statute and the defendant files a meritorious motion to transfer [**28] based on a *mandatory* venue provision, the trial court must grant the motion." *Wichita Cnty. v. Hart, 917 S.W.2d 779, 781 (Tex. 1996)* (emphasis added). The permissive venue statute does not control over the mandatory venue provision applicable in this case.

## V. The Remainder of Richey's Claims

Having determined that Richey's claims seeking his benefit of the bargain losses arose out of a major transaction, we conclude that all of Richey's claims against Relators must be transferred to Tarrant County because *Texas Civil Practice and Remedies Code § 15.004* provides that:

> In a suit in which a plaintiff properly joins two or more claims or causes of action arising from the same transaction, occurrence, or series of transactions or occurrences, and one of the claims or causes of action is governed by the mandatory venue provisions . . ., the suit shall be brought in the county required by the mandatory venue provision.

It is not necessary for us to analyze Richey's claims to determine whether they arise from the same transaction, occurrence, or series of transactions: the parties affirmatively assert that they do.



## VI. Inconsistency Among Agreements

Finally, Richey asserts that because Relators [**29] argue that this case is also governed by forum selection clauses providing that suit be brought in Chicago, New York, and Illinois, the inconsistency among all the agreements creates an ambiguity so suit should proceed in Richey's choice of venue. We disagree.

In order to finance the acquisition of Richey Oil, Nighthawk entered into credit agreements with LaSalle Business Credit, L.L.C. and D.B. Zwirn Special Opportunities Fund, L.P., which contained clauses requiring suit be brought in Chicago and New York, respectively. Richey acknowledges he was not a party to either of those agreements. Richey also signed a Subordination Agreement in which he agreed that the $6.5 million note was subordinate to the security interests of LaSalle Business Credit and D.B. Zwirn. The Subordination Agreement provided that any litigation in connection with that agreement [*535] shall be venued in New York. But Relators were not parties to that agreement.

Relators also argue that a deposit agreement with Bank of America, requiring suits regarding the Richey Oilfield account be brought in Illinois, applies to Richey's claims against them. But Richey did not bring claims against Relators regarding the Richey Oil [**30] bank account. He claimed that Fisher made defamatory statements to check payees about Richey's being responsible for the checks not being able to be cashed. Relators do not explain how these claims arise out of the deposit agreement with Bank of America.

We disagree that there is any ambiguity as to which clause should apply to Richey's claims against Relators. Richey's claims arise out of and would not exist but for the acquisition agreements. The venue selection clauses in those agreements apply.

## VII. Conclusion

The trial court abused its discretion by failing to enforce the mandatory venue selection clauses in the Stock Purchase Agreement and Goodwill Agreement. We conditionally grant relief. We direct the trial court to vacate its order denying Relators' motion to transfer venue and to grant the motion. The writ will only issue if the trial court fails to comply with our directive.

Phil Johnson

Justice

**OPINION DELIVERED**: February 28, 2014

674




PLAINTIFF'S
EXHIBIT
2

No. CV-14-41665

| | | |
|---|---|---|
| PENTEX FOUNDATION | § | IN THE DISTRICT COURT OF |
| Plaintiff | § | |
| Vs. | § | |
| VERN | § | FANNIN COUNTY, TEXAS |
| KENNETH ~~VERY~~ GIBBS | § | |
| CANDACE GIBBS WALTON | § | |
| HOWARD KIRK GIBBS | § | 336th JUDICIAL DISTRICT |
| Defendants | § | |

## ORIGINAL PETITION

COMES NOW, PENTEX FOUNDATION, Plaintiff, herein also "PENTEX", through its attorney John Skotnik, and files this suit for specific performance of a contract, and Tortious Interference with that Contract, against Kenneth Vern Gibbs, Candace Gibbs Walton, and Howard Kirk Gibbs,; and, would show the honorable court as follows:

## DISCOVERY CONTROL PLAN

Plaintiff intends that discovery be conducted under Discovery Level 2.

## PARTIES

1.     PENTEX FOUNDATION is a not for profit private foundation formed and operated under the laws of the Republic of Panama, Central America.   PENTEX does not have an office within the United States, but will accept service for this cause only through their attorney, John Skotnik, Bonham, Texas.

2.     Kenneth Vern Gibbs is a resident of Texas whose address is 4212 Wheeler St., Ft. Worth, Texas 76117, where service may be made.

3.     Candace Gibbs Walton is a resident of Texas, whose address is 500 Logan Drive in Azle, Texas  76020, where service may be made.

1

675



4. Howard Kirk Gibbs is a resident of Texas whose address is 4360 Western Center Blvd. #205, Ft. Worth, Texas 76137 where service may be made.

## JURISDICTION AND VENUE

5. The subject matter in controversy is within the jurisdictional limits of this Court.

6. The Court has jurisdiction over the parties because the Defendants are all Texas residents.

7. Venue is proper in Fannin County, Texas per Texas Civil Practice and Remedies Code § 15.035 (a), as the Defendants herein agreed in writing that:

    a. The contract was performable only in Fannin County, Texas; AND

    b. Any dispute would be resolved in the courts of Fannin County, Texas.

8. Furthermore, because venue is proper as to one Defendant, venue for this action with respect to all Defendants is proper under § 15.05 Texas Civil Practice and Remedies Code.

## RELEVANT FACTS

9. On or about the 10th day of May, 2005, an agreement entitled *"Contract for Sale of Land, Mineral Rights and Royalties, and all other Assets or Monies Received from the Estate of Bert Hughes Gibbs, Kathryn G. Gibbs, and/or the Mary L. Houseworth Trust(s)"*, hereinafter **"Contract"**, was entered into between Albert Lynn Barcroft [**"Barcroft"**], Kenneth Vern Gibbs [**"Ken"**], Candace Gibbs Walton [**"Candy"**], and Howard Kirk Gibbs [**"Howard"**]. The Contract was memorialized, executed and entered into the public record of Denton County, Texas, on or about May 24, 2005 as document number 2005-61443. A copy of the Contract (consisting of 9 pages) is attached hereto as **Exhibit "A"**, and is incorporated by reference for herein for all purposes.

2

676



37. Plaintiff has had over a million dollars of money rightfully due Plaintiff taken by Ken, Candy and Howard to pay the attorney fees that were due to be paid only by Ken, Candy and Howard under written agreement, i.e. the Contract here.

38. In addition, under the terms of the Contract, Plaintiff was to receive 30% of all proceeds from any lawsuit involving Ken, Candy and Howard. At the time the Contract was agreed to and executed, there was an Abstract of Judgment filed in Denton County [Document Number 2008-38029] against Ken, Candy and Howard in the amount of $911,252.87 plus $149,546.34 in interest, in favor of Kip H. Gibbs as NEXT FRIEND FOR Kathryn Houseworth Gibbs.

   a. As a result of Plaintiff's efforts, that judgment was retired.

   b. It is therefore proceeds from a lawsuit, and Plaintiff is entitled to its 30% share, equaling $318,239.76.

## SPECIFIC PERFORMANCE

39. Plaintiff has a right to performance under the Contract. Plaintiff has honored every consideration placed on it by the Contract; and, now, Plaintiff has a right to the consideration promised it.

40. Plaintiff would ask the court to order that the provisions of the Contract be fully enforced without delay; and, that the proper gas companies be notified of the action.

41. Plaintiff's only offense was in utilizing a provision within the Contract to withdraw its money and assets from a situation in which Plaintiff has been taken advantage of and stolen from since the outset.

42. Plaintiff asks the court to grant specific performance under the Contract without delay.

## CONDITIONS PRECEDENT

43. Plaintiff avers that all conditions precedent have occurred prior to filing of this suit.

677

7



provided by Chapter 38 of the Texas Civil Practice and Remedies Code and Section 37.009 of the Texas Civil Practice and Remedies Code, amongst others.

## ALTERNATIVE ALLEGATIONS

49. Pursuant to Rules 47 and 48, Texas Rules of Civil Procedure and the rules of pleadings, allegations in this petition are made in the alternative.

## PLAINTIFF HEREBY DEMANDS TRIAL BY JURY!!

## PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays that the Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered by this Court for Plaintiff and against the Defendants for the following:

A.     All actual damages; but, in any case, no less than one million dollars [$1,000,000.00];

B.     Restitution in the exact amount that has been unjustly taken from Plaintiff by defendants and used to pay Defendant's legal fees;

C.     Judgment against Defendant's for $318,239.76 plus interest as Plaintiff's share of the proceeds from the Abstract of Judgment referenced herein;

D.     Declaratory judgment at the earliest possible time to determine the proper ownership of the mineral interest put in dispute at the oil and gas company level by baseless letters from the Defendants;

E.     Specific Performance

F.     Grant any other relief to which plaintiff has shown itself entitled both at law and in equity, whether pled or unpled.

678



Respectfully submitted,



John Skotnik, sbn 18475150
P.O. Box 727
Bonham, Texas 75418
(903)640-4300 * FAX 640-4344
Attorney for Plaintiff,
        PENTEX FOUNDATION

679

10

**Scott Smith**

| | |
|---|---|
| **From:** | <dannyrunger@reagan.com> |
| **To:** | "Albert Barcroft" <albertbarcroft@gmail.com> |
| **Cc:** | "Scott Smith" <smithlaw@airmail.net>; "Joshua Ba" <joshua.unger@hotmail.com> |
| **Sent:** | Thursday, October 02, 2014 2:23 PM |
| **Attach:** | Computation of Damages.pdf |
| **Subject:** | Re: Order |

Scott and Al:

Each accounting is done on an annual basis. The computation of damages (see attached) summarizes all of the distributions from 2009 through 2013. In the upper 1/4 of the 2nd page under the heading of **Total Distribution 2008 through 2013**, It list the Total distributions from each year showing a combined total through 2013 of $4,993,111.

If this doesn't work let me know.

Danny


-----Original Message-----
From: "Albert Barcroft" <albertbarcroft@gmail.com>
Sent: Thursday, October 2, 2014 1:16pm
To: "Scott Smith" <smithlaw@airmail.net>, "Danny Runger" <dannyrunger@reagan.com>,
"Joshua Ba" <joshua.unger@hotmail.com>
Subject: Re: Order

I believe we should file the attached motion to reconsider immediately with a view towards mandamus. We need to attach a copy of the GWB accounting (Danny will send you, and a copy of the case. I think she might reverse on her own if she fears mandamus, because I think mandamus would lie.

On Thu, Oct 2, 2014 at 11:37 AM, Scott Smith <smithlaw@airmail.net> wrote:
  She didn't make any express findings. I don't think we need the actual order if we are just planning to file a motion to reconsider.

  ----- Original Message -----
  **From:** dannyrunger@reagan.com
  **To:** Scott Smith ; Albert Barcroft
  **Sent:** Thursday, October 02, 2014 11:51 AM
  **Subject:** Re: Order
  Scott:

  Methinks that a copy of the order is necessary to find the grounds upon which this cause was transferred. Did it relate to the Defendants residing in Tarrant County or did it relate to not being able to have a fair trial in Fannin County? Or did she just find that the 'major transaction' provision enforcing 'mandatory venue' was not required?

  Danny

680



10/2/2014

FILED FOR RECORD
FANNIN COUNTY, TEXAS

2014 OCT -9 AM 10: 11

NANCY YOUNG CROCKETT STREET
DISTRICT CLERK P.O. Box 354
SHERMAN, TEXAS 75091-0354
BY _____ DEPUTY

# SCOTT SMITH

ATTORNEY AND COUNSELOR AT LAW

E-MAIL: smithlaw@airmail.net
FACSIMILE: (903) 870-1446
TELEPHONE: (903) 868-8686

October 8, 2014

Hon. Laurine Blake
Judge, 336th Judicial District Court
Fannin County Courthouse
101 East Sam Rayburn Dr., Ste. 201
Bonham, Texas 75418

      RE: *Pentex Foundation v. Kenneth Vern Gibbs, et al.*; Cause Number
           CV-14-41665 in the 336th Judicial District Court of Fannin County,
           Texas.

Dear Judge Blake:

On October 3, 2014, we filed a Motion to Reconsider Order to Transfer Venue. The last page was not meant to be part of the motion. It is a confidential document, and its disclosure was inadvertent and accidental. I have so advised counsel. I ask that the last page be disregarded.

A copy of this letter and the enclosed is being forward to Ms. Lee and Mr. Gibbs. I thank you for your attention to this matter.

Yours very truly,

T. Scott Smith

TSS/bhs



Date/Time: Oct. 8. 2014  8:27AM

| File No. Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|
| 7276 Memory TX | 918004377901 | P.  2 | OK | |

```
Reason for error
    E. 1) Hang up or line fail          E. 2) Busy
    E. 3) No answer                     E. 4) No facsimile connection
    E. 5) Exceeded max. E-mail size
```

*SCOTT SMITH*
ATTORNEY & COUNSELOR AT LAW

120 South Crockett Street
P.O. Box 354
Sherman, Texas 75091-0354
e-mail: smithlaw@airmail.net
Facsimile (903) 870-1446
Telephone (903) 868-8686

**FACSIMILE COVER SHEET**

TO:     CHRISTY LEE 800-437-7901
FROM:   SCOTT SMITH

DATE:   October 8, 2014

NUMBER OF PAGES (Including this cover page):  2

IF THERE IS DIFFICULTY WITH THIS TRANSMISSION, PLEASE CONTACT GINA AT (903) 868-8686 IMMEDIATELY.

MESSAGE:

CONFIDENTIALITY NOTICE

The information contained in this facsimile message is a privileged attorney communication and confidential information intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is strictly prohibited. If you have received this facsimile in error, please notify us immediately by telephone and return the original message to us at the above address via the United States Postal Service.

682



## Scott Smith

**From:** "Scott Smith" <smithlaw@airmail.net>
**To:** "Christy Lee" <clee@christyleelaw.com>; "Howard Gibbs" <hkgibbs@gmail.com>
**Sent:** Wednesday, October 08, 2014 8:27 AM
**Attach:** 14-10-8 Judge Blake Letter.pdf
**Subject:** Pentex Foundation v. Gibbs

Scott Smith
Attorney and Counselor At Law
120 South Crockett Street
P.O. Box 354
Sherman, Texas 75091-0354
Facsimile 903.870.1446
Telephone 903.868.8686

683



10/8/2014

## Scott Smith

**From:**    "Scott Smith" <smithlaw@airmail.net>
**To:**      "Christy Lee" <clee@christyleelaw.com>; "Howard Gibbs" <hkgibbs@gmail.com>
**Sent:**    Friday, October 10, 2014 11:35 AM
**Subject:**  Pentex v. Gibbs, et al.; Cause Number CV-14-41665

The Court called and advised my office that the previously filed Motion to Reconsider Order to Transfer Venue has been set for hearing on **October 20, 2014, at 8:30 a.m.**

**cc:   Christy Lee by facsimile at 800-437-7901**

Scott Smith
Attorney and Counselor At Law
120 South Crockett Street
P.O. Box 354
Sherman, Texas 75091-0354
Facsimile 903.870.1446
Telephone 903.868.8686

FILED FOR RECORD
FANNIN COUNTY, TEXAS

2014 OCT 14 AM 11: 23

NANCY YOUNG
DISTRICT CLERK

BY _____
DEPUTY

684

10/10/2014



* * * Communication Result Report ( Oct. 10. 2014 11:50AM ) * * *

1)
2)

Date/Time: Oct. 10. 2014 11:39AM

| File No. Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|
| 7285 Memory TX | 918004377901 | P. 1 | OK | |

---

Reason for error
E. 1) Hang up or line fail
E. 3) No answer
E. 5) Exceeded max. E-mail size

E. 2) Busy
E. 4) No facsimile connection

Page 1 of 1

**Scott Smith**

From: "Scott Smith" <smithlaw@airmail.net>
To: "Christy Lee" <clee@christyleelaw.com>; "Howard Gibbs" <hkgibbs@gmail.com>
Sent: Friday, October 10, 2014 11:35 AM
Subject: Pentex v. Gibbs, et al.; Cause Number CV-14-41665
The Court called and advised my office that the previously filed Motion to Reconsider Order to Transfer Venue has been set for hearing on October 20, 2014, at 8:30 a.m.

cc: Christy Lee by facsimile at 800-437-7901

Scott Smith
Attorney and Counselor At Law
120 South Crockett Street
P.O. Box 354
Sherman, Texas 76091-0354
Facsimile 903.870.1446
Telephone 903.868.8686

10/10/2014

685



CAUSE NO. CV-14-41665

PENTEX FOUNDATION      )
    PLAINTIFF,      )
              )      IN THE DISTRICT COURT
VS.      )
              )      336TH JUDICIAL DISTRICT
KENNETH VERN GIBBS; AND      )
CANDACE GIBBS WALTON; AND      )
HOWARD KIRK GIBBS,      )
    DEFENDANTS.      )      FANNIN COUNTY, TEXAS

## KENNETH GIBBS AND CANDACE WALTON'S RESPONSE TO MOTION TO RECONSIDER ORDER TO TRANSFER VENUE, AND MOTION FOR SANCTIONS

COME NOW, Defendants Kenneth "Ken" Vern Gibbs and Candace "Candy" Walton, through their Counsel of Record, Law Offices of Christy Lee, P.C., to respond and object to Plaintiff and Intervenor's Motion to Reconsider Order to Transfer Venue ("the Motion"), and would respectfully show the Court the following:

### I. INTRODUCTION

1. Venue is proper in Tarrant County. TEX. CIV. PRAC. & REM. CODE ANN § 15.002.

2. Plaintiff and Intervenor cite only one case, *In Re Fisher*. 433 S.W. 3d 523 (2014). Not only is this case distinguishable, **but it is also utterly and completely irrelevant.**[1] Ken and Candy are befuddled as to why this case was cited, as it has absolutely nothing to do with the case at hand. In *In Re Fisher,* the contract specifically stated the obligation to pay, $13

---

[1] This case is so irrelevant, it is unclear if Plaintiff provided the accurate case. It is suspected that Plaintiff and Intervenor had to cite something beyond "we don't like the ruling."

million, and did not include a buy-out provision. *See id.* In fact, it was undisputed that the contract was a major transaction. *Id.* at 529.

3.    Below are the relevant provisions of the Contract for Sale of Land, Mineral Rights and Royalties ("CSL"):

> First paragraph provides that Candy, Ken, and Howard Kirk Gibbs, collectively "Gibbs," will sell thirty percent (30%) of all land, mineral rights, royalties, and any other monies or assets which they receive from (1) the Estate of Bert Gibbs; (2) Bert Gibbs and Kathryn Gibbs personally; (3) any inheritance in any form received by Gibbs now or in the future; (4) any proceeds from any lawsuits current or that may arise from seven (7) different persons or trusts; (5) any assets that have previously been passed to the Gibbs from four (4) different persons or trusts, and the list goes on (collectively the "Estates").
>
> Section 3(a) provides, as full consideration, "Barcroft has paid Gibbs total of twenty-one (21) silver dollars minted by the United Stated Mint."
>
> Section 4 states: "it is understood and agreed that Gibbs may cancel or nullify this contract only under the following conditions: a) If Gibbs pays over to Barcroft the sum of five million dollars ($5,000,000 US) in full, in addition to any money received prior to said one time payment, as liquidated damages and full settlement of all consideration on Gibbs part.

*See* Exhibit A.

4.    It is undisputed that Albert Barcroft is not a licensed attorney and that he drafted the CSL. *See* Exhibit B.

## II. NOT A MAJOR TRANSACTION

5.    A "'major transaction' means a transaction evidenced by a written agreement under which a person pays or receives, or is *obligated* to pay or receive, consideration with an *aggregate stated value* equal to or greater than $1 million." TEX. CIV. PRAC. & REM. CODE ANN § 15.020(a). Emphasis added.

KENNETH GIBBS AND CANDACE WALTON'S RESPONSE TO
MOTION TO RECONSIDER ORDER TO TRANSFER VENUE,
AND MOTION FOR SANCTIONS
*PENTEX FOUNDATION V. GIBBS, ET AL.*

CAUSE NO. CV-14-41665

-2-

687

6. There is no Texas case law which affirms that a buyout provision constitutes an obligation or an entitlement, and no case law which affirms that Section 15.020 of the Texas Civil Practices & Remedies Code applies to contracts whose lone stated value appears in a buyout provision.

7. The Contract for Sale of Land ("the CSL") posited neither a requirement to pay, nor a stated value. The sole stated value of anything anywhere in the CSL involved the buyout provision, which addressed neither an obligation nor an entitlement. Parties to the CSL were *not* required to execute the buyout provision. The buyout provision was simply that – an option. One that the respective parties might choose to act upon or not. *Not an obligation to pay.*

8. Likewise, Plaintiff and Intervenor's claim of damages in excess of $1 million did not and certainly does not render the CSL a major transaction. Plaintiff and Intervenor's argument, is frankly, ridiculous. If this were allowed by the courts, then every venue provision would be mandatory by alleging $1 million in damages.

### III. UNCONSCIONABILITY OF CONTRACT

9. If the court finds that the CSL is a major transaction, in the alternative, the mandatory venue provision "does not apply to an action if the agreement described by this section was unconscionable at the time that it was made." TEX. CIV. PRAC. & REM. CODE ANN § 15.020(d). Whether or not a contract was unconscionable at the time it was formed is a question of law. *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 562 (Tex. 2006).

10. The CSL was unconscionable on multiple levels.

11. *Grossly one-sided contracts.* A contract is unconscionable if it is grossly one-sided. *In re: Poly-America, L.P.*, Ind., 262 S.W.3d 337, 348 (Tex. 2008).

12. The terms alone are unconscionable. In Candy's Affidavit, she provides, "The twenty-one (21) silver coins were just ordinary silver coins, and certainly well circulated. Albert [Barcroft] never pretended that these coins had any kind of special value to them. In fact, Albert even stated these coins were taken out of his 'junk' silver. He stated that he needed to provide us with something, because it would make the contract valid." *See* Exhibit B.

13. So, Albert gave twenty-one (21) silver coins, which had little to no real value, for 30% of basically everything Ken, Candy, and Howard Kirk had ever received or would receive in the future from any lawsuit, inheritance, business, etc.

14. The unconscionable buyout terms were shockingly one-sided and primarily purposed to benefit Albert, much to the detriment of the other parties. Or, read the CSL, the Heirs *could* buy out Albert for $5 million.

15. ***Unauthorized practice of law.*** Texas courts do not enforce contracts to aid in the unauthorized practice of law. *In re: Heritage Organization*, 354 B.R. 407 (Bankruptcy N.D. Tex. 2006). Preparing and advising on contracts and settlements is unauthorized practice of law. *Davies v. Unauthorized Practice Committee of the State Bar of Texas*, 431 S.W.2d 590, 593-94 (Tex. Civ. App. – Tyler 1968).

16. Correspondence from Albert Barcroft and his wife Pamela clarify without question that Albert practiced law without a license. *See* Exhibit C. In the summer of 2004, Albert entered into a friendship with Howard Kirk. *See Id.* Sometime later, Albert approached Ken and Candy concerning legal issues the family was experiencing. *See Id.* He informed Ken and Candy that he graduated from law school, could help achieve resolution in the matter of the Estates, and was able to draft agreements and contracts. *See* Exhibit B. Albert then drafted the

KENNETH GIBBS AND CANDACE WALTON'S RESPONSE TO
MOTION TO RECONSIDER ORDER TO TRANSFER VENUE,
AND MOTION FOR SANCTIONS                                    CAUSE NO. CV-14-41665
*PENTEX FOUNDATION V. GIBBS, ET AL.*                              -4-

689

CSL, from which he stood to benefit greatly. *See Id.* He encouraged Ken and Candy to sign the CSL for their own benefit and counseled them concerning its terms. *See Id.*

17.    Albert's representation of himself as possessing the authority to counsel parties and to draft legal documents constituted a Class A misdemeanor and was fraud.

### IV. MOTION FOR SANCTIONS

18.    A motion for reconsideration is appropriate in the following circumstances: (1) to address an intervening change in controlling law; (2) to consider new evidence not previously available; (3) to correct a clear or manifest error of law or fact; or (4) to prevent manifest injustice. *Fisherman's Harvest, Inc., v. Post, Buckley, Schuh, and Jerigan, Inc.*, et al., No. G-05-0151, 2008 WL 4277001, at 2 (S.D. Tex. Sept. 10, 2008) (citations omitted). Not liking a ruling is not a reason to file a motion to reconsider.

19.    Plaintiff and Intervenor's Motion failed to meet a single criterion for a motion for reconsideration. The Motion not only mislead the court on the only case that was cited, but the Motion presented no intervening change in controlling and applicable law, no new evidence, no error of law or fact, and no evidence that reconsideration would prevent manifest injustice.

20.    Given the lack of consideration toward the requirements for a motion for reconsideration, and given the lack of applicable and substantiating law in the Motion, it is reasonable to conclude that Plaintiff and Intervenor filed their Motion solely for the purpose of harassment toward Ken and Candy, and sanctions are appropriate, especially since Ken and Candy (and counsel) must travel approximately 120 miles to the hearing.

KENNETH GIBBS AND CANDACE WALTON'S RESPONSE TO
MOTION TO RECONSIDER ORDER TO TRANSFER VENUE,
AND MOTION FOR SANCTIONS                                    CAUSE NO. CV-14-41665
*PENTEX FOUNDATION V. GIBBS, ET AL.*                                    -5-

690

## IV. REQUESTED RELIEF

Ken and Candy respectfully ask that the Court:

21.     Affirm its previous decision that venue is appropriate in Tarrant County;

22.     Deny the Motion to Reconsider Order to Transfer Venue;

23.     Hand down sanctions against Plaintiff and Intervenor in the amount of $_____;

and

24.     Provide other such relief that the Court finds appropriate.

Respectfully submitted,

LAW OFFICES OF CHRISTY LEE, P.C.

Christy L. Lee
Texas State Bar No. 24052302
777 Main Street, Ste. 600
Fort Worth, Texas 76102
(817) 504-6075
(800) 437-7901 - Fax
clee@christyleelaw.com

ATTORNEY FOR KENNETH GIBBS AND
CANDACE WALTON

KENNETH GIBBS AND CANDACE WALTON'S RESPONSE TO
MOTION TO RECONSIDER ORDER TO TRANSFER VENUE,
AND MOTION FOR SANCTIONS
*PENTEX FOUNDATION V. GIBBS, ET AL.*

CAUSE NO. CV-14-41665

-6-

691



## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the Kenneth Gibbs and Candace Walton's Response to Motion to Reconsider Order to Transfer Venue, and Motion for Sanctions was delivered, pursuant to Texas Rules of Civil Procedure, to the following parties on this 3rd day of November, 2014:

Party:

Howard Kirk Gibbs
4360 Western Center Blvd., No. 205
Fort Worth, TX  76157

Email: hkgibbs@gmail.com

Pentex Foundation, **and**
GBU Friends and Associates Trust
c/o Scott Smith, Attorney of Record
120 South Crockett Street
Sherman, TX  75091-0354

Email: smithlaw@airmail.com


Christy L. Lee

KENNETH GIBBS AND CANDACE WALTON'S RESPONSE TO
MOTION TO RECONSIDER ORDER TO TRANSFER VENUE,
AND MOTION FOR SANCTIONS
*PENTEX FOUNDATION V. GIBBS, ET AL.*

CAUSE NO. CV-14-41665

-7-

692

### Contract for Sale of Land, Mineral Rights and Royalties, and all other Assets or Monies Received from the Estate of Bert Hughes Gibbs, Kathryn G. Gibbs, and/or the Mary L. Houseworth Trust(s) or "The Kathryn Houseworth Gibbs Irrevocable Trust"

This agreement between Albert Lynn Barcroft, hereinafter "Barcroft", and Kenneth Vern Gibbs, Candace Gibbs Walton, and Howard Kirk Gibbs, hereinafter collectively also "Gibbs", is a **contract for sale of thirty percent 30% of all land, mineral rights, royalties, and any other monies or assets which Gibbs**, or any of the three individuals referred to collectively as "Gibbs" in this agreement, receives, or is due, from this date forward, either collectively or individually, as a result of any inheritance or estate proceeds, or any other property assets received from any trust(s) or transfers from Bert Hughes Gibbs, Mary L. Houseworth, and/or Kathryn G. Gibbs at any time, past, present, or future, including, but not limited to, the following:

a) All proceeds from the Estate of Bert Hughes Gibbs, and/or,

b) All property and/or assets of any kind which are received as a result of any past or future transference from Bert Hughes Gibbs, Kathryn G. Gibbs, or any trust to which Gibbs, or any of the individuals referred to collectively as "Gibbs" in this agreement, are beneficiary; and/or,

c) All inheritance of any kind and in any form by Gibbs, or any of the individuals referred to collectively as "Gibbs" in this agreement; and/or;

d) All proceeds from any lawsuit which currently exists, or may arise, because of, or in connection with, the relationship(s) with Bert Hughes Gibbs, Kathryn G. Gibbs, Kip Hughes Gibbs, Sandra Faye Gibbs, "The Mary L. Houseworth Irrevocable Trust", "The Kathryn Houseworth Gibbs Irrevocable Trust", and any other trust(s) to which Gibbs are beneficiary(ies) or trustee(s) in any form; and/or,

e) All property and/or assets which may have been previously passed to them by Bert Hughes Gibbs, Kathryn G. Gibbs, "The Mary L. Houseworth Irrevocable Trust", and/or "The Kathryn Houseworth Gibbs Irrevocable Trust"; and or,

f) All other property and/or assets passed to Gibbs, or any of the individuals referred to collectively as "Gibbs" in this agreement, from any source involving Bert Hughes Gibbs, Kathryn G. Gibbs, "The Kathryn Houseworth Gibbs Irrevocable

Contract for Sale of Land, Mineral Rights, Royalties and Other Assets and/or Monies

Initials of all parties _____ KVG CGW HD



Trust", and/or "The Kathryn Houseworth Gibbs Irrevocable Trust", or, any other trust(s) or business organization(s) of any kind, which might be uncovered or discovered in the future; and/or,

g) All property and/or other assets in any trust or former trust; and, any property or other assets in any corporation, limited liability company, partnership(s), sole proprietorship(s), or any other business organization of any kind in which one or more of the Gibbs are owners, trustee(s) or beneficiary(ies).

h.) Specifically exempted from this agreement are any properties and/or other assets which are currently under the full control of Gibbs, or any of the individuals referred to collectively as "Gibbs" in this agreement; provided, however, that if any legal work is required to aid in the collection of said assets, or the sale or control of said property, then said property or other assets shall be subject to the terms, conditions, and considerations set forth within this agreement as part of the property and/or assets listed above, and shall have no exemption to the terms and considerations of this agreement. Also exempted from this agreement are any personal items that were passed to Gibbs from their father, which were not included in the divorce distribution between their mother and father

This sale of 30% of all land, property and other assets described herein above shall be governed by the following terms, conditions, and considerations:

1. Gibbs, or any of the individuals referred to collectively as "Gibbs" in this agreement, shall give their/his/her full cooperation to all efforts by Barcroft to collect any of the funds referred to in this agreement. Said cooperation shall include, but not be limited to, providing necessary information and documentation, being available to give testimony, and giving full support to the overall effort of collecting funds and assets from the sources stated herein.

2. Any party hereto shall have the right to order a complete inventory of all property and other assets described herein at any time, and all parties agree to provide full cooperation to such an effort. Any costs shall be born by the party requesting the inventory.

694

3. As full consideration, Barcroft agrees to provide, or has provided, the following:

a) Barcroft has paid to Gibbs a total of twenty-one (21) silver dollars minted by the United States Mint, photocopy of said coins attached hereto as **Exhibit "A"**, and incorporated herein for all purposes as real consideration under this agreement, and Gibbs hereby acknowledges receipt of same with this signing; and,

b) Barcroft will provide his services, knowledge and best efforts in the pursuit of all available funds, property, and/or other assets from the sources stated herein; and,

c) Barcroft, at his expense, will provide legal counsel by acquiring a licensed attorney for any reasonable and prudent actions necessary to the collecting of the funds from the sources stated herein; however, should Gibbs, or any of the individual Gibbs, feel that their/his/her interests are not properly served by the attorney Barcroft provides, that party will be responsible for the legal fees of any other attorney(s) hired by Gibbs or any individual Gibbs, to protect their/his/her individual interests. In that event, it is agreed by all parties hereto that the attorney hired by Barcroft will represent only Barcroft in all future action(s). Furthermore, it is specifically agreed that said attorney hired by Barcroft will represent only Barcroft should a dispute arise between the parties hereto; and, Gibbs, individually and collectively, agree not to claim conflict of interest should said attorney represent Barcroft in a conflict between the parties hereto; and, Gibbs, collectively and individually, hereby waive their/his/her right to claim conflict of interest with regards to said attorney in such instance.

4. It is understood and agreed that Gibbs may cancel or nullify this contract <u>only</u> under the following conditions:

a) If Gibbs pays over to Barcroft the sum of five million dollars ($5,000,000.00 US) in full, in addition to any money received prior to said one time payment, as liquidated damages and full settlement of all consideration on Gibbs part.

b.) If Barcroft voluntarily abandons the effort to collect the funds from the sources stated herein; however, in this event, Barcroft shall retain all amounts already received, and will continue to receive any future proceeds from any of the property or other assets, and will retain his ownership interest in any property

Contract for Sale of Land, Mineral Rights,  2  Initials of all parties _____ _____ _____ _____
Royalties and Other Assets and/or Monies

695

which is covered by this agreement and has been brought into the control of Gibbs, or is paying benefits of any kind at the time of Barcroft's abandonment; or, which is brought into the control of Gibbs, or start paying benefits at a later date, provided that said control or payments is a result of actions prior to Barcroft's abandonment.

5. If Barcroft dies or becomes incapacitated, the contract will remain in force, and the assets which have been accessed and are paying at the time of Barcroft's death, or which are later accessed as a result of Barcroft's efforts, will go to his heirs and assigns.

6. It is hereby agreed that there shall be a business organization, the exact type to be agreed upon at a later date, created by the parties hereto; and, that all revenue of any kind received from any of the property and/or assets covered herein shall be deposited into a bank account in that entity's name, and that all expenses necessary to the continuation of revenue being paid to the parties hereto (i.e. property taxes on the royalties or property covered herein, and any necessary expenses such as well upkeep, etc.) shall be deducted and paid as required before the 70/30 division agreed to in this contract. Barcroft shall have a 50% vote in the operation of said business organization; and, the only function of said business organization shall be to facilitate the agreement in this contract. Any monies paid out of said business organization, other than the agreed upon split between the parties, shall be agreed upon by all parties hereto. The division shall be divided on a basis of 30% to Barcroft, 23.34% to Kenneth Vern Gibbs, 23.33% to Candace Walton Gibbs, and 23.33% to Howard Kirk Gibbs, at each instance of dispersal to the parties. Any party may demand a split of the assets of said business organization at any time.

7. If either party should break the terms of this agreement in any fashion, or attempt to render the contract invalid, in any way which would require legal action to correct or enforce, the party found at fault, or the party failing to prevail, shall pay all legal expenses of any type for himself/herself, and for the prevailing party.

8. This contract is written to comply with the laws of the State of Texas; and, any provision found by a court of competent jurisdiction to be in non-compliance shall be

696

automatically amended to comply with said laws in such a manner as to keep the original intent of the provision as closely in place as possible. In no event shall any such findings on one provision affect any other provision within the contract.

9 Notwithstanding any other provision under the law, it is expressly agreed that this contract shall be performable only in Fannin County, Texas; and, any dispute(s) will be resolved in the courts of Fannin County, Texas. The signing hereto of this contract by all parties completes the sale of 30% of all property and assets of Gibbs to Barcroft.

10. This agreement shall be binding on all heirs and assigns of the parties hereto.

11. No lien(s) may be placed upon any of the property covered herein unless such lien(s) is/are agreed to by all parties hereto, reduced to writing, and signed by all parties hereto before a notary public.

12 All agreements between the parties hereto are contained in writing in this contract, and no verbal agreements shall be deemed valid unless contained in writing herein. All amendments hereto must be in writing, and signed by all parties before a notary public.

13. Albert Lynn Barcroft, Kenneth Vern Gibbs, Candace Gibbs Walton, and Howard Kirk Gibbs, the principal parties hereto, hereby agree to this contract in its entirety without reservation; and, each pledge never to challenge the terms, conditions, intentions, and/or considerations under this contract with their respective signing hereunder.

**WITNESS OUR HANDS** this 10th day of May, 2005.

_____
Albert Lynn Barcroft

_____
Kenneth Vern Gibbs

_____
Candace Gibbs Walton

_____
Howard Kirk Gibbs

Contract for Sale of Land, Mineral Rights,
Royalties and Other Assets and/or Monies

5

Initials of
all parties

697

# ACKNOWLEDGEMENT

**STATE OF TEXAS**

Subscribed, Sworn, and Sealed

**COUNTY OF COLLIN**

On this 10th day of May in the year 2005, **Albert Lynn Barcroft**, known to me, did personally appear before me; and, after taking the oath, deposes and says that he is the man who executed the foregoing instrument; and, further stated that he executed the same as his free and informed act and deed for the purposes stated therein, and with a full understanding of the scope of the provisions contained therein; and, that he agrees to abide by all said provisions.

_____
Albert Lynn Barcroft

Subscribed and sworn to before me this 10th day of May in the year 2005.

RUBÍ R. JIMENEZ
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 11-08-08

_____
Notary in and for the State of Texas

**STATE OF TEXAS**

Subscribed, Sworn, and Sealed

**COUNTY OF COLLIN**

On this 10th day of May in the year 2005, **Kenneth Vern Gibbs**, known to me, did personally appear before me; and, after taking the oath, deposes and says that he is the man who executed the foregoing instrument; and, further stated that he executed the same as his free and informed act and deed for the purposes stated therein, and with a full understanding of the scope of the provisions contained therein; and, that he agrees to abide by all said provisions.

_____
Kenneth Vern Gibbs

Subscribed and sworn to before me this 10th day of May in the year 2005.

RUBÍ R. JIMENEZ
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 11-08-08

_____
Notary in and for the State of Texas

Contract for Sale of Land, Mineral Rights,
Royalties and Other Assets and/or Monies

6

Initials of
all parties

Exhibit A
Page 6 Of 7

STATE OF TEXAS

Subscribed, Sworn, and Sealed

COUNTY OF COLLIN

On this 10th day of May in the year 2005, **Candace Gibbs Walton**, known to me, did personally appear before me; and, after taking the oath, deposes and says that she is the woman who executed the foregoing instrument; and, further stated that she executed the same as her free and informed act and deed for the purposes stated therein, and with a full understanding of the scope of the provisions contained therein; and, that she agrees to abide by all said provisions.

_Candace Gibbs Walton_
Candace Gibbs Walton

Subscribed and sworn to before me this 10th day of May in the year 2005.

RUBI R. JIMENEZ
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 11-08-08

Notary in and for the State of Texas

STATE OF TEXAS

Subscribed, Sworn, and Sealed

COUNTY OF COLLIN

On this 10th day of May in the year 2005, **Howard Kirk Gibbs**, known to me, did personally appear before me; and, after taking the oath, deposes and says that he is the man who executed the foregoing instrument; and, further stated that he executed the same as his free and informed act and deed for the purposes stated therein, and with a full understanding of the scope of the provisions contained therein; and, that he agrees to abide by all said provisions.

Howard Kirk Gibbs

Subscribed and sworn to before me this 10th day of May in the year 2005

RUBI R. JIMENEZ
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 11-08-08

Notary in and for the State of Texas

Contract for Sale of Land, Mineral Rights, Royalties and Other Assets and/or Monies

Initials of all parties    KUG  CGW

Exhibit A
Page 7 Of 7

| | | |
|---|---|---|
| PENTEX FOUNDATION | ) | IN THE DISTRICT COURT |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | 336TH JUDICIAL DISTRICT |
| | ) | |
| KENNETH VERN GIBBS; AND | ) | |
| CANDACE GIBBS WALTON; AND | ) | |
| HOWARD KIRK GIBBS, | ) | |
| DEFENDANTS. | ) | FANNIN COUNTY, TEXAS |

## AFFIDAVIT OF CANDACE WALTON

I, Candace Walton, having been first duly sworn, state the following:

1.  I am over the age of eighteen (18) years. I am Defendant in this Matter before the Court. I confirm that all of the following facts are true, correct and undisputed.

2.  I have known Albert Barcroft since the end of 2004. Albert has stated that he meet Howard Kirk Gibbs sometime in the summer of 2004, about another problem that Howard Kirk was having. Then Albert offered to help settle the estate of our father, Bert Hughes Gibbs ("the Estate"). Albert stated that he wanted to help my brothers and myself achieve resolution concerning the Estate. Albert assured us that he had attended law school, could provide advice about the Estate, and was able to draft legal contracts and agreements. Albert presented himself as having my best interests at heart and even told my father that he would do everything he could do to save at least some of my father's estate for his kids.

3.  Albert was and is not licensed to practice law.

4.  Albert drafted the Contract for Sale of Land ("the CSL") without assistance.

5.  Albert provided legal advice to Ken and myself concerning the CSL. He encouraged us to sign the CSL and said that it would be to our benefit to do so.

6.  I did not have an attorney to assist me at the signing of the CSL.

7.  Albert paid Ken, Howard Kirk, and myself a total of twenty-one (21) silver coins, so seven (7) coins a piece.

8.  The twenty-one (21) silver coins were just ordinary silver coins, and certainly well circulated. Albert never pretended that these coins had any kind of special value to them. In fact, Albert even stated these coins were taken out of his "junk" silver. He stated that he needed to provide us with something, because it would make the contract valid.



Exhibit _B_

Page _1_ Of _2_

9.    Ken and I have questioned the legality of the CSL for some time and certainly it was in dispute prior to the onset of this litigation.

Further the Affiant saith not.

*Candace Walton*

Candace Walton

SUBSCRIBED AND SWORN TO before me by Candace Walton on this 3rd day of November, 2014, to attest witness my hand and seal of office.

JESUSITA IGLESIAS BEHLE
MY COMMISSION EXPIRES
April 22, 2018

*Jesusita Behle*

Notary Public in and for the State of Texas
My Commission expires: __4/22/18__

Exhibit B
Page 2 Of 2

701

Filters Used
1 Tagged Record

# Email Report

Form Format

Date Printed 10/30/2014
Time Printed 1:03PM
Printed By: CHRISTY

Date 3/06/2013 Time 10:03PM 10:03PM Duration 0.00 (hours) Code
Subject Re: FW: GWB Family and Friends Trust ATTN: Sheraz Staff Christy L Lee
Client Walton, Candace L. MatterRef Taxation on Settlement Proceeds - VMatterNo
From albertbarcroft@gmail.com
To Christy Lee
CC To
BCC To
Reminders (days before) Follow N Done N Notify N Hide N Trigger N Private N Status

Custom1 Custom3
Custom2 Custom4

Hello Christy,

I am sending this e-mail to answer a couple of your questions. I will also give you a call in the next couple of days to discuss any matter you wish with you fully. I live in Guatemala, so I will call you. Is there a better time for you?

First, I am neither an attorney nor a CPA, and I have nothing to do with the accounting for GWB Family and Friends Trust. Jack Rankin is the CPA for the trust, and Danny Unger [who I believe you have already spoken to] helps to prepare the numbers to send to Rankin. I suppose you would call me a facilitator.

To give you a little background, I came in contact with Howard Kirk in the Summer of 2004 because of another problem he had. As we got to know each other, he told me one of the most incredible stories I had ever heard. At first, I truly did not believe it. Howard told me that Denton County had killed his father [although his Dad did not die for another 5 months], and that a judge named Don Windle had sided with one of his brothers and stolen his father's entire estate. As I got more involved, I found all of his wild stories were true. I promise Bert Gibbs, on his death bed, that I would do everything I could to save at lest some of his estate for his kids. I kept that promise.

The worst part of the whole story is that a final judgment was in place for well over the 30 days required for finalization which gave virtually the entire estate to Kip, the other brother; and, in which each Candy, Howard and Ken had a 2.1 million dollar final judgment against them. It too was final, and there was talk and action towards taking their assets from them. I found the entire scenario to be totally unfair and unjust.

I have a close friend who is an attorney. I took it to him. I also involved Danny Unger, who was a good friend and is an excellent researcher. Together, we looked for a way to break the final judgment. After about a month of research, we came up with something we thought had a chance to work - a bill of review. We realized it would take a long time, a lot of research and hard work, and money that we really didn't have to expend. Enter Pentex Foundation.

Pentex Foundation is a private not for profit foundation in Panama with whom I had extensive dealings. I knew they had some money to invest, and I went to them with a proposition -- finance our battle and get a share of what we win. They agreed, and put up $250,000 for expenses. There were many times I thought we would not get that money back.

The deal I took back to Candy, Ken and Howard was simple [they did not know the foundation was involved at that time]. I would get the money for expenses and do the work for 30% of whatever we recovered. The 30% would include me, John Skotnik [the attorney], and Danny Unger. The Gibbs

Exhibit C
Page 1 of 6

Filters Used

1 Tagged Record

# Email Report

Form Format

Date Printed 10/30/2014

Time Printed 1:03PM

Printed By CHRISTY

agreed, we did a contract, and we went to work. The next 5 years of my life was totally devoted to this case.

After we were rejected in our first attempt to the Court of Appeals in Ft. Worth, it became clear that this matter had gone political; and, that if we were going to prevail, we needed someone with clout in that court. I started looking, but I found the same thing the Gibbs had found before I came along -- no lawyers wanted to touch this case. After all, it was over, settled; and, a final judgment was in place. We were close to admitting defeat when Danny told his brother-in-law, Jay Henderson about the case. Jay practices law in Kerrville and Houston. He and I talked a number of times. One day he said, I'm in. Let's see who else we can get. Enter Rickey Brantley, Scott Pelley and Virginia Hammerly, all class mates of Jay's at Baylor. We met several times. Finally, they agreed to take the case. The cost would be 10% for each one of them, and 10% for expenses, total 50%. I took the deal to Candy, Ken and Howard. They all agreed that there was no other chance, everything was already lost. We signed the deal with these guys.

The Ft. Worth Court of Appeals, obviously totally void of conscience or ethics, were putty in the hands of Rickey Brantley. Rickey used the exact same petition that we had filed 7 months earlier [and which was dismissed without hearing in 3 days]; and, the court granted everything we asked for. Although we were still a long way from the finish line, the tide had turned. I think In still have the copy we wrote if you would be interested in reading it. All Rickey did was change the signature page.

So, that's why the Gibbs' portion was so small. It came up as each one [Candy, Ken. Howard] started being 2.1 million dollars in debt, erased the judgments on each, and gave them what they now have. When I came in, no lawyer would even talk to them about taking their case, and it was over. Now they have something.

As for the voting shares of which 50% are held by Pentex Royalty Trust, that was a condition placed by Pentex Foundation BEFORE the first dollar was spent, and as part of the original conditions. What we were looking at was a family that had already cut each other's throats more than once. In the short time I had known them, I had seen them band together to fight a common foe, and then be willing to plow another sibling under. It would take an idiot to go into a situation where there was a lot of money at stake where they could band together and vote to hurt or limit another party. We are actually seeing the wisdom of that decision now, because two of the three [Ken and Candy] have decided they do not want to honor the Family Settlement Agreement that everyone agreed to that ended this mess. That agreement calls for the immediate sale of the land; however, it has been well over 4 years, and the main part is not sold [it was not even listed until last summer]. Ken [the Executor of the Estate] has stated publicly that he will never sell the home place, which constitutes about 2/3 of the total land value.

Pentex Royalty Trust has never used its voting powers to force any issue; however, it would use those powers to keep the Gibbs from totally changing the deal.

Since Pentex Foundation is, in fact, a foundation, there is no beneficiary. I was compensated out of their share for my services, as was John Skotnik and Danny Unger.

As for your concerns about the K-1's, I share your view. Pentex Royalty Trust, whose sole beneficiary is Pentex Foundation, files a tax return every year, and makes monthly tax deposits on the income it receives. The Estate itself is holding everything up. I have been complaining for the last two weeks. Pentex Royalty Trust was also forced to file an extension it did not want to file. GWB Family and Friends Trust had to file an extension for the same reason. While it is my opinion that Rickey Brantley is one of the best attorneys I have ever seen, especially in that court in Ft. Worth, I am not pleased with the way he and Ken are handling the Estate. Rickey Brantley is the attorney for the Estate. Scott

703

2

Exhibit C

Page 2 Of 6

Filters Used.

1 Tagged Record

# Email Report

Form Format

Date Printed: **10/30/2014**

Time Printed: **1:03PM**

Printed By **CHRISTY**

Pelley, Sherman, Texas. is the tax attorney. GWB Family and Friends Trust has no attorney.

This is by no means the entire story. That would take a rather large book. But this may give you a place to start, and I will supply you with all pertinent information you request when we talk on the phone.

Best regards.
Al Barcroft



From: ropingal ropingal [ropingal@gmail.com]
Sent: Monday, September 24, 2012 6:19 PM
To: Candy Walton
Subject: Gibbs Family

Candy,
I have been holding back for a long time....now, no more!!! I HAVE HAD IT!!!!! Over 8 years ago, Howard came in to Al's office, and I have regretted it ever since. Our WHOLE life changed from that day till now. All Al ever wanted to do was help you guys. It started with one small problem and escalated into the biggest NIGHTMARE. For YEARS, your family squabbles have interrupted our life. Our family BIRTHDAY's, THANKSGIVINGS, Christmas', and other holidays were not even SACRED to you. You KNEW when you called MANY times, that Al was leaving family get-togethers, at my DEEP, HEART-FELT dissatisfaction, to meet at Denton restaurants or McKinney locals, to HELP you guys with 'things that could not wait one more minute!'. You brother Kip HAD, IN FACT, successfully BEATEN and STOLEN everything, ruined your fathers health and ultimately killed him, and even, including your dignity was stomped on at that time. Al invested OUR ENTIRE retirement savings and annual income in your MESS, while I worked and scraped without his help to keep our life and money affairs in order. FIVE YEARS, he invested time and money and what EVER it took. SOLELY TO AND FOR YOU....FIVE YEARS....to get you a WIN IN COURT. And NOW, after FOUR MORE years...month after month...year after year...YOU JUST KEEP STIRRING UP SHIT...accusing AL and everybody and their uncle of cheating you and disrespecting you and the ICING ON THE CAKE...is to say that he took advantage of YOU when your son died. AL, for DAMN sure, tried to get you to wait to sign till you were not under stress. SIGNING WAS the RIGHT THING TO DO...but he wanted you to wait. YOU INSISTED on ending all the trials and tribulations and even said TO ME and countless others...that you should have been spending more time worrying about raising your kids and family matters than being angry and bitter over the contracts. WELL, YOU ARE RIGHT BACK THERE AGAIN. Why don't you get on some damn medication for OCD. EVERYBODY Knows you need it...and everybody INCLUDING me, has tried to be tactful and helpful to get YOU to a better place and understanding of your life...for you AND FOR US!!!!! TWO YEARS ago, I wrote you and told you were raising Al's blood pressure with

1

705

Exhibit C
Page 4 Of 6



all this shit...and you said you were sorry and eased up.  BUT IT DIDN'T LAST.  You have pushed him TOO far now....he HAS to give up on you, before it kills him.  TRY TO REMEMBER, HE IS NOT THE ENEMY...HE IS THE ONLY REASON YOU HAVE WHAT YOU HAVE (whether you are enjoying it or not). TRY TO REMEMBER THAT KIP DID NOT BEAT YOU OUT OF EVERYTHING. THAT THERE IS NO 'NEGOTIATING' ANYTHING NOW...the agreements YOU AND YOUR BROTHERS MADE, were made YEARS ago and ordered by a court and judge IN YOUR FAVOR. And at the time....you were DELIRIOUSLY HAPPY with the deal that was made.  NOW.... FOLLOW THE DAMN ORDERS, GET US OUR RETIREMENT BACK...AND LET US MOVE ON!!!!!  Will it take ANOTHER tragedy to OPEN your EYES and your HEART????  DOES the TRAGEDY need to be my HUSBANDS life????  HOW DARE YOU accuse him of deceiving you, disrespecting you, cheating you, ....after ALL he has done for you. He has tried to help put you and your brothers together...and YOU and YOU alone, stir it all back up!!!!  You are like a bad soap opera....DARK SHADOWS...what hateful gloom lingers around the next email or phone call...???  If Al had not taken you guys on...my life would still be normal. YOUR FAMILY Is responsible TOTALLY for the mess I am in now....AND YOU REMEMBER ONE THING, if you remember NOTHING ELSE....if something happens to MY HUSBAND....you have to deal with me....AND LADY...YOU BELIEVE ME WHEN I TELL YOU...YOU WON'T LIKE IT.  I USED TO BE A NICE PERSON, BUT NOW, I AM ONE ANGRY, HATEFUL, SPITEFUL,DEPRESSED, VINDICTIVE BITCH after the last 8 years of PURE shit, having to keep my mouth shut.  Watching you manipulate EVERY DAMN STEP of this mess into something PERSONAL ABOUT YOU!!!!!  SCREW EVERYBODY ELSE...JUST LOOK AND LISTEN TO 'CANDY'. Poor CANDY didn't get 'balls'....well GROW A BRAIN!!!! Go look in the mirror....see if you like knowing how you misuse the tenacity and intelligence God gave you.  YOU PUSH everybody away from you....and will be one lonely, miserable old lady someday if you don't START TODAY, thinking about other people instead of only thinking about YOU!!!!
I know you are gonna come right back at me....but you have no ammunition for me.  YOU have thanked me over and over and over...for allowing the time taken out of my life for your family...for 'sharing' my husbands time for ya'lls problems.  GO AHEAD, tell me just WHERE THE HELL I am wrong in even JUST one line of this.  And one more thing...no matter how STUPID you have behaved...how low you have stooped, how MEAN you have been...you can't make my husband turn on you.  He is done helping you...but he still won't do anything

2



that hurts you. I am NOT THAT WAY. I am BITTER and feel like I have nothing to loose. And if I feel justified in taking a path that helps me...even if it is bad for you....I will. AL is not that way. So BE CAREFUL, lady. YOU STILL NEED HIM....He has been sick all day after what you sent him this morning. YOU FIX THIS SHIT...get KEN to do his fucking job...stop ruining EVERYTHING GOOD that can come out of my husbands intelligence, time, money, LOYALTY, and health. I don't know if you are just this crazy MEAN....or unGODLY greedy with your insatiable need for power....AND....I DON'T GIVE A RATS ASS which it is....JUST FIX IT!!!!

It's not the breaths you take, but the moments that take your breath away....-B-

3

Exhibit
Page Of









CHRISTY L. LEE
*Attorney*

225 E. FIREWEED LANE, STE. 200
ANCHORAGE, ALASKA 99503
MAIN: 907.339.9931
FAX: 800.437.7901

777 MAIN ST., STE. 600
FORT WORTH, TEXAS 76102
PHONE: 817.504.6075
FAX: 800.437.7901

clee@christyleelaw.com
www.christyleelaw.com

November 3, 2014

Clerk of the Court
101 E Sam Rayburn Drive, Suite 200
Bonham, TX 75418

    Re:    Cause No. CV-14-41665
           Pentex Foundation vs. Kenneth Vern Gibbs, et al.

To Whom It May Concern:

Concerning Cause No. CV-14-41665, enclosed is Kenneth Gibbs and Candace Walton's Response to Motion to Reconsider Order to Transfer Venue, and Motion for Sanctions,

Please file the original document with the Court, and return the file-marked copy to the firm in the enclosed self-addressed, stamped mailer.

If you have any questions, please contact our office. Thank you for your assistance with this matter.

           Very truly yours,

           LAW OFFICES OF CHRISTY LEE, P.C.

           Laura Hogins, Paralegal

Enclosures



PROACTIVE TAX STRATEGIES

NO. CV-14-41665

| | | |
|---|---|---|
| PENTEX FOUNDATION, | § | IN THE DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| V. | § | |
| | § | |
| | § | FANNIN COUNTY, TEXAS |
| KENNETH VERN GIBBS, CANDACE | § | |
| GIBBS WALTON and HOWARD | § | |
| KIRK GIBBS, *Defendants* | § | 336ᵗʰ JUDICIAL DISTRICT |

## REPLY TO RESPONSE TO MOTION TO RECONSIDER
## ORDER TO TRANSFER VENUE

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Pentex Foundation, Plaintiff, and Joshua Unger, Trustee of

the GBU Friends and Associates Trust, Intervenor, in the above entitled and

numbered cause, file this Reply to the Response to the Motion to Reconsider the

Order Granting the Defendants' Motion to Transfer Venue, and in support of the

order shows:

### MOVANTS MET AND EXCEEDED THE REQUIREMENT
### OF PRIMA FACIE PROOF OF MANDATORY VENUE

1. A party must establish mandatory venue by prima facie proof. TEX.

R. CIV. P. 87(3). All parties have made reference to the Contract and its

$5,000,000 liquidated damages provision. Further, the uncontroverted venue facts

establish that this is a lawsuit involving in excess of $1,000,000. Movants have

established mandatory venue by prima facie proof. *Spin Doctor Golf, Inc. v.*

REPLY TO RESPONSE TO MOTION TO RECONSIDER ORDER TO TRANSFER VENUE ... PAGE 1

709



*Paymentech, L.P.*, 296 S.W.3d 354, 357, 359, teaches that this is sufficient:

> The agreement attached to the motion to transfer venue lists annual sales of over $1,000,000.00. Thus, on its face, it constitutes prima facie evidence of a major transaction within the meaning of section 15.020(a).

2.   The $5,000,000 liquidated damages clause is to be given no less effect. "The term 'liquidated damages' ordinarily refers to an unacceptable measure of damages that the parties stipulate in advance will be assessed in the event of a contract breach." *Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427, 431 (Tex. 2005). It allows contracting parties to protect themselves against the difficulty, uncertainty, and expenses involved when trying to ascertain actual damages.[1] "Given this desirable goal, it is well established that parties may stipulate at the time of contracting to a set damages amount for a breach of that contract, as long as the liquidated damages provision is not a penalty."

3.   In addition to the stated liquidated damages of $5,000,000, the facts underlying this case reflect that it was clearly a major transaction. Attached hereto as Plaintiff's Exhibit 1 is a copy of a distribution check into the GWB Family and

---

[1]   *Gator Apple, LLC v. Apple Texas Restaurants, Inc.*, 2014 Tex. App. LEXIS 2539 (Tex. App. – Dallas, Mar. 5, 2014), citing to *Carrothers Const. Co, L.L.C. v. City of S. Hutchinson*, 288 Kan. 743, 207 P.3d 231 (Kan. 2009)



Friends Trust for $2,037,803.50.[2] Attached hereto as Plaintiff's Exhibit 2 is the Affidavit of Fact of Howard Gibbs, who states that he has personally "received in excess of $1,000,000 as consideration from the [Contract]." Attached hereto as Plaintiff's Exhibit 3 is the Unsworn Statement Given Under Penalty of Perjury by Albert Barcroft, wherein he relates in paragraph 14, the same, that each of the Defendants have received well in excess of a million dollars.[3] Finally, the size of this matter is not really in dispute, as opposing counsel has represented as much in proceedings in Tarrant County:

> There is currently a $6.1 million offer on a piece of property, to pay in full, or a $8.5 million installment agreement over the next five years, that will come to the estate of Bert Gibbs. . . . There is a lot of money out there. My clients – my two clients own 25% of the estate. So if they own 25 percent, they are potentially going to get $2 million. Al Barcroft owns a percentage and Howard Kirk Gibbs also owns – he owns 12.5 pecent. . . . So we have a lot of assets for the estate of Bert Gibbs.[4]

---

[2]  The GWB Family and Friends Trust was the business entity created pursuant to paragraph 6 of the Contract to received and distribute funds pursuant to the Contract terms.

[3]  Submitted pursuant to TEX. CIV. PRAC. & REM. CODE § 132.001.

[4]  An excerpt of this transcript is submitted as Plaintiff's Exhibit 5.



711



## DEFENDANTS' CONCEDE THAT THIS SUIT INVOLVES A MAJOR TRANSACTION, BY ATTEMPTING TO ASSERT AN EXCEPTION

4. Sensing the validity of the above, the Defendants seek to assert an exception to mandatory venue by attempting to assert that the Contract was unconscionable. It should be noted that – despite raising other affirmative defenses – avoidance of the contract on the basis of unenforceability has not been alleged as an affirmative defense, as would be required by Rule 94.[5] Nowhere does it appear in the Defendant's lengthy motion and answer on file with this Court.[6]

5. With respect to this alleged claim in avoidance of the Contract, they first claim that the Contract was one-sided. This is non-sense. Defendants' own responsive evidence, attached as Exhibit "C" to their Response, is an email from Albert Barcroft. Mr. Barcroft was Movants' predecessor in interest in the Contract. He relates in **Defendant's** Exhibit "C" that at the time of the Contract's inception, the three Gibbs siblings had already lost everything from their parents' estates. A final judgment was in place granting almost the entirety of the estate to

---

[5] "In pleading to a preceding pleading, a party shall set forth affirmatively . . . any other matter constituting an avoidance or affirmative defense." TEX. R. CIV. P. 94.

[6] See, the Motion to Show Authority, Motion for Change of Venue, Original Answer, Affirmative Defenses, Original Counterclaim, and Rule 13 Motion for Sanctions of Kenneth Vern Gibbs and Candace Walton Gibbs, filed on or about April 18, 2014.



Kip, a fourth Gibbs sibling, and granting a judgment against Candy, Howard and Ken in excess of $1,000,000.[7] The essence of the Contract was to try to recoup the lost estate. The goal was successful after five years of tedious work. The Defendants now receive funds from their parents' estates that they would have otherwise never seen. This Contract was imminently fair, given that it converted the proverbial sow's ear of an adverse judgment into the silk purse of recovery.

6. Next, the Defendants assert that Mr. Barcroft practiced law without a license, and after all these years the Contract is now not enforceable. This too is a fallacy. Again, referring to the Defendant's Exhibit C, Mr. Barcroft expressly denies being an attorney. The Contract itself states, in paragraph 3, subpart c, that "Barcroft, at his expense, will provide legal counsel by acquiring a licensed attorney . . .." Mr. Barcroft specifically denies ever holding himself out as an attorney in Plaintiff's Exhibit 3, at paragraph 5. Importantly, Howard Gibbs reaffirms this:

> Al never stated that he was an attorney, and never offered to represent any of us. . . . I was at every meeting in which Candy and Ken met with Al, and Al never said he was an attorney or could represent us in any way. . . . There was no mention of Al's education in anof the meetings or conversations leading to the execution of the [Contract].

---

[7]    A copy of this judgment is attached as Exhibit B to Plaintiff's Exhibit 2, the Affidavit of Fact of Howard Kirk Gibbs.



JOSE, HENRY, BRANTLEY,
MACLEAN & ALVARADO, L.L.P.
TRUST ACCOUNT
675 N. HENDERSON ST.
FORT WORTH, TX 76107
(817) 877-3303

THE FROST NATIONAL BANK
FORT WORTH, TX
30-9/1140

09374

12/3/2008

Pay to the
Order of    GWB Family and Friends Trust                                    $ **2,037,803.50

Two Million Thirty-Seven Thousand Eight Hundred Three and 50/100********************************************Dollars

GWB Family and Friends Trust                              JOSE, HENRY, BRANTLEY, MACLEAN & ALVARADO, LLP

memo

Devon Disbursement

⑈009374⑈ ⑆114000093⑇ 600048520⑈

JOSE, HENRY, BRANTLEY, / MACLEAN & ALVARADO, L.L.P. / TRUST ACCOUNT                              09374

    GWB Family and Friends Trust                     12/3/2008
    3030 · Client Trust Liability                                          2,037,803.50

Gibbs, Bert          Devon Disbursement                                    2,037,803.50

JOSE, HENRY, BRANTLEY, / MACLEAN & ALVARADO, L.L.P. / TRUST ACCOUNT                              09374

    GWB Family and Friends Trust                     12/3/2008
    3030 · Client Trust Liability                                          2,037,803.50

PLAINTIFF'S
EXHIBIT
1

Gibbs, Bert          Devon Disbursement                                    2,037,803.50

704

534334 (3/06)

## AFFIDAVIT OF FACT

STATE OF TEXAS § 

§     **Subscribed, Sworn, and Sealed**

COUNTY OF TARRANT §

I, Howard Kirk Gibbs ("**Affiant**"), being a defendant in a lawsuit in the 336th District Court of Fannin County, Texas, case number CV-14-41665; and being of sound mind, over age of majority, competent to testify, and having a first hand knowledge of the facts contained herein, hereby certify and declare that the following facts are true, correct and complete as stated, and are so stated under the penalty of perjury.

1.     I met Al Barcroft ("**Al**") through a mutual acquaintance in October of 2004. I had a legal problem with a criminal charge of simulated legal process against me in Denton County. I was having trouble getting an attorney to represent me because of the situation, and because I had no money. Al immediately told me about John Skotnik ("**John**"), who he said was an attorney, and a personal friend of his. Al said that he would try to get John to talk to me. He did arrange a meeting, and John represented me in the County Court of Denton County, and was able to get the sentence already against me greatly reduced. He did not charge me for what he did because I had no money. I have always believed that Al paid John because he thought I had been unfairly convicted, but I don't know that for sure.

2.     Al never said he was an attorney, and never offered to represent any of us. He never charged us or asked for payment for any of the things he did other than his share of the contract signed on May 10, 2005 by my brother Ken, my sister Candy Walton, myself, and Al, said document entitled "***Contract for Sale of Land, Mineral Rights and Royalties, and all other Assets or Monies Received from the Estate of Bert Hughes Gibbs, Kathryn G. Gibbs, and/or the Mary L. Houseworth Trust(s) or 'The Kathryn Houseworth Gibbs Irrevocable Trust'***" ("**CSL**") (*See* **Exhibit "A"**). After we signed the CSL, we were all in it together, and Al treated us all like the partners we were. We all discussed and got a vote on everything we did. Al never overrode any of us on any issue from the very beginning, even though he had the votes to do it.

3.     At first mention of something I was charged with in court, he told me about John. I was at every meeting in which Candy and Ken met with Al, and Al never said he was an attorney or could represent us in any way. After the CSL was signed, we all worked together and discussed every issue as a team. Candy and I had as much input as Al did.

4.     There was no mention of Al's education in any of the meetings or conversations leading up to the signing of the CSL. I would remember if he had said he was an attorney or had gone to law school while we were negotiating a contract. He did not.

PLAINTIFF'S EXHIBIT

2

PENGAD 800-631-6989

5.     Al talked with us, and we explained about how our inheritance had been stolen from us. At first, he did not believe what we told him. He stated that he would not get involved in the whole mess, but that he would try to get John to help me on the criminal issue. But when he saw how my criminal case was handled, he said he would talk to John to see if John would represent us in the civil case if he got involved.

6.     Al would meet with us and take notes, usually at a fast food restaurant. Then he would say that he would talk to John. A few days later, he would meet with us again. After a number of these meetings, he said something to the effect of: "I must be crazy, but if you want to sell me a share of whatever we can get back, I'll put up the money for John's legal fees and for the legal research needed". We agreed and sold him 30% of everything that could be saved from our inheritance. This is the title and first paragraph of the CSL that reflects the 30% payment:

**Contract for Sale of Land, Mineral Rights and Royalties, and all other Assets or Monies Received from the Estate of Bert Hughes Gibbs, Kathryn G. Gibbs, and/or the Mary L. Houseworth Trust(s) or "The Kathryn Houseworth Gibbs Irrevocable Trust"**

This agreement between Albert Lynn Barcroft, hereinafter "Barcroft", and Kenneth Vern Gibbs, Candace Gibbs Walton, and Howard Kirk Gibbs, hereinafter collectively also "Gibbs", is a contract for sale of thirty percent 30% of all land, mineral rights, royalties, and any other monies or assets which Gibbs, or any of the three individuals referred to collectively as "Gibbs" in this agreement, receives, or is due, from this date forward, either collectively or individually, as a result of any inheritance or estate proceeds, or any other property assets received from any trust(s) or transfers from Bert Hughes Gibbs, Mary L. Houseworth, and/or Kathryn G. Gibbs at any time, past, present, or future; including, but not limited to, the following:

Al stated that the 21 silver dollars "sealed the deal", because he was going to get started immediately, and he would be spending considerable money on the project. Although we each got 7 silver dollars, it was clear that the consideration Al was going to provide was a way to possibly get some of our inheritance back, and that it would involve a lot of money from him. Even so, Ken stood up, shook Al's hand, and stated, "I think we got the better deal on this", referring to the silver dollars. We all laughed, but it was a true statement.

7.     Al provided everything he said he would, and the proof is in the fact that we were ultimately successful. Anyone who claims we sold him 30% of our inheritance for 21 silver dollars alone is a liar, a fool, or someone that does not know what actually happened. Anyone who believes we would have gotten anything had Al not come along is just plain wrong. Not only had Ken, Candy and I lost all inheritance from both of our parents, there was a seasoned judgment against us of well over $1,000,000 (*See* **Exhibit "B"**). Anybody who wants to steal Al's share negotiated in the CSL now is dishonest, ungrateful, and a thief.

8.     I have received in excess of $1,000,000 as consideration from the CSL. The 7 silver dollars I received upon the signing of the CSL was the consideration paid by Al just to establish the contract. Al never told Ken, Candy or me upon any of our numerous meetings that these 7 silver dollars each of us was paid was our only consideration. In fact, the excerpt under item #6 above states Al receives 30% of any of the estate assets recovered. The remaining 70% of assets was the consideration Ken, Candy and myself would split up after Al received his 30%. This is clearly seen on page 4, item #6 of the CSL, in which the division of recovered estate assets is described as follows:

the parties, shall be agreed upon by all parties hereto. The division shall be divided on a basis of 30% to Barcroft, 23.34% to Kenneth Vern Gibbs, 23.33% to Candace Walton Gibbs, and 23.33% to Howard Kirk Gibbs, at each instance of dispersal to the parties.

Anyone that claims the only consideration I was to receive from the CSL transaction is 7 silver dollars is delusional.

9.     After all parties signed the CSL, Al immediately brought John on board as the attorney, hired Danny Unger ("**Danny**") to do legal research, and they all worked constantly on our estate issues for the many months. Al worked on it for years.

10.     I don't know who actually wrote the CSL, and neither does Candy, because we had no way to know. Neither of us was there when it was written, and Al never stated who wrote it. Al would meet us, take notes, and then say he would talk to John and get back to us. I do know Al brought a couple of contracts to us before the one we signed. I do know that Ken, Candy and I added at least one provision to the last contract before we signed it, and that was section "h" of the CSL. Al agreed to the addition.

11.     When Al brought the contract that we finally signed back to us, he told us to read it and check it any way we wanted. If we agreed, he would meet us to sign it. We had sufficient time to have it looked over by an attorney if we wanted to, but none of us had any money, and none of us believed that our inheritance would ever be returned anyway. I am positive that had it not been for Al, our inheritance would have never been returned and Ken, Candy and I would have never been able to pay off the judgment signed by judge Don Windle. I have heard Candy say the same thing many times.

12.     I have personally seen many e-mails written by Candy to Al, and I have personally heard Candy tell Al on numerous occasions, that had it not been for him, none of us would have gotten anything, and that he was the "only one who earned his money".

13.     Prior to the entry of Ms. Christy Lee into the process, Candy had never questioned the CSL or Al in any way. She did question almost everything and everyone else, including every

attorney we ever had, and accused most of them of stealing from her. She stated many times that Al was the only one who earned his money. None of that changed until Ms. Lee made her entry.

14.     In my opinion, the only thing "unconscionable" in this whole affair is Candy and Ken trying to steal Al's share of the CSL when they and myself would have nothing without what he did.

**FURTHER, AFFIANT SAYETH NOT.**

## ACKNOWLEDGEMENT AND VERIFICATION

**THE STATE OF TEXAS**     §
                                                §
**COUNTY OF TARRANT**     §

**BEFORE ME**, the undersigned authority, on this day personally appeared Howard Kirk Gibbs, known to me to be the person whose name is subscribed to the foregoing affidavit, and, after being administered the oath, acknowledged to me that he is a defendant in the therein referenced lawsuit; and, that the foregoing "Affidavit of Fact" will be filed in that case or related matters, and the facts stated therein are true, correct, and complete, and given as his own free act and of his own personal knowledge under penalty of perjury.



Howard Kirk Gibbs

**SUBSCRIBED AND SWORN TO BEFORE ME** this 5th day of November, 2014.

STEPHANIE N. BRUMLEY
MY COMMISSION EXPIRES
November 14, 2016



Notary Public in and for "The State of Texas"





## Denton County
## Cynthia Mitchell
## County Clerk
## Denton, TX 76202

Instrument Number: 2005-61443

As

Recorded On: **May 24, 2005**          Misc General Fee Doc

**Parties: GIBBS KENNETH VERN**          Billable Pages: 9

To          Number of Pages: 9

Comment:

---

### ** Examined and Charged as Follows: **

| | | |
|---|---|---|
| Misc General Fee Doc | 30.00 | |
| **Total Recording:** | **30.00** | |

---

************ **THIS PAGE IS PART OF THE INSTRUMENT** ************

Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.

**File Information:**          **Record and Return To:**

Document Number: 2005-61443

Receipt Number: 196064          AL BARCROFT

Recorded Date/Time: May 24, 2005 11:44A          P.O. BOX 188

TRENTON TX 75490

User / Station: J Morns - Cash Station 1

---



THE STATE OF TEXAS )
COUNTY OF DENTON )

I hereby certify that this instrument was FILED in the File Number sequence on the date/time
printed hereon, and was duly RECORDED in the Official Records of Denton County, Texas.

Cynthia

County Clerk
Denton County, Texas



Ex. A
P. 1

## Contract for Sale of Land, Mineral Rights and Royalties, and all other Assets or Monies Received from the Estate of Bert Hughes Gibbs, Kathryn G. Gibbs, and/or the Mary L. Houseworth Trust(s) or "The Kathryn Houseworth Gibbs Irrevocable Trust"

This agreement between Albert Lynn Barcroft, hereinafter **"Barcroft"**, and Kenneth Vern Gibbs, Candace Gibbs Walton, and Howard Kirk Gibbs, hereinafter collectively also "Gibbs", is a **contract for sale of thirty percent 30% of all land, mineral rights, royalties, and any other monies or assets which Gibbs,** or any of the three individuals referred to collectively as "Gibbs" in this agreement, receives, or is due, from this date forward, either collectively or individually, as a result of any inheritance or estate proceeds, or any other property assets received from any trust(s) or transfers from Bert Hughes Gibbs, Mary L. Houseworth, and/or Kathryn G. Gibbs at any time, past, present, or future; including, but not limited to, the following:

a) All proceeds from the Estate of Bert Hughes Gibbs, and/or,

b) All property and/or assets of any kind which are received as a result of any past or future transference from Bert Hughes Gibbs, Kathryn G. Gibbs, or any trust to which Gibbs, or any of the individuals referred to collectively as "Gibbs" in this agreement, are beneficiary; and/or,

c) All inheritance of any kind and in any form by Gibbs, or any of the individuals referred to collectively as "Gibbs" in this agreement; and/or;

d) All proceeds from any lawsuit which currently exists, or may arise, because of, or in connection with, the relationship(s) with Bert Hughes Gibbs, Kathryn G. Gibbs, Kip Hughes Gibbs, Sandra Faye Gibbs, "The Mary L. Houseworth Irrevocable Trust", "The Kathryn Houseworth Gibbs Irrevocable Trust", and any other trust(s) to which Gibbs are beneficiary(ies) or trustee(s) in any form; and/or,

e) All property and/or assets which may have been previously passed to them by Bert Hughes Gibbs, Kathryn G. Gibbs, "The Mary L. Houseworth Irrevocable Trust", and/or "The Kathryn Houseworth Gibbs Irrevocable Trust"; and/or,

f) All other property and/or assets passed to Gibbs, or any of the individuals referred to collectively as "Gibbs" in this agreement, from any source involving Bert Hughes Gibbs, Kathryn G. Gibbs, "The Kathryn Houseworth Gibbs Irrevocable

Contract for Sale of Land, Mineral Rights,
Royalties and Other Assets and/or Monies

1

Initials of
all parties

720

Trust", and/or "The Kathryn Houseworth Gibbs Irrevocable Trust"; or, any other trust(s) or business organization(s) of any kind, which might be uncovered or discovered in the future; and/or,

g) All property and/or other assets in any trust or former trust; and, any property or other assets in any corporation, limited liability company, partnership(s), sole proprietorship(s), or any other business organization of any kind in which one or more of the Gibbs are owners, trustee(s) or beneficiary(ies).

h.) Specifically exempted from this agreement are any properties and/or other assets which are currently under the full control of Gibbs, or any of the individuals referred to collectively as "Gibbs" in this agreement; provided, however, that if any legal work is required to aid in the collection of said assets, or the sale or control of said property, then said property or other assets shall be subject to the terms, conditions, and considerations set forth within this agreement as part of the property and/or assets listed above, and shall have no exemption to the terms and considerations of this agreement. Also exempted from this agreement are any personal items that were passed to Gibbs from their father, which were not included in the divorce distribution between their mother and father.

**This sale of 30% of all land, property and other assets described herein above shall be governed by the following terms, conditions, and considerations:**

1. Gibbs, or any of the individuals referred to collectively as "Gibbs" in this agreement, shall give their/his/her full cooperation to all efforts by Barcroft to collect any of the funds referred to in this agreement. Said cooperation shall include, but not be limited to, providing necessary information and documentation, being available to give testimony, and giving full support to the overall effort of collecting funds and assets from the sources stated herein.

2. Any party hereto shall have the right to order a complete inventory of all property and other assets described herein at any time, and all parties agree to provide full cooperation to such an effort. Any costs shall be born by the party requesting the inventory.

721

Ex. A
Pg. 3

3. As full consideration, Barcroft agrees to provide, or has provided, the following:

a) Barcroft has paid to Gibbs a total of twenty-one (21) silver dollars minted by the United States Mint, photocopy of said coins attached hereto as **Exhibit "A"**, and incorporated herein for all purposes as real consideration under this agreement, and Gibbs hereby acknowledges receipt of same with this signing; and,

b) Barcroft will provide his services, knowledge and best efforts in the pursuit of all available funds, property, and/or other assets from the sources stated herein; and,

c) Barcroft, at his expense, will provide legal counsel by acquiring a licensed attorney for any reasonable and prudent actions necessary to the collecting of the funds from the sources stated herein; however, should Gibbs, or any of the individual Gibbs, feel that their/his/her interests are not properly served by the attorney Barcroft provides, that party will be responsible for the legal fees of any other attorney(s) hired by Gibbs, or any individual Gibbs, to protect their/his/her individual interests. In that event, it is agreed by all parties hereto that the attorney hired by Barcroft will represent only Barcroft in all future action(s). Furthermore, it is specifically agreed that said attorney hired by Barcroft will represent only Barcroft should a dispute arise between the parties hereto; and, Gibbs, individually and collectively, agree not to claim conflict of interest should said attorney represent Barcroft in a conflict between the parties hereto; and, Gibbs, collectively and individually, hereby waive their/his/her right to claim conflict of interest with regards to said attorney in such instance.

4. It is understood and agreed that Gibbs may cancel or nullify this contract only under the following conditions:

a) If Gibbs pays over to Barcroft the sum of five million dollars ($5,000,000.00 US) in full, in addition to any money received prior to said one time payment, as liquidated damages and full settlement of all consideration on Gibbs part.

b.) If Barcroft voluntarily abandons the effort to collect the funds from the sources stated herein; however, in this event, Barcroft shall retain all amounts already received, and will continue to receive any future proceeds from any of the property or other assets, and will retain his ownership interest in any property

which is covered by this agreement and has been brought into the control of Gibbs, or is paying benefits of any kind at the time of Barcroft's abandonment; or, which is brought into the control of Gibbs, or start paying benefits at a later date, provided that said control or payments is a result of actions prior to Barcroft's abandonment.

5. If Barcroft dies or becomes incapacitated, the contract will remain in force, and the assets which have been accessed and are paying at the time of Barcroft's death, or which are later accessed as a result of Barcroft's efforts, will go to his heirs and assigns.

6. It is hereby agreed that there shall be a business organization, the exact type to be agreed upon at a later date, created by the parties hereto; and, that all revenue of any kind received from any of the property and/or assets covered herein shall be deposited into a bank account in that entity's name, and that all expenses necessary to the continuation of revenue being paid to the parties hereto (*i.e.* property taxes on the royalties or property covered herein, and any necessary expenses such as well upkeep, etc.) shall be deducted and paid as required before the 70/30 division agreed to in this contract. Barcroft shall have a 50% vote in the operation of said business organization; and, the only function of said business organization shall be to facilitate the agreement in this contract. Any monies paid out of said business organization, other than the agreed upon split between the parties, shall be agreed upon by all parties hereto. The division shall be divided on a basis of 30% to Barcroft, 23.34% to Kenneth Vern Gibbs, 23.33% to Candace Walton Gibbs, and 23.33% to Howard Kirk Gibbs, at each instance of dispersal to the parties. Any party may demand a split of the assets of said business organization at any time.

7. If either party should break the terms of this agreement in any fashion, or attempt to render the contract invalid, in any way which would require legal action to correct or enforce, the party found at fault, or the party failing to prevail, shall pay all legal expenses of any type for himself/herself, and for the prevailing party.

8. This contract is written to comply with the laws of the State of Texas; and, any provision found by a court of competent jurisdiction to be in non-compliance shall be

4

Initials of
all parties

Ex. A
Pg. 5

automatically amended to comply with said laws in such a manner as to keep the original intent of the provision as closely in place as possible. In no event shall any such findings on one provision affect any other provision within the contract.

9. Notwithstanding any other provision under the law, it is expressly agreed that this contract shall be performable <u>only</u> in Fannin County, Texas; and, any dispute(s) will be resolved in the courts of Fannin County, Texas. The signing hereto of this contract by all parties completes the sale of 30% of all property and assets of Gibbs to Barcroft.

10. This agreement shall be binding on all heirs and assigns of the parties hereto.

11. No lien(s) may be placed upon any of the property covered herein unless such lien(s) is/are agreed to by all parties hereto, reduced to writing, and signed by all parties hereto before a notary public.

12. All agreements between the parties hereto are contained in writing in this contract, and no verbal agreements shall be deemed valid unless contained in writing herein. All amendments hereto must be in writing, and signed by all parties before a notary public.

13. Albert Lynn Barcroft, Kenneth Vern Gibbs, Candace Gibbs Walton, and Howard Kirk Gibbs, the principal parties hereto, hereby agree to this contract in its entirety without reservation; and, each pledge never to challenge the terms, conditions, intentions, and/or considerations under this contract with their respective signing hereunder.

**WITNESS OUR HANDS** this 10th day of May, 2005.

Albert Lynn Barcroft

Kenneth Vern Gibbs

Candace Gibbs Walton

Howard Kirk Gibbs

Contract for Sale of Land, Mineral Rights,
Royalties and Other Assets and/or Monies

724

5

Initials of all parties

Ex. A
Pg. 6

## ACKNOWLEDGEMENT

**STATE OF TEXAS**

**COUNTY OF COLLIN**

**Subscribed, Sworn, and Sealed**

On this 10th day of May in the year 2005, **Albert Lynn Barcroft**, known to me, did personally appear before me; and, after taking the oath, deposes and says that he is the man who executed the foregoing instrument; and, further stated that he executed the same as his free and informed act and deed for the purposes stated therein, and with a full understanding of the scope of the provisions contained therein; and, that he agrees to abide by all said provisions.



_____
Albert Lynn Barcroft

Subscribed and sworn to before me this 10th day of May in the year 2005.

RUBÍ R. JIMENEZ
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 11-08-08

_____
Notary in and for the State of Texas

**STATE OF TEXAS**

**COUNTY OF COLLIN**

**Subscribed, Sworn, and Sealed**

On this 10th day of May in the year 2005, **Kenneth Vern Gibbs**, known to me, did personally appear before me; and, after taking the oath, deposes and says that he is the man who executed the foregoing instrument; and, further stated that he executed the same as his free and informed act and deed for the purposes stated therein, and with a full understanding of the scope of the provisions contained therein; and, that he agrees to abide by all said provisions.

_____
Kenneth Vern Gibbs

Subscribed and sworn to before me this 10th day of May in the year 2005.

RUBÍ R. JIMENEZ
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 11-08-08

_____
Notary in and for the State of Texas

Contract for Sale of Land, Mineral Rights,
Royalties and Other Assets and/or Monies

6

Initials of
all parties

Ex. A
Pg. 7

725

**STATE OF TEXAS**

**COUNTY OF COLLIN**

**Subscribed, Sworn, and Sealed**

On this 10ᵗʰ day of May in the year 2005, **Candace Gibbs Walton,** known to me, did personally appear before me; and, after taking the oath, deposes and says that she is the woman who executed the foregoing instrument; and, further stated that she executed the same as her free and informed act and deed for the purposes stated therein, and with a full understanding of the scope of the provisions contained therein; and, that she agrees to abide by all said provisions.

*Candace Gibbs Walton*
Candace Gibbs Walton

Subscribed and sworn to before me this 10ᵗʰ day of May in the year 2005.



RUBI R. JIMENEZ
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 11-08-08

Notary in and for the State of Texas

**STATE OF TEXAS**

**COUNTY OF COLLIN**

**Subscribed, Sworn, and Sealed**

On this 10ᵗʰ day of May in the year 2005, **Howard Kirk Gibbs,** known to me, did personally appear before me; and, after taking the oath, deposes and says that he is the man who executed the foregoing instrument; and, further stated that he executed the same as his free and informed act and deed for the purposes stated therein, and with a full understanding of the scope of the provisions contained therein; and, that he agrees to abide by all said provisions.

Howard Kirk Gibbs

Subscribed and sworn to before me this 10ᵗʰ day of May in the year 2005.



RUBI R. JIMENEZ
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 11-08-08

Notary in and for the State of Texas

Contract for Sale of Land, Mineral Rights,
Royalties and Other Assets and/or Monies

7

Initials of all parties

Ex. A
Pg. 8

726



A. Barcroft
40 P. O. Box 188
Trenton, Texas
75490 (uld)

Exhibit "A"          KVC CSW W

Ex. A
Pg. 9

727

# ABSTRACT OF JUDGMENT
## CAUSE NO. GA-2001-196-02

CLERK OF THE COURT
Cynthia Mitchell
1450 E. McKinney, Suite 2412
Denton, Texas 76209

ATTORNEY FOR PLAINTIFF
COLLISTER, LAWRENCE C.
P.o. Box 918
Denton, Tx. 76202

THE STATE OF TEXAS
COUNTY OF DENTON

    I, Cynthia Mitchell, CLERK of the County Courts of Denton County, Texas, do hereby certify that in the Probate Court of Denton County, Texas, in a certain suit heard in said court, wherein:

**Kip H. Gibbs, AS NEXT FRIEND FOR Kathryn Houseworth Gibbs, Plaintiff(s)**
vs.
**Candace Gibbs Walton, ET. AL. Defendant(s)**

Plaintiff recovered judgment against the following Defendant(s):

| | | |
|---|---|---|
| Candace Gibbs Walton | DRIVER'S LICENSE: | UNKNOWN |
| 113 South Melanie Street | BIRTH DATE: | UNKNOWN |
| Azle, Tx | S.S.# | UNKNOWN |
| | | |
| Kenneth Gibbs | DRIVER'S LICENSE: | UNKNOWN |
| 1200 Whitley Road | BIRTH DATE: | UNKNOWN |
| Keller, Tx 76248 | S.S.# | UNLNOWN |
| | | |
| Howard Kirk Gibbs | DRIVER'S LICENSE: | UNKNOWN |
| P.O. Box 222 | BIRTH DATE: | UNKNOWN |
| Haslet, TX 76052 | S.S.#: | UNNNOWN |
| | | |
| Bert Hughes Gibbs | DRIVER'S LICENSE: | UNKNOWN |
| P.O. Box 444 | BIRTH DATE: | UNKNOWN |
| Haslet, TX 76052 | S.S.#: | UNKNOWN |

On 20th day of January, 2005, for:
    **Jointly and Severally**
        $ 911,252.87; as the principal amount due;
        Pre-judgment interest on that sum at the rate of 5%, in the sum of $ 149, 546.34 [1,198 days (date of filing until date judgment was signed) at $ 124.83 per day]
        Post-Judgment interest in the total sum at the annual rate of five and ¼ percent; and
        $ 66.25; as costs of court; and
  Said Judgment is of record in the Probate Court, Denton County, Texas. Said judgment is entitled to the following credits to-wit: NONE

GIVEN UNDER MY HAND AND SEAL OF OFFICE, at Denton, Texas, Wednesday, March 09,

CYNTHIA MITCHELL, COUNTY CLERK,
DENTON COUNTY, TEXAS

BY: _____, Deputy
Misty Hammons

THE STATE OF TEXAS
COUNTY OF _____

    I, _____, County Clerk of _____ County, do hereby certify that this Abstract of Judgment was filed for record in my office the _____ day of _____, 200___, at _____ o'clock ____ .M., and was immediately recorded the _____ day of _____, 200___, at ____o'clock __ .M., in the Judgment Records of said County in Volume _____, Page _____, and was also at the same time entered upon the Index to said Judgment Records, showing the names of each Plaintiff(s) and each Defendant(s) in said Judgment, and the numbers of the pages of the Book upon which said abstract is recorded.

    WITNESSES MY HAND AND SEAL OF OFFICE, this _____ day of _____, 200___.

_____, County Clerk
_____ County, Texas
BY: _____, Deputy Clerk

Ex. B
Pg. 1
728

# COPY

CAUSE NO. GA-2001-196

FILE FOR RECORD
DENTON CO~~~ ~ ~~~~~

| | | |
|---|---|---|
| IN THE MATTER OF<br>THE GUARDIANSHIP | § | IN THE PROBATE COURT |
| | § | |
| | § | OF     CYNTHIA MITCHELL |
| KATHRYN HOUSEWORTH GIBBS, | § | |
| AS INCAPACITATED PERSON | § | DENTON COUNTY, TEXAS |

CAUSE NO. GA-2001-196-02

| | | |
|---|---|---|
| KIP H. GIBBS, AS NEXT FRIEND FOR | § | IN THE PROBATE COURT |
| KATHRYN HOUSEWORTH GIBBS | § | |
| | § | |
| | § | OF |
| VS. | § | |
| | § | |
| CANDACE GIBBS WALTON, ET AL. | § | DENTON COUNTY, TEXAS |

## FINAL JUDGMENT

On September 13, 2004, this case was called for trial. Plaintiff, Kip H. Gibbs, in his capacities as next friend for Kathryn Houseworth Gibbs and co-guardian of the estate of Kathryn Houseworth Gibbs, appeared in person and through his attorney and announced ready for trial. Defendants, Candace Gibbs Walton, Howard Kirk Gibbs, Kenneth Vern Gibbs, and Bert Hughes Gibbs, though duly notified, failed to appear.

All matters, legal and factual, were submitted to the court for its determination. The court heard the evidence and argument of counsel and announced its decision for plaintiff.

The court orally rendered judgment for plaintiff on September 13, 2004. This written judgment memorializes that rendition.

The court finds that:

1.    All defendants are properly within the jurisdiction of the court;

Page 1 of 9 -    FINAL JUDGMENT
                 (Gibbs.Kat/Final Judgment)[lcc;011905]





2. The court has appropriate jurisdiction under the Texas Trust Code, Texas Probate Code, and the Texas Government Code;

3. All necessary citations have been issued;

4. Defendants each had notice of the setting for trial but did not attend;

5. Plaintiff provided evidence proving liability, causation, and damages for all causes of actions pleaded;

6. Bert Hughes Gibbs ("Bert") was the husband of Kathryn Houseworth Gibbs ("Kathryn"), and Candace Gibbs Walton ("Candy"), Kenneth Vern Gibbs ("Kenneth"), and Howard Kirk Gibbs ("Howard Kirk") were her children;

7. On July 17, 1990, Kathryn's mother, Mary L. Houseworth ("Mary"), created both the Mary L. Houseworth Revocable Trust ("Houseworth Trust") and the Kathryn Houseworth Gibbs Irrevocable Trust ("Gibbs Trust");

8. On February 7, 1991, Mary signed the First Amendment to the Mary L. Houseworth Revocable Trust which added Candy as a co-trustee with Mary, required joint action between Mary and Candy, and prohibited unilateral action by Candy as co-trustee;

9. Upon the death of Mary, the Houseworth Trust, by its own terms, converted to an irrevocable trust and the assets of the Houseworth Trust became assets of the Gibbs Trust and Kathryn was to receive a mandatory monthly distribution of not less than $2,000.00 nor more than $3,000.00; further, the overall purpose of the trusts were so that Kathryn shall be able to live in a manner consistent with her 1990 standard of living;

10. Compliance with the purpose and intent of the trusts would be defeated by maintaining the current level of monthly distributions to Kathryn;

730



11.    The Houseworth Trust provides that all benefits of the trust are held for Kathryn and that her children, Candy, Kenneth, Howard Kirk, and Kip Hughes Gibbs ("Kip") are the beneficiaries after Kathryn's death;

12.    The Gibbs Trust designated Mary, Kathryn, Candy, Kenneth, Howard Kirk, and Kip as beneficiaries and that all income was payable to the Houseworth Trust during Mary's lifetime, provided that distributions could be made to any beneficiary for health emergencies, and stated that Kathryn and any three of the four children could direct income or principal to be distributed directly to Kathryn;

13.    Mary died testate in 1991;

14.    Kathryn is incapable of protecting her own interests and from the importuning of her husband and children and will sign almost anything for anyone who asks her to do so;

15.    On and after August 1998, after being terrorized about impending Y2K disasters and the importuning of the defendants, Kathryn signed blanket authorizations, later signed by Candy, Kenneth, and Howard Kirk, withdrawing $1,015,000.00 from the Gibbs Trust ("Removed Funds");

16.    Kathryn was told by defendants that the Removed Funds were to provide for staples for the family during the impending crisis;

17.    The Removed Funds were controlled and/or spent by the defendants;

18.    $701,021.00 of gold coins and junk metal were purchased with the Removed Funds. The balance of the Removed Funds were either spent by or distributed to the defendants;

19.    Plaintiff received $36,200.00 from the Removed Funds which was subsequently spent for Kathryn's benefit or deposited with the court;





20.    Plaintiff did not participate with the defendants in the withdrawal of the Removed Funds;

21.    Plaintiff did not consent to the withdrawal of the Removed Funds;

22.    Plaintiff affirmatively demonstrated to defendants of his disagreement with the withdrawal of the Removed Funds;

23.    Plaintiff demanded that the Removed Funds be accounted for and returned to the Gibbs Trust after it was evident that Y2K did not pose any society ending problems;

24.    Defendants openly and steadfastly refused to comply with plaintiff's demand;

25.    Each defendant was in a fiduciary relationship with Kathryn Houseworth Gibbs ("Kathryn"), or, alternatively, a relationship of special trust and confidence giving rise to fiduciary duties;

26.    Each defendant is fully accountable to Kathryn for the Removed Funds;

27.    Each defendant breached their respective fiduciary obligation to Kathryn;

28.    The defendants' decision to purchase the gold coins and junk metal was an inadvisable, imprudent and improper investment and did not meet any standard of wise or prudent fiduciary management;

29.    Plaintiff recovered from defendants (i) all of the gold coins and junk metal purchased with the Removed Funds, and (ii) the amount of $225,873.03.

30.    Plaintiff was unable to account for $88,141.97 of the Removed Funds;

31.    Plaintiff, under court order, sold the gold coins and junk metal for $387,419.03; the sale resulted in a net loss of $313,601.97 to the Gibbs Trust;



732



32. The method of resale of the gold coins, approved by court order, was reasonably calculated, and diligently pursued, to obtain the highest possible resale cost in value on the gold coins and other precious metals;

33. Defendants, primarily Howard Kirk Gibbs, negligently or intentionally failed to comply with federal tax law which resulted in the penalties and interest being incurred by the Houseworth Trust and the Gibbs Trust;

34. The wrongful withdrawal of the Removed Funds directly caused federal income tax penalties and interest to be incurred in the amount of $143,843.81 which was subsequently paid by the Houseworth Trust and the Gibbs Trust;

35. The attorney fees in the amount of $115,665.12 incurred by plaintiff in his capacity as next friend of Kathryn Gibbs and as co-guardian of the estate of Kathryn Houseworth Gibbs in an effort to recover the Removed Funds and to recover damages incurred by the Houseworth Trust and the Gibbs Trust as a result of defendants' actions were reasonable and necessary;

36. The plaintiff has incurred actual damages in the amount of $661,252.87;

37. Five percent is the correct prejudgment interest rate applicable under the Texas Finance Code;

38. The conduct of one, some, or all, of the defendants at various stages of this litigation has been recalcitrant, obstreperous, abusive, vexatious, dilatory, and engaged in with intentional malice, or alternatively, with a reckless disregard for the rights of the trust beneficiary, Kathryn; has been engaged in for no good-faith purpose; has been engaged in bad faith during the course of this litigation; and has included the hiring and firing of four separate attorneys and multiple dilatory motions;

Page 5 of 9 - **FINAL JUDGMENT**
(Gibbs.Kat/Final Judgment)[lcc;011905]





39. The punitive damage award of $250,000.00 is based on the underlying withdrawal of $1,015,000.00, the loss of use of the Removed Funds, and the actual damages and bears a direct and rational relationship to actual damages incurred in this case and is reasonably calculated to accomplish the legitimate purposes of exemplary damages that is act as a deterrent to the same or similar conduct by others in the future and to punish wrongdoers;

40. The majority of the activity by defendants in this case cannot be excused as normal defensive tactics or advocacy or litigation process but an abuse of the system;

41. Defendants refused continuously and throughout the course of the litigation to disclose any meaningful financial information, documents, papers, exhibits, or other matters, even though proper request for the same was made;

42. There is no way in which any one defendant can be excused or set aside or limited or exculpated from the conduct of the other defendants;

43. Defendants conduct is so inextricably intertwined that the court is unable to segregate any element of damages, and hence, makes all damages, including those that are exemplary, joint and several;

44. The purposes and intentions expressed by Mary in the creation of both the Houseworth Trust and the Gibbs Trust have been frustrated through the conduct of defendants, and that because of the defendants' conduct of defendants, three of whom are contingent trust beneficiaries, that the court must modify the trusts to exclude any possibility of control by them with respect to the trusts or their administration or any ability to cause the withdrawal of funds;

45. The conduct of defendants commencing with the withdrawal of the funds from the trusts and continuing throughout the course of this litigation was undertaken with the specific malicious intent to either defraud or harm or permanently deprive the primary trust beneficiary,



734 Pg. 7 Ex. B



Kathryn, of property rightfully belonging to her and entitlements to income rightfully belonging to her and that there was no intention at any time to make restitution of such property to the primary trust beneficiary, Kathryn, and that said conduct was also committed with a reckless disregard for the rights and well-being of Kathryn;

46.     The actions of defendants operate as a forfeiture of their interest in both the Houseworth Trust and the Gibbs Trust as contingent beneficiaries, or alternatively, if this finding is later determined to not be consistent with law in that the defendants conduct does not justify a forfeiture, the court finds that such actions by defendants was of such reckless disregard and with such malicious intent and caused such harm and damage to plaintiff, that the court orders a surcharge against the interest of those contingent beneficiaries equal to their pro rata share of the judgment.

The court therefore renders judgment in favor of plaintiff and against defendants and ORDERS that:

1.     The plaintiff recover from defendants, Candace Gibbs Walton, Kenneth Vern Gibbs, Howard Kirk Gibbs, and Bert Hughes Gibbs, the sum of $911,252.87, prejudgment interest on that sum at the annual rate of five percent, in the sum of $149,546.34 [1,198 days (date of filing until date judgment was signed) at $124.83 per day], post-judgment interest in the total sum at the annual rate of five and 1/4 percent, and court costs;

2.     This judgment is joint and several;

3.     The Houseworth Trust and the Gibbs Trust are each modified to:

     a.     specifically eliminate, terminate, cancel, and forever hold for naught any right, power, or authority previously vested in Candace Gibbs Walton, Kenneth Vern Gibbs, or Howard Kirk Gibbs, or, to the extent any ever existed or

Page 7 of 9 -   FINAL JUDGMENT
(Gibbs.Kat/Final Judgment)[lcc;011905]





derivatively could exist, Bert Hughes Gibbs, with regard to any withdrawal of funds;

b.      specifically eliminate, terminate, cancel, and forever hold for naught any right, power, or authority previously vested in Candace Gibbs Walton, Kenneth Vern Gibbs, or Howard Kirk Gibbs, or, to the extent any ever existed or derivatively could exist, Bert Hughes Gibbs, over the trust assets or the duly appointed and acting trustee or successor trustee;

c.      remove Candace Gibbs Walton, Kenneth Vern Gibbs, and Howard Kirk Gibbs as contingent beneficiaries;

d.      specifically eliminate the requirement that a majority of the beneficiaries could change the trustee and plaintiff is solely allow to determine when and if a trustee should be removed and who should be appointed successor trustee;

e.      eliminate distributions to any contingent beneficiaries during the lifetime of Kathryn Houseworth Gibbs;

f.      eliminate the requirement that Candace Gibbs Walton can be named as successor trustee; and

g.      to allow monthly expenditures to Kathryn Houseworth Gibbs to exceed the maximum guideline of $3,000.00 if by doing so meets the general overall purposes of the trusts.

4.      Texas Bank is appointed trustee of the Houseworth Trust and the Gibbs Trust.

5.      Any escheated funds property belonging to either the Houseworth Trust or the Gibbs Trust can be recovered by any trustee or successor trustee.

Page 8 of 9 -    FINAL JUDGMENT
(Gibbs.Kat/Final Judgment)[lcc;011905]



736



All other relief not granted is denied.

This judgment is final, disposes of all claims and all parties, and is appealable.

The court orders execution to issue for this judgment.

Signed on January 2₺ 2005.

By: _____

**Honorable Don R. Windle,**
**Probate Judge,**
**Probate Court of Denton County, Texas**





## UNSWORN STATEMENT GIVEN UNDER PENALTY OF PERJURY

I, Albert Lynn Barcroft, Affiant, being of sound mind, over age of majority, competent to testify, and having a firsthand knowledge of the facts contained herein, hereby certify and declare that the following facts are true, correct and complete as stated, and are so stated under the penalty of perjury:

1. I signed a Contract ("CSL") with Kenneth Vern Gibbs, Candace Gibbs Walton and Howard Kirk Gibbs, herein collectively "Gibbs", on May 10, 2005.

2. Through the CSL, I purchased 30% of everything that could be recovered from the estates of the Gibbs' parents, Bert Hughes Gibbs and Kathryn Houseworth Gibbs.

3. At the point when the CSL was signed, the Gibbs had lost everything, final judgments against them were almost a year old, there was an Abstract of Judgment against each of them for over a million dollars, they had no money, no attorney would even talk to them, and they had no hope that they could ever recover.

4. As a direct result of the CSL, the judgments against them were removed, they regained a full share of their parents' estate, and their lives were returned to normal. Save for the CSL, none of this would have happened.

5. I did not claim to be an attorney, I did not claim I had attended law school, and I did not tell the Gibbs I could represent them in any manner. I did not ever ask for, expect or receive compensation for anything from the Gibbs other than as consideration under the CSL. I did not try to induce the Gibbs in any way other than to say I would put up money, hire an attorney, and work hard to get some of their inheritance back. I have many e-mails from Candace Walton, the last one coming just after Ms. Lee was hired, thanking me for saving their inheritance. Ms. Lee was able to change all of that, and replace it with charges of wrongdoing.

6. I did not draft the CSL without assistance. Contrary to her statement under oath, Candace Walton had no way to know who drafted the CSL, although she swore to that fact.

7. Defendants Candace Walton and Kenneth Gibbs stated as fact that "**John Skotnik drafted the CSL**" in their original answer in the 336th District Court of Fannin County, Texas, case number cv-14-41665 ("lawsuit") when they were attempting to disqualify John Skotnik.

8. Defendants Candace Walton and Kenneth Gibbs stated as fact that "**it is an established fact that Albert drafted the CSL**" in their Response to Motion for Summary Judgment in the same lawsuit when the wanted to say Albert Barcroft practiced law without a license.

9. There was no discovery from either John Skotnik or Albert Barcroft between the two "statements of fact" that could have resulted in any fact as to who drafted the CSL being established.

10. Candace Walton and Kenneth Gibbs have shown a strong propensity throughout these proceedings and those in a related case in Tarrant County Probate Court #2, case number 2005-0000126-2-D, to state as fact that which is not; and, to change their stated facts to meet their instant needs.

PLAINTIFF'S
EXHIBIT
3
PENGAD 800-631-6989

11. Everything I did leading up to the signing of the CSL was in business negotiations on my own behalf. I did not give legal advice, I did not represent anybody other than myself or say I could, I did not claim to have attended law school, I did not expect, ask for or receive any compensation from the Gibbs other than later as consideration under the CSL, and I did not tell the Gibbs not to get legal advice before they signed the CSL. None of these charges were made until over 8 years after the fact when Christy Lee became attorney for Candace Walton and Kenneth Gibbs, and started creating baseless allegations and lies to support those allegations. There is absolutely no evidence that any such charges were ever levied in the pre-Lee era, because said allegations were absolutely contrived after Ms. Lee took over, and are false, and the Gibbs did not used to be liars.

12. After the signing of the CSL, I immediately hired John Skotnik as attorney to represent the Gibbs' interest. John Skotnik had already represented Howard Gibbs in a criminal matter, showing that I did not hold myself out as an attorney or as someone who could represent another party.

13. The false allegation that the CSL was unconscionable because I was practicing law without a license in order to induce the Gibbs into signing the CSL, and because of the consideration given the Gibbs under the CSL is a recent invention of Ms. Lee. The allegation was not made in the Gibbs Original Answer, Counterclaim or Affirmative Defense, nor in any amendments to that answer. Neither was the allegation made in the Original Gibbs Tarrant County lawsuit filed in the Probate Court Number 2 of Tarrant County, case number 2005-0000126-2-D, which addresses virtually the same issues as the case in Fannin County. After almost a decade and numerous filings in the Fannin County and Tarrant County courts, the Gibbs have apparently just discovered that they were deceived by me while "practicing law without a license" into signing an unconscionable contract. That revelation comes strangely at a time when all their other false allegations appear to be falling short.

14. As a direct result of the CSL, each of the Gibbs has received well in excess of a million dollars, each has had a final judgment against them of over a million dollars retired, and each stands to receive several more million dollars as was pointed out by Ms. Lee in a hearing in the Tarrant County lawsuit when Ms. Lee stated, "· · · *Your Honor, you have to keep in mind, even though it does look like these are assets that have been transferred out of the estate, there are assets that aren't transferred out of the estate.··There currently is a $6.1 million offer on a piece of property, to pay in full, or a $8.5 million installment agreement over the next five years, that will come to the estate of Bert Gibbs· · ·There is a lot of money out there. My clients -- my two clients own 25 percent of the estate. So if they own 25 percent, they are potentially going to get $2 million. Al Barcroft owns a percentage and Howard Kirk Gibbs also owns -- he owns 12.5 percent.··So we have a lot of assets for the estate of Bert Gibbs."* Every single asset that Ms. Lee refers to in this statement would not belong to the Gibbs save for the CSL and the work and money that I invested into the CSL as consideration.

739

15. Save for Ms. Lee's false allegations and attempts to get her "share of the pie", it is my firm belief that there would be no lawsuit.

**FURTHER, AFFIANT SAYETH NOT.**

<u>**VERIFICATION**</u>

My name is Albert Lynn Barcroft, my date of birth is August 20, 1946, and my address is Rancho Las Brisas, San Marcos, Livingston, Izabal, Guatemala, Central America; and, I declare under Penalty of Perjury that the foregoing statements are true and correct, and not intended to mislead.

Executed at San Marcos, Livingston, Izabal, Guatemala on the 4th day of November, 2014.

Albert Lynn Barcroft

740





| IN RE GUARDIANSHIP OF | ) | IN THE PROBATE COURT |
| ESTATE OF KATHRYN H. GIBBS, | ) | OF |
| AN INCAPACITATED PERSON | ) | DENTON COUNTY, TEXAS |

AND

CAUSE NO. 05-126-2

| IN RE: THE ESTATE OF | § | IN THE PROBATE COURT |
| | § | |
| BERT HUGHES GIBBS, | § | NO. TWO OF |
| | § | |
| DECEASED | § | TARRANT COUNTY, TEXAS |

## FAMILY SETTLEMENT AGREEMENT

THIS FAMILY SETTLEMENT AGREEMENT (this "Agreement" or "FSA") is made and entered into by and among the following persons, both individually and in the fiduciary capacities described below:

I.    Kenneth Vern Gibbs ("Ken"), Individually and as Independent Executor of the Estate of Bert Gibbs, Deceased and in all capacities listed under his signature line below;

2.    Candace Gibbs Walton ("Candy"), Individually and in all capacities listed under her signature line below;

3.    Kip Hughes Gibbs ("Kip") , Individually and in all capacities listed under his signature line below;

4.    Howard Kirk Gibbs ("Howard Kirk"), Individually and in all capacities listed under his signature line below;

5.    Kathryn Houseworth Gibbs ("Kathryn") , Individually and in all capacities listed under her signature line below;

6.    Sandra Faye Gibbs ("Sandra") , Individually and in all capacities listed under her signature line below;

PLAINTIFF'S
EXHIBIT
4

FAMILY SETTLEMENT AGREEMENT - Page 1
c:\cases\Gibbs\FSA 8'25'08-final

KVG    CGW    HKG    KHG    SFG    KHG

741

3.25 **Representations.** The Parties to this Agreement make the following representations to such other Parties:

(a) The representing Party is legally competent to execute this Agreement and that this Agreement is valid, binding and enforceable as against himself or herself, any such Party's Successors and Affiliates.

(b) The representing Party believes that neither the Decedent nor the Ward have properly executed any right of survivorship or pay on death agreements or other agreements relating to the creation of non-probate assets and that, if any such agreements exist each respective Party hereby revokes said agreement and returns it to its original title and that any such agreements or contracts are void and of no effect and that any non-probate assets are an asset of either the Decedent's and/or Ward's estate and pass pursuant to the terms of this Agreement.

(c) The representing Party owns the claims released herein and has not assigned, released, waived, relinquished, pledged or in any manner whatsoever, sold or transferred, his or her interest, right, and/or claims to or against the Decedent, Decedent's Estate, Ward, Ward's Estate, except as to his or her attorneys, and or the following persons who will also join in the execution of this Agreement. Ken, Candy, and Howard Kirk represent that they have assigned an interest to Al Barcroft, who approves and ratifies all of the terms and provisions of this Agreement as represented by his execution of this Agreement. The Parties agree that the interest of Kathryn and the interest of Kip, respectively, is not and shall never be affected or reduced in any way because of any assignment of any interest made by Ken, Howard Kirk or Candy to Al Barcroft or any other person and that any such assignment shall only affect or reduce the interest of Ken, Howard Kirk and/or Candy in any Property covered by this FSA.

Further, the Parties agree that the enforcement of the assignment by any Party to any attorney or third party may be secured at the request of such attorney or third party by the filing of an appropriate Security Agreement/Deed of Trust, reflecting the existence of the assignment obligation and the enforcement of the same by the attorneys and/or third party who will be treated as Secured Parties.

(d) **Each Party confirms and agrees that such Party (i) has relied on his or her own judgment and has not been induced to sign or execute this Agreement by promises, agreements or representations not expressly stated herein, (ii) has freely and willingly executed this Agreement and hereby expressly disclaims reliance on any fact, promise, undertaking or representation made by any other Party or Personal Representative, save and except for the express agreements and representations contained in this Agreement, (iii) waives any right to additional information regarding the matters governed and effected**

**READ, UNDERSTOOD, APPROVED AND
AGREED AS TO FORM, CONTENT
AND SUBSTANCE:**

*Candace Gibbs Walton*

Candace Gibbs Walton, individually, as an heir and/or beneficiary of the Estate of Bert H. Gibbs, Deceased, and as a potential heir and/or beneficiary of the Estate of Kathryn H. Gibbs, Individually and/or as an Incapacitated Person, and as a contingent beneficiary of the Mary L. Houseworth Revocable Trust ("Houseworth Trust") and the Kathryn Houseworth Gibbs Irrevocable Trust ("Kathryn Gibbs Trust"), and as the virtual representative and next friend of her children, and their successors, plus those minor, unborn, unascertained, and contingent beneficiaries of the Estates of either Bert H. Gibbs, Deceased, and/or the Estate of Kathryn H. Gibbs, Individually and/or as an Incapacitated Person.

STATE OF TEXAS                  §
                                §
COUNTY OF TARRANT               §

This instrument was signed and acknowledged before me on the ___5___ day of ___September___, 2008, by CANDACE GIBBS WALTON, in the above stated capacities, known to me or whose identity was verified.

Notary Public in and for the State of Texas

My Commission expires on: _9-4-2011_

CATHIE L SMITH
Notary Public, State of Texas
My Commission Expires
September 04, 2011

KUG     CUW     N

743

**READ, UNDERSTOOD, APPROVED AND
AGREED AS TO FORM, CONTENT
AND SUBSTANCE:**

_____
Al Barcroft-Assignee of Ken, Candy and Howard Kirk


STATE OF TEXAS         §
                                  §

COUNTY OF TARRANT       §

This instrument was signed and acknowledged before me on the 5th day of September, 2008, by AL BARCROFT, in the above stated capacities, known to me or whose identity was verified

CATHIE L SMITH
Notary Public, State of Texas
My Commission Expires
September 04, 2011

_____
Notary Public in and for the State of Texas

My Commission expires on: 9-4-2011

FAMILY SETTLEMENT AGREEMENT - Page 44
cases\Gibbs\FSA 8'15'08-final

744

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 2005-0000126-2-D

|  |  |
|---|---|
| IN RE: ESTATE OF BERT HUGHES GIBBS, DECEASED; | ) IN THE PROBATE COURT ) ) |
| CANDACE WALTON AND KENNETH GIBBS, | ) ) ) |
| Plaintiffs, | ) ) |
| VS. | ) COURT NO. 2 ) |
| BEVERLY MILLER, INDIVIDUALLY, AND AS TRUSTEE OF THE GWB FRIENDS AND FAMILY TRUST, ALBERT BARCROFT, INDIVIDUALLY AND AS LEGAL REPRESENTATIVE OF PENTEX ROYALTY TRUST AND PENTEX FOUNDATION, DANNY UNGER, AS TRUSTEE OF GBU FRIENDS AND ASSOCIATES TRUST, AND HOWARD KIRK GIBBS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) TARRANT COUNTY, TEXAS |

PLAINTIFF'S
EXHIBIT
5
PENGAD 800-631-6989

\* \* \* \* \*
\*\*\*EXCERPT\*\*\*
\*\*\*MOTION HEARING\*\*\*
\* \* \* \* \*

On the 31st day of July, 2014, the following

proceedings came on to be heard in the above-entitled

and numbered cause before the Honorable

Patrick Ferchill, Judge presiding, held in Fort Worth,

Tarrant County, Texas;

Proceedings reported by machine shorthand.



personal representative of the estate pending in this Court is a party. And you can consolidate these cases.

THE COURT: True.

MS. LEE: Well. Okay. What happened is when this lawsuit was filed, it was filed specifically stating that it was for Pentex Foundation not getting attorney fees that it was entitled to from -- from -- from the estate of Bert Gibbs.

Your Honor, you have to keep in mind, even though it does look like these are assets that have been transferred out of the estate, there are assets that aren't transferred out of the estate. There currently is a $6.1 million offer on a piece of property, to pay in full, or a $8.5 million installment agreement over the next five years, that will come to the estate of Bert Gibbs.

There is a lot of money out there. My clients -- my two clients own 25 percent of the estate. So if they own 25 percent, they are potentially going to get $2 million. Al Barcroft owns a percentage and Howard Kirk Gibbs also owns -- he owns 12.5 percent. So we have a lot of assets for the estate of Bert Gibbs.

And we filed an amended answer in the Fannin county case, because what they allege -- and -- what they allege is exactly what

NO. CV-14-41665

| | | |
|---|---|---|
| PENTEX FOUNDATION, | § | IN THE DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| V. | § | |
| | § | FANNIN COUNTY, TEXAS |
| | § | |
| KENNETH VERN GIBBS, CANDACE | § | |
| GIBBS WALTON and HOWARD | § | |
| KIRK GIBBS, *Defendants* | § | 336th JUDICIAL DISTRICT |

## SCHEDULING ORDER

On November 12, 2014, the parties appeared and the following orders were entered with respect to the scheduling of this case.

1. January 29, 2015, 1:00 p.m. -- Hearing on matters contained within the following documents:

   A. Motion to Show Authority, Motion for Change of Venue, Motion to Strike Intervention, Motion to Dismiss With Prejudice, and Rule 13 Motion for Sanctions filed by Kenneth Gibbs and Candace Walton, Defendants (filed 4-23-13)

   B. Plaintiff's Motion to Compel (filed 7-18-14)

   C. Plaintiff and Intervenor's Motion for Partial Summary Judgment (filed 8-12-14)

   D. Motion to Quash or for Protective Order Relating to Subpoenas and Deposition Notices (filed 9-4-14)

   E. Defendant's Motion for Leave of Court to File Third-Party Petition (filed 9-15-14)

   F. Motion to Compel Discovery from GBU Friends and Associates Trust (filed 9-25-14)

2. March 12, 2015. Mediation must be complete by this date.

SCHEDULING ORDER ... PAGE 1

747



3.    May 14, 2015 1:00 p.m. – Pretrial Conference. All discovery must be completed by this date.

4.    June 1, 2015, 2015, 8:30 a.m. –    Jury trial shall commence.

SIGNED November 17, 2014.

_____
LAURINE J. BLAKE, JUDGE PRESIDING

APPROVED:

_____
Scott Smith, Attorney for Plaintiff and Intervenor

_____
Christy Lee, Attorney for Defendants

_____
Howard Gibbs, Pro Se

SCHEDULING ORDER ... PAGE 2

748

NO. CV-14-41665

| | | |
|---|---|---|
| PENTEX FOUNDATION, | § | IN THE DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| V. | § | |
| | § | FANNIN COUNTY, TEXAS |
| KENNETH VERN GIBBS, CANDACE | § | |
| GIBBS WALTON and HOWARD | § | |
| KIRK GIBBS, *Defendants* | § | 336th JUDICIAL DISTRICT |

## ORDER OF REFERRAL FOR MEDIATION

This case is appropriate for mediation pursuant to TEX. CIV. PRAC. & REM. CODE § 154.0001, et.seq., The Honorable Curt Henderson (curthenderson.com) is appointed Mediator in the above case and all counsel are directed to contact Mediator to arrange the logistics of mediation within 30 business days. It is ordered that mediation shall be completed within 120 days from November 12, 2014.

Mediation is a mandatory but non-binding settlement conference, conducted with the assistance of the Mediator. Mediation is private, confidential and privileged from process and discovery. After mediation, the Court will be advised by the Mediator, parties and counsel, only that the case did or did not settle. The Mediator shall not be a witness nor may the Mediator's records be subpoenaed or used as evidence. No subpoenas, citations, writs, or other process shall be served at or near the location of any mediation session, upon any person entering, leaving or attending any mediation session.

Fees for the mediation are to be divided and borne equally by the parties unless agreed otherwise, and shall be paid by the parties directly to the Mediator, and shall be taxed as costs.

**Named parties shall be present during the entire mediation process and each corporate party must be represented by an executive office with authority to negotiate a settlement.**

Referral to mediation is not a substitute for trial and the case will be tried if not settled.

ORDER OF REFERRAL FOR MEDIATION ... PAGE 1

749



SIGNED November 17, 2014.

_____
LAURINE BLAKE, JUDGE PRESIDING

APPROVED AS TO FORM:

_____
Scott Smith, Attorney for Plaintiff and Intervenor

_____
Christy Lee, Attorney for Defendants

_____
Howard Gibbs, Pro Se

## NO. CV-14-41665

| | | |
|---|---|---|
| PENTEX FOUNDATION, | § | IN THE DISTRICT COURT OF |
|      *Plaintiff* | § | |
| | § | |
| V. | § | |
| | § | FANNIN COUNTY, TEXAS |
| KENNETH VERN GIBBS, CANDACE | § | |
| GIBBS WALTON and HOWARD | § | |
| KIRK GIBBS,    *Defendants* | § | 336th JUDICIAL DISTRICT |

## ORDER ON MOTION TO RECONSIDER ORDER TO TRANSFER VENUE

On November 12, 2014, came on to be considered the Motion to Reconsider Order to Transfer Venue, filed by Pentex Foundation, Plaintiff, and Joshua Unger, Trustee of GBU Friends and Associates Trust, Intervenor. The Court, having considered the motion, is of the opinion that it should be granted and that the following orders should be entered.

It is therefore ORDERED that the Order Approving Kenneth Gibbs and Candace Walton's Motion to Change Venue, signed on September 30, 2014, is vacated and withdrawn.

It is further ORDERED that the Motion to Change Venue filed by Kenneth Gibbs and Candace Walton is in all things denied.

SIGNED November 21, 2014.

_____
LAURINE J. BLAKE, JUDGE PRESIDING

ORDER ON MOTION TO CHANGE VENUE ... PAGE 1



APPROVED AS TO FORM ONLY:

_____
Scott Smith, Attorney for Plaintiff and Intervenor


_____
Christy Lee, Attorney for Defendants

_____
Howard Gibbs, Pro Se

ORDER ON MOTION TO CHANGE VENUE ... PAGE 2

752

LAW OFFICES OF


P.C.

CHRISTY L. LEE
Attorney



225 E. FIREWEED LANE, STE. 200
ANCHORAGE, ALASKA 99503
MAIN: 907.339.9931
FAX: 800.437.7901

777 MAIN ST. STE. 600
FORT WORTH, TEXAS 76102
PHONE: 817.504.6075
FAX: 800.437.7901

clee@christyleelaw.com
www.christyleelaw.com



November 26, 2014

Clerk of the Court
101 E Sam Rayburn Drive, Suite 200
Bonham, TX 75418

  Re: Cause No. CV-14-41665
    Pentex Foundation vs. Kenneth Vern Gibbs, et al.

To Whom It May Concern:

We need a certified copy of the Complete Clerk's Record for Cause No. CV-14-41665, which should include also the court's docket, notes, memorandums, motions, responses, objections, and signed orders, along with all other filings.

Please send this record to the following:

  Robert Hogue
  Highland Park Place
  4514 Cole Avenue #600
  Dallas, Texas 75205-4193

If you have any questions, or need we need to make payment arrangements, please contact our office. Thank you for your assistance with this matter.

    Very truly yours,

    LAW OFFICES OF CHRISTY LEE, P.C.

    Laura Hogins, Paralegal



753





**Nancy Young**
District Clerk Fannin County

336th Judicial District

December 5, 2014

Laura Hogins
Law Offices of Christy Lee
225 East Fireweed Lane
Suite 200
Anchorage, Alaska 99503

Re:  Pentex Foundation vs. Kenneth Vern Gibbs, et al
     Cause Number CV-14-41665

Dear Ms. Hogins:

The District Clerk's Office charges a fee of one dollar for each page copied from the case file and a fee of one dollar for each document certified. These fees are payable in advance.

Cause Number 14-41665 consists of 758 pages. The cost for copies of these documents is seven hundred fifty-eight dollars ($758.00) and fifteen dollars ($15.00) for postage for a total cost of seven hundred seventy-three dollars ($773.00).

Upon receipt of the proper fees, we will process your request.

Please advise if we can be of further assistance.


Respectfully,

Linda Long
Deputy Clerk
Fannin County, Texas


Fannin County Courthouse  •  101 E. Sam Rayburn Dr., Suite 201  •  Bonham, Texas 75418  •  (903) 583-7459  •  FAX (903) 640-1826

754



FILED FOR RECORD
COUNTY, TE

2014 DEC -8 PM 3: 44

NANCY YOUNG
DISTRICT CLERK

BY _____ DEPUTY

# CHARLA REAMY

*Certified Shorthand Reporter*
*336th Judicial District*
*101 E. Sam Rayburn Drive*
*Bonham, Texas 75418*
*Phone (903) 583-2863*

...........................................................................................................

*December 8, 2014*

Mr. Howard Kirk Gibbs
*4360 Western Center Blvd., #205*
*Ft. Worth, Texas 76137*

RE:  Pentex Foundation vs. Kenneth Vern Gibbs, et al.
Cause Number CV-14-41665

Mr. Gibbs,

*Ms. Christy Lee has requested that I transcribe the November 12,*
*2014, hearing on the Motion to Reconsider Order to Transfer Venue.*
*Should you like a copy of the transcript, please forward $55.00 to me*
*at the address above and I will mail a copy to you.*

*Should you have any questions, please don't hesitate to contact me.*

*Sincerely,*

*Charla Reamy, CSR, TCRR*

Cc: Fannin County District Clerk

755



# SCOTT SMITH
### ATTORNEY AND COUNSELOR AT LAW



E-MAIL: smithlaw@airmail.net
FACSIMILE: (903) 870-1446
TELEPHONE: (903) 868-8686

120 SOUTH CROCKETT STREET
P.O. BOX 354
BONHAM, TEXAS 75091-0354

December 15, 2014

Nancy Young, District Clerk
Fannin County Courthouse
101 East Sam Rayburn Dr., Ste. 201
Bonham, Texas 75418

> RE: *Pentex Foundation v. Kenneth Vern Gibbs, et al.*; Cause Number CV-14-41665 in the 336th Judicial District Court of Fannin County, Texas.

Dear Ms. Young:

Enclosed please find an original and one copy of the following: Motion to Reconsider Order to Transfer Venue. Please have the Fiat presented to the Court and returned to my office in the enclosed self-addressed envelope.

Please be advised, pursuant to the State Bar Rules, the Texas Lawyer's Creed, and respective local rules, that I will be out of the office on the following dates for vacation and continuing education requirements:

March 16-17, 2015
April 22-28, 2015

Please do not set any matter for hearing or trial during this time, or within three days after the date of such period. I would request that no discovery be served during this period or served as to require a response during this period. I thank you for your attention to this matter.

Yours very truly,

T. Scott Smith

TSS/bhs

cc:     Christy L. Lee, Esq.
        Howard Kirk Gibbs, Pro Se.

756





Scott Smith
Attorney and Counselor at Law

P.O. Box 354
Sherman, Texas 75091-0354

N TEXAS
DALLAS 750
15 DEC '14
PM 11 L

FOREVER



Nancy Young, District Clerk
Fannin County Courthouse
101 East Sam Rayburn Dr., Ste. 201
Bonham, Texas 75418

75418437399

757

# Cheryl Dane

**From:** Cheryl Dane [cmdane@fanninco.ne]
**Sent:** Thursday, December 18, 2014 9:54 AM
**To:** 'smithlaw@airmail.net'
**Subject:** FW: cv-14-41665
**Attachments:** Letter.tif

I typed that in incorrectly. We did not receive them. Sorry.

**From:** Cheryl Dane [mailto:cmdane@fanninco.ne]
**Sent:** Thursday, December 18, 2014 9:53 AM
**To:** 'smithlaw@airmail.net'
**Subject:** cv-14-41665

Hello, your letter states that the Motion to Reconsider Order and Fiat were enclosed but we did receive them.
Please see a copy of your letter and the envelope.
Thank you,

*Cheryl Dane*
*Deputy Clerk*
*District Clerks Office*
*Fannin County*
*903-583-7459*
http://www.co.fannin.tx.us/

758                                           1



REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. CV-14-41665

PENTEX FOUNDATION,                    ) IN THE DISTRICT COURT
                                      )
                                      )
          Plaintiffs,                 )
                                      )
                                      )
VS.                                   ) 336TH JUDICIAL DISTRICT
                                      )
                                      )
KENNETH VERN GIBBS and                )
CANDACE GIBBS WALTON and              )
HOWARD KIRK GIBBS,                    )
                                      )
                                      )
          Defendants.                 ) FANNIN COUNTY, TEXAS


-------------------------------

HEARING BEFORE THE COURT

-------------------------------


    On the 30th day of September, 2014, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Laurine Blake, Judge

presiding, held in Bonham, Fannin County, Texas;

    Proceedings reported by machine shorthand.

A P P E A R A N C E S

FOR THE PLAINTIFF:

    MR. SCOTT SMITH
    Attorney at Law
    120 South Crockett Street
    P.O. Box 354
    Sherman, Texas 75091
    (903) 868-8686
    Fax:  (903) 870-1446
    SBOT NO. 18688900


FOR THE DEFENDANTS:

    MS. CHRISTY L. LEE
    Attorney at Law
    777 Main Street
    Suite 600
    Ft. Worth, Texas 76102
    (817) 504-6075
    Fax:  (800) 437-7901
    SBOT NO. 24052302


PRO SE DEFENDANT:

    MR. HOWARD KIRK GIBBS
    4360 Western Center Blvd.
    Suite 205
    Ft. Worth, Texas 76137
    (817) 233-4423

INDEX

(September 30, 2014)

Page

Announcements...................................... 04

PLAINTIFF'S WITNESSES

|  | Direct | Cross |
|---|---|---|
| CHRISTY LEE | 10 | |

Court Reporter's Certificate....................... 41

EXHIBIT INDEX

PLAINTIFF'S EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 16 | Series of e-mails | 11 | 12 |
| 17 | August 21, 2014 e-mail | 14 | 15 |

DEFENDANT'S EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| A | Rule 11 Agreement for Method of Service | 10 | 10 |

THE COURT: Pentex Foundation versus Gibbs, and others, CV-14-41665. We'll have the attorneys take a seat at counsel table. If there are any parties that are here, we'll have them take a seat, as well. Okay. Before we get started, let's go ahead and have each of the attorneys state their names for the court reporter so she has the benefit of that and spell your name where necessary.

MR. SMITH: Your Honor, I'm Scott Smith. I'm here representing Pentex Foundation. The representative who's here for Pentex is Danny Unger, who's in the back. I'm also representing Joshua Unger, trustee to the GBU Family and Friends Trust. He's present in the courtroom, as well.

MS. LEE: My name is Christy Lee. I'm here representing two of the defendants, Candace Walton and Kenneth Gibbs.

MR. SMITH: And we have a pro se.

MR. GIBBS: I'm Howard Gibbs. I am pro se.

THE COURT: Okay. And, Mr. Gibbs, are you affiliated with one of the sides or the other?

MR. GIBBS: Yes, ma'am, I'm a defendant. Is that what you mean, Your Honor?

THE COURT: Well, you're sitting at plaintiff's table. So, my question is, are you sort of affiliated with them or is that just where the other chair was?

MS. LEE: No, I requested for him to sit over at

my table and he wanted to sit over there by them. You'll find out --

THE COURT: That's fine. At some point there will be a division of time, it will be based on the side that you're affiliated with to some degree.

MR. SMITH: I think it's fair to say he's aligned with my clients in the majority of the relief requested.

THE COURT: Okay. We have a variety of motions that were filed and we had some filed here at the end that -- I guess, the Court's practice has been a little bit -- well, for lack of a better word -- informal in that the Court's coordinator nor the Court were setting some of the motions or signing the motions for the hearing today. Though, I'm left with the impression some of the parties may be of the opinion that they were actually being included in today's hearing, and I need to know what the position of the parties are on that issue so we can sort this out.

MR. SMITH: Judge, if it may help things, I wrote down a summary of what I think is pending based on the order in which they were filed.

THE COURT: And to the point that I was asking, though, is it your impression that those are live to be addressed, as well, today?

MR. SMITH: This is my impression. There's some

other things that have been filed --

MS. LEE: No.

MR. SMITH: Let me finish, please. Other things that have been filed that are not set. This is what I believe is set for today.

MS. LEE: Okay. I disagree, Your Honor.

THE COURT: Okay.

MS. LEE: For his list, first -- well, the motion to quash which concerns -- yes, September 30th. Also, the October 13th subpoenas that were filed, that is also in his motion to quash which he doesn't have here on his list. The motion to issue authority, yes; motion to transfer venue; first supplement to motion to show authority, yes; motion to strike intervention that was filed -- that's actually on our notice to -- for the hearing when we first set the hearing. So, motion to strike intervention is not on his list. I have the notice for hearing for that, Your Honor. Motion for leave to file third-party petition, yes.

The thing that's mostly up for dispute is the -- well, besides on his list -- we have a motion to strike intervention which should be on this list. And then the motion for partial summary judgment, I never received notice of, an e-mail. We have a Rule 11 agreement, Your Honor, which is where we -- for judicial economy and just because of where everybody lives, we had been sending things through e-mail.

And the Rule 11 agreement provides that if the party does not respond back stating "I have received the document," that it needs -- that alternate service needs to be made, meaning it needs to be faxed or mailed. And I was never faxed nor mailed the -- his notice -- his fiat saying that this motion for partial summary judgment would be heard today.

And there seems to be -- I mean, I truly did not receive notice on that to be heard. And we have enough motions to be heard anyway. And I did respond to it only when I was responding -- there was other motions that were filed on the same day I filed my response to motion for partial summary judgment. I also filed a motion to compel discovery, but that's not being heard today.

And I do have -- for the motion to strike, I believe I do have the notice of hearing which was filed with the Court. It was -- the one -- the original hearing to be heard was the motion to show authority, the motion to transfer venue, and, I believe, the motion to strike. And I -- let me check in my folder to see if I happen to have that.

MR. SMITH: Judge, I do have a serious problem with the motion for summary judgment, the contention of Counsel that she did not get notice of that. She asked me yesterday to send her the notice. I did. She's claiming not to have received it, but I have very high confidence that she did receive it based upon subsequent correspondence. And this is a

critical motion.  I think how you decide on the motion for summary judgment will make a lot of this stuff resolve itself. That's why it's such a critical motion for us to solve.

THE COURT:  Which would mean it would be very important to make sure she actually had adequate notice --

MS. LEE:  Right.

THE COURT:  -- if it's that significant.

MR. SMITH:  I've got proof of it.

MS. LEE:  No, Your Honor, I --

THE COURT:  I guess my point is this:  How much time does she need?

MR. SMITH:  It's been on file for six weeks.

THE COURT:  Okay.  How much time does she need for notice?

MR. SMITH:  She needs 21 days.  I gave her April -- August 21st.

MS. LEE:  Your Honor, I did not receive that. And what he is conferring --

THE COURT:  What is it going to hurt to have 21 more days?

MR. SMITH:  What's going to hurt --

THE COURT:  Or, over whatever -- or whatever the amount of time.

MR. SMITH:  I can tell you what it's going to hurt, Your Honor.  When she filed this case in Tarrant County,

she filed a series of lis pendens which has frozen all the assets that my clients receive in order to fund their defense. And so, every month that passes by, we're falling further and further behind and we're looking at risking not being able to fund our defense because of the lis pendens which has been filed.

MS. LEE: Your Honor --

MR. SMITH: And it's a very simple motion. It's the crux of this case. It's how we see the case versus how they see the case. And I think it's a very simple legal proposition.

THE COURT: Okay. Well, and I'm not talking about how simple it is. You're saying it's a dramatic remedy --

MS. LEE: Yes.

THE COURT: -- it's going to define the case.

MS. LEE: Right. I --

THE COURT: Ma'am, if I want you to interrupt, I will ask you to interrupt me. I understand you're a zealous advocate, but please hold your tongue. Really?

All right. I think that it's important that if it's going to be that critical of a motion, that I want to make sure we have solid information whether somebody was served or not and how much time that's going to take. I'll do everything I can to make sure we get this heard on the 21st day, or

whatever we need to do, if that's -- if that is a failing in this case. I don't need to have anything overturned on appeal and redo it again. So, let's look and see what it is that you have to demonstrate that there was some notice, if there was in fact.

MR. SMITH: I would be happy to do that, Your Honor. Actually, I think it might be important to have Counsel represent to the Court affirmatively --

THE COURT: You need to speak up a little bit.

MR. SMITH: I'm sorry. My voice doesn't carry. I think I need to call Counsel for the purpose of establishing notice.

THE COURT: Okay. All right. Ma'am, if you'll raise your right hand.

(Witness sworn by the Court.)

THE COURT: You may put your hand down. You may proceed.

MR. SMITH: Thank you, Your Honor. Can we do this informally?

THE COURT: You may.

CHRISTY LEE,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

Q. State your name, please.

A. Christy Lee.

Q. Are you representing to the Court that you did not get notice on August the 21st setting this matter for hearing -- setting the motion for partial summary judgment for hearing today?

A. Was that the e-mail that you sent me last night?

Q. Yes.

A. No, I did not receive that e-mail.

Q. I'm going to show you a package of exhibits -- and this is a copy for you -- marked as Exhibit 16, Your Honor. And I'll represent this is a series of correspondence between myself and Counsel and ask that it be admitted.

MS. LEE: No, I object to these documents. This is -- this is not what I have in my file at all. And I have a very extensive IT and I had my IT individuals -- this is not -- I can assure you this is not a reply to your e-mail. I replied to this letter.

MR. SMITH: I'm just asking to offer the exhibits, Your Honor.

MS. LEE: No, I object to the exhibit, Your Honor. I can assure you this is not a response in which I replied on Page 2. Oh, wait -- I apologize. I don't believe this was a reply, but I do believe that this is associated with the August 22nd e-mail, which is what I had responded to. The August 22nd e-mail is concerning his letter. So, I do not --

can I ask you some questions about the exhibit just to ensure that I'm understanding what you're trying to do?

THE COURT: Have you asked the questions that you need of this witness?

MR. SMITH: Not yet. I wanted to get the document admitted so I can ask follow-up questions. There won't be many.

MS. LEE: I still question Number 2. The other documents, I believe --

THE COURT: You're saying Page 2?

MS. LEE: Yes, ma'am. I believe the rest are accurate.

THE COURT: Okay. The exhibit will be admitted -- Plaintiff's 16.

MR. SMITH: Thank you.

Q. (By Mr. Smith) Do you see on the first page of Exhibit 16 the reference in green to a 30-day extension request?

A. In green?

Q. Yeah, it should be highlighted in green on Exhibit 16.

A. Yes.

Q. If you look at the last -- Page 7, you responded to that, didn't you?

A. No, that was from your Rule 11 agreement that you had

-- I had my staff -- I did not respond to this e-mail.  I responded to the fax that your staff sent me concerning the Rule 11 agreement.

Q.   Okay.  You can see on the first page of Exhibit 16 it references the attachment "Rule 11 agreement."  You see that on the attachment line?

A.   I'm sorry, I don't know where you're at.

Q.   Here on the first page.

A.   Okay.

Q.   "Attachments," it says, "Clerk reappearance, Rule 11 agreement, motion for partial summary judgment."  You see those?

A.   Yes.

Q.   Okay.  And in the other letters that are contained within Exhibit 16, there's no other reference to this 30-day extension except in your response on Page 7, is there?

A.   Your Rule 11 agreement -- which you did not put here -- which was faxed to my office did have the 30-day agreement.

MR. SMITH:  That's all I have of this witness, Your Honor.

THE COURT:  Okay.  Counsel, do you have any testimony or information you would like to present to the Court on this point?

MS. LEE:  Yes, Your Honor.  I did not receive the e-mail on the 21st.  When I received this letter, Your

Honor, which is attached to Number 3 -- on Page 3, it says, "Finally, will you be sending me the Rule 11 agreement I sent you yesterday?" -- which is at the bottom. I had my staff call his office to inquire about what Rule 11 agreement. They faxed me a Rule 11 agreement and that is what was referred to. Unfortunately, my fax is in my Alaska office and my staff is not -- I only have one in Alaska. And she's not available to retrieve the information from the fax because she is seriously ill right now, so -- and I only found out about this yesterday. I can assure Your Honor I'm prepared for everything else. I looked in my spam folder. I do have a spam that holds e-mails. If I knew this was going to be heard -- even though we have all of these other motions to be heard -- I would have been prepared for it.

THE COURT: Okay.

MR. SMITH: I have another exhibit, Your Honor. Mr. Gibbs -- I asked him, he's the pro se -- I asked him to print up the e-mails that he got. He can affirm this if you'd like. But I have Exhibit 17, which is what he gave me that he had printed up, which is the e-mail that he received. And I'll offer that at this time if I may.

THE COURT: On 17?

MR. SMITH: Yes, ma'am.

THE COURT: I'm waiting for her response. I've heard nothing.

MS. LEE: It purports to be the same e-mail that he's saying that he sent to me on Exhibit -- Page 1.

THE COURT: Okay. Exhibit 17 is admitted appearing no objection.

MR. SMITH: And, finally, I would offer that I do not believe that we were asked to fax any Rule 11 agreement. Most everything we do -- at least from our side of the case -- is done via e-mail, and that's why I gave you the entire e-mail traffic during this period of time. I do believe notice was validly served and we're asking to proceed on the motion for partial summary judgment.

THE COURT: Okay. Your response.

MS. LEE: I actually have the Rule 11 agreement that was signed by all parties, and it specifically states that "The parties agree to e-mail service of all documents pertaining to the matter and to acknowledge the receipt of the service within one business day by e-mail or fax. If no acknowledgement of the service is forthcoming from the receiving party within one business day, the service shall be effected in an alternate manner pursuant to Rule 21 of the Texas Rule of Civil Procedures."

I did not reply to him, Your Honor. And he can confirm that I do write back saying, "Received it," "Got it," "Thank you." And I did not reply. The only reply that he has is three days later on August 23rd -- or, no, I -- on the next

day in which, when I reply, I'm replying to the attached letter for Number 3 on the very next day that says -- where I say, "I've not been in my office all day yesterday and I'm getting the e-mails now, so I'll be responding hopefully by the end of the day."

We have filed this Rule 11 agreement, Your Honor, but I have a copy for you if you would like it.

THE COURT:  You're welcome to mark it if you desire to offer it at this part of the hearing.

MS. LEE:  Exhibit A, Your Honor.  May I please approach?

THE COURT:  Opposing counsel?

MR. SMITH:  I have no objection.

THE COURT:  Admitted.  All right.  Ms. Lee, what is the configuration of your office?  How do you run your business?

MS. LEE:  I have two offices, Your Honor.  I have one in Alaska and one in Texas.  The one in Alaska is my main office with my server.  Anyone who works for me logs into that server.  That's where my faxes come in to.  I have currently one staff in Alaska, two staff in Texas, but they remote in.  So, everything is done out of my main Alaska office.  When I file documents, we file them through Federal Express overnight from Alaska.

THE COURT:  So, where do you reside?

MS. LEE:  My permanent residence is in Alaska, Your Honor.

THE COURT:  But you live down here?

MS. LEE:  I do have a place here, Your Honor, yes.  And my office in Fort Worth is more of a satellite office.  I do not have staff there.

THE COURT:  But you have two people associated with the Texas office?

MS. LEE:  Yes, Your Honor.  One of them is located in India and one of them -- she's just there for the military.  She's an attorney -- and the other one is in College Station.

THE COURT:  So, how do you get your correspondence?

MS. LEE:  If it comes to my Texas office, they scan it in and they send it to me.  All e-mails, obviously, will come to my e-mail address that I can access anywhere in the world.  I can log into my server.  I also have it on my iPhone.  So, if Mr. Smith serves me with anything, it goes to my Texas office.  They scan it in and send it to my Alaska office, and then when I'm in town I will take the originals. Or, if I need them to ship to me, I'll have them ship it.

THE COURT:  Do you have anyone else that handles your e-mails for you or you handle them directly yourself?

MS. LEE:  I handle them myself, Your Honor.

THE COURT: Okay. And what is the notice regarding the family medical leave -- how does that play into where you're spending your time or what you're doing for work right now?

MS. LEE: I spend a lot of time in Texas because my father is very ill right now. Opposing Counsel is aware of that.

THE COURT: All right. Now, anything further on this point, Mr. Smith?

MR. SMITH: No, Your Honor. No. I'm sorry.

THE COURT: Anything further, Ms. Lee?

MS. LEE: Concerning the motion for partial summary judgment, Your Honor?

THE COURT: Yes.

MS. LEE: No. Well, no, Your Honor -- if we're just talking about me receiving notice, then, no.

THE COURT: Correct. That's all I'm talking about. We haven't argued any motions.

All right. So, when are you saying that you actually received notice of this service?

MS. LEE: Yesterday. I received the document, Your Honor, when he provided it to me in August. I did not receive notice of the hearing until yesterday. And the only way -- the reason I received notice was because the very beginning of his response to my -- or his objections to my

response, it stated that I did not file it and it's supposed to be heard today. And that was the first time I became aware of it, through his filing.

THE COURT: Okay. What we're going to do is, we're going to take up the summary judgment motion at another time. We need to pick that time. I don't have the benefit of having the Court's coordinator at this location. Let me make that contact because this issue needs to be firmed up.

(A break was taken.)

MR. SMITH: I was going to try to get your attention before you get off the phone. Counsel is actually supposed to be in the State for depositions the 13th, 14th, and 15th. She's indicated she is willing to waive the 21-day requirement if you want to do it during that period of time. I'm okay with that.

THE COURT: I have a capital murder case starting that day.

MR. SMITH: That seems to take precedence.

THE COURT: It will probably take us all day to pick on Monday. We're doing questionnaires. Unless the parties want to come in on Tuesday at 8 a.m. And then I need to know how long you expect to argue your motion for summary judgment. I can accommodate you if you can be here at 8. I would expect you be done within an hour's time.

MR. SMITH: I can certainly be done in an hour's

time.  There will be objections, no doubt.  And that will take more time than the actual motion.  But I think an hour would be more than enough time.

THE COURT:  Is that sufficient time for both sides to finish up their case?

MS. LEE:  If he's willing to do it in an hour, then we'll do it in an hour.

THE COURT:  Okay.  Then we'll do it October 14th at 8 a.m.

MR. GIBBS:  Your Honor, I have a previous work engagement.  I wanted to come up here for the hearing but I do have a previous engagement.  May I have leave of the Court, please?

THE COURT:  Yes.

MR. GIBBS:  Thank you.

THE COURT:  For the purposes of the summary judgment motion, sir, you can appear by phone if you want. Otherwise, we'll expect you also to have had notice of the setting based on the fact that I'm setting it in court.

MR. GIBBS:  Yes, ma'am.

THE COURT:  So, you won't receive anything else in writing as far as the Court is concerned.  But October 14th at 8 a.m. we'll have the motion for summary judgment.

MR. GIBBS:  Does that mean I need to be here, Your Honor?

THE COURT:  Only if you want to be heard.
You're also welcome to appear by phone.

MR. GIBBS:  Yes, ma'am.

THE COURT:  You'll need to make those
arrangements.  Thank you.

All right.  Let's step through the other motions
that we have.  We have the motion to show authority, motion for
change of venue.

MS. LEE:  Yes, Your Honor.

THE COURT:  Do the parties think those are
appropriate to take up initially?

MS. LEE:  Yes, Your Honor.  Also, I've conferred
with opposing Counsel, and the motion to strike was
inadvertently left off.  That should be on the list, as well.
Motion to strike intervention.

MR. SMITH:  I believe it should have been set,
yes, Your Honor.

THE COURT:  Okay.

MR. SMITH:  I tried to be inclusive.  It was set
for original filing, which included the motion to show
authority as I recall.  The intervention was filed later.

MS. LEE:  June 23rd.

MR. SMITH:  Yeah, it's properly set.

MS. LEE:  And if, Your Honor, we're going by
dates, I think that would be Number 2.  So, that would be after

the motion to show authority, motion to change venue.

THE COURT: Okay. I'm looking at the document filed on April 25th, motion to show authority, motion for a change of venue, others. Is that one of the documents you all are talking about or have you had amended pleadings since then on that?

MS. LEE: Yes, Your Honor. I believe there's also a first supplement to the motion to show authority, as well.

THE COURT: Okay. I have first supplement to motion to show authority filed on September 29th, 2014. Is that the document you're referring to?

MS. LEE: The 29th?

THE COURT: September 29th, today's date, at 9:28 a.m.

MS. LEE: That would have been yesterday, Your Honor?

THE COURT: I'm sorry. Yesterday, yes.

MS. LEE: I guess that's the document. We shipped it out on -- prior to that. Should have received it Friday. But, yes, Your Honor, that would be the document.

THE COURT: Okay. Are you expecting that this is supposed to replace the other or is it actually serving to supplement?

MS. LEE: Just a supplement, Your Honor.

THE COURT: Okay. Then I'm looking at the June 18th filing of the original petition and intervention. And I am assuming that that's the petition or motion that's being objected to or challenged.

MS. LEE: Yes, Your Honor.

MR. SMITH: No.

THE COURT: You're saying, no, you have a supplemental one?

MR. SMITH: No, I think the motion to show authority was dealing with the original petition that was filed by Pentex Foundation.

MS. LEE: I believe she's -- what she's referring to is my -- Your Honor, you're referring to my motion to strike?

THE COURT: Yes.

MS. LEE: Yes.

MR. SMITH: It would be that petition and intervention, yes, Your Honor.

THE COURT: Okay. I just want to make sure I have my hands on the documents we're talking about. All right. I'll receive some input on the motions that y'all want to address first.

MS. LEE: Your Honor, I think the motion to show authority should be first. Potentially some housekeeping concerning some subpoenas to -- that I sent out -- which

documents have not been provided to me. That could be very brief before the motion to show authority.

THE COURT: All right.

MR. SMITH: Your Honor, it's my position that the motion to show authority is not properly before the Court. You probably don't see a whole lot of these. I don't know if you're familiar with the Rule but I brought a copy for you.

THE COURT: Thank you.

MR. SMITH: I have a copy for Counsel, as well. It does require that the motion be sworn. And this motion -- until the first supplement on the 25th, there's not even a hint of an affidavit. And the affidavit that we got does not -- is not sufficient for what is required. And I've got a case law to show you, Your Honor. It's the Townsend case out of Beaumont last year. It says -- and this is coming right from Rule 12 -- "requires a sworn statement that the movant believes the suit is being defended without authority." I've got a copy of the affidavit that Counsel submitted to tender to the Court, and all it does is authenticate certain documents. It doesn't trigger the motion to show authority because Counsel has not stated under oath that the suit is being prosecuted or defended without authority. Without that, it's not properly before the Court.

THE COURT: Okay. Your response.

MS. LEE: It's throughout the entire document,

Your Honor. It's throughout all the documents that this is -- they do not have authority. That this case has been filed -- that is not only in my motion to show authority, but it is in every single document that we have filed with this Court -- almost every single document that we have filed. That he -- that Scott Smith is pursuing this case without the authority of Pentex Foundation -- without the board of Pentex Foundation. It's throughout -- and so, the affidavit is certifying the authenticity of the documents that are provided to show that the authority was not appropriately obtained by Mr. Smith nor by Mr. Skotnik when they were hired. And I do have both of my defendants here who have filed multiple affidavits with this Court and could also profess that this is being filed without authority.

THE COURT: Okay. But do you have a sworn motion is his point. The Rule --

MS. LEE: All you have -- it's my understanding, Your Honor, that we have to provide an affidavit and I did provide an affidavit.

THE COURT: Okay. Well, have you looked at what he's saying the Rule says and what's been printed out?

MS. LEE: Well, the Rule provides that a sworn written motion, and that was supplemented in my first supplement, Your Honor.

THE COURT: So, you're saying you filed the

affidavit?

MS. LEE: Yes, Your Honor. It's the affidavit that he had provided to you, Your Honor. But, again, I have my clients here. We are swearing that he has -- he is prosecuting this case without authority. And I can assure you that the evidence will show that.

THE COURT: Well, I'm not ready to hear that part. We've got to get over this hurdle. So, show me --

MR. SMITH: Additionally, Your Honor -- I'm sorry. I don't mean to interrupt. It does require ten days before the hearing. And we got this -- I got it on the 25th, you got it today or yesterday. So, that's not even timely even if it was sufficient. So, there's a twofold problem here.

MS. LEE: I don't believe that it does provide it has to be -- you have to have notice of the hearing ten days before the hearing. The notice was given out in, I believe, June. This has been on the docket since June.

THE COURT: Okay. It says, "The notice of the motion shall be served upon the challenged attorney at least ten days before the hearing on the motion but the motion must be sworn to." So, was it sworn to? It sort of presupposes the swearing to the motion will have happened first and then we've got ten days' notice for the hearing. Are you saying it happened in that order?

MS. LEE: No, Your Honor. The motion was

originally --

THE COURT: I mean, we wanted to make sure we gave you the time --

MS. LEE: Absolutely.

THE COURT: -- on the motion for partial summary judgment, so, in all fairness, don't you think that Mr. Smith should have time --

MS. LEE: Yes, Your Honor.

THE COURT: -- I mean, consistent with the Rules? I mean, if we're going to play by the rules on one side, we need to play by the rules on the other, don't you think?

MS. LEE: That's why I'm not really arguing it, Your Honor.

THE COURT: Okay. All right. So, then it would seem that the parties need to address this motion at a time when you have sufficient notice, or are you trying to use it now as a defensive measure to say it shouldn't get to be raised at all?

MR. SMITH: Absolutely, Your Honor. It's here, it's set. And if it's not set properly, it should be dismissed.

MS. LEE: Your Honor, I have a lot of case law that -- and even in -- I think Mr. Smith can also inform you that he was able -- in another court hearing concerning a

motion to show authority, that he was able to get an extension to provide additional information. And even though I could have argued the exact same thing -- the motion was prime and ready to be heard -- that it should not be heard and should be dismissed with prejudice, but that's not what -- and I know that court's ruling is not precedence on your court. I'm just letting you know if we're all going to play fair, he was able to get an extension for that court hearing to provide additional information. I'll be more than happy to supplement those again, get it to this Court tomorrow, next day, and we can have it set on the 13th or another day that is mutually appropriate.

MR. SMITH: And this is the problem, Your Honor. This is a side show. We can't get to the meat of the matter if we're playing games with side shows. We did have a hearing in Tarrant County in July. And we produced all the information requested in July and August. We produced about 500 pages of documents, a lot of which supports --

THE COURT: So, are you ready to go forward on the motion now, Mr. Smith?

MR. SMITH: I'm not prepared to go forward because it's not properly before the Court.

THE COURT: Okay. Well, we can't have it both ways. I can't give you everything when it's just the ruling that you want. I mean, if you want to have me rule on it, she

wants to move forward. If you want to have the time you need, then I'll give you the time you need. You said you already presented to one, it would seem you would be prepared. However, if you're not prepared because you did not have notice, I'm happy to give her the time that she needs. Which way do you want it?

MR. SMITH: I would prefer to have it properly set with the supporting affidavit.

THE COURT: Okay. Well, let's do that, then. Okay. So, what -- when do y'all want to hear it? I cannot stack multiple hearings on the 14th. I will be distracted with another matter. Okay. I can't have this many hours put into this hearing at that time. I want to give you the time that you need. We can set this before that hearing because that one was set for 21 days out.

MS. LEE: Your Honor, did you say that -- when you had spoken to the clerk -- that you had time on the 20th, or what days were you looking at?

THE COURT: I was asking about the 20th. It would be another 8 a.m. start. The jury trial, we expect that mini-cap to run through the next week. There's a chance that it would not. But I would need to start at 8 a.m. on that Monday, the 20th.

MR. SMITH: I can do it then, Your Honor, but I am set for a jury trial in the 15th District Court. My guess

is that's not going to be reached but I'd like everybody to know that when you set this.

THE COURT: Okay. Well -- but if we start this case -- if we start this at 8 a.m., we wouldn't actually have priority but we would do everything we could to get you out of here.

MR. SMITH: I'm already set. I can't make it. That's a jury trial setting.

THE COURT: Right. But having this at 8 a.m. would be earlier than the 8:30 or 9:00.

MR. SMITH: It's virtually impossible to complete this in an hour. She subpoenaed several witnesses for this.

THE COURT: Okay. Then when -- what works for you? You don't want it put off.

MR. SMITH: I'm just saying I can't double-set it if I can't be able to call and tell the Court I'm going to be in a jury trial.

THE COURT: Right. I mean, I don't think that's a good use of anybody's time. You're telling me that your clients want this heard now. If you want to put it off, I'll be happy to give you a different day. What timeframe -- what timeframe would you like?

MR. SMITH: I can do it that Tuesday. I'll know for sure if I'm in the jury trial by Monday, so...

MS. LEE: October 21st?

THE COURT: 8 a.m. on the 21st?

MR. SMITH: Yes, ma'am.

MS. LEE: Yes, Your Honor.

THE COURT: All right. We'll see everybody at 8:00 a.m. on that one. All right. Okay. I believe there's a motion for change of venue. Are the parties ready on this matter?

MS. LEE: Yes, Your Honor, I am.

MR. SMITH: Yes, Your Honor.

MS. LEE: No objection.

THE COURT: All right. Looks like we're going to make some progress. All right. Go ahead and you may make your argument. I believe, Ms. Lee, this is your motion.

MS. LEE: Yes, Your Honor. Our -- the basic argument that we have is that obviously the venue is not proper. A contract for sale for land, which is the whole -- which is why we're in front of this Court -- was drafted and it's an undisputed fact drafted by an individual, Allen Barcroft, who is not an attorney. He drafted this document --

MR. SMITH: Are we making evidence, Your Honor?

MS. LEE: I can provide --

MR. SMITH: There's no affidavit to support these kinds of allegations and I don't think it would be appropriate to get into those.

THE COURT: Okay. Do you have something to demonstrate what you're arguing?

MS. LEE: Well, I have my clients here who can testify to the drafting of the document because they signed it. But it comes to the crux of, they're trying to say that a document that this gentleman drafted --

MR. SMITH: Your Honor, I don't mean to interrupt. I need to make an objection. Venue motions are based upon venue facts pleaded and affidavits, not testimony. So, I would object to anything outside the record.

THE COURT: What's your response to that, Ms. Lee?

MS. LEE: I believe -- I have to look at my documents, but I believe that I have the information in my actual motion, Your Honor.

THE COURT: Is it filed in the form of affidavit or something that supports --

MS. LEE: No, Your Honor, it's in my motion. I can move on. I have other arguments I can argue.

THE COURT: Okay. So, there's no evidence to support that. We'll move on.

MS. LEE: Yes, Your Honor. Okay. So, Mr. Smith provides -- so, this is a mandatory venue provision in the contract because the contract -- there's a five-million-dollar potential buyout. And he provides that -- according to Rule

15.020(a) of the Civil Practice and Remedies Code -- that "A major transaction means a transaction by written agreement under which a person pays or receives or is obligated to pay or receive or entitled to receive consideration of more than a million dollars."

Well, a five-million-dollar buyout provision is not a provision in which a person has to pay or receive or is obligated to pay or receive. His argument is that because it's a major transaction, that the venue is proper because the document provides that the venue should be in Fannin County, Your Honor. So, our first argument is that it is not a major transaction. If you look at the contract for sale, what was exchanged was 21 gold coins in exchange for 30-percent interest into an estate. Even though I am not -- I'm not certain on what the coins are, they're certainly not worth a million dollars. Then if you also look at Section 15.020(d) of the Civil Practice and Remedies Code, it provides that "Any section in a contract that applies an action that is unconscionable at the time that it was made, then that venue provision is not respected."

So, again, we have 21 gold coins for 30 percent of the estate. Which, I believe, a rough estimate, they received maybe several-hundred-thousands of dollars -- certainly not a million. And certainly having a five-million-dollar buyout provision, that seems quite

unconscionable to me. I'll give you 21 coins. In order to get out of this contract, you have to give me five-million dollars.

So, Section 15.035 states that "A contract in writing" -- "If a person has contracted in writing to perform an obligation in a particular county, expressly naming the county" -- which is exactly what this contract states -- "then the obligation may be brought against him in the county in which he signed the document or in which the client or the individual is domiciled." All of the defendants are in Tarrant County; the notary was in Collin; the contract for sale was recorded in Denton County. But, again, it says "Fannin County" on the document. It is not a major transaction. So, contrary to opposing party, it's not mandatory because it's not a major transaction.

Now, it also provides in (b) of that provision exactly what I had stated, that if a person pays money arising out of transactions or services entitled primarily for personal, family, household, or agricultural use, then that's where the lawsuit should be -- which should be in Collin County or Tarrant County.

Besides those arguments, Your Honor, John Skotnik who originally filed the document -- he filed the document and he is a municipal court judge. Also, Mr. Skotnik is, I believe, a municipal judge, as well. May not be in this county, may be in Grayson County. My clients are highly

prejudice by having this in Fannin County. There's no connection to this contract for sale in Fannin County. It was recorded in Denton. The individuals have always lived in Tarrant. It was signed in Collin County. And it's just from the -- from the convenience of the drafter to say it was in Fannin County.

So, we respectfully request that this Court -- that this hearing be moved to another county. And as Your Honor will no doubt hear multiple times, there is another lawsuit in Tarrant County that's being heard. It's similar to this case. It has almost the same players, but it's concerning the actual money that was into a trust.

So, the contract for sale provided that an entity would be created. That entity is allegedly the GWB trust. That lawsuit is in Tarrant County. We would like to consolidate the cases, but of course the cases can't be consolidated once the cases have been transferred. So, my clients would like this to be transferred to Tarrant County, and if not, then as 15.35 -- I'm sorry -- 15.035(b), it should be either in Tarrant County or in Collin County where it was signed. Thank you, Your Honor.

MR. SMITH: Well, the reason I wanted to stick to what was filed is because I think what they filed is different from what you just heard, Your Honor. The motion to transfer venue before the Court is Pages 3 and 4 of the initial

filing they made. And what they did was, they filed a motion to transfer for the convenience of the parties. It's not a mandatory venue election they're making. It's not a permissive venue if they're saying that they can't get a fair trial here, prejudice in this county is so great they cannot get a fair and impartial trial. That's what they're telling this Court is the basis for why they want their venue changed. In response, we did file -- I don't know if you found our response to the motion to transfer venue.

THE COURT: I did. Let me lay my hands on it.

MR. SMITH: Essentially, we attached the contract that's really the basis of this whole lawsuit and the one in Tarrant County. I have an extra copy if you'd like it.

THE COURT: Well, I'll lay hands on it. I have it. The one filed September 4th?

MR. SMITH: Yes, Your Honor.

THE COURT: Yes, sir.

MR. SMITH: What we did is, we have attached the actual contract at issue. And there is a venue provision. It does specify venue in Fannin County, Texas. And I've given you the law that says in the instance where it involves in excess of -- I think it's one-million dollars -- that's considered a major transaction. This contract has a specific buyout of five-million dollars. Therefore, by its very expressed terms, it does involve a major transaction. Under that circumstance,

the venue provision in the contract prevails and is not only permissive, it is mandatory. I don't think there's any doubt that this Court has venue and should not transfer venue.

And just as an aside, the case filed here in Fannin County was the first filed case. The case in Tarrant County was filed second. So, I don't have a player in that suit. I have not participated in those proceedings, but I do know this is the earlier-filed suit.

THE COURT: You have a response, Ms. Lee?

MS. LEE: I would like to point out that when John Skotnik -- who is the municipal court judge -- when he was the attorney for the defendants, that's when the argument was that there would be a great prejudice in this county, Your Honor. We did not amend that motion. But I would just like to reiterate one more time that the law is very clear, it provides that a major transaction is if a person is obligated to pay or entitled to receive consideration in more than one-million dollars. A buyout provision is not an obligation, it is a buyout. And that's 15.020. So, the venue here is not mandatory. And if you go to -- that's all I want to say, Your Honor.

THE COURT: Okay. Does either party have any information about the value of the 21 gold coins filed with anything?

MR. SMITH: I don't know. I can represent to

the Court that the estates are large estates and I would not be surprised if there were over a million dollars easily in those estates that are at issue.

MS. LEE:  I would disagree, Your Honor.

THE COURT:  I'm sure there's substantial money involved.  The question is regarding the actual transaction that is evidenced by the contract that was signed, not about the estates, necessarily.  I understand they might be part of that, but -- I don't see anything that indicates that all of the estates were involved in this contract.

MS. LEE:  They weren't, Your Honor.

THE COURT:  The difficulty is I don't have any information indicating the value of the 21 gold coins.  I mean, depending on what they were.  If they came from a particular shipwreck, they could be worth a million dollars easy.

MR. SMITH:  There's other consideration expressed in the contract.

THE COURT:  Okay.  Well, based on the other information in the case, the Court is going to grant the motion to transfer venue.  I don't like that because I know I can probably resolve this case more quickly than you can get it done over in the neighboring county.  So, personally, I think it would be more efficient here but I think it's appropriate given where the defendants reside and that I don't have any evidence that this is a case that involves more than a million

dollars in a sense that the buyout provision -- I don't think -- rises to that level.  If there's something that can be done as a result of the ruling on the motion to transfer venue in the way of an appeal, I'm happy to have somebody correct me.  But, otherwise, that's the Court's ruling.

MR. SMITH:  Where are you transferring it to, Your Honor?

THE COURT:  To Tarrant County.

MS. LEE:  Your Honor, I do have an order.

THE COURT:  And I believe -- you may have Mr. Smith look at it and see if it comports to the Court's ruling.  And have the clerk's office be notified of this and for you all to work with them to get it transferred as expeditiously --

MS. LEE:  Is this acceptable?

MR. SMITH:  That's fine.

MS. LEE:  May I approach, Your Honor?

THE COURT:  Yes.

MS. LEE:  He approved it, Your Honor.

MR. SMITH:  Your Honor, I assume that would be to a district court in Tarrant County?

THE COURT:  Yes.  I don't know why there would be another one.  I would think it would be a court of the same jurisdiction as this one.  I'm assuming they have civil jurisdiction courts, as well as -- I don't think they have that

many general jurisdiction courts, so I'm going to assume it's going to go to a court with jurisdiction over this matter. If they have a general jurisdiction court -- I don't think that I make the call. I think what happens is it's just a category of courts. As long as they have civil jurisdiction, it will go into that court. It might end up being a general jurisdiction court if Tarrant County has any of those left. And it will otherwise go into one that is strictly civil. The clerk -- I would assume -- would assign that randomly. And then the parties will make their arguments over there if they desire to have those combined and what other court. That would be for a different court to make that decision, not this court. All right. Is there anything else that needs to be addressed?

MS. LEE: No, Your Honor.

MR. SMITH: I don't think there would be anything else if it's been transferred.

THE COURT: All right. Then the other matters will no longer have any setting on the Court's docket and the order has been signed. And we will have this file delivered to the district clerk -- we'll have the bailiff deliver it and that way, if you all will go to the clerk's office you can obtain your copy today.

MS. LEE: Your Honor, may I approach?

THE COURT: Yes.

MS. LEE: I am so sorry about me talking over

you. That was so inappropriate.

THE COURT: The court reporter can write that down.

MS. LEE: I don't know when I would come in your courtroom again, but I can assure you I am seriously sincere --

THE COURT: I appreciate it. Thank you.

REPORTER'S CERTIFICATE

THE STATE OF TEXAS    )

COUNTY OF FANNIN       )

I, Gale H. Fiasco, Official Court Reporter in and for the County Court at Law of Fannin County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted, tendered in an offer of proof or offered into evidence.

WITNESS MY OFFICIAL HAND this the ___8th___ day of ___December___, 2014.

Gale H. Fiasco
Texas CSR 6268
Expiration Date: 12/31/2015
210 S. Main Street
Bonham, Texas 75418
(903) 583-9258



**PLAINTIFF'S EXHIBIT 16**

## Scott Smith

**From:**    "Scott Smith" <smithlaw@airmail.net>
**To:**        "Christy Lee" <clee@christyleelaw.com>
**Cc:**        "Howard Gibbs" <hkgibbs@gmail.com>
**Sent:**     Thursday, August 21, 2014 1:36 PM
**Attach:**   14-5-7 Clerk re appearance.pdf; Rule 11 Agreement.pdf; 14-8-12 Motion for Partial Summary Judgment.pdf
**Subject:**  Pentex Foundation v. Gibbs, et al.; CV-14-41665

Christy,

You probably do not recall, but when I entered my appearance I gave notice of my vacation next month. I am attaching a copy. The discovery you sent requires a response during that time period. That, and given the volume of discovery, I am requesting a thirty day extension. If this is agreeable, I am attaching a proposed Rule 11 Agreement to that end. If not, let me know and I can so move the Court.

Also, I am attaching the file-marked Plaintiff's and Intervenor's Motion for Partial Summary Judgment, with a completed FIAT. Note that this motion is set for hearing on **September 30, 2014, at 8:30 a.m.**

Scott Smith
Attorney and Counselor At Law
120 South Crockett Street
P.O. Box 354
Sherman, Texas 75091-0354
Facsimile 903.870.1446
Telephone 903.868.8686



PLAINTIFF'S
EXHIBIT
16
Pentex/GBU

PENGAD 800-631-6989

8/21/2014

2

## Scott Smith

| | |
|---|---|
| **From:** | "Christy Lee" <clee@christyleelaw.com> |
| **To:** | "Scott Smith" <smithlaw@airmail.net> |
| **Sent:** | Friday, August 22, 2014 3:29 PM |
| **Subject:** | RE: Pentex Foundation v. Gibbs |

Scott,

I have not been in my office all day yesterday and am getting to emails now, so I will be responding hopefully by the end of the day. If I can unable to respond to you before the end of the day, you will have a response by the end of the weekend.

Christy

---

Christy Lee, LL.M., J.D., M.S.
Law Offices of Christy Lee, P.C.
225 E. Fireweed Lane, Suite 200
Anchorage, Alaska 99503
Phone: (907) 339-9931
Fax: (800) 437-7901

777 Main Street, Ste. 600
Fort Worth, TX 76102
Phone: (817) 504-6075
Fax: (800) 437-7901

EMail:    clee@christyleelaw.com
Website: www.christyleelaw.com

---

**From:** Scott Smith [mailto:smithlaw@airmail.net]
**Sent:** 08/22/2014 12:21 PM
**To:** Christy Lee
**Cc:** Howard Gibbs; Earl Hargrave
**Subject:** Pentex Foundation v. Gibbs

Please see attached letter.

---

Scott Smith
Attorney and Counselor At Law
120 South Crockett Street
P.O. Box 354
Sherman, Texas 75091-0354
Facsimile 903.870.1446
Telephone 903.868.8686

# SCOTT SMITH
ATTORNEY AND COUNSELOR AT LAW

E-MAIL: smithlaw@airmail.net
FACSIMILE: (903) 870-1446
TELEPHONE: (903) 868-8686

120 SOUTH CROCKETT STREET
P.O. BOX 354
SHERMAN, TEXAS 75091-0354

August 22, 2014

VIA EMAIL

Christy Lee, Esq.
Attorney At Law
225 E. Fireweed Lane, Suite 200
Anchorage, Alaska 99503

     RE: *Family Settlement Agreement.*

Dear Christy:

     With respect to you demand for alternative dispute resolution, my clients Pentex Foundation and Joshua Unger, Trustee of the GBU Friends and Associates Trust will agree to mediation with a mutually agreeable mediator. I believe this should be conducted with all parties under the caption of both the Fannin County and Tarrant County cases so we do not have any loose ends should there actually be a settlement.

     I also want to reiterate that we disagree that the Fannin County case involves the estate or that the Family Settlement Agreement provisions have been implicated. Even if it was, again page 3, section 3.26(a) of the FSA is clearly permissive, using the word "may." Section 3.26(b) follows and states certain potential results if a "beneficiary" is determined to have engaged in certain conduct. I ask again, is it your position that the Pentex Foundation and/or the GBU Trust are a "beneficiaries?"

     Finally, will you be sending the Rule 11 agreement I sent to you yesterday? I thank you for your attention to this matter.

Yours very truly,

T. Scott Smith

TSS/bhs

3

cc:      Howard Gibbs
          Earl Hargrave

4

## Scott Smith

**From:** "Christy Lee" <clee@christyleelaw.com>
**To:** "Scott Smith" <smithlaw@airmail.net>
**Sent:** Sunday, August 24, 2014 9:12 PM
Scott,

I have been unable to speak to my client about your proposed rule 11 agreement. I will try every effort to get back to you tomorrow. Christy

Sent from my iPhone

5

## Scott Smith

**From:** "Christy Lee" <clee@christyleelaw.com>
**To:** "Scott Smith" <smithlaw@airmail.net>
**Sent:** Monday, August 25, 2014 10:41 PM
**Attach:** Signed Ltr to Scott Smith re ADR and extension for discovery (Walton).PDF
**Subject:** FSA and Discovery Extension

Scott,

Please see the attached letter in response to your Rule 11 agreement to extend the deadline for discovery and the FSA mediation.

As you are aware, I am on FMLA, but will continue to be responsive to all correspondence.

Christy

---

Christy Lee, LL.M., J.D., M.S.
Law Offices of Christy Lee, P.C.
225 E. Fireweed Lane, Suite 200
Anchorage, Alaska 99503
Phone: (907) 339-9931
Fax: (800) 437-7901

777 Main Street, Ste. 600
Fort Worth, TX 76102
Phone: (817) 504-6075
Fax: (800) 437-7901

EMail:    clee@christyleelaw.com
Website: www.christyleelaw.com






CHRISTY L. LEE
Attorney

225 E. Fireweed Lane, Ste. 200
Anchorage, Alaska 99503
Phone: 907.339.9931
Fax: 800.437.7901

777 Main Street, Ste. 600
Fort Worth, Texas 76102
Phone: 817.504.6075
Fax: 800.437.7901

clee@christyleelaw.com
www.christyleelaw.com

August 25, 2014

VIA    Fax: 903-870-1446
       Email

Scott Smith
120 South Crockett Street
Sherman, TX 75091-0354

        Re:    Request for Extension for Discovery
               ADR for Family Settlement Agreement

Dear Scott:

I received your letters concerning ADR and a request to extend the deadline for discovery from Pentex Foundation and GBU Friends and Associates Trust.

No doubt your clients want to commingle the Tarrant County case and the Fannin County case, especially since Judge Ferchill's recent ruling. However, the two (2) cases are separate and cannot be comingled. The Fannin County case is against the Estate of Bert Hughes Gibbs because the only person who could determine the attorney fees is Ken as Independent Administrator of the Estate (the "Estate").

Because the FSA involves the Estate, mediation must occur in Tarrant County. We will set this as soon as possible, even though I am on family medical leave act ("FMLA"). As I have previously stated, your client will be responsible for its share of the fees associated with the ADR. As my client believes that the Fannin County lawsuit is a farce, and since you have done nothing but assist Howard Kirk Gibbs, Howard Kirk will be invited to participate in this ADR. If you see any issue with approaching ADR in this manner, please let me know as soon as possible. You and Howard Kirk can provide me a list of three (3) mediators in Tarrant County, and I will let you know Ken's choice. That seems fair. If you prefer a different way to choose the mediator, please let me know.

Regarding the discovery requests from Ken to Pentex and GBU Trust: The respective due dates of September 10 and 11, 2014, were oversights on my part. I apologize for scheduling the production during your leave. After much persuasion, under the circumstances, Ken will agree to an extension. However, a thirty- (30-) day extension is excessive. Would either Pentex or GBU Trust have agreed to a thirty- (30) day extension for my client? Based on developments thus far,

Ken fully anticipates that your clients will object to all discovery requests, provide him with nothing, and that a motion to compel will be necessary.

My client feels that a fifteen- (15-) day extension is more than reasonable, especially since your leave is planned for only a little more than a week in early September. Therefore, Ken will extend the production deadline for both Pentex and GBU Trust to 5:30 p.m., Monday, September 25, 2014, provided that both Pentex and GBU Trust will agree in a Rule 11 Agreement that the hearing September 30, 2014, is to be postponed until after the mediation (or a mutually agreed upon date). Ken has no issue with rescheduling the hearings on September 30th as soon as possible, as we are sure the docket is filling up in Fannin County. We also have other motions that will be filed very shortly and we would like those to be heard on the same day as well.

Under the circumstances, Ken's new deadline is very generous. As I am sure you realize, Ken has no reason to trust you and does not, in fact, want to offer you any concessions at all, especially since it was revealed that you agreed to represent Beverly Miller in Tarrant County. Even Judge Ferchill was shocked at the disturbing news that you accepted the $50,000 retainer drawn from a GWB Family and Friends Trust bank account. Of course, we have no verification that you did return the money. Under the circumstances, Ken will not provide a longer extension than fifteen (15) days for discovery.

Due to yours and your client's past and very recent actions, Ken has very little faith that your clients will participate in good faith in the mediation, so we need to schedule a time for depositions for Joshua Unger, Danny Unger, Al Barcroft, and the mysterious person who signed the engagement letter. When can I schedule the various parties, including Al, for depositions? If you want to continue to state that you do not represent Al, please put that in writing, yet again. Obviously, having these depositions back to back would be preferable and please have Al Barcroft give all the information he has about Pentex Foundation to Danny Unger, since Al has always been the legal representative of Pentex Foundation (or as Beverly Miller has testified that Pentex Foundation is Al) and Danny Unger needs to give Joshua Unger all the information concerning GBU Trust, as Danny Unger was the initial trustee.

Please forward me a Rule 11 Agreement to the extension of discovery and postponing the September 30th hearing until after the mediation (or call the court and lets agree to a date). Please provide me all the dates in which you are *not* available in September and October, and I will get the mediation scheduled as soon as possible. I suspect it will take the entire day. If you believe otherwise, please let me know. Also, please provide me a list of "complaints" that your client has about Ken's administration of the Estate, and also provide my office with a settlement offer or solutions prior to one (1) week to mediation.

Very truly yours,

LAW OFFICES OF CHRISTY LEE, P.C.

Christy L. Lee



**PLAINTIFF'S EXHIBIT 17**

**Scott Smith** 📎

To: Christy Lee
Cc: Howard Gibbs
Reply-To: Scott Smith

**Pentex Foundation v. Gibbs, et al.; CV-14-41665**

August 21, 2014  1:41 PM

Hide Details

Christy,

You probably do not recall, but when I entered my appearance I gave notice of my vacation next month.  I am attaching a copy.  The discovery you sent requires a response during that time period.  That, and given the volume of discovery, I am requesting a thirty day extension.  If this is agreeable, I am attaching a proposed Rule 11 Agreement to that end.  If not, let me know and I can so move the Court.

Also, I am attaching the file-marked Plaintiff's and Intervenor's Motion for Partial Summary Judgment, with a completed FIAT.  Note that this motion is set for hearing on **September 30, 2014, at 8:30 a.m.**

Scott Smith
Attorney and Counselor At Law
120 South Crockett Street
P.O. Box 354
Sherman, Texas 75091-0354
Facsimile 903.870.1446
Telephone 903.868.8686







14-5-7 Clerk re
appearance.pdf

Rule 11 Agreement.pdf

14-8-12 Motion for
Partial Sum...dgment.pdf



PLAINTIFF'S
EXHIBIT
17
Pentex/GBU

PENGAD 800-631-6989



**DEFENDANT'S EXHIBIT A**

CAUSE No. CV-14-41665

| | | |
|---|---|---|
| PENTEX FOUNDATION, | ) | IN THE DISTRICT COURT |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | 336TH JUDICIAL DISTRICT |
| | ) | |
| KENNETH VERN GIBBS; AND | ) | |
| CANDACE GIBBS WALTON; AND | ) | |
| HOWARD KIRK GIBBS, | ) | |
| DEFENDANTS. | ) | FANNIN COUNTY, TEXAS |

## RULE 11 AGREEMENT FOR METHOD OF SERVICE

TO THE HONORABLE JUDGE OF COURT:

On June 20, 2014, this Agreement was entered into by Kenneth Vern Gibbs and Candace Walton, Defendants; Howard Kirk Gibbs, Defendant, pro se; and Pentex Foundation, Plaintiff; and GBU Friends and Associates Trust, Intervenor; by and through their respective attorneys and Howard Kirk Gibbs; and the Parties together hereby submit the following Rule 11 Agreement to the Court regarding the referenced case.

In the effort to conserve resources, the Parties agree to emailed service of all documents pertaining to the Matter and to acknowledge receipt of the service within one (1) business day by email or facsimile. If no acknowledgement of the service is forthcoming from the receiving Party within one (1) business day, service shall be effected in an alternative manner, pursuant to Rule 21 of the Texas Rules of Civil Procedure. However, service shall be deemed completed at the time the email is sent, except on holidays or weekends, at which time service shall be deemed completed on the next business day.

RULE 11 AGREEMENT FOR METHOD OF SERVICE
*Pentex Foundation vs. Gibbs et al.*

CAUSE No. CV-14-41665
-1-

Exhibit A

Respectfully submitted,

LAW OFFICES OF CHRISTY LEE, PC.

6/23/14
Date

By: _____
Christy L. Lee
Texas State Bar No. 24052302
777 Main Street, Ste. 600
Fort Worth, Texas 76102
(817) 504-6075 Office
(800) 437-7901 Fax
clee@christyleelaw.com

ATTORNEY FOR KENNETH GIBBS AND
CANDACE WALTON

SCOTT SMITH

6/23/14
Date

By: _____
Scott Smith
Texas State Bar No. 18688900
120 South Crockett Street
P.O. Box 354
Sherman, Texas 75418
(903) 868-8686 Office
(903) 870-1446 Fax
smithlaw@airmail.net

ATTORNEY FOR PLAINTIFF AND
INTERVENOR

6/23/14
Date

_____
Howard Kirk Gibbs, Pro Se
4360 Western Center Boulevard, Suite 205
Fort Worth, Texas 76137
(817) 233-4423
hkgibbs@gmail.com

RULE 11 AGREEMENT FOR METHOD OF SERVICE
*Pentex Foundation vs. Gibbs et al.*

CAUSE NO. CV-14-41665
-2-

REPORTER'S RECORD
VOLUME 1
TRIAL COURT CAUSE NO. CV-14-41665


PENTEX FOUNDATION                 ) IN THE DISTRICT COURT
        Plaintiff,                )
                                  )
                                  )
VS.                               )   FANNIN COUNTY, TEXAS
                                  )
KENNETH VERN GIBBS and            )
CANDACE GIBBS WALTON and          )
HOWARD KIRK GIBBS,                )
        Defendants.               ) 336TH JUDICIAL DISTRICT




* * * * * * * * * * * * * * * * *

HEARING BEFORE THE COURT ON

MOTION TO RECONSIDER ORDER TO TRANSFER VENUE

* * * * * * * * * * * * * * * * *










On the 12th day of November, 2014, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Laurine Blake, Judge Presiding, held in Bonham, Fannin County, Texas:

Proceedings reported by stenographic method.

APPEARANCES

Mr. Thomas Scott
SBOT 18688900
Attorney and Counselor at Law
120 S. Crockett Street
Sherman, Texas   75090
(903) 868-8686


ATTORNEY FOR THE PETITIONER and INTERVENOR

        - AND -

Ms. Christy Lee
SBOT 24052302
Law Offices of Christy Lee
777 Main Street
Suite 600
Fort Worth, Texas   76102
(817) 504-6075

ATTORNEY FOR THE DEFENDANTS
KENNETH GIBBS and CANDACE WALTON

VOLUME 1

HEARING BEFORE THE COURT

                                    Page    Vol.

NOVEMBER 12, 2014


Plaintiff's Argument by Mr. Smith........15      1

Defendant's Argument by Ms. Lee.........19      1

Court's Ruling..........................27      1

Court Reporter's Certificate............33      1

EXHIBIT INDEX

(None.)

P R O C E E D I N G S

THE COURT: Have the parties come forward in Pentex Foundation versus Kenneth Vern Gibbs and others. This is CV-14-41665.

Okay. I'll hear from the attorneys. We'll start, Mr. Smith, with your argument. I believe this is your motion.

MR. SMITH: It is my motion, Your Honor. And, for the record, I'm here representing Pentex Foundation, the plaintiff, and Joshua Unger, trustee, the intervenor.

THE COURT: Yes, ma'am.

MS. LEE: Your Honor, I've spoken -- I'm Christy Lee. I represent Candace Walton and Kenneth Gibbs. I have spoken with opposing counsel prior to the hearing about a procedural issue, which I believe that must be addressed prior to listening or hearing the motion to reconsider.

THE COURT: Which is what?

MS. LEE: It is -- under the Rule of 87, Section five of the Texas Rules of Civil Procedure, this Court does not have the power to hear a motion to reconsider on venue, and I have the law and -- I have case law and statute, Your Honor, if you'd like for me to approach.

THE COURT: Have you already shared that with Mr. Smith?

MS. LEE: No, Your Honor. I just found out about this -- Mr. Smith about half a day prior -- half a business day prior to this hearing, he provided me with a 41-page reply which cited to section -- to Texas Rule of Civil Procedure 87. So, I just became aware of this as -- as of this morning, Your Honor. But I do have copies for him, as well as your court if you --

THE COURT: Okay.

MS. LEE: If I may have permission to proceed.

THE COURT: Okay.

MS. LEE: May I please approach, Your Honor?

THE COURT: You may.

MS. LEE: The Texas Rule of Civil Procedure 87, Determination of Motion to Transfer, Section five, specifically states that if an action has been transferred to a proper venue, which this Court -- it has happened on September 28th -- in response to a motion to transfer, then no further motions to transfer shall be considered, unless the motion to transfer is based on two things. One is the

grounds that an impartial trial cannot be had under Rules 257 and 259, which opposing party has not asserted, or on the ground of mandatory venue, which opposing party did assert in the first motion -- in the first response to motion for transfer. This rule continues to provide that those two exceptions are only allowed provided that such a claim was not available to them at the time.

And, Your Honor, I have a copy of their motion -- their response to the motion to transfer venue, and that is exactly what they argued at the last court hearing was a mandatory -- it was a mandatory venue provision. Then I have case law, Your Honor. There's also Marathon Corporation versus Pitzner, and I've highlighted -- your Honor, may I approach?

THE COURT: Yes.

MS. LEE: It's at very back of this case. It's footnote number six. It cites Texas Rule of Civil Procedure just as I've cited to you, Your Honor, and then it also states that a motion to reconsider transfer of venue was not proper under the rules, and a hearing should not have even been granted. Then I have other cases, Your Honor. I have Van Es versus Frazier, Dorchester Master Limited Partnership versus

Anthony, In Re Shell. And they all provide that a tax court has the authority to make -- I'm sorry. Tax Court, sorry. Trial court has the authority to make only one venue determination.

And even a case, In Re Medical Carbon Research, and that says, rule -- venue selection and Rule 87, Section five of the Texas Rules of Civil Procedure does not permit consideration of a motion to transfer venue. A trial court has the authority to make only one venue determination. And this talks about, because any reconsideration of an order denying the motion to transfer would be void, that even today if it's even heard, that it would be voided. And I do have some of these cases available, Your Honor, if you would like to see them.

THE COURT: Certainly.

MS. LEE: Okay. May I approach, Your Honor?

THE COURT: Yes. Anything else on this point, Counsel?

MS. LEE: No, Your Honor.

THE COURT: All right. Your response, Mr. Smith.

MR. SMITH: Yes. It certainly would've been nice to know this beforehand; however, I am

familiar with Rule 87.5, and you've got to read it fairly careful because there's two triggers for this rule to be applied. The first says, If venue has been sustained against a motion to transfer -- that's not us -- or if an action has been transferred to a proper county. That's where we would fall under. That -- and the reason there's two different ones is because, until the file is actually transferred, this rule doesn't kick in.

And this file has not actually been transferred. That's one of the reasons we got our motion for reconsideration in fairly promptly was so that we could have it intercept the actual act of transferring the file. And I can see and would hope the Court would make a judicial notice finding that the Court's file appears to still be here in Fannin County, so it has not actually physically been transferred yet, so...

THE COURT: Okay. I've got my file. I think there would always be a copy here, but I don't see anything indicating the clerk has done any physical transfer of the file.

MR. SMITH: So, if, in fact, it has not physically been transferred, this is still a proper motion. And the reason for that is obvious. So we

can correct any errors if there are -- if, in fact, we can convince the Court there was an error made before we make an effort to make a petition for writ of mandamus. So, we believe the Court does have jurisdiction and that you can proceed forward with a motion.

MS. LEE: Your Honor, I -- I would just like to --

MR. SMITH: I'm sorry. One other thought.

MS. LEE: Sure.

MR. SMITH: In the cases that she's given me, I just looked through them real quick. Every one of these are cases where the motion was denied under that first clause. So, that -- when the motion's denied and the order is entered, that does keep you from filing a motion for reconsideration. And the reason for that is this: Under the old rules where we didn't have the statute granting mandamus relief for mandatory venue, you did not have the right to appeal venue decisions, and so, once the order's entered denying it, you can have your right on appeal and have your remedy later. But when you've got a situation such as we have where a mandamus is available, if we can get to the Court and convince you of the error of

your ruling, if you agree with us, that saves everybody time, money, and judicial resources.

THE COURT: Okay.

MS. LEE: Your Honor, there is one other case.

THE COURT: Okay.

MS. LEE: Besides reiterating that the case that I did provide -- it specifically states that a motion to reconsider is not appropriate and that you're only entitled to one bite at the apple. There's also another case which asserts to some of his other arguments. Can I please approach the bench, Your Honor?

THE COURT: Yes.

MS. LEE: This one is In Re Chester, and there were so many important parts in this, I did not highlight it. But it specifically provides that after 30 days of hearing the motion -- after an order is signed, that the Court lacks plenary power to rule on a motion to reconsider. And it was very clear that after 30 days -- and, in this case, it was a matter of, I think, 32 days when the Court heard a motion to reconsider concerning a change of venue, and it was a mandatory provision in the agreement, and the Court ruled that it did not have authority because of

judicial economy and they wanted to make it quite quick in order to have it heard in another -- in the appropriate venue.

So, that Court asserts (sic) Mr. Smith's arguments that if there's an error -- and so, the Court does have the power if there was an error, which, of course, we don't believe there was an error, within 30 days. And from the research that I did -- and I will state that it was not extensive due to the time constraints and because I was not made aware of this until I received the reply from Mr. Scott (sic), which, again, was half a business day prior to this hearing, that there's no extension to the 30 days. So, this Court only had 30 days if they felt that there was an error. So, it is my client's opinion that the Court does not have the power or the authority to even rule on a motion to reconsider the change of venue.

MR. SMITH: Again, looking at this very quickly, this Chester case looks like the motion was -- I'm going to strike that because I haven't read it carefully. I don't want to misrepresent it to the Court.

THE COURT: Okay. I have two thoughts on this. I would have liked to have had the hearing

sooner. I'm uncertain of why it took the time it did. I know in the past there's some difficulty of having the appearance of counsel on certain days, so we had gone through quite amount of pain to make sure we were accommodating people on that. I don't know if that factored into this.

MR. SMITH: I believe it did. Ms. Reamy actually set this hearing, I think, when Ms. Kreider was out of town, and Ms. Lee was not available, and I accommodated her schedule is what I recall.

MS. LEE: I was available within the 30 days, Your Honor, but he had a trial and he had, I think, a CLE.

THE COURT: So, you're saying he can accommodate your schedule, but you're not going to accommodate his for purposes of the 30 days?

MS. LEE: Oh, my gosh, no, Your Honor. It was set for this day only because he had other -- he had other issues. I mean, he had pending cases, as I believe maybe a CLE, or he had a trial. I wasn't sure.

THE COURT: Do you think there's a -- do you think there's a timeframe for correcting the Court's ruling by way of mandamus? You think he can't do that after he's filed this motion?

MS. LEE: Absolutely. He -- he has -- there's that avenue. He is able to file a mandamus, I believe.

THE COURT: So, if it was outside the 30 days and I don't rule on it, the higher court has the ability to mandamus me and make me do it, but you're saying I don't have the ability to hear the case myself and correct a mistake.

MS. LEE: No, Your Honor. I please stand corrected. From my understanding from the research I did -- and like I stated, it was not extensive -- if it's outside the 30 days, there is not -- there's not a discretion. That -- that was my understanding. Again, I -- I did not do extensive research on that. If you would like to -- I'd just like that for the record. We can proceed. I believe that we went on the merits of the case.

THE COURT: Okay. Well, let's -- let's go ahead and have the hearing. If the higher court wants to do something different, they have the ability to correct anything that I've made a mistake on, because I think it's important to try to get it done right the first time, and that's why I granted the -- the hearing opportunity on the motion to reconsider. I'm going to overrule the objection to having the

hearing based on the fact that this is a -- this is, in my opinion, to reconsider if I have missed something legally that is required. And, therefore, I want to go ahead and proceed with the reconsideration of the motion to -- of the motion, itself, to transfer the venue. So, you may proceed on your request, Mr. Smith.

MR. SMITH: Thank you, Your Honor. And for the clarity of the record for what we just discussed, is it the Court's finding that there has not been a physical transfer of the file?

THE COURT: Yes.

MR. SMITH: Thank you. And I appreciate you having a hearing on this, Your Honor. After the last hearing, clearly, we disagreed with the Court's ruling on venue. That's what courts are for. We understand that. But we looked at our remedies and we saw that there is a statute that allows mandamus on a mandatory venue ruling. And so, before we went to that effort, we thought it would be prudent to come back to the Court and see if we could re-examine the ruling to see if, in fact, we are correct.

Now, what is this? This is not a new motion. We could not even bring another motion for venue. Venue, as you know, is determined as a matter

of primary -- it's a primary determination. You determine venue before you move on to other things, and, because of that, the hearing that we had on September 30th was a fixed date for evidence. And I say this because the response which was filed by the defendants brought in a bunch of new evidence, and we, in turn, felt like we had to respond with that with our reply. I really don't think that's important because the facts that we are going to be arguing about were fixed on September 30th. We're simply asking that you re-examine those facts because I think that's sufficient to make a ruling that we can all live with.

So, what was the venue evidence that was before the Court? And I'll take you to Rule 87.3, and it may actually be in what Counsel handed out. I don't know. But what it says is, All venue facts when properly pleaded shall be taken as true unless specifically denied by the adverse party. And what did we have when we came here on September 30th? We had attached the contract to the petition. It was asserted in the petition that all parties agreed in writing that any dispute would be performable in Fannin County, Texas.

In the response to the motion for venue,

we attached the contract once again and specifically pleaded paragraph four which references the liquidated-damages provision of $5 million, and none of this was ever denied. So, those facts by rule were taken as true.

Now, I've got a case here, a copy for Counsel. What I've done is I've excerpted the paragraph of the contract at issue.

THE COURT: Thank you.

MR. SMITH: And then there's a case called Spin Doctor. That's actually the case name. I'm not making light of the fact that it's called Spin Doctor. And what it says is, you look at the face of the document. You don't look outside the document. You look at the face of the document. And this is what the statute says, too. And, in Spin Doctor, the agreement says, The agreement attached to the motion to transfer venue lists annual sales of over $1 million. Thus, on its face, it constitutes prima facie evidence of a major transaction within the statute.

And I'll be candid with you, Your Honor, there's not a whole lot of cases talking about what a major transaction is. There's very few, and the ones that do, mostly just parrot the statute. But I

thought this was a pretty compelling one, because it says you look at the four corners of the document, and if it references consideration in excess of a million dollars, the inquiry is over. Your prima facie case is met.

Here, this contract says, the liquidated damages, should you breach, is $5 million, and that says it's in full settlement of all consideration on the Gibbs' claims. Now, why is that important? I've got another handout. I've cited the statute here, and it says, basically, if consideration is at a stated value of excess of one million, that's a major transaction.

I said, Well, what is -- what is liquidated damages action doing for us? So, I pulled the supreme court case of Flores, and it says, Liquidated damages refers to an acceptable measure of damages that parties stipulate to in advance that will be assessed in the event of a contract breach. So, the parties here stipulated to a specified amount -- $5 million -- and said this is adequate consideration for this contract in the event of a breach. Thus, on its face, the contract says it's in excess of a million dollars.

I also note that these type of clauses

are favored in the courts. The supreme court has said in 2006 that we encourage these type of clauses because the parties, by gosh, they know what they're doing, they should be able to give effect to their own agreements. And so, the Texas law encourages enforcement of these agreements.

So, for all these reason, Your Honor, we believe this is a major transaction; we believe that it's, on its face, in excess of a million dollars; we believe the Texas law encourages enforcement of these. We believe that we came at you pretty fast and furious in the last hearing and maybe that wasn't made very clear, but we feel like you have an opportunity to restore venue to Fannin County, Texas, the county where the parties stipulated and agreed venue should be, and that we can move on down the road with this litigation. Thank you for your time.

THE COURT: Thank you.

Counsel.

MS. LEE: Yes, Your Honor. And I also have some cases, Your Honor. The first one -- may I please approach?

THE COURT: Certainly. Thank you.

MS. LEE: In Re Togs Energy specifically states, Your Honor -- it states obviously the statute,

the 15 -- the 15.020. But here's the -- with all due respect to Mr. Scott, I don't think he understands the concept of the consideration. It is very clear that in the contract, it has to have a aggregated stated value, and in the agreement in every case, even the one that he cites -- the Spin Doctors -- Your Honor, it stated that it was a million dollars. There's no case that says that liquidated damages, which is a buy-out provision, is considered an obligation to pay.

The actual provision for a major transaction is that a person pays, receives, or obligated -- obligated -- to pay or receive. You are not obligated to pay liquidated damages. Consideration with an aggregated stated value, and as Mr. Smith stated, it has to be in the four corners of the contract. You actually have to have that amount of money for over a million dollars. It has to be stated. It cannot be, how much could that possibly be.

Also, in In Re Togs Energy, it stated that affidavits or anything else is absolutely irrelevant. They're not even going to consider it because it does not -- because it doesn't contain a major transaction in an affidavit. I mean, you only look to what the contract states.

Now, again, in the Spin Doctors Golf as co-counsel -- opposing counsel has already talked about, Your Honor, they quote the agreement as listed annual sales of over a million dollars, and the Court held, as he said, the prima facie evidence of a transaction. But they leave out extremely important language. The Court in Spin Doctors emphasized that Paymentech, by contrast to the Texas Association of School Boards case, was obligated to pay. They absolutely had to pay the funds to Spin Doctor as it received data from the credit card sales. Paymentech did not assume any risk. No risk. No liquidated damages. Nothing. It was an absolute obligation. The written agreement actually said that the credit card sales was valued at about 5 million. That was the obligation to pay.

Once again, our case is very different because Al Barcroft, when he signed -- drafted and signed the contract for sale, he assumed a risk, and the buy-out provision did not create an obligation. Now, Candy, Ken, and Howard Kirk, they didn't have to buy him out. I mean, again, it's a buy-out provision, so he may never have received anything. As do we point out on paragraph six of Howard Kirk Gibbs' affidavit in the opposing parties' reply, Al was

taking a big risk. That's what he states. He's taking a big risk to help us. So, again, a risk with no obligation that was created for the Gibbs to have to pay him anything. They've not cited to any case, showed any obligation that there's more than $1 million that needs to be paid.

So, we need to talk about, like, what is consideration, because I think that seems to be an issue here. Consideration is what -- is the something that you receive in return and each side promises to pay. So, in the contract for sale, Al Barcroft promised to give his silver coins, 21; his services, which included providing legal services; and acquire legal counsel at his own expense. This was not valued, Your Honor. There was no value in the contract. Those three things were his consideration. That is what has -- those have to be valued. And then the 30 percent of absolutely everything that my client -- and I will go through that in a minute. But the 30 percent of everything that Ken, Candy, and Howard Kirk were possibly going to get from the Gibbs, that was their consideration. And, again, Your Honor, that was not provided for. There was no value on that one.

So, on the face of the document, there is no -- I mean, I have the Spin Doctors case. I read it

extensively. Again, in that agreement, it stated that the total sales were 5 million. That was in the contract. There is not one case -- and I can say that wholeheartedly because I have read every single case to my knowledge concerning a motion to transfer and major transaction. There's not one case concerning a buy-out provision or liquidated damages that require an obligation to pay, and, therefore, make it a major transaction.

Now, Your Honor, in the alternative, if you believe -- if the Court believes that the $5 million liquidated damages or the affidavits and the checks and other things that they're alleging to be true -- if you believe that that happens to be a million dollars and, therefore, a major transaction, there is -- in the alternative, I'd like to argue that there is an exception to the mandatory venue provision. That is Section 15.020(d).

MR. SMITH: And, Judge, this is where I was talking earlier about this is getting outside the scope of our hearing because we're not starting a new hearing. We're examining the hearing that we had, and this evidence of brought forward new after the fact. So, we would object to the presentation.

MS. LEE: Your Honor, this is exactly

what I argued in my other hearing. Identical. I've not changed my argument.

THE COURT: I'm going to allow for the argument. I won't allow for anything outside of what had been argued the last time. You may proceed.

MS. LEE: So, the -- that provision states that a mandatory venue provision does not apply to an action if the agreement is -- was unconscionable at the time it was made. We -- our two arguments, which we argued before, was, it was grossly one-sided and the unauthorized practice of law. And Al Barcroft drafted the contract for sale for his own accord, and he's the beneficiary. He would receive something as a benefit. The grossly one-sided argument is 21 junk coins which my client has -- which we did discuss at the last hearing -- 21 junk coins that happen to be of nominal value -- we don't know what the value is, Your Honor, at that time -- and, in exchange, he would -- he would receive -- Al Barcroft would receive a whole lieu (sic) of things including inheritances from any form that were received by my clients now and in the future. It's in the contract. It's actually in paragraph one. There's about, I think, seven to nine different things of what he's going to receive in exchange for what he provided.

So, practicing law without a license is considered a misdemeanor -- a Class-A misdemeanor -- and also, in my opinion, considered fraud. The courts are very clear that you can't draft a contract in which you're going to be -- draft a contract as a -- practicing law without a license and reap a benefit from it.

And my clients -- my clients and the defendant live in Tarrant County. Everything is in Tarrant County. Absolutely everything. There is nothing that is here. Even the -- and to my -- I'm not quite -- well, the defendants, I don't even think they live in Fannin County. And they could. You can correct me if I'm wrong. But everybody is in Tarrant County, and the appropriate venue is Tarrant County.

THE COURT: All right. Thank you.

Any final rebuttal?

MR. SMITH: Your Honor, I really feel like I need to respond to some of that, but I feel like it's outside the record for what we're doing today. I could spend a fair amount of time rebutting what she just said, all of which was contained in her response that she filed after you transferred the case or after you have entered the order, because what they actually filed beforehand was four paragraphs in their

original answer, none of which talk about what she's talking about. It talked about being inconvenient. It didn't talk about unconscionable contracts.

I really hate to get into that because I think it's a red herring, and I think I'll stand by what I said; and, that is, you look at the four corners of this contract, it's stating an aggregate value, and the reason that is, is to make sure we have a major transaction, and it states the venue -- the parties' agreement to have venue in Fannin County, Texas, and so, unless you want to hear a response to that reply -- or a reply to that response, I'll lay that with the Court's file.

THE COURT: Okay. My focus has been on whether the buy-out provision that the $5 million stated is an obligation or not. Is there any -- anything else that you would offer there, Mr. Smith, to clarify? An obligation of the contract.

MR. SMITH: Yes. I mean, I'm -- I may be repeating myself, but it says that liquidated damages are created by the parties to ascertain the amount of the contract when it's difficult to come up with an amount of the contract. That's what they did here. The law encourages liquidated damages. It's stated in black and white on the contract, so I believe that's

an obligation to pay as stated in the 15.020.

THE COURT: Okay. Okay. The -- I, having reconsidered my order, will make the ruling that the venue in this case should not be transferred to Tarrant County. We need to go ahead and get a scheduling order in place and pick some dates certain. There were some motions that were filed and we need to address that.

MS. LEE: Your Honor, I will be filing a mandamus.

THE COURT: I figured I'd get it one way or the other, so -- both of y'all are very articulate and very good advocates, and I'm happy to have a higher court review this as we might need to go along our way.

MS. LEE: So, Your Honor, I respectfully request not to get back on the docket or scheduling so I can get that filed.

THE COURT: Well, what I want to do is, I want to go ahead and pick the dates before y'all walk out, and then in the event you file it, which I have no doubt you will -- but when you do, then it will abate our hearings until they actually take the action that they might need to take. And they're very, very quick about these matters, and I would expect, then,

whatever we had scheduled that got abated would be just reinstituted. So, I'd like y'all to pick dates that are reasonable.

MS. LEE: And, Your Honor, just for clarification, did you -- is it your determination that that buy-out -- the $5 million liquidated damages is -- makes it a mandatory venue?

THE COURT: That was the part that I was focusing on last time. When I made the decision to transfer it, I was -- I have reconsidered that, but any provision that allows or provides for the matter based on the limited evidence that was presented to the Court -- I'm trying to make the decision based on the contract that was there, which I think is all I can make it on. Not all of the extraneous evidence that everybody is offering after the last ruling, so...

MR. SMITH: I will prepare an appropriate order and circulate it to Counsel.

THE COURT: Okay, what I want y'all to do, then, is go ahead and pick those dates with the Court's coordinator, and then when we get the other motion -- so, if you'll pick them to be reasonable dates that might happen to be outside of about 30 to 45 days, which is probably about how long the Court

will take to make this ruling.

MR. SMITH: Are you asking us to pick a trial date and move forward or just dates for the hearings that we had set before?

THE COURT: Both. I think we need an end date that the parties can expect. This matter's been a bit protracted for a variety of reasons, the least of which is not -- it is the fact that it's a complicated case, and I understand that. There's a lot at stake and a lot of emotion. I think the parties need to get the thing resolved, and that is one thing that we can accomplish is getting some closure.

MR. SMITH: Well, Your Honor, we have discussed -- I know you ordered mediation last time. We've discussed mediation and it hasn't really gotten any traction. It might be helpful if you order us to mediation.

THE COURT: Okay. I would also expect you still select the final hearing date, the pretrial date. The Court will order mediation, and I'll appoint Judge Curt Henderson. He's a retired judge from the 219th District Court. You can get online and he -- you can electronically set up the date certain that you want to select. He'll meet down in Collin

County, so it'll be in between the two locations to some degree. And he has the most years service as a judge in Collin County's history, so he will be very knowledgeable. I think when he took -- either when he took the bar exam or the board certification exam, he got the top score in the State of Texas that year. He should prove to be very informed, very helpful, and he is, in my opinion, young. He is, I think, 60 or 61.

MR. SMITH: Thank you for finding that, Your Honor.

THE COURT: That's young. So, it's not like he's -- you know, he's going to be on it and he's up-to-date with technology issues and things of that nature. So, all of your communication -- he does a lot electronically, and he drafts final mediation agreements, I think. He's very good about letting us know.

We need to pick a mediation deadline date, as well. I'd like the parties to have that accomplished within -- 120 days should give the higher court the time they need to rule. Do y'all think that's reasonable, 120 days? Four months out?

MR. SMITH: Certainly.

MS. LEE: That's fine.

MR. SMITH: And I would also like to

state for the record, Mr. Howard Kirk Gibbs, the pro se defendant, is here, as well. So, I think that's all of the parties.

THE COURT: Okay. So, I need to make sure all of the parties have all of this information before they go. I want everybody to know. Nobody needs to be in the dark. We need to go ahead and get some resolution for everyone. And so, when you see the Court's coordinator, before anybody leaves, they're going to receive those dates. It will be the final hearing date. If it's a jury, which I'm assuming, we'll go ahead and put it on the jury trial docket. We'll have -- pretrial will be about a month preceding that. Pick a timeframe that y'all think is reasonable to accommodate your issues of discovery that you might have, and we will do everything that we can to give your case the highest priority.

Every case that's set on the civil docket is likely -- they all resolve, so your case is likely to be the one that goes, so don't think it's going to get reset. It will be the one that goes, so pick a real date, a meaningful date for you. Have the mediation about 120 days out, and include in the order that you submit on the scheduling order a separate document appointing Judge Henderson so we can get that

off to him ASAP, and he'll know to expect you all to contact him. But the way you'll contact him is directly yourselves electronically on his website. Ms. Kreider can give you the information on how to contact him.

MR. SMITH: May Mr. Gibbs come back with us?

THE COURT: Absolutely. All right. I do appreciate y'all's time and patience with the Court. Thank you.

(End of proceedings.)

THE STATE OF TEXAS )

COUNTY OF FANNIN )

I, Charla Reamy, Official Court Reporter in and for the 336th District Court of Fannin County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 8th day of December, A.D., 2014.

_____
CHARLA REAMY, Texas CSR 6361
Expiration Date: 12-31-16
Official Court Reporter,
336th District Court
Fannin County, Texas
Bonham, Texas 75418
(903) 583-2863